# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TED CRUZ FOR SENATE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 19-908 (APM) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, *et al.*, | ) | MOTION TO DISMISS |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FEDERAL ELECTION COMMISSION'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Federal Election Commission ("Commission" or "FEC") hereby moves for an order dismissing plaintiffs' complaint.  Plaintiffs lack standing to bring this action because they have suffered no Article III injury.  A supporting memorandum of points and authorities and a proposed order accompany this motion.

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

Kevin Deeley
Associate General Counsel
kdeeley@fec.gov

Harry J. Summers
Assistant General Counsel
hsummers@fec.gov

June 7, 2019

Kevin P. Hancock
Acting Assistant General Counsel
khancock@fec.gov

*/s/ Seth Nesin*
Seth Nesin
Attorney
snesin@fec.gov

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
1050 First Street, N.E.
Washington, DC 20463
(202) 694-1650

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TED CRUZ FOR SENATE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 19-908 (APM) |
| ) | |
| v. ) | |
| ) | MOTION TO DISMISS |
| FEDERAL ELECTION COMMISSION, *et al.*, ) | AND OPPOSITION |
| ) | |
| Defendants. ) | |

## DEFENDANT FEDERAL ELECTION COMMISSION'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR A THREE-JUDGE COURT AND MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel

Kevin Deeley
Associate General Counsel

Harry J. Summers
Assistant General Counsel

Kevin P. Hancock
Acting Assistant General Counsel

Seth Nesin
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
1050 First Street, N.E.
Washington, DC 20463
(202) 694-1650

June 7, 2019

# TABLE OF CONTENTS

*Page*

**BACKGROUND** ................................................................................................................ 3

I.   STATUTORY AND REGULATORY BACKGROUND ...................................................... 3

   A.  Defendant FEC and the Federal Election Campaign Act ...................................... 3

   B.  Campaign Committees and Their Receipt of Contributions ................................ 4

   C.  FECA's Limitation on Campaign Committees' Post-Election Repayments of
       Personal Loans from Candidates ......................................................................... 5

   D.  FEC Regulations Implementing the Loan Repayment Limit ............................... 6

   E.  BCRA's "Millionaire's Amendment" and *Davis v. FEC* ................................... 8

II.  FACTUAL BACKGROUND AND PLAINTIFFS' CLAIMS ............................................. 9

**ARGUMENT** ................................................................................................................ 11

I.   CLAIMS DO NOT QUALIFY FOR A THREE-JUDGE COURT UNDER BCRA § 403
     IF THEY ARE NON-JUSTICIABLE, INSUBSTANTIAL, OR CHALLENGING A
     REGULATION ........................................................................................................ 11

II.  PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE BECAUSE PLAINTIFFS LACK
     STANDING ............................................................................................................ 13

   A.  Both Plaintiffs Lack Standing Because the Injuries They Allege Are
       Self-Inflicted ..................................................................................................... 15

   B.  The Committee Lacks Standing Because It Has No Injury ................................ 21

   C.  Plaintiffs Cannot Assert Standing for Potential Contributors ......................... 21

       1.  No Potential Contributors Are Plaintiffs in This Case and There is
           No Reason to Believe Any Exist .............................................................. 22

       2.  Potential Contributors Have No Injury Because Neither the Law Nor
           Regulation Prevent Them From Making Contributions to the Campaign ............. 24

III. PLAINTIFFS' CONSTITUTIONAL CLAIMS ARE WHOLLY
     INSUBSTANTIAL .................................................................................................. 25

A. Rational Basis Scrutiny Should Apply to the Loan Repayment Limit Because It Does Not Burden the First Amendment Rights of Candidates, Campaign Committees, or Contributors ................................................................................ 27

    1. The Repayment of a Personal Loan Does Not Constitute Political Speech ............ 28

    2. The Loan Repayment Limit Does Not Impede a Candidate's First Amendment Right to Make Unlimited Personal Expenditures to Pursue a Political Campaign ................................................................................................. 29

    3. Plaintiffs Fail to Allege that Cruz Desired to Loan Additional Funds or that the Loan Repayment Limit Prevents Campaigns From Amassing Resources for Effective Advocacy .......................................................................... 32

    4. Potential Contributors Do Not Have a Right to Have Their Contributions Used for Any Specific Purpose .................................................................................. 34

B. Limiting the Use of Post-Election Contributions to Repay Personal Loans to $250,000 Easily Passes Constitutional Scrutiny ............................................................. 35

    1. The Government Has Not Just Legitimate, But Important and Compelling Interests in Lessening the Risk of Quid Pro Quo Corruption and Its Appearance ...................................................................................................................... 37

    2. The Loan Repayment Limit Is Rationally Related to the Government's Anti-Corruption Interests and Not Overbroad ................................................................. 40

IV. BECAUSE A THREE-JUDGE COURT COULD NOT INVALIDATE FEC REGULATIONS THE APPLICATION SHOULD BE DENIED AS TO COUNTS III, IV AND V .................................................................................................. 44

**CONCLUSION** ............................................................................................................................... 45

# TABLE OF AUTHORITIES

*Page*

*Cases*

*Afifi v. Lynch*, 101 F. Supp. 3d 90 (D.D.C. 2015) .................................................................. 16, 18

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................ 22

*Am. Soc. For Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13
  (D.C. Cir. 2011) ............................................................................................................................ 17

*Amato v. Wilentz*, 952 F.2d 742 (3d Cir. 1991) ........................................................................... 22

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011) ......... 31, 32

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ........................................................................... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 13

*Baker v. Adler*, No. 81-1779, 1982 WL 1396 (D.C. Cir. Apr. 8, 1982) ....................................... 21

*Bluman v. FEC*, 766 F. Supp. 2d 1 (D.D.C. 2011) ................................................................... 12, 45

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) .................................................................... 23

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................................... 42

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................................................... passim

*Cal. Med. Ass'n v. FEC*, 453 U.S. 182 (1981) ............................................................................... 38

*Citizens United v. FEC*, 558 U.S. 310 (2010) ............................................................................... 39

*Dandridge v. Williams*, 397 U.S. 471 (1970) ............................................................................... 36

*Davis v. FEC*, 554 U.S. 724 (2008) ..................................................... 8, 14, 26, 29, 31, 32, 39

*Dominguez v. UAL Corp.*, 666 F.3d 1359 (D.C. Cir. 2012) .......................................................... 13

*Ellis v. Comm'r of IRS*, 67 F. Supp. 3d 325 (D.D.C. 2014) .......................................................... 14

*Ellis v. Comm'r of IRS*, 622 F. App'x 2 (D.C. Cir. 2015) ............................................................. 14

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) .................................................. 36

*FEC v. Beaumont*, 539 U.S. 146 (2003) ..................................................................... 38

*FEC v. Colo. Repub. Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001) .................................... 38

*FEC v. Craig for U.S. Senate*, 70 F. Supp. 3d 82 (D.D.C. 2014) ................................................ 24

*FEC v. Craig for U.S. Senate*, 816 F.3d 829 (D.C. Cir. 2016) ...................................................... 24

*FEC v. O'Donnell*, 209 F. Supp. 3d 727 (D. Del. 2016) ........................ 27, 28, 35, 37, 38, 42, 43

*Feinberg v. FDIC*, 522 F.2d 1335 (D.C. Cir. 1975) ................................................................... 25

*Flores ex rel. J.F. v. District of Columbia*, 437 F. Supp. 2d 22 (D.D.C. 2006) ......................... 13

*Georgia v. McCollum*, 505 U.S. 42 (1992) ............................................................................... 23

*Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90 (1974) ................................................ 12

*Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012) ..................................................... 16

*Heller v. Doe*, 509 U.S. 312 (1993) ......................................................................................... 36

*Holmes v. FEC*, 823 F.3d 69 (D.C. Cir. 2016) ......................................................................... 26

*Holmes v. FEC*, 875 F.3d 1153 (D.C. Cir. 2017) ......................................................... 25, 35, 38

*Huron v. Berry*, 12 F. Supp. 3d 46 (D.D.C. 2013) .................................................................... 18

*Huron v. Cobert*, 809 F.3d 1274 (D.C. Cir. 2016) .................................................................... 18

*J. Roderick MacArthur Foundation v. FBI*, 102 F.3d 600 (D.C. Cir. 1996) ......................... 14-15

*Lewis v. Casey*, 518 U.S. 343 (1996) ....................................................................................... 14

*Libertarian National Committee v. FEC*, ___ F.3d ___, No. 18-5227,
    2019 WL 2180336 (D.C. Cir. May 21, 2019) ....................................................... 18-19, 33, 43

*L. A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999) .................................... 42

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................... 13

*McConnell v. FEC*, 540 U.S. 93 (2003) ........................................................... 16, 37, 43, 44, 45

*McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003) ..................................................... 44, 45

*McCutcheon v. FEC*, 572 U.S. 185 (2014) .................................................... 12, 23, 37

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) .................................... 36

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826
  (D.C. Cir. 2006) .................................................................................... 14, 16

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000) ......................................... 38

*Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433 (D.C. Cir. 1989) .......................... 17

*Powers v. Ohio*, 499 U.S. 400 (1991) ................................................................... 22, 23

*Randall v. Sorrell*, 548 U.S. 230 (2006) ............................................................... 33, 34

*Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150 (D.D.C. 2010) ........................ 38

*Republican Nat'l Comm. v. FEC*, 561 U.S. 1040 (2010) ............................................. 38

*Republican Party of La. v. FEC*, 146 F. Supp. 3d 1 (D.D.C. 2015) .......................... 11, 12, 13, 25

*Romer v. Evans*, 517 U.S. 620 (1996) ..................................................................... 35

*Rufer v. FEC*, 64 F. Supp. 3d 195 (D.D.C. 2014) ................................................... 12, 23

*Schonberg v. FEC*, 792 F. Supp. 2d 14 (D.D.C. 2011) ........................................... 12, 13, 25

*Shapiro v. McManus*, 136 S. Ct. 450 (2015) ........................................................ 12, 13, 25

*Singleton v. Wulff*, 428 U.S. 106 (1976) ................................................................. 22

*Stop This Insanity, Inc. Employee Leadership Fund v. FEC*, 761 F.3d 10 (2014) ...................... 18

*Vance v. Bradley*, 440 U.S. 93 (1979) ..................................................................... 36

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) ....................................................... 14, 23, 38

**Statutes and Regulations**

Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 ............................ 5

BCRA § 403 ..................................................................................................... 11, 12, 13

BCRA § 403(a) ................................................................................................... 11, 44

BCRA § 403(d)(2) ............................................................................................................. 11

BCRA § 403(d)(3) ............................................................................................................. 11

Federal Election Campaign Act, 52 U.S.C. §§ 30101-146 (formerly 2 U.S.C. §§ 431-57) ........... 3

11 C.F.R. § 110.1(b)(2)(i) ................................................................................................... 4

11 C.F.R. § 110.1(b)(2)(ii) .................................................................................................. 4

11 C.F.R. § 110.1(b)(3)(i) ............................................................................................... 4, 24

11 C.F.R. § 110.1(b)(3)(ii)(A) ............................................................................................. 4

11 C.F.R. § 110.1(b)(3)(ii)(B) ............................................................................................. 5

11 C.F.R. § 110.1(b)(3)(ii)(C) .......................................................................................... 5, 7

11 C.F.R. § 116.11 .......................................................................................... 6, 9, 10, 44

11 C.F.R. § 116.11(a) ................................................................................................... 6, 11

11 C.F.R. § 116.11(b) ......................................................................................................... 7

11 C.F.R. § 116.11(b)(1) ............................................................................................... 7, 32

