**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TED CRUZ FOR SENATE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-908-APM |
| | ) | |
| FEDERAL ELECTION COMMISSION, *et al.,* | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
APPLICATION FOR A THREE-JUDGE COURT AND
RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

Chris Gober
  (D.C. Bar No. 975981)
The Gober Group PLLC
3595 RR 620 S., Suite 200
Austin, TX 78738
  (512) 354-1787

Charles J. Cooper
  (D.C. Bar No. 248070)
John D. Ohlendorf
  (DC Bar. No. 1024544)
J. Joel Alicea
  (D.C. Bar. No. 1022784)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (facsimile)
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

June 28, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

I.     Section 304's Limit on the Repayment of Personal Loans. ................................ 4

II.    Senator Cruz's 2018 Loans. ................................................................................ 6

III.   Procedural History. ............................................................................................. 7

ARGUMENT ...................................................................................................................... 8

I.     Section 403 of BCRA Requires the Court To Convene a Three-Judge Court
       Immediately, Before Deciding Defendants' Challenge to Plaintiffs' Standing. ... 8

       A.    Section 403 Requires That Defendants' Standing Challenge Must Be
             Decided by a Three-Judge Court. ............................................................. 8

       B.    Plaintiffs' Constitutional Challenge to Section 304 Is Plainly
             Substantial. ............................................................................................... 14

       C.    The Jurisdiction of the Three-Judge Court Required by Section 403
             Extends to Plaintiffs' Challenge to FEC's Implementing Regulations. ... 29

II.    In Any Event, Defendants' Challenge to Plaintiffs' Standing Fails. ................ 32

       A.    Plaintiffs' Injuries Are Not Self-Inflicted. ............................................... 32

       B.    Plaintiffs Have Standing To Bring Their Overbreadth Claim. ................. 44

CONCLUSION ....................................................................................................................

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                      **<u>Page</u>**

*Adams v. Clinton*, 40 F. Supp. 2d 1 (D.D.C. 1999) ......................................................31

*Afifi v. Lynch*, 101 F. Supp. 3d 90 (D.D.C. 2015)........................................................44

*Alabama v. Bozeman*, 533 U.S. 146 (2001).................................................................9

*\*Allee v. Medrano*, 416 U.S. 802 (1974) .............................................................30, 31

*\*Allen v. Wright*, 468 U.S. 737 (1984) .......................................................................35

*\*Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004).....................................15, 18, 26, 28

*\*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011)....................................................................16, 22, 23, 24, 25

*Arizona v. Holder*, 839 F. Supp. 2d 36 (D.D.C. 2012) ...............................................31

*Becker v. FEC*, 230 F.3d 381 (1st Cir. 2000) .............................................................38

*Bell v. Hood*, 327 U.S. 678 (1946)..............................................................................14

*Bluman v. FEC*, 766 F. Supp. 2d 1 (D.D.C. 2011) ....................................................32

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)............................................................44

*Brown v. Board of Educ.*, 347 U.S. 483 (1954) ..........................................................35

*\*Buckley v. Valeo*, 424 U.S. 1 (1976)..............................3, 4, 16, 17, 19, 20, 22, 25, 29

*Camreta v. Greene*, 563 U.S. 692 (2011) ....................................................13, 30, 32

*\*City of Jersey City v. Consol. Rail Corp.*, 668 F.3d 741 (D.C. Cir. 2012) ............38, 39

*City of Jersey City v. Consol. Rail Corp.*, 741 F. Supp. 2d 131 (D.D.C. 2010) .........39

*City of Rome, Ga. v. United States*, 472 F. Supp. 221 (D.D.C. 1979).........................31

*Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604 (1996)...............23

*\*Davis v. FEC*, 554 U.S. 724 (2008) ..............................................16, 17, 19, 21, 24, 25

*Dombrowski v. Pfister*, 380 U.S. 479 (1965)...............................................................44

*Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136 (D.C. Cir. 2011) ....................34

*Evers v. Dwyer*, 358 U.S. 202 (1958).........................................................................36

*Ex parte Poresky*, 290 U.S. 30 (1933) .......................................................................12

*Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994).......................................................................36

*FEC v. O'Donnell*, 209 F. Supp. 3d 727 (D. Del. 2016) .......................................19, 20

*Gonzalez v. Automatic Emps. Credit Union*, 419 U.S. 90 (1974).........................12, 13

*Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012) ................................34, 43

*\*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......................................34, 36

*Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989) ........................34

*Huron v. Berry*, 12 F. Supp. 3d 46 (D.D.C. 2013)...................................................................42, 43

*In re Sealed Case*, 838 F.2d 476 (D.C. Cir.)...................................................................................30

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
    2019 WL 2552955 (D.C. Cir. June 21, 2019)............................................................................33

*Independence Inst. v. FEC*, 816 F.3d 113 (D.C. Cir. 2016) ..............................................13, 14, 15

*Independence Inst. v. FEC*, 216 F. Supp. 3d 176 (D.D.C. 2016) ...................................................15

*J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600 (D.C. Cir. 1996)..........................................36

*Kuehl v. Sellner*, 887 F.3d 845 (8th Cir. 2018)..............................................................................35

*\*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) ......................................................................41

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)................................9

*Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533 (D.C. Cir. 2019) ............................23, 39, 40

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .....................................................................32

*McConnell v. FEC*, 540 U.S. 93 (2003).........................................................................29, 32, 43

*\*McCutcheon v. FEC*, 572 U.S. 185 (2014).................................................................20, 23, 26, 28

*Meese v. Keene*, 481 U.S. 465 (1987).............................................................................................41

*NAACP v. New York*, 413 U.S. 345 (1973).....................................................................................10

*National Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*,
    468 F.3d 826 (D.C. Cir. 2006)..............................................................................................41, 42

*Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433 (D.C. Cir. 1989) ....................................34, 43

*Randall v. Sorrell*, 548 U.S. 230 (2006) ........................................................................................25

*Reuss v. Balles*, 584 F.2d 461 (D.C. Cir. 1978).............................................................................12

*Rosado v. Wyman*, 397 U.S. 397 (1970)........................................................................................10

*Rufer v. FEC*, 64 F. Supp. 3d 195 (D.D.C. 2014)..........................................................................13

*San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306 (9th Cir. 1981).................................30

*SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ...........................................................................30

*\*Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984)............................44, 45

*\*Shapiro v. McManus*, 136 S. Ct. 450 (2015) ......................................................................14, 15, 29

*Stop This Insanity Inc. Emp. Leadership Fund v. FEC*, 761 F.3d 10 (D.C. Cir. 2014)................43

*Turner Broad. System, Inc. v. FCC*, 810 F. Supp. 1308 (D.D.C. 1992) .......................................30

*United States v. Supreme Court of New Mexico*, 839 F.3d 888 (10th Cir. 2016)........................40

*Warth v. Seldin*, 422 U.S. 490 (1975).............................................................................................35

**Legislative and Administrative Materials**

28 U.S.C.
    § 1253 (1970) .................................................................................................................13
    § 1367 ...........................................................................................................................31
    § 2281 (1970) .................................................................................................................11
    § 2284(b) .....................................................................................................................7, 8

47 U.S.C. § 555 ...................................................................................................................10

52 U.S.C.
    § 10101(g) .....................................................................................................................10
    § 30109(a)(5)(A) .............................................................................................................6
    § 30109(a)(5)(B) .............................................................................................................6
    § 30109(d)(1)(A) .............................................................................................................6
    § 30110 ...........................................................................................................................11
    § 30110 note ........................................................................1, 7, 8, 9, 10, 12, 29, 30
    § 30116(a) .....................................................................................................................26
    § 30116(j) .........................................................................................1, 4, 6, 20, 27

S.J. Res. 46, 110th Cong., 122 Stat. 5036, Sec. 1(b)(2) (2008) ...........................11, 30

147 CONG REC.
    S2459 (daily ed. Mar. 19, 2001) (statement of Sen. Feinstein) ...........................4
    S2460 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) ......................4, 5
    S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin) .......................5, 24
    S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) .........................5
    S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin) .............................5
    S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine) .......................4, 24
    S2464 (daily ed. Mar. 19, 2001) (statement of Sen. Sessions) ...........................5
    S2465 (daily ed. Mar. 19, 2001) (statement of Sen. Dodd) ..............................24
    S2465 (daily ed. Mar. 19, 2001) (statement of Sen. Sessions) ...........................5
    S2538 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine) ...........................5
    S2540 (daily ed. Mar. 20, 2001) (statement of Sen. McCain) .........................25
    S2540 (daily ed. Mar. 20, 2001) (statement of Sen. Durbin) .............................5
    S2544 (daily ed. Mar. 20, 2001) (statement of Sen. Daschle) ........................24
    S2548 (daily ed. Mar. 20, 2001) (statement of Sen. Levin) .............................24
    S2852 (daily ed. Mar. 26, 2001) (statement of Sen. Reid) .......................24, 25

148 CONG. REC. S2142 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold) ....................1, 10

11 C.F.R.
    § 100.110(a) .................................................................................................................17
    § 100.111 .......................................................................................................................17
    § 100.142 .......................................................................................................................17
    § 100.143 .......................................................................................................................17
    § 110.1(b)(3) .................................................................................................................23
    § 110.1(b)(3)(i) ..........................................................................................................4, 6
    § 110.1(b)(3)(ii)(C) ....................................................................................................23
    § 110.1(b)(3)(iii) .........................................................................................................26

§ 116.11.............................................................................................................5, 20
§ 116.11(b)................................................................................................................20
§ 116.11(b)(1)...........................................................................................................27

§ 116.11(a).................................................................................................................6
§ 116.11(c)..............................................................................................................5, 6
§ 116.11(c)(2).............................................................................................................6

## **Other Authorities**

Brief for Appellee, *Davis v. FEC*, 2008 WL 742921 (Mar. 19, 2008)...........................18

*Campaign Finance Data: Candidates 2020*, FEC, https://bit.ly/2EAEJIM
    (last accessed June 27, 2019)................................................................................29

Michael E. Solimine, *The Fall and Rise of Specialized Federal Constitutional Courts*,
    17 U. Pa. J. Const. L. 115 (2014)..........................................................................11

Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. (3d ed.)......................9, 34, 36

# INTRODUCTION

When Congress enacted the Bipartisan Campaign Reform Act of 2002 ("BCRA"), it recognized that it was legislating in an area that implicated the most fundamental First Amendment rights of free political expression, and that the controversial new rules it was imposing would thus be subject to constitutional challenge in the courts. Accordingly, to ensure "expedited judicial review" of such challenges, 148 CONG. REC. S2142 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold), Congress established a special procedure to govern them: under Section 403 of the Act, "[i]f any action is brought for declaratory or injunctive relief to challenge the constitutionality of any provision of this Act[,] . . . [t]he action shall be filed in the United States District Court for the District of Columbia and shall be heard by a 3-judge court convened pursuant to [28 U.S.C.] section 2284." 52 U.S.C. § 30110 note. The terms of the specialized judicial-review provision are both expansive and unyielding. They apply to "*any* action" challenging the constitutionality of BCRA, not just some of them; they govern the determination of the "action" *as a whole*, not just particular claims, motions, or remedies it may encompass; and they provide that when any such action is brought, it "*shall* be heard by a 3-judge court," not that such a body may be convened as a discretionary matter. *Id.* (emphases added).