11 C.F.R. § 116.11(b)(2) ........................................................................................... 7, 24, 32

11 C.F.R. § 116.11(b)(3) ............................................................................................... 7, 32

11 C.F.R. § 116.11(c) ......................................................................................................... 7

11 C.F.R. § 116.11(c)(1) ........................................................................................... 7, 10, 17

11 C.F.R. § 116.11(c)(2) .............................................................................................. 10, 21

18 U.S.C. § 201(b)(1) ....................................................................................................... 41

28 U.S.C. § 2284 ......................................................................................................... 11, 25

28 U.S.C. § 2284(b)(1) ..................................................................................................... 11

52 U.S.C. § 30101(5) ......................................................................................................... 4

52 U.S.C. § 30101(6) ......................................................................................................... 4

52 U.S.C. § 30102(e)(1) ................................................................................................... 4

52 U.S.C. § 30102(e)(2) ................................................................................................... 4

52 U.S.C. § 30104 ........................................................................................................... 3

52 U.S.C. § 30110 ......................................................................................................... 11

52 U.S.C. § 30116(a) ................................................................................................... 3, 4

52 U.S.C. § 30118 ........................................................................................................... 3

52 U.S.C. § 30119 ........................................................................................................... 3

52 U.S.C. § 30121 ........................................................................................................... 3

52 U.S.C. § 30116(j) ................................................................................................... 5, 6

### *Miscellaneous*

Federal Rule of Civil Procedure 12(b)(1) .............................................................. 1, 13

Advisory Opinion 2008-09 (Lautenberg) .................................................................... 9

13A Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.5 (3d ed.
   April 2019 Update) ................................................................................................. 17

Peter Overby, *How Will Clinton Resolve Campaign Debt?*, National Public Radio
   (May 14, 2018, 6:00 AM) ....................................................................................... 42

147 Cong. Rec. S2451 (daily ed. Mar. 19, 2001) ....................................................... 6

147 Cong. Rec. S2462 (daily ed. Mar. 19, 2001) ................................................... 5, 39

147 Cong. Rec. S2537 (daily ed. Mar. 20, 2001) ................................................... 5, 39

Increased Contribution and Coordinated Party Expenditure Limits for Candidates
   Opposing Self-Financed Candidates, 68 Fed. Reg. 3970 (Jan. 27, 2003) ........... 6, 7

Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist
   Bundling Disclosure Threshold, 84 Fed. Reg. 2504 (Feb. 7, 2019) ......................... 4

Repeal of Increased Contribution and Coordinated Party Expenditure Limits for Candidates
    Opposing Self-Financed Candidates, 73 Fed. Reg. 79,597 (Dec. 30, 2008).............................. 8

The Senate Code of Official Conduct, Select Committee on Ethics (March 2015) .................... 41

In this case, plaintiffs U.S. Senator Rafael Edward ("Ted") Cruz and his campaign committee, Ted Cruz for Senate ("Committee"), challenge critical anti-corruption election laws that prevent federal campaigns from using in excess of $250,000 in contributions received after an election to repay a newly elected officeholder's personal loans.  For three reasons, this Court should deny plaintiffs' request for a three-judge district court to hear those claims.

First, plaintiffs lack Article III standing and so their claims should be dismissed under Federal Rule of Civil Procedure 12(b)(1).  Neither plaintiff suffered a cognizable injury because self-inflicted injuries are not sufficient to confer standing.  As the complaint and public campaign finance reports make obvious, plaintiffs attempted to engineer an injury for the purpose of bringing this lawsuit.  The plaintiffs' contrived attempt to create a burden began when — on the day before the election — Senator Cruz loaned $10,000 in excess of the $250,000 limit to the Committee, even though at that time the Committee had $2.2 million in cash on hand.  Plaintiffs could have then avoided their self-inflicted injury by simply using the Committee's abundant election-day cash on hand to pay $10,000 back to Cruz within 20 days after the election.  But plaintiffs chose to forego that option.  Instead, plaintiffs preferred a more burdensome and illegal option:  to use contributions raised after the election to repay Cruz in excess of the $250,000 legal limit.  But this mere preference is legally insufficient to confer standing since plaintiffs' injuries must be fairly traceable to the challenged laws, and not plaintiffs' voluntary choices.  In any event, publicly available facts undermine the complaint's suggestion that plaintiffs in fact preferred to repay their vendors before paying Cruz's $10,000.

Even if the alleged injury created by plaintiffs were cognizable, that injury would apply only to Senator Cruz and not the Committee, which lacks any injury whatsoever because its inability to repay Senator Cruz made it $10,000 richer.  Plaintiffs also lack standing to bring

1

claims on behalf of alleged potential contributors, both because they lack the criteria necessary for third-party standing and because such potential contributors, if they exist, have not been injured either.

Second, plaintiffs' claims are not substantial enough to be heard by a three-judge court, the ruling of which would be subject to mandatory direct review by the U.S. Supreme Court. Because the $250,000 limit applies to loan repayments, not political speech, mere rational basis review applies to the law.  Plaintiffs' constitutional theory is entirely foreclosed by Supreme Court precedent, which makes clear that the provisions at issue are constitutional because they do not infringe on a candidate's right to make unlimited campaign expenditures.  Despite a complete lack of impediment to Senator Cruz spending as much of his personal funds as he wished to pay for his campaign's speech, plaintiffs suggest that they have a colorable claim based on an infringement of that very constitutional right.

In truth, plaintiffs are attempting to create new constitutional rights for candidates to have their personal loans repaid, and for contributors to direct how their campaign contributions are spent.  No such rights exist.  Plaintiffs' claims not only fail to identify a cognizable right that is being infringed, they also ignore that a modest burden on any such right would obviously be justified by the government's interests in diminishing corruption and its appearance.  Plaintiffs' constitutional claims therefore fail to meet the substantiality threshold necessary for the convening of a three-judge court.

Third, and lastly, the special-review procedure plaintiffs have attempted to invoke only creates three-judge court jurisdiction for claims that challenge the constitutionality of the relevant statute, and not any regulations promulgated by defendant Federal Election Commission ("FEC" or "Commission").  As a result, even if plaintiffs had standing to assert their three

regulatory claims (Counts III, IV, and V), and even if those claims were substantial, the Court

should nevertheless deny plaintiffs' application for a three-judge court with respect to those

claims and dismiss them.

## BACKGROUND

## I.      STATUTORY AND REGULATORY BACKGROUND

### A.      Defendant FEC and the Federal Election Campaign Act

Defendant FEC[1] is an independent agency of the United States with exclusive jurisdiction

to administer, interpret, and civilly enforce the Federal Election Campaign Act ("FECA" or "the

Act"), 52 U.S.C. §§ 30101-46 (formerly 2 U.S.C. 431-57).[2]

In 1974, Congress created the FEC and substantially revised FECA in response to the

Watergate scandal and the "deeply disturbing" reports from the 1972 federal elections of

contributors giving large amounts of money to candidates "to secure a political quid pro quo."

*Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976) (per curiam).  With FECA, Congress primarily

intended to "limit the actuality and appearance of corruption resulting from large individual

financial contributions."  *Id.* at 26.  To that end, the Act limits the dollar amounts and

permissible sources of contributions to candidates for federal office, political parties, and

political committees, and requires those entities to disclose what they spend and receive through

reports filed with the FEC.  52 U.S.C. §§ 30104, 30116(a), 30118-19, 30121.

---

[1]      In addition to the FEC, plaintiffs' complaint names each of the agency's four current commissioners as defendants in their official capacities.  (Compl. For Declaratory and Injunctive Relief ("Compl.") (Docket No. 1).)  References to "defendant," "FEC," and "Commission" herein should be understood to refer all defendants.

[2]      In 2014, FECA was moved from Title 2 to Title 52 of the United States Code.  *See* Editorial Reclassification Table, http://uscode.house.gov/editorialreclassification/t52/ Reclassifications_Title_52.html (last visited June 4, 2019).

In 1976, the Supreme Court generally upheld FECA's contribution limits and disclosure requirements against a facial challenge, but the Court struck down FECA's limits on expenditures by individuals and candidates. *Buckley*, 424 U.S. at 43-44.  In denying the challenge to contribution limits, the Court explained that "[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential officeholders, the integrity of our system of representative democracy is undermined." *Id.* at 26-27.

### B.      Campaign Committees and Their Receipt of Contributions

The Act requires federal candidates to designate at least one "authorized committee," which may receive contributions and make expenditures on the candidate's behalf, to serve as its "principal campaign committee."  52 U.S.C. §§ 30101(5)-(6), 30102(e)(1)-(2).

FECA limits the amount individual contributors may give to a campaign committee to an inflation-adjusted $2,800 per election.  52 U.S.C. § 30116(a); FEC, Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 84 Fed. Reg. 2504, 2506 (Feb. 7, 2019).  Under the Commission's regulations, contributors may designate their contributions for a particular election.  11 C.F.R. § 110.1(b)(2)(i).  In the absence of a designation, a contribution is presumed to be for the recipient's next election.  *Id.* § 110.1(b)(2)(ii).  A contribution designated for a *previous* election may be accepted by a campaign committee only to the extent that the contribution does not exceed the committee's "net debts outstanding" from that election.  *Id.* § 110.1(b)(3)(i).  In general, a campaign committee's "net debts outstanding" equals its total amount of unpaid debts and obligations for an election, less its total resources from that election available to pay those debts and obligations, including cash on hand available and amounts owed to the committee.  *Id.* § 110.1(b)(3)(ii)(A)-

(C).  Thus, a campaign may accept post-election contributions only to the extent necessary to pay down a net shortfall from that election.

### C.  FECA's Limitation on Campaign Committees' Post-Election Repayments of Personal Loans from Candidates

In 2002, Congress enacted the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 ("BCRA"), which amended FECA.  One change added a modest limit on a campaign committee's ability to use post-election contributions to repay its net debts outstanding.  Under 52 U.S.C. § 30116(j) (the "Loan Repayment Limit"), a campaign committee may use contributions raised after an election to repay "personal loans" that a candidate "incurs . . . in connection with the candidate's campaign" only up to $250,000.[3]  Neither the Loan Repayment Limit nor any other law prevents a campaign committee from using contributions raised before or on the date of an election to repay candidate personal loans in any amount.

According to the sponsor of the Loan Repayment Limit, the purpose of the law is to mitigate the heightened risk of quid pro quo corruption and its appearance resulting from already elected officeholders soliciting contributions for their own personal benefit.  *See* 147 Cong. Rec. S2537 (daily ed. Mar. 20, 2001) (statement of Sen. Domenici) (''If you incur debt from a personal loan and then you get elected as Senator, and then you go around and say, now I am Senator, I want you to get my money so I can pay back what I used of my own money to run for election.  It is clear in this amendment that you cannot do that in the future.''); *id.* at S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) (explaining that a candidate who incurred

---

[3]   The Loan Repayment Limit states that a candidate "who incurs personal loans . . . in connection with the candidate's campaign for election shall not repay (directly or indirectly), to the extent such loans exceed $250,000, such loans from any contributions made to such candidate or any authorized committee of such candidate after the date of such election."  52 U.S.C. § 30116(j).

personal loans for his campaign should not be able "to get it back from [his or her] constituents under fundraising events that [he or she] would hold and then ask them: How would you like me to vote now that I am a Senator?").

###### D.     FEC Regulations Implementing the Loan Repayment Limit

Following the passage of BCRA, the Commission issued regulations implementing the new law.  With respect to the Loan Repayment Limit, the Commission promulgated 11 C.F.R. § 116.11.  That regulation contains three general provisions.