This action falls four-square within this provision's terms. Plaintiffs—Senator Cruz and his authorized campaign committee ("Cruz Committee")—"challeng[e] the constitutionality" of a "provision of th[e] Act": Section 304's $250,000 limit on the use of post-election campaign contributions to repay loans a candidate makes to his campaign. *See* 52 U.S.C. § 30116(j). Under the unambiguous text of Section 403, that is the end of the inquiry. The matter really is as simple as we described in our initial Application for a Three-Judge Court: this is an action challenging the constitutionality of a provision of BCRA, so a three-judge court must be convened. Period.

Defendants—the Federal Election Commission and its members ("FEC")—ask this Court to engraft a series of exceptions onto Section 403's exceptionless text. First, they maintain that a single judge can decline to convene a three-judge court under BCRA if there is no subject matter jurisdiction and that there is no jurisdiction here because Plaintiffs lack standing. That qualification appears nowhere in Section 403 and is, in fact, flatly contrary to it: Section 403 requires a three-judge court to hear and determine the "action" as a whole, and a pretrial motion to dismiss under Rule 12(b)(1) is indisputably part of that "action." To be sure, there are *other* three-judge court provisions—such as the statutes that once required three-judge-court adjudication of any motion for an injunction restraining an unconstitutional federal or state statute—that are drawn less broadly, and those provisions can and have been read as allowing a single-judge to make a threshold jurisdictional determination. But Section 403's text is dispositively different, so the Supreme Court and D.C. Circuit precedents cited by the FEC—all of which interpreted and applied these other, textually distinct three-judge court provisions—are inapposite. And while a few previous decisions of this Court have adopted Defendants' jurisdiction exception in the BCRA context, those cases are non-binding, and they did not consider the textual features of BCRA that make it distinct, so they are not persuasive.

Even if this Court, sitting as a single judge, *could* resolve Defendants' standing challenge, Plaintiffs clearly have standing. The Government does not dispute that Senator Cruz has been injured by Section 304; rather, it asserts his injury is self-inflicted because he made his loan to the campaign the day before the election. But this reasoning contradicts basic principles of standing doctrine established in landmark civil rights cases. The FEC also asserts that Senator Cruz and the Cruz Committee inflicted their injuries on themselves because they could have arranged to repay the Senator's loans using pre-election funds. Yes, and Rosa Parks could have sat in the back of the

bus. FEC's argument essentially faults Plaintiffs for not forfeiting the very constitutional right they seek to vindicate in this litigation. The Supreme Court and the D.C. Circuit have rejected arguments just like the ones the FEC makes here, and this Court should do the same.

Finally, the FEC's premature attempt to obtain a victory on the merits also fails. The Supreme Court and D.C. Circuit have time and again reminded the lower courts that a single judge can decline to convene a three-judge court by resolving the merits of the case only if the claims are wholly insubstantial, obviously frivolous, and essentially fictitious. The First Amendment claims alleged in the complaint challenge a restriction on the right of a candidate to use his own money "without legislative limit on behalf of his own candidacy." *Buckley v. Valeo*, 424 U.S. 1, 54 (1976). Section 304 plainly burdens this core First Amendment right, by restricting the pools of funds that a campaign committee may use to pay off the candidate's loans and thereby necessarily diminishing, in the FEC's own words, "the likelihood he or she might be repaid." Def. FEC's Opp'n to Pls.' Appl. for a Three-Judge Ct. & Mot. to Dismiss at 44 (June 7, 2019), Doc. 26 ("MTD Br."). And an increase in the risk of repayment likewise necessarily diminishes the likelihood that such a loan, and the core political speech it would have funded, will be made in the first place. Section 304 thus cannot survive judicial scrutiny, for the governmental interest it *actually* was designed to advance (levelling the playing field between wealthy and non-wealthy candidates) is flatly impermissible, and the sanitized interest the FEC has conjured up to justify it in this litigation (curbing *quid pro quo* corruption) is in reality *impeded* by Section 304's limits. The FEC's request that this Court adjudicate *the merits* of this case before convening a three-judge court is thus flatly contrary to binding Supreme Court and D.C. Circuit precedent.

Defendants' motion to dismiss must be denied, and a three-judge court convened immediately.

# BACKGROUND

## I.    Section 304's Limit on the Repayment of Personal Loans.

Federal law generally allows a federal candidate's authorized campaign committee to use money contributed *after* an election to pay the debts that it incurred *before* the election in connection with the campaign and that remain outstanding after Election Day. *See* 11 C.F.R. § 110.1(b)(3)(i). And ever since the landmark decision in *Buckley v. Valeo*, it has been a foundational principle of campaign finance law that a candidate may spend unlimited amounts of his own money in support of his own campaign for election: "the First Amendment simply cannot tolerate [a legal] restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy." 424 U.S. at 54. The provisions challenged in this lawsuit lie at the intersection of these two legal rules. Adopted as part of the "Millionaire's Amendment" designed to "level the playing field" between self-funding candidates and their non-self-funding opponents, Section 304 of BCRA imposes a $250,000 limit on a committee's ability to use funds contributed after the election to repay loans made by the candidate to support his campaign.

> Any candidate who incurs personal loans made after the effective date of the Bipartisan Campaign Reform Act of 2002 in connection with the candidate's campaign for election shall not repay (directly or indirectly), to the extent such loans exceed $250,000, such loans from any contributions made to such candidate or any authorized committee of such candidate after the date of such election.

52 U.S.C. § 30116(j).

The legislative history of BCRA leaves little doubt that the purpose of the Millionaire's Amendment was to "level the playing field" between wealthy and non-wealthy candidates. 147 CONG. REC. S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine). Indeed, the congressional debate over the provision is *replete* with statements making that point clear. *See, e.g.*, *id.* at S2459 (statement of Sen. Feinstein) (amendment was "an attempt to level the playing

field."); *id.* at 2460 (statement of Sen. Domenici) (same); *id.* at S2464 (statement of Sen. Sessions) (same); *Id.* at S2540 (daily ed. Mar. 20, 2001) (statement of Sen. Durbin) (same).

This was not simply the purpose of the Millionaire's Amendment as a whole: it was the purpose of *the loan-repayment limit in particular*. The debate over the Amendment *did not distinguish* between wealthy candidates *spending* money and *loaning it*, because, as its sponsors noted, "a lot of people who are very wealthy do not give money to their campaign; they loan it and say they will be repaid later." 147 CONG. REC. S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin); *see also id.* at S2462 (statement of Sen. Durbin) ("Think about what this institution will become if that is what one of the rules is to be part of the game: That you have to be loaning or contributing literally millions of dollars in order to be a candidate for public office."); *id.* at S2465 (statement of Sen. Sessions) (amendment "prohibits wealthy candidates, who incur personal loans in connection with their campaign that exceed $250,000, from repaying those loans from any contributions made to the candidate."); *id.* at S2462 (statement of Sen. Domenici) ("it should be a condition to your putting up your own money, knowing right up front you are not going to get it back from your constituents"). Accordingly, as one co-sponsor made clear, the repayment limit for "personal loans or property used for collateral for a loan to the campaign" was merely a part of the Amendment's effort to "create greater fairness and accountability in the Federal election process by addressing the inequity that arises when a wealthy candidate pays for his or her campaign with personal funds." 147 CONG REC. S2538 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine).

FEC has promulgated regulations implementing Section 304's loan-repayment limit. *See* 11. C.F.R. § 116.11. When "the aggregate outstanding balance of the personal loans exceeds $250,000 after the election," the FEC's regulations establish a 20-day post-election limit on a campaign committee's ability to use cash on hand as of the date of the election to repay pre-election

candidate loans. *Id.* § 116.11(c). Any balance in excess of the $250,000 cap after the 20-day period cannot be repaid; it must be treated "as a contribution by the candidate." *Id.* § 116.11(c)(2). And the FEC's regulations differ in one important respect from the requirements of BCRA. While the text of Section 304 reaches only personal loans that a candidate "*incurs*" in connection with his campaign, 52 U.S.C. § 30116(j) (emphasis added), the FEC's regulation applies not only to loans *incurred* by the candidate for the benefit of his campaign, but also to loans that a candidate *makes* directly to the campaign from his personal funds. *See* 11 C.F.R. § 116.11(a).

The penalties for violating the $250,000 limit found in BCRA and Section 116.11 are serious, including both civil and criminal penalties. *See* 52 U.S.C. §§ 30109(a)(5)(A); 30109(a)(5)(B); 30109(d)(1)(A).

## II.    Senator Cruz's 2018 Loans.

BCRA's $250,000 limit, as implemented by Section 116.11, has had a direct and adverse effect on Plaintiffs, burdening their right to engage in core political speech and forcing Senator Cruz to forego repayment of $10,000 of personal loans made to support his campaign.

Prior to the November 6, 2018 election, Senator Cruz made or incurred two loans totaling $260,000 to the Cruz Committee to help finance his reelection campaign for the United States Senate: a $5,000 loan that Senator Cruz made from his personal bank accounts and a $255,000 margin loan that Senator Cruz incurred for the benefit of the campaign and that is secured with his personal assets. Compl. ¶ 28 (Apr. 1, 2019), Doc. 1 ("Compl."). At the end of November 6, the Cruz Committee did not have sufficient funds to both repay these loans and satisfy the nearly $2.5 million in debts it incurred to other creditors in connection with the election—in fact, it ended the election with approximately $406,194 in "net debts outstanding," as defined in 11 C.F.R. § 110.1(b)(3)(i). Compl. ¶ 29. Accordingly, during the 20 days following the election, it used its cash on hand to satisfy debts to other creditors rather than repay Senator Cruz's loans. *Id.* Only in

6

December—well after the 20-day deadline—did the Committee begin to repay Senator Cruz's personal loans. Compl. ¶ 30. And since by then Plaintiffs were bound by Section 304's limit, the Committee could repay only $250,000 of the margin loan, leaving a total of $10,000 ($5,000 of the margin loan and the $5,000 loan from Senator Cruz's own bank accounts) unpaid. Compl. ¶¶ 30–31.

## III.   Procedural History.

Plaintiffs brought suit on April 1, 2019, challenging both Section 304 of BCRA and 11 C.F.R § 116.11, as unconstitutional and unlawful. Because Plaintiffs' complaint includes a constitutional challenge to a provision of BCRA, Plaintiffs simultaneously filed an application for the convening of a three-judge court pursuant to Section 403 of BCRA, which provides:

> If any action is brought for declaratory or injunctive relief to challenge the constitutionality of any provision of this Act or any amendment made by this Act . . . , the following rules shall apply:
>
> > (1)  The action shall be filed in the United States District Court for the District of Columbia and shall be heard by a 3-judge court convened pursuant to section 2284 of title 28, United States Code.
> >
> > . . . .
> >
> > (3)  A final decision in the action shall be reviewable only by appeal directly to the Supreme Court of the United States. . . .
> >
> > (4)  It shall be the duty of the United States District Court for the District of Columbia and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of the action and appeal.

52 U.S.C. § 30110 note. 28 U.S.C. Section 2284, in turn, provides:

> In any action required to be heard and determined by a district court of three judges . . . , the composition and procedure of the court shall be as follows:
>
> > (1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. . . .

28 U.S.C. § 2284(b).

On June 7, FEC filed a response to our application and a cross-motion to dismiss the case.

## ARGUMENT

The FEC raises essentially three arguments in support of its request that this Court dismiss some or all of our claims without convening a three-judge court. First, it contends that both Senator Cruz and the Committee lack standing to challenge Section 304 because the injuries they have suffered are "self-inflicted." Second, FEC maintains that the merits of our claims are so entirely frivolous and insubstantial that they fall outside the bounds of BCRA's three-judge-court requirement. And third, it argues that our challenge to its regulations implementing Section 304 is beyond the jurisdiction of a three-judge court. None of these arguments has merit.