First, paragraph (a) of section 116.11 defines the "personal loans" to which the Loan Repayment Limit applies to include "not only loans made by candidates to their authorized committees, but also loans made by other persons to the authorized committees that are endorsed or guaranteed by the candidate or that are secured by the personal funds of the candidate." Increased Contribution and Coordinated Party Expenditure Limits for Candidates Opposing Self-Financed Candidates, 68 Fed. Reg. 3970, 3973 (Jan. 27, 2003).  The Loan Repayment Limit applies to "[a]ny candidate who incurs personal loans," 52 U.S.C. § 30116(j), which the Commission construed to apply to "loans made by candidates" in addition to "loans made to candidates" for two reasons.  First, the provision's legislative history repeatedly states that the Loan Repayment Limit would apply to a candidate's loan of personal funds to his or her campaign.[4]  Second, the result of any other interpretation "would be that similarly situated candidates may be treated differently."  68 Fed. Reg. at 3974.  It would make little sense, the Commission pointed out, to apply the Loan Repayment Limit to a candidate who "takes out a

---

[4]     For example, the Loan Repayment Limit's sponsor stated that "anything more than [the $250,000 threshold], they cannot repay it by going out and having fundraisers once they are elected *with their own money*."  68 Fed. Reg. 3970, at 4002 n.2 (quoting 147 Cong. Rec. S2451 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) (emphasis added)).

loan from a lending institution and then lends the loan proceeds to his or her authorized committee" but not to "a candidate who liquidates an asset and loans the proceeds from the sale to his or her authorized committee." *Id.*

Second, paragraph (b) of section 116.11 clarifies the limited nature of the Loan Repayment Limit.  Under paragraph (b)(1), "[r]epayment of the entire loan amount is permitted under BCRA and FECA even if the total loan amount exceeds $250,000 and as long as these contributions were made on or before the date of the election."  68 Fed. Reg. at 3974.  Under paragraphs (b)(2) and (3), the committee may repay only up to a maximum of $250,000 using contributions that were received after the date of the election.  11 C.F.R. § 116.11(b)(2), (3).[5]

Third, paragraph (c) of the regulation establishes a 20-day period following an election during which a committee can use the cash it had on hand as of the day after the election to pay back all or part of the candidate's personal loans ("20-Day Repayment Period").  11 C.F.R. § 116.11(c)(1).  After a general election, a campaign committee must file a report with the FEC reporting its receipts and disbursements for a period expiring 20 days after the election.  68 Fed. Reg. at 3974.  Thus, after the 20-day post-election period has elapsed, a campaign committee must "treat the remaining balance of the candidate's personal loan that exceeds $250,000 as a contribution from the candidate to the authorized committee, given that this amount could never be repaid, and given that the amount must be accounted for on the authorized committee's next report."  *Id.* (citing 11 C.F.R. § 116.11(c)).

---

[5]     Given this limit, the "net debts outstanding" calculation discussed above, *see supra* p. 4, does not include the amount of a candidate's personal loans in excess of $250,000, *see* 11 C.F.R. § 110.1(b)(3)(ii)(C).

E.      BCRA's "Millionaire's Amendment" and *Davis v. FEC*

Separate from the Loan Repayment Limit, BCRA's amendments to FECA included a provision known as the "Millionaire's Amendment" that applied only to Congressional candidates. *See Davis v. FEC*, 554 U.S. 724, 729-30 (2008). Under that part of the law, if a candidate for Congress spent in excess of a certain amount of personal funds in support of his or her campaign and additional criteria were met, the law would increase the contribution limits for the self-funding candidate's opponent to help the opponent keep pace. *See id.* at 729. In 2008, the Supreme Court struck down the Millionaire's Amendment in *Davis v. FEC*. *Id.* at 744. The *Davis* Court found that the law's "asymmetrical" contribution limits burdened a candidate's First Amendment right to make "unlimited expenditures of his personal funds" by "enabling his opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of [the self-funder's] speech." *Id.* at 734, 736.

In the Commission's subsequent rulemaking, the agency concluded that neither the Loan Repayment Limit nor its implementing regulation had been impacted by *Davis*. *See* Repeal of Increased Contribution and Coordinated Party Expenditure Limits for Candidates Opposing Self-Financed Candidates, 73 Fed. Reg. 79,597, 79,600 (Dec. 30, 2008). The Commission noted that *Davis* did not address the validity of the Loan Repayment Limit, nor had it been challenged in that case. *Id.* The Commission also considered various factors indicating that *Davis* did not undermine the validity of the Loan Repayment Limit, since that limit: (1) had been codified in a different subsection of the U.S. Code than the Millionaire's Amendment; (2) "has a wider application" than the provision struck down in *Davis* in that it applied to all federal candidates, not just House candidates opposing a self-funded candidate; (3) "can operate effectively without" the Millionaire's Amendment because it does not rely in any way on that provision; and (4) was

not intended by Congress to be "inextricably tied" to the Millionaire's Amendment, given its

distinct text, function, and legislative history.  *See also* Advisory Opinion 2008-09 (Lautenberg)

(concluding that 11 C.F.R. § 116.11 remained valid and applicable after *Davis*).

## II.   FACTUAL BACKGROUND AND PLAINTIFFS' CLAIMS

By a significant margin, the 2018 Texas Senate campaign between Senator Cruz and Beto

O'Rourke was the most expensive Senate campaign in U.S. history.[6]  Cruz declared his

candidacy for re-election on May 4, 2016.  Letter from Cabell Hobbs, Assistant Treasurer for the

Committee, to Mr. Bradley Matheson, Reports Analysis Division, FEC (May 11, 2016).[7]  Cruz

funded his campaign "in large part by contributions from individual supporters" (Compl. for

Declaratory and Injunctive Relief ("Compl.") ¶ 12 (Docket No. 1)), and indeed, during the 2018

election cycle, the Committee raised more than $35 million — $29.2 million of which came from

individual contributions, *see* FEC, Ted Cruz for Senate Financial Summary.[8]

On the day before the November 6, 2018 general election, Senator Cruz loaned his

campaign $260,000.  *See* Ted Cruz for Senate, FEC Form 3 at 401-02 (Jan. 31, 2019).[9]  This was

the only loan received by the Cruz campaign.  FEC, Ted Cruz for Senate Financial Summary.[10]

Of the total loan amount, $255,000 originated from Cruz's margin-approved brokerage account,

and $5,000 originated from Cruz's personal bank accounts.  (Compl. ¶ 28.)  At the end of

election day, the Committee had approximately $2.2 million cash on hand.  (*Id.* ¶ 29.)

---

[6]     Most Expensive Races, OpenSecrets.org, https://www.opensecrets.org/overview/
topraces.php?cycle=2018&display=allcands (last viewed June 4, 2019).

[7]     https://docquery.fec.gov/pdf/557/201605110200177557/201605110200177557.pdf.

[8]     https://www.fec.gov/data/committee/C00492785/?cycle=2018.

[9]     http://docquery.fec.gov/pdf/325/201901319145235325/201901319145235325.pdf.

[10]    https://www.fec.gov/data/committee/C00492785/?cycle=2018.

Pursuant to the 20-Day Repayment Period, the Committee had until November 26, 2018 to use its $2.2 million in cash on hand to repay Senator Cruz all or part of the $260,000 he had loaned it the day before the election.  *See* 11 C.F.R. § 116.11(c)(1).  During the 20-Day Repayment Period, however, the Committee "used the funds it had on hand to pay vendors and meet other obligations instead of repaying CRUZ's loans."  (Compl. ¶ 29.)  After the conclusion of the 20-day window, on November 27, 2018, the Committee was required to treat the $10,000 of Cruz's personal loans that exceeded the $250,000 Loan Repayment Limit, and which the Committee did not use its cash on hand to repay during the 20-Day Repayment Period, as a contribution from Cruz to his Committee.  *See* 11 C.F.R. § 116.11(c)(2).

Subsequently, using "money raised after the election," the Committee repaid the statutory maximum of $250,000 of Cruz's personal loans in four payments in December 2018.  (Compl. ¶¶ 30-31.)  The entirety of those payments went toward Cruz's personal loan that originated from his margin account.  (*Id.* ¶ 30.)  As a result, of the remaining $10,000 of Cruz's personal loan that was converted to a contribution to his Committee, $5,000 originated from Cruz's personal bank account and $5,000 originated from his margin loan.  (*Id.* ¶¶ 31-32.)

On April 1, 2019, plaintiffs filed a five-count complaint.  (Compl. ¶¶ 34-51.)  The first two counts challenge the constitutionality of the statute and the remaining three counts challenge the regulation.  Plaintiffs' statutory claims, Counts I and II, assert that that the Loan Repayment Limit violates the First Amendment on its face and as applied to plaintiffs and to "potential post-election donors to Plaintiffs."  (*Id.* ¶¶ 34-44).  In Count III, plaintiffs claim that 11 C.F.R. § 116.11 is likewise unconstitutional and violates the Administrative Procedure Act (APA").  (*Id.* ¶¶ 45-46.)  In Count IV, plaintiffs claim that the 20-Day Repayment Period of section 116.11(c) is both unconstitutional and arbitrary and capricious in violation of the APA.  (*Id.* ¶¶ 47-48.)

Finally, in Count V, plaintiffs claim that the Commission's regulation defining "personal loan" at section 116.11(a) violates the APA.  (*Id.* ¶¶ 49-51.)  Plaintiffs seek declaratory and injunctive relief.  (*Id.* ¶ 52.)

With their complaint, plaintiffs also filed an application for a three-judge court under BCRA's special judicial review provision.  (Pls.' Appl. For a Three Judge Ct. (Docket No. 2).)

## ARGUMENT

## I.      CLAIMS DO NOT QUALIFY FOR A THREE-JUDGE COURT UNDER BCRA § 403 IF THEY ARE NON-JUSTICIABLE, INSUBSTANTIAL, OR CHALLENGING A REGULATION

Section 403 of BCRA provides that a plaintiff may request the convening of a three-judge court pursuant to 28 U.S.C. § 2284, for actions challenging the constitutionality of "any provision" of BCRA or "any amendment made by" it.  BCRA § 403(a), (d)(2) (reprinted at 52 U.S.C. § 30110 (note)).  A final decision by a three-judge court under BCRA § 403 "shall be reviewable only by appeal directly to the Supreme Court of the United States."  *Id.* § 403(a)(3).

At this stage of the proceedings under BCRA § 403, it is the role of this Court "to determine how and by whom this case will be heard."  *Republican Party of La. v. FEC*, 146 F. Supp. 3d 1, 8 (D.D.C. 2015).  While BCRA's judicial-review provision states that a constitutional challenge to BCRA "shall" be heard by a three-judge court in this District, courts have established that the single-court judge to which the case is assigned plays a critical gatekeeper role.  *See Republican Party of La.*, 146 F. Supp. 3d at 8 (explaining that even though "BCRA's judicial-review provision appears straightforward . . . [n]ot just any constitutional challenge needs to be heard by a three-judge court").  Indeed, the federal three-judge court statute, which BCRA 403 incorporates, explicitly gives a single district judge the authority to "determine[] that three judges are not required."  28 U.S.C. § 2284(b)(1).

This gatekeeper role is crucial because the Supreme Court has no discretion of its own to refuse adjudication on the merits in direct appeal cases. *McCutcheon v. FEC*, 572 U.S. 185, 196 (2014). As a result, courts in this District have followed the Supreme Court's direction that "due to an 'overriding policy . . . of minimizing the mandatory docket of [the Supreme] Court in the interests of sound judicial administration,' district courts are to narrowly construe statutory provisions providing for three-judge courts." *Rufer v. FEC*, 64 F. Supp. 3d 195, 202 (D.D.C. 2014) (quoting *Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90, 98 (1974)).