The root difficulty is that BCRA's three-judge court requirement, in plain English, unequivocally instructs that when an "action" is brought challenging one of the Act's provisions, the entire "action" "*shall* be heard by a 3-judge court." 52 U.S.C. § 30110 note (emphasis added). Because Defendants' pre-trial motion to dismiss this "action" is plainly a part of this "action," it is three-judge business, not single-judge business. The FEC's argument that the merits of our claims are so insubstantial as to escape BCRA's mandatory three-judge court requirement is itself frivolous. Finally, *even if* the FEC's challenge to our standing were properly before this single-judge Court (and it is not), its motion to dismiss would *still* fail, for both Plaintiffs have standing to vindicate their own First Amendment rights and to challenge BCRA's overbroad restrictions.

I.  **Section 403 of BCRA Requires the Court To Convene a Three-Judge Court Immediately, Before Deciding Defendants' Challenge to Plaintiffs' Standing.**

   A. **Section 403 Requires That Defendants' Standing Challenge Must Be Decided by a Three-Judge Court.**

Section 403 of BCRA describes, in certain and unequivocal terms, what is to happen when an action, like this one, is "brought for declaratory or injunctive relief to challenge the

8

constitutionality of any provision of this Act." 52 U.S.C. § 30110 note. The action is to be "filed in the United States District Court for the District of Columbia *and shall be heard by a 3-judge court* convened pursuant to Section 2284 of title 28, United States Code." *Id.* (emphasis added). Section 403 does not say that such an action "may" be heard by a three-judge court, or that a three-judge court should be convened "in some cases." Nor does it say that only particular *issues or motions* are the business of all three judges. No, Congress has instructed that when a constitutional challenge to BCRA is filed, the entire "action" "*shall* be heard by a 3-judge court." *Id.* (emphasis added). As the Supreme Court has repeatedly held, "the word 'shall' is ordinarily the language of command," *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001), an unambiguous word that "normally creates an obligation impervious to judicial discretion," *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 27 (1998). And Section 403 itself creates no exceptions to its overriding command that an action such as this one "shall be heard by a 3-judge court." 52 U.S.C. § 30110 note.

The unyielding nature of Section 403's instruction that a three-judge court *shall* be convened accords with Congress's core purpose in subjecting actions like this one to the jurisdiction of a three-judge court. Congress has generally reserved the three-judge-court process for issues of great, national importance, 17A WRIGHT & MILLER, FED. PRAC. & PROC. § 4235 (3d ed.)—a description that perfectly captures the core First Amendment rights at stake in litigation over the constitutionality of BCRA. Further, as Senator Feingold, co-sponsor of BCRA, explained on the eve of the statute's passage, Congress thought adjudication in a three-judge district court— with direct, mandatory appellate review by the Supreme Court—was particularly essential in this context so that the severe constitutional doubts many in Congress harbored about several of

BCRA's restrictions could be resolved as swiftly as possible through an "expedited judicial review process." 148 CONG. REC. S2142 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold).

The FEC argues that the Court should "narrowly construe" Section 403, to further the "overriding policy of minimizing the mandatory docket of the Supreme Court." MTD Br. 12 (ellipses and brackets omitted)). But even assuming that such a policy exists, that policy has no application here, because under the plain language of Section 403, the Supreme Court will have mandatory, direct appellate jurisdiction in this case *regardless* of whether a three-judge court is convened. BCRA provides that "[i]f any action is brought for declaratory or injunctive relief to challenge the constitutionality of any provision of this Act," then "[a] final decision in the action shall be reviewable only by appeal directly to the Supreme Court of the United States." 52 U.S.C. § 30110 note. In contrast to other three-judge court provisions, *see, e.g.*, 47 U.S.C. § 555; 52 U.S.C. § 10101(g), BCRA *nowhere* conditions the existence of mandatory appellate jurisdiction in the Supreme Court on the actual convening of, or decision by, a three-judge court. The Supreme Court thus has direct appellate jurisdiction over this case regardless of how this Court rules on the pending cross-motions. *Cf. NAACP v. New York*, 413 U.S. 345, 353–54 (1973) (Voting Rights Act's three-judge-court appeal provision was "subject to broad construction" and encompassed "any meaningful judicial determination made in the progress of the . . . lawsuit").

To be sure, if Plaintiffs do not have standing, then the three-judge court, like this Court, will lack subject-matter jurisdiction over the case. But the question at this stage in the proceedings is not *whether jurisdiction exists*, but rather *which court decides* whether jurisdiction exists. And since it is a "truism that a court always has jurisdiction to determine its own jurisdiction," *Rosado v. Wyman*, 397 U.S. 397, 403 n.3 (1970), the three-judge court, no less than this one, will possess

jurisdiction to answer that question regardless of what the answer is. Because determining the answer is itself a part of this "action," Section 403 demands that it go to the three-judge court.

Section 403 is broader than many other three-judge court provisions. For instance, perhaps the best-known of these provisions—former 28 U.S.C. §§ 2281 and 2282's requirements relating to injunctions in constitutional challenges—applied not to a type of *action* but to any request for a particular type of *remedy*. Those statutes provided that no injunction restraining the enforcement of federal or state statutes on the grounds of unconstitutionality could be granted "unless the application therefor is heard and determined by a district court of three judges." 28 U.S.C. § 2281 (1970). Adjudication of the remainder of the action was left to a single judge.

Similarly, other statutes apply only to particular *claims*, rather than the action as a whole. For instance, when enacting legislation implementing the so-called "Saxbe Fix"—Congress's attempt to solve the potential Emoluments Clause problem when a Member of Congress is appointed to executive office by retroactively undoing salary increases enacted during the appointee's congressional tenure—Congress has repeatedly provided for three-judge court adjudication of "[a]ny *claim* challenging the constitutionality of the appointment." S.J. Res. 46, 110th Cong., 122 Stat. 5036, Sec. 1(b)(2) (2008) (emphasis added); *see generally* Michael E. Solimine, *The Fall and Rise of Specialized Federal Constitutional Courts*, 17 U. PA. J. CONST. L. 115, 131 (2014). And the provision governing challenges to FECA similarly provides for the certification and transfer to the *en banc* D.C. Circuit of specific *questions*—regarding the "constitutionality of this Act," 52 U.S.C. § 30110—not entire cases. These provisions show that when Congress wishes to disturb the ordinary march of civil procedure for only a *portion* of a case, it knows how to do it. Yet BCRA demands three-judge consideration of the action as a whole.

This distinction disposes of the FEC's reliance on 28 U.S.C. § 2284. As Defendants point out, BCRA states that the three-judge court shall be "convened pursuant to section 2284 of title 28," and that provision, in turn, provides that a single judge need not convene such a body if "he determines that three judges are not required." But whatever discretion may be granted to a single judge by this provision in cases arising under other three-judge-court provisions, under BCRA this determination is straightforward: if the action is one "brought for declaratory or injunctive relief to challenge the constitutionality of any provision of [BCRA]," then *three judges are required*, under Section 403, and the inquiry is at an end. 52 U.S.C. § 30110 note.

The FEC cites a handful of Supreme Court and D.C. Circuit decisions in support of its assertion that this Court, sitting as a single judge, can decide the issue of standing. But with the exception of the non-binding decisions of this Court, all of the cases cited by Defendants arose in the context of three-judge court provisions *other* than BCRA's. Those cases are thus inapposite.

The key Supreme Court precedent under Section 2281, for instance, is *Gonzalez v. Automatic Employee's Credit Union*, which held that the lack of "subject-matter jurisdiction" is "a ground upon which a single judge could . . . decline[ ] to convene a three-judge court" under Section 2281's three-judge court-requirement for injunctive relief against state statutes. 419 U.S. 90, 100 (1974); *see also Ex parte Poresky*, 290 U.S. 30, 32 (1933); *Reuss v. Balles*, 584 F.2d 461, 464 (D.C. Cir. 1978). But *Gonzalez* is inapposite here because, as just explained, Section 2281 merely required that certain *motions* be heard by a three-judge court: those requesting injunctions. As the Supreme Court reasoned, although "dismissal of a complaint on grounds short of the merits does 'deny' [a request for an] injunction in a literal sense," *Gonzalez*, 419 U.S. at 96, both formally and practically such an order of dismissal only decides the defendant's motion to dismiss, not the application for injunctive relief, so a three-judge court is unnecessary under the terms of Section

2281 itself. Under Section 403 of BCRA, by contrast, a three-judge court must adjudicate the entire "action"—which includes, of course, a pre-trial motion to dismiss for lack of jurisdiction.

*Gonzalez* is also distinguishable because it was based, in important measure, on the "overriding policy, historically encouraged by Congress, of minimizing the mandatory docket of th[e] [Supreme] Court." *Id.* at 98. Under the three-judge-court scheme relating specifically to injunctions, the scope of the Court's appellate jurisdiction mapped onto the types of decisions made by three judges—kicking in only upon the entry of "an order granting or denying . . . [an] injunction" under Section 2281 or 2282. 28 U.S.C. § 1253 (1970). The Court's conclusion that the "dismissal of a complaint on grounds short of the merits" does not really constitute a decision on the substance of an application for injunctive relief thus reduced both the quantity of three-court business *and* the scope of its own appellate docket. *Gonzalez*, 419 U.S. at 96. But as discussed, this consideration has no force here because BCRA vests mandatory and exclusive appellate jurisdiction in the Supreme Court over "*any* action" challenging the constitutionality of BCRA.

The decisions of this Court holding that a single judge may dismiss a case under BCRA if it does not present a "justiciable controversy," *Rufer v. FEC*, 64 F. Supp. 3d 195, 202 (D.D.C. 2014), have not addressed these crucial textual distinctions between Section 403 and these other statutes. Instead, they have mechanically applied *Gonzalez*'s rule in the context of BCRA. These district-court decisions are not binding on this Court, so they cannot preclude its consideration of these key textual differences now. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

Precedential holdings from the D.C. Circuit are of course binding here, but that Court has never squarely held that *Gonzalez*'s rule applies under BCRA. We are aware of only one D.C. Circuit case addressing this issue in the context of BCRA: *Independence Institute v. FEC*, 816 F.3d 113 (D.C. Cir. 2016). And while that case does state that "a three-judge court is not required where

13

the district court itself lacks jurisdiction," *id.* at 116, it likewise does so in passing, without any inquiry into whether this rule should apply in the context of Section 403. While the casual nature of the comment would not matter if it were the *holding* of the D.C. Circuit, this aside in *Independence Institute* is the purest of dicta since the D.C. Circuit in fact *reversed* the dismissal in that case, holding that because there was at least one non-frivolous BCRA claim, "the case must proceed to a three-judge court." *Id.* at 117.

This Court thus remains free to consider, for the first time, the crucial textual distinctions between BCRA and the provisions at issue in previous precedents. It should hold that under the plain text of Section 403, Defendants' standing challenge must go to the three-judge court.

## B.   Plaintiffs' Constitutional Challenge to Section 304 Is Plainly Substantial.

Of course, a litigant cannot help himself to a three-judge court by asserting a facially frivolous claim challenging the constitutionality of BCRA. A single judge thus "need not unthinkingly initiate the procedures to convene a three-judge court without first examining the allegations in the complaint" to determine whether the BCRA claim is "wholly insubstantial and frivolous." *See Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015). Just as the courts have long prevented litigants from artfully pleading their way into federal question jurisdiction by taking a state-law case and tacking on a wholly frivolous claim arising under federal law, *see Bell v. Hood*, 327 U.S. 678, 682–83 (1946), so too have the courts denied three-judge treatment to facially frivolous claims. But the FEC dramatically understates the stringency of this requirement.