Consistent with that narrow construction mandate, applications for three-judge courts made pursuant to BCRA § 403 are subject to at least three important restrictions. First, the plaintiff's claims must present a "'justiciable controversy,'" including by satisfying Article III's standing requirement. *Republican Party of La.*, 146 F. Supp. 3d at 8 (quoting *Schonberg v. FEC*, 792 F. Supp. 2d 14, 17 (D.D.C. 2011)). Second, the plaintiff's case also "must present a 'substantial claim.'" *Id.* (quoting *Schonberg*, 792 F. Supp. 2d at 17); *see also Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015) (explaining that "constitutional insubstantiality" is equated to concepts such as "wholly insubstantial" and "obviously without merit" (internal quotation marks omitted)). Third, the plaintiff's claims must challenge statutory provisions of BCRA, and not Commission regulations. *See, e.g.*, *Bluman v. FEC*, 766 F. Supp. 2d 1, 4 (D.D.C. 2011).

As detailed below, these three restrictions on BCRA § 403 render all five of plaintiffs' claims in this case ineligible for a three-judge court. First, plaintiffs lack standing. Second, even if plaintiffs had standing, all of their claims are so obviously foreclosed by Supreme Court precedent that they are not substantial enough for three-judge court review and direct appeal to the Supreme Court. Finally, Counts III, IV, and V of the complaint suffer from the additional flaw that they challenge the validity of Commission regulations, not BCRA.

## II.     PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE BECAUSE PLAINTIFFS LACK STANDING

To qualify for a three-judge court under BCRA 403, the plaintiff's claims must present a

"'justiciable controversy.'"  *Republican Party of La.*, 146 F. Supp. 3d at 8 (quoting *Schonberg*,

792 F. Supp. 2d at 17).  For example, "claims should not be heard by a three-judge court if

Plaintiffs lack standing."  *Id.*; *see also Shapiro*, 136 S. Ct. at 455 ("[A] three-judge court is not

required where the district court itself lacks jurisdiction." (internal quotation marks omitted)).

Plaintiffs cannot carry their burden of establishing that they have Article III standing.

*See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  To survive the FEC's motion to dismiss

under Rule 12(b)(1), plaintiffs' complaint "must contain sufficient factual matter, accepted as

true, to 'state a claim [of standing] that is plausible on its face.'"  *Arpaio*, 797 F.3d at 19 (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although the Court must accept as true all of the

plaintiff's well-pled factual allegations and draw all reasonable inferences in favor of the

plaintiff, the Court need not accept the plaintiff's legal conclusions as true.  *Id.*  The Court also

need not "accept inferences that are unsupported by the facts set out in the complaint."  *Id.*

(internal quotation marks omitted).  Also, this Court "may look beyond the allegations contained

in the complaint" to "materials outside the pleadings" to determine whether plaintiffs can carry

their burden of proving they have standing.  *Flores ex rel. J.F. v. District of Columbia*, 437 F.

Supp. 2d 22, 28-29 (D.D.C. 2006) (internal quotation marks omitted).

"Every plaintiff in federal court bears the burden of establishing the three elements that

make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact,

causation, and redressability."  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012)

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Each of the two plaintiffs

in this case must therefore have a distinct, actual injury that is connected to the relief requested

for the case to be a "proper object of this District Court's remediation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (observing that the district court had found "actual injury on the part of only one named plaintiff"); *Wagner v. FEC*, 793 F.3d 1, 4 (D.C. Cir. 2015) (en banc) (explaining that claims of two of three plaintiffs had become moot).

In addition, "'[s]tanding is not dispensed in gross.'" *Davis*, 554 U.S. at 734 (quoting *Lewis*, 518 U.S. at 358 n.6); *Wagner*, 793 F.3d at 5 (same). It is therefore required that "a plaintiff must demonstrate standing for *each claim* he seeks to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (internal quotation marks omitted and emphasis added).

## A.     Both Plaintiffs Lack Standing Because the Injuries They Allege Are Self-Inflicted

The D.C. Circuit has "consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). Self-inflicted injuries are neither "cognizable under Article III," nor "fairly traceable to the defendant's challenged conduct." *Id.* (finding no standing because "the association's asserted injury appears to be largely of its own making"). Plaintiffs' claimed injury — that the Committee now cannot repay Cruz's $10,000 loan balance (Compl. ¶¶ 32-33) — was self-inflicted in two independent ways.

First, there is no rational explanation for Senator Cruz's personal loans to the Committee other than as an attempt to manufacture an injury so plaintiffs could bring this lawsuit. Such an injury is self-inflicted, however, and thus cannot confer standing, because it was "substantially caused by the plaintiff's own conduct." *Ellis v. Comm'r of IRS*, 67 F. Supp. 3d 325, 336-37 (D.D.C. 2014), *aff'd*, 622 F. App'x 2 (D.C. Cir. 2015) (per curiam).

For example, in *J. Roderick MacArthur Foundation v. FBI*, a foundation had claimed that the FBI's practice of maintaining records on the foundation would discourage grantees from

14

seeking its grants and make it more difficult for the foundation's employees to find future work. 102 F.3d 600, 606 (D.C. Cir. 1996).  The D.C. Circuit held that the foundation lacked standing because these alleged injuries were only possible if the FBI's files were publicly known, and they were only publicly known when the foundation made the information public.  *Id.*

In this case, the timing, amount, and circumstances surrounding Cruz's personal loans show that they could have served no purpose for the Cruz campaign other than to support this suit, and the complaint does not claim otherwise.  The $260,000 loans were made to the Committee the day before the election.  By that point, Senator Cruz had already been a candidate for more than two-and-a-half years.  Not only had the Committee raised approximately $35 million in contributions by that time, but on the date of the election, the Committee still had $2.2 million in cash on hand.  *See* FEC Form 3 (Report of Receipts and Disbursements), Ted Cruz for Senate, Post-General 2018 at 7791-92 ("Post-General Report").[11]  Thus, Senator Cruz's $260,000 loan amounted to barely more than one-tenth of the cash the Committee already possessed with less than 24 hours to go before the election.  Any notion that the loan might have been helpful for paying the campaign's other debts is undermined by the Committee's contemporaneous spending: on the same day Cruz made his loan to the Committee, the Committee donated $200,000 to the Texas Republican Party.  *See id. at* 7790.

Additionally, the amount and structure of the $260,000 loan are transparently tailored for a challenge to the validity of the Loan Repayment Limit and its regulation.  A loan of $10,000 less would not have been impacted by the $250,000 Loan Repayment Limit, and therefore plaintiffs would have no injury to bring this lawsuit.  The excess $10,000 that represents plaintiffs' alleged injury is also neatly divided between a $5,000 loan that Senator Cruz

---

[11]    http://docquery.fec.gov/pdf/477/201812069134977477/201812069134977477.pdf

originated from a margin loan and $5,000 that originated from Cruz's personal bank account.

The complaint does not attempt to explain why Senator Cruz saw fit to loan $5,000 in personal

funds to a campaign that already had more than $2.2 million on the day before the election.  But

by doing so, it gave plaintiffs an alleged basis upon which to challenge the regulation's

determination that the statute applies to both types of personal loans.  (*See* Compl. ¶¶ 49-51.)

Plaintiffs' litigation-driven machinations should not be permitted to provide a potential

foundation for invalidating important, corruption-fighting election laws.

Second, plaintiffs' alleged injury was self-inflicted for the additional reason that, after

they unnecessarily constructed the conditions necessary for their alleged injury, plaintiffs then

chose not to take legally available steps to avoid that injury.  A plaintiff has impermissibly self-

inflicted its own injury where it "has within its grasp an easy means for alleviating the alleged

[injury]" and yet "has *chosen* to remain in the lurch."  *Gonzales*, 468 F.3d at 831.

For example, in *Gonzales*, the D.C. Circuit held that a family planning association lacked

standing to sue a government agency where it claimed that uncertainty over how to comply with

a purportedly conflicting statute and regulation might cause it to lose funding.  *Gonzales*, 468

F.3d at 829, 831.  The association could have resolved this alleged uncertainty on its own, the

D.C. Circuit explained, since the APA would have allowed it to simply ask the relevant agency

to clarify the alleged uncertainty.  *Id.* at 831.  Because the plaintiff did not do so, it lacked

standing.  *Id.*[12]

---

[12]        *See also McConnell v. FEC*, 540 U.S. 93, 228 (2003) (finding any injury to political
candidates challenging law increasing limits on "hard money" contributions stemmed from their
own choice not to accept such contributions); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177
(D.C. Cir. 2012) (concluding that costs and risks associated with producing a 15% ethanol blend
was not traceable to the EPA's decision to allow that blend on the market for fuel manufactures
who chose to switch for financial reasons rather than any regulatory compulsion); *Petro-Chem
Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (holding that hazardous waste

16

Here, after the election, plaintiffs could have avoided their alleged injury by repaying at least $10,000 to Cruz within 20 days from their $2.2 million in election-day cash on hand.  *See* 11 C.F.R. § 116.11(c)(1).  Plaintiffs' choice to allow the 20-Day Repayment Period to expire without repaying $10,000 to Cruz directly resulted in that amount being converted into an unrepayable contribution from Cruz to the committee.

Plaintiffs' choice to remain in the lurch was completely voluntary.  The complaint admits that after the election the Committee "used the funds it had on hand to pay vendors and meet other obligations instead of repaying CRUZ's loans."  (Compl. ¶ 29.)  The complaint appears to suggest that plaintiffs were required to make this choice because the Committee ended the election with $406,194 in net debts outstanding.  *Id.*  But the Committee could have satisfied all of its obligations by using its $2.2 million in cash on hand to pay down its $2.5 million in debt — including $10,000 to Cruz.  And then the Committee could have raised $406,194 in post-election contributions to repay the remaining $250,000 it owed to Cruz (as the Committee later did (*see* Compl. ¶¶ 30-31)), and to repay the remaining $156,194 of its net debts outstanding.