Both the Supreme Court and the D.C. Circuit have recently rebuked the lower courts for pretermitting the convening of a three-judge court by too-closely scrutinizing the case on the merits. In *Shapiro*, the Supreme Court held that the district court erred in dismissing a claim entitled to three-judge adjudication on the merits, emphasizing that the convening of a three-judge court could be dispensed with on this basis only if a claim is " 'essentially fictitious,' 'wholly

14

insubstantial,' 'obviously frivolous,' and 'obviously without merit.' " 136 S. Ct. at 456 (quoting *Goosby v. Osser*, 409 U.S. 512, 518 (1973)). Similarly, in *Independence Institute*, the D.C. Circuit reversed this Court's dismissal of a BCRA case, reasoning that "as the *Shapiro* Court stressed, the exception for insubstantial claims is narrow." 816 F.3d at 116. While the court did not "suggest that [the plaintiff's] argument is a winner," *id.* at 117—and indeed, the three-judge court ultimately dismissed the claims on the merits, *Independence Inst. v. FEC*, 216 F. Supp. 3d 176, 193 (D.D.C. 2016), *aff'd*, 137 S. Ct. 1204 (2017)—it was nonetheless "entitled to make its case to a three-judge district court," *Independence Institute*, 816 F.3d at 117.

Here, far from "essentially fictitious," our claims will ultimately prevail. Section 304 represents a remarkable intrusion on the rights of candidates and their campaign committees to make constitutionally protected decisions about how and when to speak during an election. During the heat of a campaign, a candidate may determine that she must give or loan her own money to her campaign to fund additional speech. That is particularly true of a challenger, who "may need to speak early in order to establish her position and garner contributions." *Anderson v. Spear*, 356 F.3d 651, 673 (6th Cir. 2004). And in the critical days before an election, a campaign's creditors are in an especially precarious position, since any debts they are owed as of election night are inherently subject to a risk of default. After all, the campaign may close out the election without sufficient cash on hand to cover all of its outstanding debts; and a candidate's ability to raise money to repay debts *after* an election is far from assured. Indeed, a candidate may be forced to loan her campaign *additional* money just so that it can repay its other creditors—and avoid the legal and reputational risks of defaulting on its obligations to those who spoke on its behalf.

Section 304 intensifies and distorts these inherent risks, deliberately curbing the funding, and thus the speech, of both candidates and their campaigns. By baring the repayment of candidate

15

loans greater than $250,000 from money raised *after* the election, the challenged limit necessarily increases the risk that these loans will not be repaid in full, or perhaps at all. Section 304 thus has the design and effect of *deterring* a candidate from making loans in excess of $250,000—directly burdening his First Amendment right "to speak without legislative limit on behalf of his own candidacy." *Buckley*, 424 U.S. at 54. And Section 304 burdens the speech of committees, too. If a committee ends an election owing both debts to creditors and more than $250,000 in debt to the candidate, Section 304 forces the committee to use its cash on hand, if any, to *pay the candidate first* (or default on that portion of the candidate's loan outright), and if there is any money left over, then to repay debts to other creditors, including the vendors who engaged in core political speech on behalf of the campaign.

Section 304 thus represents a severe intrusion upon the First Amendment's heartland. In the following sections, we briefly show: (1) that the conduct restricted by the challenged provisions is protected by the First Amendment, (2) that Section 304, and the regulations implementing it, directly burden those First Amendment rights, and (3) that this infringement of the First Amendment right to free speech cannot survive constitutional scrutiny.

1.      "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quotation marks omitted). And there is no more fundamental First Amendment liberty than the right of a candidate "to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election." *Davis v. FEC*, 554 U.S. 724, 738 (2008). While the Supreme Court's campaign finance jurisprudence has ebbed and flowed over the decades following its landmark decision in *Buckley*, one principle has endured without change: any legal burden placed "on personal expenditures by a candidate in furtherance of his own

candidacy . . . clearly and directly interferes with constitutionally protected freedoms" and may be upheld only if it satisfies the strictest judicial scrutiny. 424 U.S. at 53.

A candidate who makes or incurs loans for the benefit of his campaign is exercising this core First Amendment freedom. When Senator Cruz loaned $5,000 of his own money to his Committee for expenditure on behalf of his reelection, he was using his personal financial means to "vigorously and tirelessly . . . advocate his own election," *id.* at 52—and that was no less true because of his hope, when he loaned this money, that the campaign would be able to reimburse the sum after the election. Likewise, when Senator Cruz pledged his own personal assets to secure a $255,000 loan that he, in turn, loaned to his Committee, he was engaged in "the vigorous exercise of the right to use personal funds to finance campaign speech," *Davis*, 554 U.S. at 739— notwithstanding his hope that the Committee would later be able to repay the loan so that he, in turn, could discharge the security interest on his assets. After all, those loans went to fund *pure political speech*—either directly or by repaying debts to vendors and other campaign creditors.

Indeed, because making and incurring loans on behalf of one's own candidacy is the transfer of a "thing[ ] of value," it qualifies as an "expenditure" under the *FEC's own definition* of that term. 11 C.F.R. § 100.110(a). The FEC's definition of expenditure *explicitly includes* most loans, *see id.* § 100.111(a) (defining expenditure to include a "loan"); *id.* §§ 100.142 & 100.143 (excepting certain bank loans and lines of credit), and "any guarantee or endorsement of a loan by a candidate," *id.* § 100.111(b). Accordingly, under both common sense and the FEC's own definitions, when Senator Cruz made and incurred the 2018 loans on behalf of his candidacy he was exercising his core First Amendment right of using his own financial resources "to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election." *Buckley*, 424 U.S. at 52. As the Sixth Circuit held in a directly analogous case, "[a]s a matter of

17

campaign finance law, . . . limitations on candidate loans are limitations on campaign expenditures, and limitations on campaign expenditures are prohibited by *Buckley.*" *Anderson*, 356 F.3d at 673.

The FEC resists this proposition, arguing that Section 304 "does not regulate or affect speech or speech-related activities." MTD Br. 28. But Defendants reach that conclusion only by *redefining* the First Amendment right supposedly at issue as the right to avoid the specific *burden* imposed by BCRA's challenged restriction. Thus, the FEC asserts that Senator Cruz is merely asserting the right "to have [his] personal loans repaid," and "having [one's] loans repaid . . . is not a constitutional right at all." *Id.* at 2, 27. This confused line of reasoning mistakes the *burden* imposed by the challenged law (making it more difficult for a candidate to have his personal loans repaid) for the *right that is burdened* (the candidate's right to expend personal resources, including in the form of personal loans, on behalf of his election). If that trick worked, it could be used to defeat *every* First Amendment claim. For the Government could defend, for example, even a blanket $5,000 fine on anyone who speaks out against the current administration's policies by arguing that avoiding the payment of $5,000 "is not a constitutional right at all."

Indeed, the Supreme Court *explicitly repudiated* this gambit in both *Davis* and *Bennett*. In *Davis*, a self-funding candidate challenged another portion of the Millionaire's Amendment, which asymmetrically raised the contribution limits for the supporters of the plaintiff's opponent when the plaintiff spent more than a certain amount of his personal funds. Just as it does here, the Government defended that burden on speech by arguing that it "does not limit in any way the use of a candidate's personal wealth in his run for office," and "the First Amendment poses no bar to Congress's efforts to *increase* political speech." Brief for Appellee at 29, *Davis*, 2008 WL 742921 (Mar. 19, 2008). The Supreme Court emphatically rejected that argument. While acknowledging that there is "no constitutional basis for attacking contribution limits on the ground that they are

too high," the *constitutional right* in question, the Court noted, was "the right to spend personal funds for campaign speech." *Davis*, 554 U.S. at 737–40. And because BCRA's asymmetric contribution-limit scheme imposed "a special and potentially significant burden" on that right, it was subject to strict scrutiny. *Id.*

Similarly, *Bennett* involved an Arizona law that granted publicly financed candidates extra funding when their privately financed competitor spent more than a certain amount of personal funds. Just as FEC here argues that there is no "constitutional right[ ] for candidates to have their personal loans repaid," MTD Br. 2, Justice Kagan's dissent in *Bennett* emphasized that *Buckley* had upheld public financing of election campaigns under the First Amendment, 564 U.S. at 758 (Kagan, J., dissenting). The *mechanism* Arizona used to burden speech was thus perfectly constitutional in the abstract. But that was beside the point. As the majority explained, "[w]hether Arizona's matching funds provision comports with the First Amendment is not simply a question of whether the State can give a subsidy to a candidate to fund that candidate's election, but whether that subsidy can be triggered by the speech of another candidate." *Id.* at 743 n.9 (majority opinion). And when a subsidy is triggered "in direct response to the political speech of privately financed candidates," it constitutes "an unprecedented penalty on any candidate who robustly exercises his First Amendment rights." *Id.* at 736, 747 (brackets omitted). Under the FEC's define-the-right-as-the-burden reasoning, both of these cases would have come out the other way.

The FEC repeatedly cites the District of Delaware's decision in *FEC v. O'Donnell*, 209 F. Supp. 3d 727 (D. Del. 2016), but that case is completely irrelevant. *O'Donnell* upheld FECA's bar on using campaign contributions for the candidate's "personal use," reasoning that "the prohibition does not implicate First Amendment concerns" because it in no way "restricts or limits *political* speech." *Id.* at 739. "[A] payment for [a candidate's] living space [i]s payment for a personal

19

expense, *not* a payment to facilitate political expression." *Id.* Here, the use of campaign contributions to repay Senator Cruz's loans is plainly not a "personal use." The FEC intimates that post-election loan-repayment contributions "effectively go[ ] into the candidate's pocket" to "subsidize [the candidate's] own personal expenses," MTD. Br. 28, 41, but that is not so: such contributions go to refund to the candidate money that was *used by the campaign for pure political speech*. Indeed, despite this rhetoric, the FEC *nowhere* claims that the use of contributions to repay personal loans converts the contributions to "personal use." After all, using contributions in this way is *entirely legal* with respect both to contributions made *before* the election and with respect to the first $250,000 of contributions made *after* the election. 52 U.S.C. § 30116(j); 11 C.F.R. § 116.11(b). No "personal use" of campaign funds is at issue here, and *O'Donnell* is thus inapposite.[1]

Finally, the rights of campaign committees and contributors that are at stake here are also protected by the First Amendment. When a committee repays vendors who produced campaign advertisements, for instance, it is exercising a right that lies at the heartland of the First Amendment: the right to "spend [money] on political communication during a campaign." *Buckley*, 424 U.S. at 19. That is evident from the FEC's own briefing. Defendants note that the Cruz Committee used its cash-on-hand during the 20-day repayment window to reimburse vendors who engaged in political speech during the campaign and to make a contribution to the Texas Pastor Council, and it belittles the Committee's "desire" to prioritize these expenditures over repaying Senator Cruz. MTD Br. 19. But these expenditures paid for *core First Amendment expression*. And the post-election *contributions* that Section 304 bars, of course, also enjoy First Amendment protection. *Buckley*, 424 U.S. at 25; *McCutcheon v. FEC*, 572 U.S. 185, 203 (2014).