Plaintiffs' *preference* to use post-election contributions to repay Cruz's $10,000 in violation of federal law instead does not constitute an injury that confers standing.  It was a mere "self-inflicted budgetary choice."  *Am. Soc. For Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (citation and internal quotation marks omitted).  For

---

disposal companies that chose geologic repositories over safer methods did so in their own economic self-interest, breaking the causal chain between the threatened injury and EPA's regulations); *Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 (D.D.C. 2015) (finding a lack of standing to bring claim that the FBI's investigation of plaintiff cost him employment opportunities because potential employers only knew about the investigation due to plaintiff's decision to publicize it in the media); 13A Charles Alan Wright et al., *Fed. Practice and Procedure* § 3531.5 (3d ed. April 2019 Update) ("At some point, standing may be denied because the injury seems solely—or almost solely—attributable to the plaintiff.").

example, in *Huron v. Berry*, a district court dismissed a family's challenge to the federal government's decision to approve certain health insurance plans for its employees that lacked coverage for devices that aid communication-impaired individuals.  12 F. Supp. 3d 46, 47 (D.D.C. 2013), *aff'd sub nom. Huron v. Cobert*, 809 F.3d 1274 (D.C. Cir. 2016).  The family had a self-inflicted injury, and therefore lacked standing, because it had elected to enroll in an allegedly offending plan rather than selecting a different plan offering the coverage needed.  *Id.* at 53.  It "makes no difference," the court stated, that the family's choice of plan was "motivated by cost considerations and other family members' healthcare needs."  *Id.*

Similarly, in the campaign finance context, the D.C. Circuit has held that plaintiffs cannot impose First Amendment harm on themselves by foregoing legally available options for their desired spending in lieu of more burdensome and illegal spending options.  *See Stop This Insanity, Inc. Emp. Leadership Fund v. FEC*, 761 F.3d 10 (2014).  In *Stop This Insanity*, the Court of Appeals rejected a corporation's argument that its connected political committee should be free from FECA's restrictions on its ability to solicit funds to pay for electoral speech.  *Id.* at 11.  The D.C. Circuit pointed out that the corporation itself already had the ability under FECA to freely solicit funds to pay for its speech.  *Id.* at 11, 14.  As a result, the plaintiff had passed up a "*less* burdensome" and "more robust option" for its desired spending, and then, "trapped in a snare it has fashioned for itself," the plaintiff "claim[ed] there is a constitutional right to do things the hard way."  *Id.* at 14.  The D.C. Circuit's response: "We cannot sanction such an illogical conclusion."  *Id.*  Likewise, this Court should reject plaintiffs' attempt to repay Cruz using "the hard way."[13]

---

[13]     Plaintiffs desire to repay Cruz's $10,000 the "hard way" distinguishes this case from the D.C. Circuit's recent ruling in *Libertarian National Committee, Inc. v. FEC*, ___ F.3d ___, No. 18-5227, 2019 WL 2180336 (D.C. Cir. May 21, 2019) (en banc).  There, the D.C. Circuit held

Additionally, the complaint's suggestion that plaintiffs needed "to pay vendors and meet other obligations instead of repaying CRUZ's loans" due to concerns unrelated to the statute (Compl. ¶ 29), not only fails to establish standing, but is also unsupported by the alleged and publicly available facts.  As an initial matter, the Committee's own disclosures to the FEC reveal that it could have made a $10,000 payment to Cruz within the 20-Day Repayment Period without altering its other spending at all.  The Committee made only $1,977,738.60 in total disbursements within the 20-Day Repayment Period, meaning that it still had over $200,000 cash on hand at the end of the 20-day window with which it could have made a $10,000 payment to Cruz.  *See* Post-General Report at 7725-7790 (date).[14]

Furthermore, within the 20-day period the Committee made disbursements that make evident that the Committee could not have been motivated by a desire to pay vendors and other obligations before repaying Cruz.  For example, on November 26, 2018, the Committee made a $2,000 donation to the Texas Pastor Council, undermining any suggestion that it could not repay Cruz any of his $10,000 debt because it had to "pay vendors and meet other obligations." Compl. ¶ 29; Post-General Report at 7790.[15]  On the same day, the Committee also made a $886.60 payment to Senator Cruz for "Travel – Mileage/Per Diem" and a $63.66 payment to his wife for "Travel."  *Id.* at 7768-69.  Unlike the repaying of Cruz's loan, neither the donation to the

---

that a political party had not caused its own injury by refusing to accept an entire bequeathed contribution at once because FECA required it "to choose between immediate access to the money [that had been contributed to the party] and long-term flexibility in spending it."  *Id.* at *3.  That court said that when the "committee chose the lesser of two evils" and refused to accept the entire contribution subject to restrictions on how it could be spent, that choice did not "transform[] FECA's limitation into a self-imposed restriction."  *Id.*  In contrast here, plaintiffs voluntarily chose to forego an option with no "evil" attached to it at all: using its cash on hand to repay Cruz's $10,000 debt.

[14]     http://docquery.fec.gov/pdf/477/201812069134977477/201812069134977477.pdf.

[15]     *Id.*

Texas Pastor Council nor the travel reimbursements to the Cruzes needed to be made during the 20-Day Repayment Period.  In other words, the Committee could have paid back $950.26 of Cruz's loan within the 20-day window on November 26, 2018, instead of using that same money to reimburse Cruz and his wife for travel expenses, thereby putting all parties in the same exact financial position but allowing that additional $950.26 to be paid outside the 20-day window using other cash on hand or post-election contributions.  It chose not to do so.

Finally, the Committee's ability to repay $10,000 to Cruz before paying its vendors within the 20-day window is further demonstrated by its commencement of repayments to Cruz as soon as the 20-day period ended, before payment of all vendors.  On December 4, 2018, the Committee used post-election contributions to make a $25,000 payment to Cruz (and an additional $225,000 in payments over the following three weeks).  (Compl. ¶¶ 30-31.)  But from December 5, 2018 to the end of 2018, the Committee paid an additional $263,765.60 to vendors, payroll, and other obligations.  *See* FEC Form 3 (Report of Receipts and Disbursements), Ted Cruz for Senate, Year-End 2018 at 351-97 (Jan. 31, 2019).[16]  If the Committee were truly concerned about its ability to pay vendors, it would have waited to pay back Cruz until all such vendors had been paid.  The facts therefore do not support the complaint's suggestion that the Loan Repayment Limit forced plaintiffs into a Hobson's choice whereby they could not pay Cruz back $10,000 and also meet their obligations to vendors.

Plaintiffs' pretense for their self-inflicted injury lacks legal merit and is inconsistent with the facts.  Plaintiffs lack standing because any such injury was entirely due to their own choices.

---

[16]    http://docquery.fec.gov/pdf/325/201901319145235325/201901319145235325.pdf.

**B.      The Committee Lacks Standing Because It Has No Injury**

Even if this Court were to find that Senator Cruz was injured by involuntarily having made a $10,000 contribution to his winning Senate campaign, it should nonetheless find that the Committee lacks standing.  The Committee has $10,000 *more* as a result of Cruz's loan-turned-contribution, and therefore lacks any injury.  As discussed above, each plaintiff in this case bears its own burden of establishing standing.  In this case, because plaintiffs' chose not to repay $10,000 of Cruz's personal loans during the 20-Day Repayment Period, 11 C.F.R. § 116.11(c)(2) requires that $10,000 be characterized as a contribution to the Committee.  Therefore, as a result of the laws that plaintiffs challenge, the Committee has benefitted by $10,000.  Being in a better financial position as a result of a law cannot constitute an "injury."  *See, e.g.*, *Baker v. Adler*, No. 81-1779, 1982 WL 1396, at *2 (D.C. Cir. Apr. 8, 1982) (stating that a plaintiff lacks standing where "rather than being injured" it "has actually benefited" from the challenged action by receiving "monies involved" (internal quotation marks omitted)).

**C.      Plaintiffs Cannot Assert Standing for Potential Contributors**

Plaintiffs not only claim to have suffered an injury themselves as a result of the Loan Repayment Limit, they also claim that it "restricts the speech of those potential donors who would otherwise support a candidate financially by contributing after an election to fund pre-election political speech." (Compl. ¶¶ 3, 44.)  But plaintiffs do not have standing to assert constitutional claims on behalf of these hypothetical potential donors that are not plaintiffs in this case.  Furthermore, it seems highly unlikely that any such potential donors even exist and plaintiffs have identified none.  And even if such donors did exist, they would not have suffered any injury as a result of the Loan Repayment Limit.

### 1.     No Potential Contributors Are Plaintiffs in This Case and There is No Reason to Believe Any Exist

Plaintiffs lack standing to make a claim on behalf of potential post-election donors.  "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."  *Powers v. Ohio*, 499 U.S. 400, 410 (1991).  The Supreme Court has described some limited exceptions where litigants can assert claims of third parties.  *Id.* at 411.  However, "[b]ecause third party standing is the 'exception' rather than the norm, the burden is on the plaintiff 'to establish that [he] has third party standing, not on the defendant to rebut third party standing.'"  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) (*quoting Amato v. Wilentz,* 952 F.2d 742, 750 (3d Cir.1991)).

Plaintiffs here have made no effort to establish that such third party standing is warranted, nor could they.  A plaintiff may qualify for the exception to the rule against third-party standing only if "three important criteria are satisfied."  *Powers*, 499 U.S. at 411.  Plaintiffs in this case cannot satisfy at least two of these requirements.

The first criterion is that "the litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute."  *Powers*, 499 U.S. at 411 (quoting *Singleton v. Wulff,* 428 U.S. 106, 112 (1976)).  As discussed in Parts II.A and II.B, *supra*, the plaintiffs lack standing and therefore cannot bring a claim on behalf of any third parties.

The third criterion is also absent in this case — "there must exist some hindrance to the third party's ability to protect his or her own interests."  *Powers*, 499 U.S. at 411.  The Supreme Court has indicated that this prong may be met, for example, in the context of a criminal defendant asserting the rights of an improperly excluded juror because although "individuals excluded from jury service on the basis of race have a right to bring suit on their own behalf,

22

the 'barriers to a suit by an excluded juror are daunting.'" *Georgia v. McCollum*, 505 U.S. 42, 56

(1992) (quoting *Powers*, 499 U.S. at 414).

But there are no such daunting barriers to a suit here.  If there are potential contributors

that believe that their First Amendment rights are being infringed due to the Loan Repayment

Limit, there is no reason why such individuals are incapable of attempting to join with plaintiffs

in this case or attempting to bring their own litigation.  Numerous contributors or would-be

contributors have brought suit to challenge provisions of FECA, either on their own or with

committee or party plaintiffs.  *See, e.g., McCutcheon*, 572 U.S. at 194 (potential contributor

brought suit along with national party to challenge FECA's aggregate contribution limits);

*Wagner*, 793 F.3d at 3 (three federal contractors brought suit to challenge FECA ban on federal

contractor contributions); *Bluman*, 800 F. Supp. 2d at 282 (two foreign nationals challenged

FECA's prohibition on contributions and expenditures by foreign nationals); *Rufer*, 64 F. Supp.

3d. at 200 (individual contributor and political parties challenged FECA's limitations on

contributing and spending "soft money").[17]

In addition, plaintiffs have failed to plead that there actually are any "potential post-

election donors" to the Cruz Committee that have been injured by the Loan Repayment Limit.

The chances that any such donors exist is vanishingly small.  Because the Committee still had

net debts outstanding after election day, individuals interested in expressing their support for

Senator Cruz's candidacy were already legally able to make post-election contributions to the

---

[17]     For many of the same reasons, plaintiffs also lack standing to bring a claim that the Loan
Repayment Limit is unconstitutional as applied to losing candidates.  (Compl. ¶ 40.)  There is no
losing candidate that is a party to this case, and plaintiffs have made no attempt to meet their
burden of establishing third-party standing with respect to losing candidates.  Nor could they,
because even if plaintiffs themselves have standing here, they lack a "close relation" to any
losing candidate and there is no reason why losing candidate could not bring his or her own
lawsuit.  *See Powers*, 499 U.S. at 411.

Committee to pay off that net debt, *see* 11 C.F.R. § 110.1(b)(3)(i), including the portion of that

net debt attributable to $250,000 of Cruz's personal loan, *see id.* § 116.11(b)(2).  As a result, the

Loan Repayment Limit would only be a hindrance to someone who wanted to give a post-

election contribution to the Committee, but *only if* that contribution would be used to repay the

$10,000 portion of Senator Cruz's personal loans that exceeded $250,000, rather than to repay

the $250,000 or any other campaign obligations, which the law allows.

Plaintiffs' complaint does not state that such a person exists, even though it does allege

that the Committee used "money raised after the election" to repay $250,000 of Cruz's loan.

(Compl. ¶ 31.)  Many contributors presumably intend that their donations be used for campaign-

related purposes.  *Cf. FEC v. Craig for U.S. Senate*, 70 F. Supp. 3d 82, 99 (D.D.C. 2014)

(discussing donor intent in the context of FECA's personal use prohibition), *aff'd* 816 F.3d 829

(D.C. Cir. 2016).  Nothing in the complaint states that any of those post-election contributors

insisted that their contributions be used to repay any portion of Cruz's personal loan, let alone

the $10,000 portion of that loan exceeding the Loan Repayment Limit.