---

[1] In all events, a single non-binding decision from a district court in another circuit cannot even conceivably suffice to show that Plaintiffs' claims are wholly frivolous and insubstantial.

2.      Section 304 imposes a direct and significant burden on the exercise of these First Amendment rights. By limiting the sources of funding that committees can use to repay candidate loans, the $250,000 cap necessarily increases the risk that these loans will not be repaid in full, or perhaps at all. Indeed, the FEC itself acknowledges that, in part because of Section 304, "a candidate deciding to loan his or her campaign money in advance of the election [will] not be able to accurately determine the likelihood he or she might be repaid." MTD Br. 44. As in *Davis*, this provision thus limits "a candidate who wishes to exercise that right [to] two choices," 554 U.S. at 740: loan more than $250,000 under the significantly enhanced risk that such a loan *will not be repaid* in full, or simply decline to loan money in excess of this sum at all. And as in *Davis*, Section 304 "does not provide any way in which a candidate can exercise that right without abridgment." *Id.*

The FEC argues that "*Davis* is inapposite here because it involved a BCRA provision that *penalized* candidates for spending their own money in support of their campaigns," while Section 304 "imposes no similar penalty." MTD Br. 31, 32. That is simply false. As just shown, Section 304 *does* penalize a candidate's right to loan money to his campaign—a form of political "spending" under the FEC's own definitions—by directly and significantly reducing "the likelihood he or she might be repaid," MTD Br. 44. The FEC also notes that unlike the limit in *Davis*, "the Loan Repayment Limit is not asymmetrical." MTD Br. 32. But the Supreme Court in *Bennett* specifically *rejected* the notion that "the reach of that opinion is limited to asymmetrical contribution limits," noting that *Davis* had focused on this feature of the Millionaire's Amendment only "because that was the particular burden on candidate speech we faced." 564 U.S. at 740.

Defendants also argue that Section 304 does not trigger First Amendment scrutiny because it "does not infringe on a candidate's ability to spend as much as he or she wants" and thus "Senator

Cruz was free to contribute or loan as much money as he wished to the Committee for such speech." MTD Br. 30. But precisely the same argument was made, and rejected, in both *Davis*, *compare* 554 U.S. at 754–55 (Stevens, J., dissenting) *with id.* at 738–39 (majority opinion), and *Bennett, compare* 564 U.S. at 763 (Kagan, J., dissenting), *with id.* at 742–43 (majority opinion). It is far too late in the day to argue that the Government is free to burden the right to spend money on speech so long as it refrains from *directly capping* those expenditures. And the notion that Senator Cruz remains free to "loan as much money as he wished to the Committee," MTD Br. 30, is plainly without merit, given that any loans in excess of $250,000 carry a significantly enhanced repayment risk, due to Section 304's limits on the sources of funds that can be used to repay them.

Section 304 also burdens the First Amendment rights of committees. The FEC points out that our complaint does not allege that the loan-repayment limit prevents the Committee from "amassing the resources necessary for effective campaign advocacy." MTD Br. 33 (brackets and quotation marks omitted). But Section 304 burdens the Committee's rights not only by limiting its *receipts*, but by limiting its *expenditures*. Because Section 304 bars a committee from repaying more than $250,000 in candidate loans from money raised after an election, it effectively forces the committee to repay such loans in excess of $250,00 with *pre*-election money, in preference to using that money to fund (or reimburse) core political speech. Section 304's demand that committees *forego* (or at the very least *delay*) engaging in this constitutionally protected expression if they do not wish to default on the candidate's loans "necessarily reduces the quantity of expression," thereby "restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19.[2]

---

[2] In any event, the *en banc* D.C. Circuit recently concluded that "*Buckley* and its progeny hardly foreclose application of closely drawn scrutiny" to contribution limits challenged by a

Finally, Section 304 also burdens the rights of contributors. While the FEC argues that Section 304 does not "prevent any individual from making a contribution, either before or after an election," MTD Br. 35, that is not so. For an individual who wishes to contribute money to a candidate in connection with an election but is unable to do so *before* the election, the FEC's regulations allow him to make post-election contributions only to the extent the candidate has "net debts outstanding." 11 C.F.R. § 110.1(b)(3). And by barring more than $250,000 in post-election contributions from going towards repayment of the candidate's loans—and excluding those loans from the calculation of net debts outstanding, *id.* § 110.1(b)(3)(ii)(C)—Section 304 creates the possibility that some individuals who wish to contribute post-election will be prevented from doing so, because the candidate's net-debts-outstanding ceiling will already have been reached. Section 304 thus impinges upon the rights of these contributors "to participate in the public debate through political expression and political association." *McCutcheon*, 572 U.S. at 203.

3.      Because Section 304 burdens the core First Amendment expression of Senator Cruz and his Committee, it is subject to strict scrutiny—not the mere rational basis review proposed by the FEC. *See Bennett*, 564 U.S. at 748. Indeed, at a minimum, "closely drawn" scrutiny is required, given the restraints the challenged provisions impose on the rights of contributors. *McCutcheon*, 572 U.S. at 199.[3] Section 304 flunks either standard for at least four reasons.

*First*, while the FEC asserts that the loan-repayment limit was designed "to mitigate the heightened risk of quid pro quo corruption and its appearance," MTD Br. 39, the provision's

---

committee, even if the limits do not prevent it from amassing the necessary resources for effective advocacy. *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 541 (D.C. Cir. 2019) (en banc).

[3] Plaintiffs reserve the right to argue before the Supreme Court that *Buckley*'s prescription of "closely drawn" scrutiny for contribution limits either is tantamount to strict scrutiny or is itself inconsistent with fundamental First Amendment principles. *See, e.g.*, *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 635–44 (1996) (Thomas, J., dissenting).

legislative history shows that it was *actually* designed to burden the ability of wealthy candidates to loan large sums to their campaign, thereby "level[ling] the playing field" between competing candidates, 147 CONG. REC. S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine). In *Davis*, the Government acknowledged, and the Court accepted, that the purpose of the Millionaire's Amendment was to "level electoral opportunities for candidates of different personal wealth." 554 U.S. at 741. And the legislative history demonstrates that this purpose extended to Section 304 in particular, for as one of its co-sponsor's recognized, "a lot of people who are very wealthy do not give money to their campaign; they loan it and say they will be repaid later." 147 CONG. REC. S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin). As the Supreme Court has repeatedly stressed, because "[l]eveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election, . . . it is *not legitimate* for the government to attempt to equalize electoral opportunities in this manner." *Bennett*, 564 U.S. at 749–50 (quotation marks omitted) (emphasis added). Indeed, "such basic intrusion by the government into the debate over who should govern goes to the heart of First Amendment values." *Id.*

In addition to "level[ling] the playing field," several legislators opposed to the Millionaire's Amendment pointed out that the provision also had an even more antidemocratic design—it "protects incumbents." 147 CONG. REC. S2544 (daily ed. Mar. 20, 2001) (statement of Sen. Daschle). After all, while challengers often need to spend significant amounts of seed money to raise name recognition even *before* they start to receive significant contributions, *see Anderson*, 356 F.3d at 673, incumbents "have a lot of advantages that do not come out of our personal checkbooks," 147 CONG. REC. S2465 (daily ed. Mar. 19, 2001) (statement of Sen. Dodd); *see also id.* at S2548 (daily ed. Mar. 20, 2001) (statement of Sen. Levin) (similar); *id.* at S2852 (daily ed.

Mar. 26, 2001) (statement of Sen. Reid) (similar). Indeed, in a remarkably forthright statement,

Senator McCain—a supporter of the Amendment—noted that the provision

> addresses, in all candor, a concern that literally every nonmillionaire Member of
> this body has, and that is that they wake up some morning and pick up the paper
> and find out that some multimillionaire is going to run for their seat, and that person
> intends to invest 3, 5, 8, 10, now up to $70 million of their own money in order to
> win.

*Id.* at S2540 (daily ed. Mar. 20, 2001) (statement of Sen. McCain). The Supreme Court has

consistently cautioned that campaign finance restrictions may not "magnify the advantages of

incumbency to the point where they put challengers to a significant disadvantage," and that "where

there is strong indication in a particular case, *i.e.,* danger signs, that such risks exist (both present

in kind and likely serious in degree), courts . . . must review the record independently and carefully

with an eye toward assessing the statute's 'tailoring.' " *Randall v. Sorrell*, 548 U.S. 230, 248, 249

(2006) (opinion of Breyer, J.). Those "danger signs" are present here.

    *Second*, even accepting the FEC's proffered anti-corruption interest at face value, that

interest cannot justify Section 304 because the speech it restricts—the right of a candidate to spend

his own money, in the form of a personal loan, to advance his candidacy—actually *reduces* the

possibility of corruption. As the Supreme Court has emphasized time and again, "reliance on

personal funds *reduces* the threat of corruption, and therefore [the Millionaire's Amendment], by

discouraging use of personal funds, disserves the anticorruption interest." *Davis*, 554 U.S. at 740–

41; *see also Buckley*, 424 U.S. at 53; *Bennett*, 564 U.S. at 751. The FEC cannot justify Section 304

as an anti-corruption measure when the primary effect of the burden it imposes on candidates'

speech "*disserves* the anticorruption interest." *Davis*, 554 U.S. at 741 (emphasis added).

    *Third*, Section 304's limits are not necessary to combat corruption for an independent

reason: the federal contribution limits *already* serve to eliminate any concern that contributions

will lead to *quid-pro-quo* corruption or its appearance. The base limit of $2,800 per contributor (as

adjusted for inflation) applies to all contributions "with respect to any election," 52 U.S.C. § 30116(a)—so it governs post-election contributions "with respect to [that] election" in the same measure as pre-election contributions. *Id.*; *see also* 11 C.F.R. § 110.1(b)(3)(iii). As the Supreme Court explained in *McCutcheon*, "[t]hose base limits remain the primary means of regulating campaign contributions," and "Congress's selection of a [$2,800] base limit indicates its belief that contributions of that amount or less *do not create a cognizable risk of corruption*." 572 U.S. at 209, 210 (emphasis added). Indeed, *McCutcheon struck down* FECA's additional "aggregate" contribution limit, explaining that "it is difficult to understand" how violation of the aggregate limit could "be regarded as corruptible" if "there is no corruption concern" in contributing up to the base limit for each candidate. *Id.* So too here: Congress's selection of a $2,800 base limit indicates its judgment that contributions in that amount—whether made pre- or post-election—do not raise the specter of *quid-pro-quo* corruption, and that remains true even if the committee uses them to repay candidate loans. *See Anderson*, 356 F.3d at 673 (invalidating cap on candidate loans because "the risk of *quid pro quo* is substantially mitigated by individual contribution limits").

The FEC makes two arguments in an attempt to avoid this logic. First, it argues that candidate-loan-repayment contributions are especially corrupting because they are received "*after an election, at a time when the winner is already known and thus in a better position than a mere candidate to guarantee legislative favors to big donors.*" MTD Br. 40–41. But Section 304 is a spectacularly poor fit for any such interest, since the same is true of *all* post-election contributions—yet federal law generally *allows* supporters to make contributions to an election after it has taken place. More fundamentally, this reasoning would doom *all contributions to incumbent officeholders*. These, no less than loan-repayment contributions, take place "*after an election, at a time when the winner is already known.*" *Id.* Yet there is no dispute that a contributor

could have given Senator Cruz $2,800 on November 7, 2018, if he had designated it for the *upcoming* election cycle. The notion that the contribution would have suddenly become corrupting if it were instead designated for the 2018 election is farcical.