> **2.      Potential Contributors Have No Injury Because Neither the Law Nor
>          Regulation Prevent Them From Making Contributions to the
>          Campaign**

Even if plaintiffs could identify a potential post-election contributor to the Committee

who would contribute only if the contribution were specifically used to pay back Cruz's $10,000

— that person still would not have suffered any legally cognizable injury if the Committee used

the contribution to pay vendors rather than Senator Cruz.  The Supreme Court has explained that

the First Amendment value of a contribution is that it constitutes a "symbolic expression of

support" for a candidate and serves to "affiliate a person with a candidate."  *Buckley*, 424 at 21-

22.  A contributor's First Amendment rights are not dependent upon the timing of the

contribution or the manner in which a campaign actually uses that contribution. *Id.* at 21 ("While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor."). Indeed, since contributors have no right to direct the use of funds, each spending decision is generally "an independent one on the part of the campaign." *Holmes v. FEC*, 875 F.3d 1153, 1167 (D.C. Cir. 2017) (en banc). Potential contributors therefore would lack any cognizable injury because they would be able to give a symbolic expression of support to Senator Cruz and affiliate themselves with him by making contributions — regardless of whether the contribution was made pre- or post-election or how the Committee spent the money. The Loan Repayment Limit does not prevent any person from making a contribution, and therefore no potential contributor could possibly be harmed by it.

## III.    PLAINTIFFS' CONSTITUTIONAL CLAIMS ARE WHOLLY INSUBSTANTIAL

Even if the Court finds that any plaintiff has standing, it should deny plaintiffs' application for a three-judge court for the separate and independent reason that plaintiffs have failed to "present a 'substantial claim,'" as they must. *Republican Party of La.*, 146 F. Supp. 3d at 8 (quoting *Schonberg*, 792 F. Supp. 2d at 17). Claims fall short of this standard if they are "'obviously without merit,' or if their 'unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.'" *Id.* (quoting *Feinberg v. FDIC*, 522 F.2d 1335, 1338 (D.C. Cir. 1975)); *see also Shapiro*, 136 S. Ct. at 456 (explaining that claims do not qualify for a three-judge court under 28 U.S.C. § 2284 if they are "obviously without merit" (internal quotation marks omitted)).

Plaintiffs' constitutional claims against BCRA's Loan Repayment Limit are foreclosed by Supreme Court precedent, most notably by *Buckley v. Valeo* and *Davis v. FEC*.  And to the extent that this case is an implicit effort to overturn Supreme Court precedent, plaintiffs have asserted no "non-frivolous argument in favor of overturning [Supreme Court] precedent" as would be required to clear the insubstantiality bar.  *Holmes v. FEC*, 823 F.3d 69, 74 (D.C. Cir. 2016).

Plaintiffs make no effort in their application for a three-judge court to explain why their challenge to the Loan Repayment Limit is not foreclosed.  (*See* Docket No. 2.)  Plaintiffs' complaint generally asserts that the Loan Repayment Limit restricts core political speech and that the Supreme Court in other cases has invalidated unrelated campaign finance laws that also "restricted core political speech."  (Compl. ¶ 7.)  But of course, the fact that some parts of FECA have been struck down as unconstitutional is not sufficient to make a colorable claim that the Loan Repayment Limit is similarly unconstitutional.

For the reasons detailed below, plaintiffs' claims are insubstantial.  First, mere rational basis scrutiny should apply to the Loan Repayment Limit since it does not limit political speech. Neither Cruz nor any other candidate will have his or her First Amendment right to spend unlimited amounts on a political campaign hindered by the Loan Repayment Limit.  The limit also does not burden the First Amendment rights of potential donors to Cruz or other candidates, who are free to contribute to candidates with whom they wish to support and affiliate.  Second, even assuming plaintiffs could identify a burdened speech right, the Loan Repayment Limit

would easily pass constitutional scrutiny given that the law limits the risk of corruption and its appearance in narrow circumstances where such concerns are at their zenith.[18]

###### A.  Rational Basis Scrutiny Should Apply to the Loan Repayment Limit Because It Does Not Burden the First Amendment Rights of Candidates, Campaign Committees, or Contributors

Not every transaction made by a candidate or committee involves the exercise of political expression, and so not every transaction by a candidate or committee implicates the First Amendment.  *See, e.g.*, *FEC v. O'Donnell*, 209 F. Supp. 3d 727, 739-40 (D. Del. 2016). Plaintiffs' complaint attempts to get around this reality by characterizing transactions that do not involve speech in a manner that purportedly suggests that they do.  Plaintiffs' complaint states that the Loan Repayment Limit violates the First Amendment because it "restricts political speech of candidates and their campaign committees," while it also "restricts the speech of those potential donors who would otherwise support a candidate financially by contributing after an election to fund pre-election speech."  (Compl. ¶ 3.)  But these generalities, which gloss over the actual mechanics of the Loan Repayment Limit, do not establish that the law restricts the speech rights of either candidates, their committees, or their potential donors.  Rather, the provision merely sets conditions on a candidate having his or her loans repaid, which is not a constitutional right at all.

---

[18]     Plaintiffs' claims challenging Commission regulations in Claims III, IV, and V are similarly insubstantial; however, the Commission need not separately address the insubstantiality of those claims here, since BCRA § 403 reserves three-judge court consideration only for constitutional challenges to BCRA provisions.  *See infra*, Part IV.

### 1.    The Repayment of a Personal Loan Does Not Constitute Political Speech

Where a FECA spending restriction "does not regulate or affect speech or speech-related activities," the law "does not implicate First Amendment concerns" and mere rational basis scrutiny applies.  *O'Donnell*, 209 F. Supp. 3d at 739-40.

In *FEC v. O'Donnell*, the court rejected a First Amendment claim against FECA's provision banning campaigns from spending campaign funds on a candidate's personal use.  *Id.* at 739.  That law prohibits the use of campaign funds to pay expenses that would exist irrespective of the candidate's campaign, such as for a mortgage or clothing.  *Id.*   The court held that heightened scrutiny did not apply to the law even though it limits the ability of a candidate and its committee to spend funds received from campaign contributors.  *Id.*  As the court explained, since the law "does not restrict the content of one's message" or "limit the amount of speech or political activity in which one can engage," the law "does not implicate First Amendment concerns."  *Id.* at 739.  The court therefore upheld the law under rational basis scrutiny.  *Id.*

Like money spent on a candidate's personal use, money that repays a candidate's personal loan after an election effectively goes into the candidate's pocket, and not to fund speech or speech-related activities.  The facts of this case are illustrative.  If the Committee were able to raise an additional $10,000 in post-election contributions to repay Cruz, $5,000 of that amount would replenish "personal bank accounts" and the other $5,000 would satisfy Cruz's obligation on the "margin loan that is secured with CRUZ's personal assets."  (*See* Compl. ¶ 28.) Either way, no political speech is involved.

As a result, plaintiffs are incorrect when they claim that the Loan Repayment Limit restricts political speech by "limiting the time period in which the candidate may raise money to

communicate his or her political message."  (Compl. ¶ 3.)  Again, repaying a candidate so their

personal funds increase is not the communication of a political message.  And it makes little

sense to equate the two because when a candidate raises money *after* an election, by that time

any political message has already been communicated.  For example, if plaintiffs were to obtain

the relief they seek here, the additional post-election contributions they may receive to repay

$10,000 to Cruz would not result in any additional speech; rather, those contributions would be

simply given to Cruz, who could then replenish his own bank account and repay his margin loan.

Plaintiffs would have engaged in the same amount of speech with or without the Loan

Repayment Limit, and they do not allege otherwise in their complaint.[19]

### 2. The Loan Repayment Limit Does Not Impede a Candidate's First Amendment Right to Make Unlimited Personal Expenditures to Pursue a Political Campaign

The Loan Repayment Limit does not "infringe a candidate's 'fundamental . . . right to

spend personal funds for campaign speech,'" as plaintiffs claim.  (*See* Compl. ¶ 3 (quoting

*Davis*, 554 U.S. at 738).)

Dating back to 1976 in *Buckley v. Valeo*, the Supreme Court has established a clear

constitutional line between restrictions on a candidate's use of his or her own money to finance a

campaign, and on a candidate's use of other people's money.  FECA as originally drafted set

"limits on expenditures by a candidate 'from his personal funds, or the personal funds of his

immediate family.'"  *Buckley*, 424 U.S. at 51.  The Court found that this limit on self-funding

was an infringement on a candidate's "First Amendment right to engage in the discussion of

---

[19]     Not only that, but the Complaint contains no allegation that the Committee in fact used
the $260,000 in personal loans it received from Cruz on political speech in the first place. In fact,
the campaign's publicly available campaign finance reports suggest that the Committee did not
use the personal loans at all.  *See supra* at pp. 15-16.

public issues and vigorously and tirelessly to advocate his own election and the election of other candidates." *Id.* at 52. Because *Buckley* also found that this infringement on a candidate's First Amendment rights was not supported by a sufficient government interest, it held that the "restriction on a candidate's personal expenditures is unconstitutional." *Id.* at 54. But at the same time the Supreme Court held that candidates have the right to contribute and spend their own money without limit, it also upheld FECA's individual contribution limits in part because such a contribution limit "entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20.

The Loan Repayment Limit in no way "limit[s] the candidate's ability to lend the campaign necessary funds," as plaintiffs incorrectly allege. (Compl. ¶ 3.) While the Loan Repayment Limit was not yet law at the time of the *Buckley* decision, the analysis in *Buckley* leaves no doubt about its constitutionality. Unlike the candidate expenditure limit struck down in *Buckley*, the Loan Repayment Limit does not infringe on a candidate's ability to spend as much as he or she wants to engage in discussion of issues or on to advocate in an election. Senator Cruz was free to contribute or loan as much money as he wished to the Committee for such speech. The Loan Repayment Limit sets a narrow restriction only on how a campaign may *repay* such loans, and even then, only when such loans exceed $250,000, and even then, only after an election. The Loan Repayment Limit therefore is not even a "marginal restriction" on speech like the contribution limits upheld in *Buckley*, because while individual contributors are limited in the amount they can contribute to a campaign ($2,800 per election), a candidate like Senator Cruz has no such limit on the amount he can contribute or loan. The Loan Repayment Limit therefore does not directly infringe on candidate speech at all.

Effectively conceding that the Loan Repayment Limit places no *actual* limit on a candidate's ability to self-fund a campaign, plaintiffs argue that speech is only "effectively" limited by the Loan Repayment Limit.  (*See* Compl. ¶¶ 3, 7.)  But there is no actual or effective infringement on speech in this case, and plaintiffs' reliance on *Davis v. FEC,* 554 U.S. 724 (2008) and *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 564 U.S. 721 (2011) is misplaced.  *Id.*  Just like the self-funding limit struck down in *Buckley*, both of the cases referenced by plaintiffs involved infringements on speech that are not present in this case.