The Government's second argument fares no better. Section 304, the FEC notes, "applies to funds given by a campaign to a candidate or officeholder who can then essentially pocket those funds and use them for any purpose," and, it says, "[a]t the very least, it *appears* corrupt to the public when candidates use contributions for their personal projects." MTD Br. 41. Once again, if this is the interest genuinely protected by Section 304, then the provision is radically underinclusive—for precisely the same reasoning applies to the use of *pre*-election funds to repay candidate loans, yet the challenged provisions allow campaign funds to be used this way *without limit. See* 52 U.S.C. § 30116(j); 11 C.F.R. § 116.11(b)(1). Further, the same logic would apply to *any* repayment of a candidate loan with post-election funds, yet Section 304 allows such repayment up to $250,000. And more fundamentally, this argument simply misunderstands the nature of these contributions. As noted above, a debt-repayment contribution does not go "to subsidize [the candidate's] own personal expenses," MTD Br. 41; it refunds money that was spent *furthering the candidate's election campaign*, just like any other contribution. That is why repaying candidate loans *does not* fall afoul of the federal law's separate prohibition, not challenged here, on the conversion of campaign funds to personal use. *See supra*, pp. 19–20.

Indeed, where a candidate wishes to spend an extra $1,000 on his election campaign, the following two alternative transactions are, for all intents and purposes, completely identical:

> (1) the candidate makes a $1,000 loan to his campaign before the election, which is paid back by the campaign after the election because a contributor has made a $1,000 post-election donation;

> (2) the contributor makes a $1,000 contribution before the election, which relieves the candidate of the need of loaning the campaign $1,000 of his own money.

27

In both cases, the candidate is able to spend the needed $1,000 on core political speech, and in both cases, the contribution allows the Candidate to spend $1,000 of his own money for purposes other than the campaign. Yet by the FEC's lights, the second scenario raises no concerns whatsoever, but the first must be banned "to prevent the public's confidence in the system of representative Government from being eroded to a disastrous extent." *Id.* There is nothing to this.

*Finally*, even ignoring all of these points and assuming that Section 304 validly serves to combat *quid pro quo* corruption for winning candidates like Senator Cruz, the provision still could not validly be applied to *losing* candidates—who no longer have the *power* to grant political favors in a *quid pro quo* return for post-election contributions. *See Anderson*, 356 F.3d at 673 ("[T]he risk of *quid pro quo* is virtually non-existent where the contribution is made to a losing candidate who seeks to recoup some of his debt."). The FEC suggests that "incumbent candidates that lose are still officeholders for some time after their loss and other candidates who lose an election may be elected to federal office in the future." MTD Br. 43. But at the very least, the notion that donors will contribute post-election funds as part of a *quid pro quo* deal to a *lame duck* officeholder is highly speculative at best—and it thus "cannot justify the substantial intrusion on First Amendment rights at issue in this case." *McCutcheon*, 572 U.S. at 218. And while a losing candidate may of course "be elected to federal office in the future," the same is true of *every eligible citizen in the country*, so this is hardly a justification for saddling *additional* limits on these losing candidates.

The FEC argues that "[a]ny overbreadth of the Loan Repayment Restriction would be insubstantial in relation to its legitimate sweep," given that Section 304, on its view, legitimately applies to all "winning candidates and is thus extensive." MTD Br. 42. But on average, there are far more losers than winners in a contested election—there are currently 737 declared candidates

for President in the 2020 election[4]—so Section 304's supposedly "legitimate sweep" is in fact *swamped* by its illegitimate application to 736 (so far) losing candidates. Defendants respond, citing *Buckley*, that "[i]n any case, courts have repeatedly upheld FECA restrictions that apply to *all* candidates against overbreadth challenges, even if the justification applied more to some candidates than others." *Id*. at 43. But *Buckley* upheld FECA's contribution limits even though "most large contributors do not seek improper influence" because it is "difficult to isolate suspect contributions" and "Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety" required across-the-board limits. 424 U.S. at 29; *see also McConnell v. FEC*, 540 U.S. 93, 159–60 (2003) (rejecting line between minor and major parties as unrelated to the Government's interest). Here, there is obviously no difficulty in determining who won and lost the election (that is a rather important feature of the system), and loan-repayment contributions to losing candidates simply do not raise any meaningful appearance of corruption.

Section 304 is accordingly unconstitutional on its face, and Plaintiffs are likely to prevail in their challenge. At the very least, the First Amendment claims at issue are not "essentially fictitious," *Shapiro*, 136 S. Ct. at 456, and that suffices to require a three-judge court.

## C. The Jurisdiction of the Three-Judge Court Required by Section 403 Extends to Plaintiffs' Challenge to FEC's Implementing Regulations.

Finally, Defendants are wrong to assert that counts 3, 4, and 5 of our complaint—the claims challenging the FEC's implementing regulation, 11 C.F.R. § 116.11—are outside the three-judge court's jurisdiction. As discussed above, the three-judge court provision that Congress included in BCRA unambiguously requires that where suit is brought "to challenge the constitutionality of any provision of this Act," a three-judge court must be convened to hear "the action" as a whole. 52

---

[4] *Campaign Finance Data: Candidates 2020*, FEC, https://bit.ly/2EAEJIM (last accessed June 27, 2019).

U.S.C. § 30110 note. If Congress had wished to impose a narrower requirement, requiring three-judge consideration only of certain *claims*, it had before it several models of how to do so. *Cf.* S.J. Res. 46, 110th Cong., 122 Stat. 5036, Sec. 1(b)(2) (2008). But it chose not to limit Section 403 in this way, and this Court has no power to disregard that choice by disaggregating the action to target certain claims for single-judge adjudication.[5]

To be sure, in *Turner Broadcasting System, Inc. v. FCC*, a three-judge court of this District, over Judge Jackson's dissent, rejected a similar argument in the context of the Cable Act's three-judge court provision, due to the "burdens" it would inflict "on the federal judicial system." 810 F. Supp. 1308, 1312 (D.D.C. 1992). But that decision is not precedential. *See Camreta*, 563 U.S. at 709 n.7; *see also San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1315 n.24 (9th Cir. 1981) ("When a district court is convened as a statutory three-judge panel, it still is sitting as a district court for purposes of stare decisis."); *In re Sealed Case*, 838 F.2d 476, 491 n.24 (D.C. Cir.), *rev'd on other grounds sub nom. Morrison v. Olson*, 487 U.S. 654 (1988) (citing *Gianturco*). And given that "[i]t is Congress's job to enact policy and it is this Court's job to follow the policy Congress has prescribed," *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018), we respectfully submit that Judge Jackson's reasoning is more persuasive than the majority's.

The FEC's argument independently fails because quite apart from Section 403's encompassing text, it has long been understood that where a three-judge court has been properly convened with respect to at least *one* claim, the court also has supplemental jurisdiction to adjudicate closely related claims. In *Allee v. Medrano*, 416 U.S. 802 (1974), for example, a three-

---

[5] It is possible, we suppose, that if a claim challenging the constitutionality of BCRA were joined with a sufficient number of sufficiently unrelated claims, the unrelated claims would so predominate over the BCRA claim that the action would no longer be one "brought . . . to challenge the constitutionality of [BCRA]." But for the reasons discussed below, there is no place for such a concern here. *See infra*, p. 31.

judge court convened under Section 2281 to consider an injunction invalidating certain Texas statutes also enjoined the defendants from enforcing *other* statutes, which were concededly constitutional, in a harassing manner. The Supreme Court rejected the defendants' argument that this portion of the three-judge court's decision was beyond its jurisdiction, holding that "it could properly consider" the broader challenge to the defendants' intimidation and harassment "and grant relief in the exercise of jurisdiction ancillary to that conferred by the constitutional attack on the state statutes which plainly required a three-judge court." *Id.* at 812. While this supplemental jurisdiction would not extend to a claim "completely unrelated to the basis on which the three-judge court was convened," the claim in *Allee* was "intimately bound up with and ancillary to the remainder of the court's judgment," so supplemental jurisdiction was proper. *Id.* at 812 n.8; *see also City of Rome, Ga. v. United States*, 472 F. Supp. 221, 236 (D.D.C. 1979), *aff'd*, 446 U.S. 156 (1980); *Arizona v. Holder*, 839 F. Supp. 2d 36, 39 (D.D.C. 2012); *Adams v. Clinton*, 40 F. Supp. 2d 1, 4 (D.D.C. 1999); 28 U.S.C. § 1367 (granting supplemental jurisdiction).

Supplemental jurisdiction is plainly appropriate in this case. As in *Allee*, the claims challenging 11 C.F.R. § 116.11 are "intimately bound up with" the constitutional challenge to the provision of BCRA it implements. The factual allegations underlying both sets of claims arise out of precisely the same 2018 candidate loans. The bulk of the challenge to the regulation is based on the claim that it suffers from precisely the same First Amendment infirmity as Section 304 of BCRA. Indeed, were Plaintiffs' challenge to BCRA to succeed and Section 304 struck down as unconstitutional, the challenged regulation implementing that provision likewise could obviously no longer be enforced—giving Plaintiffs the very relief they seek in these claims. It would be senseless to disaggregate and separately adjudicate these claims in different courts—precisely the inefficient result the doctrine of supplemental jurisdiction is designed to avoid.

The cases the FEC cites do not dictate a different result. It notes that this Court in *McConnell* declined to consider the constitutionality of the regulations implementing a section of BCRA challenged in that case. But the Court's reasoning in *McConnell* was principally based on ripeness concerns—it concluded that the regulations were "not properly before this Court" because they "were not final until after briefing and oral arguments in this case were completed." 251 F. Supp. 2d 176, 260, 264 (D.D.C. 2003), *aff'd in part*, 540 U.S. 93 (2003). These ripeness concerns also motivated the Supreme Court's affirmance of this determination. *See McConnell*, 540 U.S. at 223. And, yes, *Bluman v. FEC* did adopt Defendants' theory that "the FEC's regulations are not appropriately challenged in a three-judge court" in declining to convene a three-judge court to consider an ancillary challenge to a regulation implementing a provision of BCRA, 766 F. Supp. 2d 1, 4 (D.D.C. 2011), but that decision is not binding, *see Camreta*, 563 U.S. at 709 n.7. And the *Bluman* Court did not even *consider* the possibility that the three-judge court would have *supplemental* jurisdiction, so it provides no guidance whatsoever on that question.

## II.    In Any Event, Defendants' Challenge to Plaintiffs' Standing Fails.

As demonstrated above, *see supra* Part I. A, BCRA requires that Defendants' Rule 12(b)(1) motion be adjudicated by a three-judge court, but their motion is doomed even if this Court nonetheless proceeds to decide the standing question, for Plaintiffs have standing to bring this case.

### A.    Plaintiffs' Injuries Are Not Self-Inflicted.

The "irreducible constitutional minimum of standing contains three elements": (1) injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted). The FEC does not deny that Senator Cruz and the Cruz Committee have suffered injury-

in-fact, nor that their injuries will be redressed by a favorable decision. Rather, it contends that Plaintiffs lack standing because their injuries are self-inflicted, an attack on the causation element of standing. That contention is mired in confusion.

The Government is mistaken when it assumes that the Cruz Committee's asserted injury is that it gained $10,000 of Senator Cruz's money. MTD Br. 21. Rather, as previously discussed, the Committee's injuries are two-fold. First, it *did not want* to pocket the Senator's money; it wanted to repay its debt to the candidate in full, no less than it wanted to pay other creditors to whom it owed money, for that would incentivize Senator Cruz, no less than others, to extend credit to the Committee in the future. Compl. ¶ 33. By making such reimbursements more difficult, Section 304 burdens the Committee's First Amendment right to raise money. Second, by limiting when and how the Cruz Committee can reimburse the Senator while also meeting its obligations to pay its vendors and other creditors, the challenged limit also impermissibly burdens the Committee's right to spend money on campaign speech.