*Davis* is inapposite here because it involved a BCRA provision that *penalized* candidates for spending their own money in support of their campaigns.  Prior to the enactment of BCRA, limits on contributions by individuals to campaigns were uniform across all races.  *Davis*, 554 U.S. at 728.  The passage of BCRA's "Millionaire's Amendment" changed this, and according to that provision, if a candidate spent more than a certain amount of his or her own personal funds and certain other criteria were met, that candidate's opponent could accept larger individual contributions, while the self-funding candidate's contribution limits would remain the same.  *Id.* at 729.  The Supreme Court struck down these "asymmetrical" limits because they "impose[d] an unprecedented penalty on any candidate who robustly exercises [the] First Amendment right" to self-finance.  *Id.* at 739.  *Davis* explained that a candidate considering self-funding "must shoulder a special and potentially significant burden if they make that choice," because doing so would not only increase his or her quantity of speech, but also that of his or her opponent.  *Id.*

Similarly, *Arizona Free Enterprise* also has no bearing here because, like the law in *Davis*, the Arizona law at issue there also impermissibly imposed an asymmetrical penalty on self-funding candidates.  The Arizona law provided that a candidate accepting public financing would receive additional public monies if his or her privately-financed opponent spent money

31

above a certain threshold.  *Ariz. Free Enter.*, 564 U.S. 728-32.  The Supreme Court struck down

the Arizona law using the same reasoning as it did in *Davis*, citing the "'special and potentially

significant burden'" that a privately financed candidate faced in exercising his or her

constitutional right to spend funds.  *Id.* at 737 (quoting *Davis*, 554 U.S. at 739).

The Loan Repayment Limit imposes no similar penalty on a self-funding candidate.

Although neither of the above cases even mentions the Loan Repayment Limit, plaintiffs assert

that the reasoning in these two cases supports their legal theory.  (Compl. ¶¶ 3, 7.)  But in fact

these cases, consistent with *Buckley*, foreclose plaintiffs' legal theory.  Unlike the provisions at

issue in *Davis* and *Arizona Free Enterprise*, the Loan Repayment Limit is not asymmetrical — it

applies equally to all candidates and grants no special advantages to the opponent of a candidate

who loans money to his or her campaign.  The limit thus does not force candidates into a choice

whether to help an opponent by exercising his or her constitutional rights or forego those rights.

It also does not impermissibly "diminish the effectiveness of [the self-funder's] speech" by

amplifying the speech of the self-funder's opponents.  *Davis*, 554 U.S. at 736.

### 3.     Plaintiffs Fail to Allege that Cruz Desired to Loan Additional Funds or that the Loan Repayment Limit Prevents Campaigns from Amassing Resources for Effective Advocacy

Plaintiffs' claim that the Loan Repayment Limit effectively limits a candidate's ability to

lend his or her campaign necessary funds (Compl. ¶ 3) is further undermined by the absence of

any allegation in the complaint that Cruz himself would have loaned additional funds to his

campaign committee but for the Loan Repayment Limit.[20]  And nor could they because, as

---

[20]     Even if they had made that allegation, the Loan Repayment Limit does not prevent a campaign from repaying a candidate's personal loans in full.  *See* 11 C.F.R. § 116.11(b)(1). Campaigns are free to fully repay personal loans before the election using any of its funds and within 20 days after the election using the campaign's cash on hand as of the day after the election.  *Id.*  The Loan Repayment Limit applies only to a small subset of funds that present the

demonstrated earlier, Cruz's loans were transparently offered in the minimum amounts needed to attempt to manufacture standing. *See supra* pp 15-16.

In any event, plaintiffs' complaint suffers from a more fundamental defect in its hypothetical discussion of candidates loaning less money due to the Loan Repayment Limit. The complaint fails to make the allegation that campaigns will lack sufficient resources, a showing that would be necessary for a violation of First Amendment rights to occur. (*See* Compl. ¶ 3.) "Receiving money *facilitates* speech, to be sure, but a bank account balance becomes speech only when spent for expressive purposes." *Libertarian Nat'l Comm., Inc. v. FEC*, No. 18-5227, 2019 WL 2180336, at *11 (D.C. Cir. May 21, 2019) (en banc). Because the receipt of funds is not in and of itself speech, the Supreme Court has stated that contribution limits only unconstitutionally infringe on speech if they prevent a campaign from "amassing the resources necessary for effective [campaign] advocacy," *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (quoting *Buckley*, 424 U.S. at 21). "That is because contribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Id.* at 248-49 (invalidating limits "amount[ing] to $200 per election per candidate"); *see also Buckley*, 424 U.S. at 21 ("Given the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for

---

highest risk of quid pro quo corruption — those contributed after an election to repay a former candidate's large personal debt. *See id.* §§ 116.11(b)(2)-(3). In fact, plaintiffs in this case lack standing for the very reason that the Loan Repayment Limit did not prevent the Committee from fully repaying Cruz's personal loans. *See supra* p. 17, 19-20.

effective advocacy.")  A law does not unconstitutionally infringe on the First Amendment rights of a campaign merely because it makes it more difficult to raise money.

Yet that is exactly the plaintiffs' theory.  The mere possibility that the Committee might receive less money in loans as a result of the Loan Repayment Limit is not a constitutional infringement.  After all, the Loan Repayment Limit is far from unique in this respect.  Many campaign finance laws that have been upheld by the courts make it more difficult for campaigns to raise money given Congress's important interest in preventing quid pro quo corruption and its appearance.  For example, laws prohibiting campaign contributions from corporations, foreign nationals, and government contractors all make it harder for a campaign to raise funds.  As do individual contribution limits, for example, but those limits are nonetheless constitutional as long as they continue to allow candidates to effectively speak.  *Randall,* 548 U.S. at 248; *Buckley*, 424 U.S. at 21.

Given the millions of dollars raised by the Committee during the 2018 campaign, plaintiffs have understandably not asserted that the Loan Repayment Limit makes it impossible to engage in effective advocacy.  Because the Committee was obviously capable of raising enough money to engage in effective advocacy, the allegation that the Committee's rights could have been infringed if Senator Cruz loaned it less money than he preferred is wholly insubstantial.

### 4.  Potential Contributors Do Not Have a Right to Have Their Contributions Used for Any Specific Purpose

Finally, plaintiffs argue that the Loan Repayment Limit "restricts the speech of those potential donors who would otherwise support a candidate financially by contributing after an election to fund pre-election political speech."  (Compl. ¶¶ 3, 44.)  But this argument also fails to describe an infringement of speech.

The Supreme Court explained in *Buckley* that contributions implicate the First Amendment rights of contributors in two ways.  First, a "contribution serves as a general expression of support for the candidate and his views."  *Buckley*, 424 U.S. at 21.  Second, contributions "serve[] to affiliate a person with a candidate."  *Id.* at 22.  The contributor's expression of support and act of affiliation are complete at the time he or she makes the contribution, and do not depend on what a campaign then does with the money.  *Id.* at 21 ("While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.")

This framework articulated in *Buckley* forecloses plaintiffs' argument.  The Loan Repayment Limit does not prevent any individual from making a contribution, either before or after an election.  Contributors remain entirely free to make "a general expression of support for the candidate and his views" and to "affiliate . . . with a candidate."  *Id.* at 21-22.  But an individual has no constitutional right to direct how her contribution is used after it leaves her hands.  Such spending decisions belong to campaigns, not contributors.  *Holmes*, 875 F.3d at 1167.  So there is no restriction on speech if a contribution that might otherwise be used to repay a candidate's loan is directed to another purpose.  And if an individual chooses not to contribute because he only wants his contribution to be used to repay a candidate's loan, then it is not the Loan Repayment Limit preventing that speech, rather, it is the contributor's own decisionmaking.

### B.    Limiting the Use of Post-Election Contributions to Repay Personal Loans to $250,000 Easily Passes Constitutional Scrutiny

Because the Loan Repayment Restriction does not burden any fundamental right, the Court should apply rational basis review when determining its constitutionality.  *Romer v.*

*Evans,* 517 U.S. 620, 631 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the [law] so long as it bears a rational relation to some legitimate end."); *O'Donnell*, 209 F. Supp. 3d at 740 (applying rational basis to FECA's ban on the personal use of campaign funds because it does not implicate a First Amendment harm).

Under rational basis review, a court is not to judge the "wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993). Instead, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 464 (1981) (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)). Claimants attacking a legislative classification on rational-basis review have the burden "to negative every conceivable basis which might support it." *Beach Commc'ns*, 508 U.S. at 315 (citation and quotation marks omitted). "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993) ("A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970))).

Here, the Loan Repayment Limit so clearly bears a rational relation to a legitimate government end that plaintiffs' claims are wholly insubstantial. The Supreme Court has repeatedly held that the government has not just a legitimate, but an important and even compelling interest in lessening the risk that contributions to candidates and officeholders will result in quid pro quo corruption or its appearance. The Loan Repayment Limit here bears, at the very least, a rational relation to that important interest, given the heightened corruption risks

present when a campaign gives hundreds of thousands of dollars received *after* an election to a

candidate or officeholder who can then essentially pocket those funds and use them for any

purpose.

> **1.     The Government Has Not Just Legitimate, But Important and
> Compelling Interests in Lessening the Risk of Quid Pro Quo
> Corruption and Its Appearance**

Plaintiffs cannot show that the government lacks any legitimate interest to support the

Loan Repayment Limit.  Since the Supreme Court's 1976 ruling in *Buckley*, federal courts have

reaffirmed over and over again that even restrictions on political speech can be justified by the

important governmental interests in preventing quid pro quo corruption or the appearance of quid

pro quo corruption.   For example, in *Buckley*, the Supreme Court upheld, under heightened

scrutiny, FECA's $1,000 per-election limit on contributions by individuals to candidates because

that limit furthered the government's anti-corruption interests.  424 U.S. at 26-27.  As *Buckley*

explained, "'[t]o the extent that large contributions are given to secure a political quid pro quo

from current and potential office holders, the integrity of our system of representative democracy

is undermined." *Id.*

Similarly in 2003, citing the anti-corruption interests, the Supreme Court in *McConnell*

upheld BCRA's ban on national political parties spending any donations they received that were

not subject to FECA's rules regarding permissible amounts and sources of contributions.  540

U.S. at 143 ("Our cases have made clear that the prevention of corruption or its appearance

constitutes a sufficiently important interest to justify political contribution limits.").  In

*McCutcheon*, the opinion of the Court went so far as to note that the interest is "compelling" and

"would satisfy even strict scrutiny." 572 U.S. at 199.  In *O'Donnell*, the district court relied upon

the anti-corruption interests in holding that FECA's ban on campaign funds being spent on

37

personal use passed rational basis scrutiny.   209 F. Supp. 3d at 740-41.  As that court explained,

the personal use ban not only "reduces corruption and promotes public confidence in the

campaign finance and political system," but also has the added benefit of "increas[ing]

participation in the political process by allowing contributors to support a campaign without

worrying that their funds will be converted to personal use."  *Id.* at 740.

These are but a few examples.  For decades, the Supreme Court and other courts have

reiterated that the government's interest in preventing corruption and its appearance is important

enough to sustain even FECA provisions that — unlike the Loan Repayment Limit — burden

political speech and association.  *See, e.g.*, *FEC v. Beaumont*, 539 U.S. 146, 159-60 (2003)

(upholding federal ban on contributions by corporations to candidates); *FEC v. Colo. Repub.

Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001) (upholding federal limits on the amounts that

national political parties could spend in coordination with their candidates on political speech);

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 390 (2000) (upholding state limits on

contributions to candidates); *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 184-85 (1981) (upholding

limits as applied to an association's contributions to a multicandidate political committee);

*Holmes*, 875 F.3d at 1156 (explaining that FECA's contribution limits "aim to prevent the

appearance or actuality of corruption" and that "[*Buckley*] rejected a constitutional challenge to

those ceilings and that holding remains undisturbed"); *Wagner v. FEC*, 793 F.3d 1, 3 (D.C. Cir.

2015) (en banc) (upholding ban on contributions by federal contractors to candidates);

*Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 158-59 (D.D.C.) (three-judge court)

(upholding BCRA's ban on political parties spending donations not subject to FECA where the

party promises not to link its officeholders with the donors), *aff'd*, 561 U.S. 1040 (2010).