The FEC makes two arguments for why Senator Cruz and the Cruz Committee's injuries are self-inflicted. First, the FEC asserts that Senator Cruz voluntarily courted his financial injury by loaning $260,000 to his campaign the day before the 2018 election. MTD Br. 15. Even leaving aside the fact that the Senator's injection of funds into his campaign helped to ensure that the Committee's creditors would be paid, the FEC misses the mark. The relevant injury for standing purposes is the Senator's *constitutional* injury: the burden placed on his First Amendment right to spend money, in the form of a loan, to support his campaign imposed by the restrictions on the Committee's use of post-election contributions to repay Senator Cruz's loans. *See In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 2019 WL 2552955, at *5 (D.C. Cir. June 21, 2019). By lending his campaign $260,000, Senator Cruz simply exercised a constitutional right. It is well-

established that a plaintiff does not lose standing by voluntarily taking steps to exercise a constitutional right and thus bring about an injury to that right.

"Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury." 13A WRIGHT & MILLER § 3531.5; *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 189 (D.C. Cir. 2012) (Kavanaugh, J., dissenting). It is not enough that a plaintiff "voluntarily" or "willfully" took some action resulted in his injury, *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (alteration marks omitted), since "surely all judicially cognizable injuries can be traced back to some voluntary action of the plaintiff," *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 935 (D.C. Cir. 1989) (Wald, C.J., dissenting). Rather, a plaintiff lacks standing only if his injury is "so *completely due* to the [complainant's] own fault as to break the causal chain." *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (alteration in original) (emphasis added). Where, instead, the defendant is engaged in an ongoing violation of constitutional or statutory rights, and a would-be plaintiff simply exercises the right that exposes himself to that violation, the injury is caused by the defendant, not the plaintiff.

For example, in *Havens Realty Corp. v. Coleman*, two plaintiffs—one black and one white—inquired about the availability of apartments in buildings owned by the defendant. 455 U.S. 363, 368 (1982). The black plaintiff did so "fully expecting that he would receive false information." *Id.* at 374. The defendant, in violation of the Fair Housing Act, consistently told the black plaintiff that there were no apartments available and told the white plaintiff that there were vacancies. *Id.* at 368. The Supreme Court held that the black plaintiff's voluntary decision to exercise his right to inquire about housing—knowing full well that he would be discriminated against—did not detract from the fact that he had "suffered 'specific injury,' " such that "the Art. III requirement of injury in fact [was] satisfied." *Id.* at 374 (citation omitted).

By the same token, Senator Cruz's decision to exercise his right to loan money to his campaign the day before the election—knowing full well that he was less likely to be fully reimbursed because of Section 304's limits—does not diminish the fact that his First Amendment rights have been violated by Section 304 and its implementing regulations. "[W]hen an individual searches for and finds a violation of the law, it is the violation itself—not the search—that causes the plaintiff injury." *Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018). Senator Cruz did not create the First Amendment violation entailed by Section 304; the Federal Government did.

Indeed, a contrary view would call into question several landmark cases striking down racial segregation and other forms of unconstitutional discrimination. The "diminished ability to receive an education in a racially integrated school . . . is, beyond any doubt, not only judicially cognizable but, as shown by *Brown v. Board of Education*, 347 U.S. 483 (1954) . . . , one of the most serious injuries recognized in our legal system." *Allen v. Wright*, 468 U.S. 737, 756 (1984). Yet the plaintiffs in *Brown* would not have had standing unless they had been "personally denied equal treatment by the challenged discriminatory conduct." *Id.* at 755 (quotation marks omitted); *see also Warth v. Seldin*, 422 U.S. 490, 502 (1975). They therefore voluntarily sought, and were denied, "admission to schools attended by white children under laws requiring or permitting segregation according to race." *Brown*, 347 U.S. at 487. Contrary to the FEC's logic, the fact that the *Brown* plaintiffs willfully exposed themselves to their constitutional injury by voluntarily seeking admission to a segregated school—and experiencing the expected unconstitutional discrimination—did not *defeat* their standing; it *created* their standing. The injury they suffered was entirely and directly caused by the unconstitutional state laws imposing segregation that preexisted their voluntary action.

For the same reasons, Senator Cruz's subjective motivation for lending $260,000 to his campaign the day before the election is completely irrelevant to the standing analysis. In *Havens*, "[t]hat the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, d[id] not negate the simple fact of injury." 455 U.S. at 374; *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1272 (D.C. Cir. 1994) ("the testers merely *posed* as potential renters or purchasers"). Similarly, in *Evers v. Dwyer*, the Supreme Court held that an "actual controversy" existed even though the plaintiff voluntarily sat in the whites-only section of a municipal bus "for the purpose of instituting this litigation." 358 U.S. 202, 203 (1958). The Court held that the plaintiff's motivation was irrelevant. *Id.* at 204. So too here: it matters not at all why Senator Cruz loaned money to his campaign, even assuming the loans were designed to bring a test case. *See* 13 WRIGHT & MILLER, § 3530 ("If actually adversary interests are involved, deliberate provocation of litigation does not defeat the existence of a controversy.").[6]

Nothing in the FEC's brief supports its argument. The only case cited by Defendants, *J. Roderick MacArthur Foundation v. FBI*, 102 F.3d 600 (D.C. Cir. 1996), does not even mention the role a plaintiff's motivation plays in evaluating standing, and its discussion of self-inflicted injuries is fully consistent with our analysis. The claimed right in *J. Roderick MacArthur Foundation* "depend[ed] upon the FBI's maintenance of a file on the Foundation being known to third parties," *id.* at 606, but third parties would not have known about the file if the Foundation itself had not itself made the file public, thus *creating* an injury to the claimed right where one

---

[6] *See also* WRIGHT & MILLER, § 3530 ("From its earliest days, the Supreme Court has decided cases plainly framed for the sole purpose of securing its disposition of legal questions . . . . It is widely supposed that some of its most famous constitutional decisions have likewise been rendered in deliberate test cases . . . .").

36

would otherwise not have existed. Here, Section 304's limit on the repayment of candidate loans would violate the First Amendment *even if Senator Cruz had never loaned money to his campaign*. Senator Cruz's loans did not *create* the violation of his First Amendment rights; rather, exercising his right to make those loans merely ensured that the First Amendment injury caused by Section 304 was *actualized*, in the same way that a racial minority actualizes a preexisting constitutional violation by voluntarily subjecting himself to the racially discriminatory practice. *J. Roderick MacArthur Foundation* has no bearing on this case.

The Government's second self-infliction argument is that Plaintiffs "unnecessarily constructed the conditions necessary for their alleged injury" and "chose not to take legally available steps to avoid that injury." MTD Br. 16. The FEC then spends several pages explaining how, if it had been running the Cruz Committee, it would have achieved the goal of fully reimbursing Senator Cruz's loans while complying with Section 304 and its implementing regulations, and asserting that the Committee's failure to do so was self-inflicted. *Id.* at 17–20. This argument is deeply flawed for at least two reasons.[7]

First, it again misconceives the injury at issue. The FEC focuses exclusively on Senator Cruz's financial injury, but the relevant injury is Plaintiffs' *constitutional* injury of being denied the use of post-election contributions to fully reimburse the Senator's loans. The denial of those funds burdens their First Amendment rights even if, in this particular instance, they could have fully reimbursed the Senator's loans without transgressing Section 304. Plaintiffs' challenge is to the restrictions on their constitutional right to use *post*-election funds to reimburse Senator Cruz,

---

[7] This second argument necessarily assumes that the actions of the Cruz Committee may be freely attributed to Cruz himself—since otherwise, the Committee's failure to pay off the loans with pre-election money could in no way be described as "self-inflicted" *by Cruz*. While the FEC cites no authority to establish this premise, we assume it for the sake of the analysis below.

and they cannot forfeit standing by failing to use *pre*-election funds for that purpose. A plaintiff does not forfeit standing because he does not conform his conduct to the very law whose constitutionality he challenges.

For example, suppose a city prohibits all Republicans—and only Republicans—from speaking in public parks on Sundays. If a Republican who was prevented from speaking on Sunday challenged the law, it would be no answer to say that he could have spoken Monday through Saturday. Because he had a constitutional right against such discrimination, the Republican has still been injured by the denial of his right to speak on Sunday. Moreover, he did not "self-inflict" his injury by insisting on speaking on Sunday; the *city's law* injured him by unconstitutionally prohibiting him from speaking on Sunday. *See Becker v. FEC*, 230 F.3d 381, 388 (1st Cir. 2000). So too here: because Senator Cruz and the Cruz Committee have a constitutional right to use post-election funds to fully reimburse the Senator's loans, they are still injured even if they could have done so with pre-election funds, and they did not "self-inflict" their injury by exercising their right to use only post-election funds.[8]

This is the same principle that the D.C. Circuit relied on in rejecting a self-inflicted-injury argument in *City of Jersey City v. Consolidated Rail Corp.*, 668 F.3d 741 (D.C. Cir. 2012). In that case, Jersey City wanted to purchase property owned by Consolidated Rail, but Consolidated Rail sold the property to private developers instead. *Id.* at 743–44. The City sued, alleging that the sale was void for violating a federal statute guaranteeing the City the right of first refusal in purchasing the property. *Id.* at 744–45. Consolidated Rail argued that the City's injury was self-inflicted

---

[8] The Government therefore misunderstands the issue when it says: "Plaintiffs' preference to use post-election contributions to repay Cruz's $10,000 in violation of federal law instead does not constitute an injury that confers standing." MTD Br. 17. Plaintiffs have a *right* to use post-election contributions to repay the Senator's loans, so they had no obligation to abjure that right to conform to Section 304 and its implementing regulations.

because it had passed on two previous opportunities to purchase the property. *Id.* at 746; *see also City of Jersey City v. Consol. Rail Corp.*, 741 F. Supp. 2d 131, 142 (D.D.C. 2010). Although the District Court agreed with Consolidated Rail and dismissed the suit, *id.*, the D.C. Circuit reversed, holding that the City had standing because "the fact that the City could have purchased the property in no way absolve[d] Conrail of its legal duty" to accord the City procedural protections. 668 F.3d at 746. Critical to the D.C. Circuit's conclusion was its assumption, for purposes of standing, that the City did have a right to the procedural protections it claimed. *Id.* Here, even if the Cruz Committee could have reimbursed Senator Cruz using *pre*-election funds, that "in no way absolves [the FEC] of its legal duty" to permit the Cruz Committee to fully reimburse Senator Cruz using *post-election* funds, *id.* at 746, since (as this Court must assume, for purposes of standing) Plaintiffs have a constitutional right to use *post*-election funds to reimburse the Senator.