Like these provisions, the Loan Repayment Limit's purpose is also to mitigate the heightened risk of quid pro quo corruption and its appearance resulting from campaigns spending contributions they received after an election for the personal benefit of their candidate.  As the sponsor of the Loan Repayment Limit explained, a candidate who incurred personal loans for his campaign should not be able "to get it back from [his or her] constituents under fundraising events that [he or she] would hold and then ask them: How would you like me to vote now that I am a Senator?"  *See* 147 Cong. Rec. S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici); *see also id.* S2537 (daily ed. Mar. 20, 2001) (statement of Sen. Domenici) (''If you incur debt from a personal loan and then you get elected as Senator, and then you go around and say, now I am Senator, I want you to get me money so I can pay back what I used of my own money to run for election.  It is clear in this amendment that you cannot do that in the future.'').

Plaintiffs' complaint suggests that their legal theory claims support from cases such as *Citizens United v. FEC* and *Davis v. FEC*, in which the Supreme Court struck down campaign finance laws as unconstitutional.  (Compl. ¶ 7.)  But the laws in those cases were struck down specifically because they were predicated on interests other than the government's interest in preventing corruption and its appearance.  *See Davis*, 554 U.S.at 740 (striking down law motivated by leveling electoral opportunities for candidates of different wealth rather than being "justified by any governmental interest in eliminating corruption or the perception of corruption"); *Citizens United v. FEC*, 558 U.S. 310, 348 (2010) (holding that infringement on speech could not be justified by an interest in "the corrosive and distorting effects of immense

aggregations of wealth").  By contrast, the Loan Repayment Restriction is motivated by the

legitimate governmental interest in preventing corruption and its appearance.[21]

### 2.    The Loan Repayment Limit Is Rationally Related to the Government's Anti-Corruption Interests and Not Overbroad

Plaintiffs also cannot demonstrate, as they must, that the Loan Repayment Limit is an

irrational means for Congress to address concerns about corruption and its appearance stemming

from campaigns using funds received from contributors after an election to give directly to the

candidate.  Even if there are better means by which Congress could have addressed its anti-

corruption interests, the Loan Repayment Restriction would nonetheless easily pass

constitutional muster under rational basis review.

The Loan Repayment Limit does not restrict political spending.  And courts have

repeatedly held that even laws that do limit political contributions or spending (or even prohibit

certain types of such spending) are not overbroad and are sufficiently tailored to the anti-

corruption interests where those restrictions target the types of contributions or spending most

likely to result in corruption while leaving open other avenues for political speech and

association.  *See, e.g., Buckley*, 424 U.S. at 28, 29, 33-35 (contribution limits closely drawn to

anticorruption interests because they focus on "the narrow aspect of political association where

the actuality and potential for corruption have been identified").

For two reasons, the Loan Repayment Limit is tailored to apply in situations when the

strength of the government's already important interests are at their peak.  First, the limit applies

where a campaign has spent hundreds of thousands of dollars received *after* an election, at a time

---

[21]    As a result, even if the Court were to find that the provision infringes on political speech and applied heightened scrutiny, the law would nonetheless be constitutional under the long line of cases identifying the prevention of corruption and its appearance as not just legitimate, but important and compelling government interests.

when the winner is already known and thus in a better position than a mere candidate to

guarantee legislative favors to big donors.  Second, the Loan Repayment Limit applies to funds

given by a campaign to a candidate or officeholder who can then essentially pocket those funds

and use them for any purpose.

Given these two aspects of the Loan Repayment Limit, in the absence of the provision, an

individual interested in obtaining legislative favor with a newly elected Senator or

Representative could give up to a total of $5,600 ($2,800 for the primary and general elections)

that would go directly into the pocket of that officeholder.  Even when used for campaign-related

purposes, large contributions that are "given to secure a political quid pro quo from current and

potential office holders" undermine the "integrity of our system of representative democracy."

*Buckley*, 424 U.S. at 26-27.  That system is threatened even further when federal candidates use

contributions to subsidize their own personal expenses.  At the very least, it *appears* corrupt to

the public when candidates use contributions for their personal projects.  And as the Supreme

Court has explained, "the avoidance of the appearance" of corruption is "critical" to prevent the

public's "confidence in the system of representative Government" from being "eroded to a

disastrous extent."   *Buckley*, 424 U.S. at 27 (internal quotation marks omitted).[22]

---

[22]     In other contexts, the law recognizes the particular danger of elected officials receiving funds that they can use for any purpose from constituents.  Giving something of value to a public official for the purpose of influencing an official act under other circumstances constitutes bribery.  18 U.S.C. § 201(b)(1).  Similarly, the Senate Ethics Rules prohibit Senators from receiving gifts over $50, and limit the total amount of gifts a Senator may receive in an entire year to $100.  *See* The Senate Code of Official Conduct, Select Committee on Ethics (March 2015), Rule XXXV(2)(A), https://www.ethics.senate.gov/public/index.cfm/files/ serve?File_id=EFA7BF74-4A50-46A5-BB6F-B8D26B9755BF (last visited on June 5, 2019).  The Loan Repayment Restriction is another means by which such quid pro quo corruption and its appearance are diminished.

The Loan Repayment Limit is well-tailored for the additional reason that it does not restrict *any* avenues for independent political speech by candidates and campaign committees, or for contributions by candidate supporters.  *See supra* pp. 29-35.  Nor does the Loan Repayment Limit prevent campaigns from repaying candidate personal loans *in full* by using any funds before an election or by using their election-day cash on hand within 20 day of the election.  *See supra* pp. 6-7.

Finally, the Loan Repayment Limit is not overbroad because it applies equally to all candidates, including candidates who lost an election, as plaintiffs claim (*see* Compl.¶ 40).  As previously discussed, the Loan Repayment Limit does not infringe on speech, and the overbreadth doctrine would only be applicable if the First Amendment were implicated.  *See O'Donnell*, 209 F. Supp. 3d at 740 (rejecting overbreadth challenge against the personal-use ban because defendants "fail to identify *even one* fact pattern in which a prohibited expense would interfere with political speech").  But even if the Court finds some infringement of speech, "the overbreadth doctrine is not casually employed."  *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39-40 (1999).  To strike down a statute for being overbroad, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

Any overbreadth of the Loan Repayment Restriction would be insubstantial in relation to its legitimate sweep.  First, the statute's "plainly legitimate sweep" includes application to winning candidates and is thus extensive.  *Broadrick*, 413 U.S. at 615.  Though both winning and losing candidates carry debt from personal loans, winning candidates do possess a greater capacity to retire that debt through payment from contributions over time.  *See, e.g.*, Peter Overby, *How Will Clinton Resolve Campaign Debt?*, National Public Radio (May 14, 2018, 6:00

AM), https://www.npr.org/templates/story/story.php?storyId=90425733 (noting the comment of a former FEC Commissioner and counsel to a losing presidential campaign that "only winners have an easy time dealing with debt" and that debt retirement in the context of those not taking office "'is the hardest task in American politics'").

But even so, winning candidates do not mark the full extent of the Loan Repayment Limit's legitimate sweep, because incumbent candidates that lose are still officeholders for some time after their loss and other candidates who lose an election may be elected to federal office in the future.[23]  In any case, courts have repeatedly upheld FECA restrictions that apply to *all* candidates against overbreadth challenges, even if the justification applied more to some candidates than others.  *Buckley*, 424 U.S. at 29 (even though "most large contributors do not seek improper influence over a candidate's position or an officeholder's action," it is nonetheless justified as a "prophylactic" to limit the *risk* and *appearance* of corruption arising inherently from large contributions because it is "difficult to isolate suspect contributions"); *McConnell*, 540 U.S. at 158-59 (restrictions on minor parties closely drawn despite unlikelihood of success because "[i]t is . . . reasonable to require that all parties and candidates follow the same set of rules designed to protect the integrity of the electoral process."); *Libertarian Nat'l Comm.*, 2019 WL 2180336 at *6 ("Because the First Amendment does not require Congress to ignore the fact that candidates, donors, and parties test the limits of the current law, prophylactic contribution limits are permissible — even vital — to forestall the worst forms of political corruption." (internal quotation marks and citations omitted)).

---

[23]    The number of losing candidates who will never hold federal office to whom the Loan Repayment Restriction could apply is lessened even further by the fact that a substantial number of candidates for federal office are either not able to loan their campaign $250,000 or not able to raise $250,000 in campaign contributions.

Indeed, if the Loan Repayment Limit did only apply to winning candidates, it would risk creating the very type of "asymmetrical" limit that the Supreme Court condemned in *Davis*, the primary case upon which plaintiffs' rely.  And such a law would be administratively problematic for candidates, because a candidate deciding to loan his or her campaign money in advance of the election would not be able to accurately determine the likelihood he or she might be repaid. *Cf. O'Donnell*, 209 F. Supp. 3d at 740-41 (suggesting that under rational basis review, the personal-use ban's application to expenses "almost always personal in nature" would be constitutional even if justified only by "administrative efficiency").

Because plaintiffs have failed to identify any legitimate constitutional rights that are being infringed, and because plaintiffs cannot show that the Loan Repayment Limit fails to rationally serve government's legitimate interest in diminishing quid pro quo corruption and its appearance, the Court should deny plaintiffs' application for a three-judge court for failure to present a substantial question.

## IV.  BECAUSE A THREE-JUDGE COURT COULD NOT INVALIDATE FEC REGULATIONS, THE APPLICATION SHOULD BE DENIED AS TO COUNTS III, IV AND V

The Plaintiffs' last three claims for relief all seek to invalidate the Commission's regulation at 11 C.F.R. § 116.11, rather than the Loan Repayment Limit in the statute.  (Compl. ¶ 46 (claiming regulation is unconstitutional in its entirety); *id.* ¶ 48 (claiming 20-day limit in regulation is unconstitutional and unlawful under the APA); *id.* ¶ 51 (claiming that the regulation's definition of "personal funds" is unlawful under the APA).  But because these "alleged constitutional infirmities are found in the implementing regulations rather than the statute itself," *McConnell*, 540 U.S. at 223, these constitutional claims cannot be heard by a three-judge court.  Nor can the APA challenges to the Commission's regulations be brought

before a three-judge court, because BCRA only provides for three-judge court jurisdiction for actions challenging "the constitutionality of *any provision* of this Act or *any amendment* made by this Act." BCRA § 403(a) (emphases added). The district court in *McConnell* held that the plaintiffs' challenges to FEC regulations were unripe and that the proper venue to challenge them was a single-judge court under the Administrative Procedure Act, rather than in a three-judge court. *McConnell v. FEC*, 251 F. Supp. 2d 176, 264 (D.D.C. 2003). The Supreme Court affirmed this point: "As the District Court explained, issues concerning the regulations are not appropriately raised in this facial challenge to BCRA, but must be pursued in a separate proceeding." 540 U.S. at 223. Because a three-judge court would "lack[] the jurisdiction to rule on the regulations," *McConnell*, 251 F. Supp. 2d at 264, this Court should deny plaintiffs' request for a three-judge court "insofar as it requests that a three-judge court hear its claim[s] that [the regulations are] unconstitutional," *Bluman*, 766 F. Supp. 2d at 4.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' application for a three-judge court and dismiss the case.

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

Kevin Deeley
Associate General Counsel
kdeeley@fec.gov

Harry J. Summers
Assistant General Counsel
hsummers@fec.gov

June 7, 2019

Kevin P. Hancock
Acting Assistant General Counsel
khancock@fec.gov

*/s/ Seth Nesin*
Seth Nesin
Attorney
snesin@fec.gov

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
1050 First Street, N.E.
Washington, DC 20463
(202) 694-1650