A similar principle animated *Libertarian National Committee*. There, a deceased member of the Libertarian Party bequeathed $235,575.20 to the Libertarian National Committee ("LNC")—well above the annual contribution limit of $33,400. 924 F.3d at 536. The LNC could have accepted the bequest all at once by placing $33,400 in its general treasury and placing the rest in segregated accounts that limited the purposes for which the funds could be spent, but the LNC did not want to impose restrictions on the funds by placing them in the segregated accounts. *Id.* Claiming that it had a First Amendment right to accept the entire bequest without the spending restrictions imposed on the segregated accounts, the LNC sued. The FEC argued that the LNC lacked standing because it could have accepted the bequest all at once via the segregated accounts, but as the D.C. Circuit observed in rejecting that argument, the FEC misunderstood the nature of the LNC's injury: "[T]he LNC's injury stems not from its inability to accept the entire bequest immediately (which it could have done), but rather from the committee's inability to accept

[immediately] the entire bequest for *general expressive purposes* (which FECA prohibits)." *Id.* at 538 (quotation marks omitted) (alteration in original). Because the LNC claimed—and the D.C. Circuit had to assume—a constitutional right to accept the bequest into an *unrestricted* account, the LNC could not be said to have inflicted an injury on itself by refusing to accept the bequest into *restricted* accounts. In the same way, because Plaintiffs here claim (and have) a constitutional right to use exclusively *post-election* funds to repay Senator Cruz's loans in full, they cannot be said to have inflicted an injury on themselves by not using *pre-election* funds for that purpose.

The FEC tries to distinguish *Libertarian National Committee* by pointing out that the D.C. Circuit framed the LNC's choice as being between "the lesser of two evils," *id.*, while in this case, according to the FEC, "plaintiffs voluntarily chose to forego an option with no 'evil' attached to it at all: using its cash on hand to repay Cruz's $10,000 debt." MTD Br. 19 n.13. But Section 304 and its implementing regulations *did* place Plaintiffs in the position of choosing between two evils: foregoing their constitutional right to use exclusively post-election contributions to reimburse Senator Cruz or failing to fully reimburse Senator Cruz.

Third, the Government essentially argues that Plaintiffs lack standing because they did not spend campaign funds in the sequence the Government thinks they should have: by prioritizing the use of pre-election funds to reimburse Senator Cruz. The FEC devotes several pages of its brief to criticizing the Cruz Committee for various spending decisions it made after the election, MTD Br. 17, 19–20, but the FEC cannot defeat Plaintiffs' standing by complaining that the Cruz Committee did not exercise its First Amendment rights the way the Government thinks best. "[I]t is an injury in itself to avoid lawful conduct—viz., [reimbursing the Senator with post-election contributions]—in order to avoid the application of an allegedly unlawful Rule." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 902–03 (10th Cir. 2016).

*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011), is an example of this principle. In that case, the electorate of the city of Kinston, North Carolina, voted to change its municipal elections from a partisan to a nonpartisan system. *Id.* at 96. The Attorney General blocked implementation of that change under the preclearance provisions of Section 5 of the Voting Rights Act. *Id.* John Nix, a Republican who wanted to run for office under the nonpartisan system due to Kinston's majority-Democratic electorate, challenged the constitutionality of Section 5. *Id.* at 783, 786. The Government argued that Nix's injury was self-inflicted, but the D.C. Circuit held otherwise: "Nix could avoid the alleged electoral disadvantages of the partisan system only by running as a Democrat. But given Nix's First Amendment right to freedom of association, that option cannot possibly provide a basis for depriving him of standing." *Id.* at 789.

The same is true here: the Cruz Committee had a First Amendment right to prioritize its spending of pre-election contributions by paying vendors and other creditors rather than reimbursing Senator Cruz, and the Government cannot demand that the Committee give up that right to avoid the financial injury resulting from an unconstitutional statute. "[T]he need to take such affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury." *Meese v. Keene*, 481 U.S. 465, 475 (1987) (plaintiff could have "minimized" the harm inflicted by a statute by speaking a message he did not wish to speak, but still had standing to challenge the statute).

The Government discusses three cases—and cites several more—for the proposition that self-inflicted injuries do not give rise to Article III standing, but none of these cases is on-point.

In *National Family Planning & Reproductive Health Association, Inc. v. Gonzales*, the plaintiff alleged that a statute and a regulation were in conflict, such that the plaintiff's members did not know how to comply with both without jeopardizing their federal funding. 468 F.3d 826, 829 (D.C. Cir. 2006). The D.C. Circuit pointed out that the plaintiff could have asked the agency

that promulgated the regulation how to reconcile it with the statute but had failed to do so. *Id.* at 831. "As the association has *chosen* to remain in the lurch, it cannot demonstrate an injury sufficient to confer standing." *Id*. But the nature of the claim in *Gonzales* is different from the one here. The *Gonzales* plaintiff did not claim a right *not* to ask the agency to clarify its interpretation of the statute and regulation; here, Plaintiffs *do* claim a right *not* to be forced to use pre-election contributions to reimburse Senator Cruz. While the Government could demand that the *Gonzales* plaintiff resolve its alleged injury by asking the agency for clarification, the Government cannot demand that the Cruz Committee use pre-election funds to reimburse the Senator, since that is precisely what Plaintiffs claim they have a constitutional right *not* to do.

*Huron v. Berry*, 12 F. Supp. 3d 46 (D.D.C. 2013), is distinguishable for similar reasons. There, the plaintiff alleged that it was illegal for his government healthcare plan to refuse to cover a particular medical device, but before filing suit, "Huron and his family had three opportunities . . . to transfer from their [healthcare] plan to one of several other [healthcare] plans with [the medical device] coverage." *Id.* at 52–53. Because the plaintiff selected a plan without coverage for the device he needed despite the availability of other plans covering the device—and chose to remain in that plan despite multiple opportunities to transfer to a new plan—his injury was self-inflicted. *Id.* at 53. But, again, the nature of the injury in *Huron* was quite different from the nature of the injury here. The plaintiff in *Huron* was injured by his inability to afford his medical device without insurance coverage. *Id.* at 51. Because any insurance plan that covered his device would redress his injury, his decision not to choose a plan with coverage meant that his injury was self-inflicted. By contrast, Plaintiffs in this case are injured by their inability to use post-election contributions to fully reimburse Senator Cruz, and that injury cannot be redressed by pointing to *other* sources of funds that could have been used to reimburse the Senator.

*Stop This Insanity Inc. Employee Leadership Fund v. FEC*, 761 F.3d 10 (D.C. Cir. 2014) ("*STII*"), is even further afield. The plaintiff in that case willingly formed a type of political action committee that imposed more restrictions on its independent expenditures and solicitations than other forms of organization, yet it argued that the First Amendment required strict scrutiny of those restrictions under *Citizens United*. *STII*, 761 F.3d at 12–13. The D.C. Circuit pointed to the self-imposed nature of these restrictions as part of its evaluation *of the merits*—specifically, the applicable level of scrutiny—*not* the plaintiff's standing. *Id.* at 14–15. Indeed, the D.C. Circuit did not question the plaintiff's standing in that case. *STII* is therefore irrelevant for that reason alone. Moreover, *STII* did not assert a constitutional right to choose its more-restrictive form of organization, so it could be faulted for making its life more difficult. By contrast, Plaintiffs here claim that they *do* have a constitutional right to use post-election contributions to fully reimburse Senator Cruz, so they cannot be faulted for exercising that constitutional right.

The Government's other cases are similarly inapposite, which is presumably why the FEC spends so little time on them. *See* MTD Br. 16 n.12. *McConnell*, 540 U.S. at 228, *Grocery Manufacturers' Ass'n v. EPA*, 693 F.3d 169, 177–78 (D.C. Cir. 2012), and *Petro-Chem Processing*, 866 F.2d at 438, all involved challenges to laws that *permitted* the plaintiffs to take some action that they did *not wish* to take. Here, by contrast, Plaintiffs are challenging laws that *forbid* them from taking an action that they *do* wish to take: using post-election contributions to fully reimburse Senator Cruz. The former cases involved injuries stemming from ideological commitments (*McConnell*) or economic competition (*Grocery Manufacturers*; *Petro-Chem*);[9] this

---

[9] As *Huron* recognized, *Grocery Manufacturers* and *Petro-Chem* stand for the proposition that "economic considerations that cause an individual to reject a certain option because it is less favorable in some ways and more favorable in others does not transform an otherwise voluntary decision into a coerced one." 12 F. Supp. 3d at 53.

case involves constitutional injury (i.e., the inability to use post-election contributions to fully reimburse a candidate) caused directly by Section 304 and its implementing regulations.[10] There is no comparison between these cases and this one.

**B.      Plaintiffs Have Standing To Bring Their Overbreadth Claim.**

Finally, the FEC seeks dismissal of Plaintiffs' claim that the challenged provisions violate the First Amendment rights of *contributors*. Plaintiffs "do not have standing to assert constitutional claims on behalf of these hypothetical potential donors," FEC says, since there is no "barrier" impeding those contributors from bringing suit themselves, and the criteria for "third party standing" thus cannot be satisfied. MTD Br. 20–22. Defendants misunderstand the nature of our challenge on behalf of contributors. We do not assert "third party standing" to raise those potential donors' constitutional rights in a representative capacity; rather, our claim that Section 304 violates their rights is an *overbreadth challenge*. The overbreadth doctrine is a "departure from traditional rules of standing," allowing plaintiffs "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression," *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 613 (1973); *see also Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). The Supreme Court, accordingly, has squarely held that "where the claim is that a statute is overly broad in violation of the First Amendment, . . . a party [may]

---

[10] *Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 (D.D.C. 2015), is distinguishable for the same reason as *J. Roderick MacArthur Foundation*: the injury in *Afifi* could only have come into existence via the voluntary action of the plaintiff, whereas the injury in this case (i.e., the diminished likelihood that a candidate will be reimbursed for money spent on his campaign) is ongoing and preexisted the voluntary action of the Plaintiffs.

assert the rights of another without regard to the ability of the other to assert his own claims," *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957 (1984).[11]

Of course, the plaintiff in an overbreadth challenge must still "satisf[y] the requirement of 'injury-in-fact.' " *Id.* at 958. But as shown above, *supra* Part II.A, both of the Plaintiffs in this case easily clear this threshold.

Finally, the FEC urges that standing should be denied because "it seems highly unlikely that any such potential donors even exist." MTD Br. 21. Not so. As explained above, there is a definite class of contributors who are injured by Section 304's limits: those who wish to contribute, after an election, to a candidate whose only "net debts outstanding" are comprised of personal loans in excess of the $250,000 limit. *See supra*, p. 23. For individuals in this profile, Section 304 amounts to a cap on their contributions to that candidate, preventing them from engaging in protected speech and association. There is no question that there are candidates, and contributors, who meet this description (if not, then Section 304 serves no function *whatsoever*).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss and should convene a three-judge court pursuant to BCRA § 403 and 28 U.S.C. § 2284(b).

---

[11] For the same reason, Plaintiffs may raise an overbreadth claim on behalf of losing candidates without showing that they have a "close relation" to such candidates or that those candidates "could not bring [their] own lawsuit." MTD Br. 23 n.17.

Dated:  June 28, 2019                     Respectfully submitted,

                                          s/ Charles J. Cooper
                                          Charles J. Cooper
Chris Gober                                 (D.C. Bar No. 248070)
  (D.C. Bar No. 975981)                   John D. Ohlendorf
The Gober Group PLLC                        (D.C. Bar. No. 1024544)
3595 RR 620 S., Suite 200                 J. Joel Alicea
Austin, TX 78738                            (D.C. Bar. No. 1022784)
(512) 354-1787                            COOPER & KIRK, PLLC
                                          1523 New Hampshire Avenue, N.W.
                                          Washington, D.C. 20036
                                          (202) 220-9600
                                          (202) 220-9601 (facsimile)
                                          ccooper@cooperkirk.com

              *Attorneys for Plaintiffs*