**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————— ) | |
| **TED CRUZ FOR SENATE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 19-cv-908 (APM)** |
| ) | |
| **FEDERAL ELECTION COMMISSION, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————————— ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I.    INTRODUCTION

Plaintiffs, Senator Rafael Edward Cruz ("Senator Cruz") and Ted Cruz for Senate ("Cruz Committee" or "Committee"), seek declaratory and injunctive relief invalidating and enjoining the enforcement of Section 304 of the Bipartisan Campaign Reform Act ("BCRA") and its implementing regulations, which place limits on the amount of post-election contributions that may be used to pay back a candidate's pre-election loans.  They have asked the court to convene a three-judge district court to hear their challenges in accordance with BCRA's judicial review provision.  Defendants, the Federal Election Commission and its four current Commissioners (collectively the "FEC"), oppose that request and have moved to dismiss the Complaint for lack of jurisdiction.  For the reasons that follow, the court grants Plaintiffs' motion to convene a three-judge court and denies the FEC's motion to dismiss.

## II.      BACKGROUND

### A.      Legal Background

#### 1.      The Loan Repayment Limit

In 2002, Congress enacted the Bipartisan Campaign Reform Act ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, which amended the Federal Election Campaign Act of 1971 ("FECA"). One provision of BCRA states that a "candidate who incurs personal loans . . . in connection with the candidate's campaign for election shall not repay (directly or indirectly), to the extent such loans exceed $250,000, such loans from any contributions made to such candidate or any authorized committee of such candidate after the date of such election."  52 U.S.C. § 30116(j). The FEC's implementing regulations clarify that BCRA's $250,000 limit applies both to loans secured by the candidate for the benefit of his campaign and to loans made to the campaign from the candidate's personal funds.  11 C.F.R. § 116.11(a).

BCRA and its implementing regulations (collectively the "Loan Repayment Limit") thus give a campaign committee two options for paying back a candidate's personal loans after an election.  First, the committee may repay up to "the entire amount of the personal loans using contributions to the candidate or the candidate's authorized committee provided that those contributions were made on the day of the election or before."  *Id.* § 116.11(b)(1).  If the committee elects to use pre-election contributions to repay all or part of the loan, "it must do so within 20 days of the election."  *Id.* ¶ 116.11(c)(1).

Alternatively, the committee "[m]ay repay up to $250,000 of the personal loans from contributions made to the candidate or the candidate's authorized committee after the date of the election."  *Id.* § 116.11(b)(2).  There is no time limit on when the campaign may repay the $250,000 using post-election contributions; however, the committee "[m]ust not repay . . . the

aggregate amount of the personal loans that exceeds $250,000, from contributions to the candidate or the candidate's authorized committee if those contributions were made after the date of the election." *Id.* § 116.11(b)(3).   After the 20-day post-election period has elapsed, the committee must "treat the remaining balance of the candidate's personal loan that exceeds $250,000 as a contribution from the candidate."   *See* Increased Contribution and Coordinated Party Expenditure Limits for Candidates Opposing Self-Financed Candidates, 68 Fed. Reg. 3970, 3974 (Jan. 27, 2003); *see also* 11 C.F.R. § 116.11(c)(2).

### 2.   *Judicial Review of Constitutional Challenges to BCRA*

Section 403 of BCRA provides that "[i]f any action is brought for declaratory or injunctive relief to challenge the constitutionality of any provision of this Act[,] . . . [t]he action shall be filed in the United States District Court for the District of Columbia and shall be heard by a 3-judge court convened pursuant to [28 U.S.C.] section 2284."   *See* Pub. L. No. 107-155, § 403(a) (codified at 52 U.S.C. § 30110 note (hereinafter BCRA § 403)).   The party seeking to convene a three-judge court must file a request, whereupon "the judge to whom the request is presented shall" initiate the process, "unless he determines that three judges are not required." 28 U.S.C. § 2284(b)(1).   A three-judge court's final decision on such an action "shall be reviewable only by appeal directly to the Supreme Court of the United States."   BCRA § 403(a)(3).

### B.   **Factual Background**

This case arises from Senator Cruz's 2018 reelection campaign for the United States Senate.   On the day before the November 6, 2018 general election, Senator Cruz made two loans totaling $260,000 to the Cruz Committee to help finance his campaign.   *See* Compl., ECF No. 1

[hereinafter Compl.], ¶ 28; Ted Cruz for Senate, FEC Form 3 at 401-02 (Jan. 31, 2019).[1]  Of the $260,000 lent to the Committee, $5,000 originated from Senator Cruz's personal bank accounts and $255,000 originated from a margin loan secured with Senator Cruz's personal assets. Compl. ¶ 28.

At the close of election day, the Cruz Committee had approximately $2.2 million on hand and nearly $2.5 million in debts associated with the 2018 general election. *Id.* ¶ 29.  The Committee then "used the funds it had on hand to pay vendors and meet other obligations instead of repaying [Senator Cruz's] loans." *Id.*  The Committee did not use any of the funds it had on hand to pay off Senator Cruz's loans during the 20-day period, meaning that after that period elapsed, the balance of those loans that exceeded BCRA's $250,000 statutory cap on post-election contributions—$10,000—converted into a campaign contribution. *See id.* ¶¶ 30–31; 11 C.F.R. § 116.11(c)(2).

Following the 20-day repayment period, the Cruz Committee repaid Senator Cruz the $250,000 statutory maximum using post-election contributions, but BCRA foreclosed it from paying back the $10,000 balance.  Compl. ¶¶ 31–32.  Plaintiffs allege that, "[a]bsent the restrictions of [BCRA] and the Commission's corresponding regulation[s]," they "would solicit debt-retirement funds from potential donors and would use post-election contributions to defray the remaining $10,000 loan balance." *Id.* ¶ 33.

### C.   Procedural History

In April 2019, Plaintiffs filed suit against the FEC, contending that:  (1) the Loan Repayment Limit unconstitutionally infringes on their First Amendment rights to freedom of speech; (2) the limit also infringes on the First Amendment free speech rights of potential post-election donors; and (3) the implementing regulation, 11 C.F.R. § 116.11, is contrary to law and

---

[1] Available at https://docquery.fec.gov/pdf/325/201901319145235325/201901319145235325.pdf.

arbitrary and capricious.  *See* Compl. ¶¶ 5, 34–51.  On the same day, Plaintiffs filed a request to convene a three-judge district court pursuant to BCRA § 403 and 28 U.S.C. § 2284.  *See* Appl. For a Three-Judge Court, ECF No. 2.

The FEC opposes Plaintiffs' motion to appoint a three-judge court and seeks dismissal of Plaintiffs' Complaint for lack of jurisdiction.  *See* Defs.' Opp'n to Pls.' Appl. for a Three-Judge Court and Mot. to Dismiss for Lack of Subject-Matter Jurisdiction, ECF No. 25 [hereinafter Defs.' Mot.].  The FEC argues that this case is not justiciable because Plaintiffs lack standing, *see id.* at 13–24, and that the three-judge court lacks subject-matter jurisdiction over the case because Plaintiffs' constitutional claims are "wholly insubstantial," *see id.* at 25–44.  The FEC also contends this court should deny Plaintiffs' request to convene a three-judge court with respect to their challenges to the implementing regulations because the three-judge court would lack authority to rule on those challenges.  *Id.* at 44–45.  Plaintiffs retort that (1) the FEC's standing argument must be resolved by a three-judge court, and that in any event Plaintiffs do have standing; (2) their challenges are constitutionally substantial; and (3) a three-judge court has, at a minimum, supplemental jurisdiction to adjudicate Plaintiffs' challenges to the FEC's implementing regulations.  *See generally* Pls.' Reply in Supp. of Their Appl. For a Three-Judge Court & Resp. to Defs.' Mot. to Dismiss, ECF No. 29 [hereinafter Pls.' Reply].

## III.   DISCUSSION

### A.   Plaintiffs' Standing

#### 1.   *This Court Has Jurisdiction to Decide the Standing Question*

Plaintiffs contend that BCRA's requirement that a three-judge court be convened to hear any "action" challenging BCRA's constitutionality precludes a single-judge court from ruling on

5

a motion to dismiss for lack of standing in such an action.  Plaintiffs' rigid reading of the word "action," however, is foreclosed by binding Supreme Court precedent.

Section 403 of BCRA provides that a three-judge district court shall adjudicate any "action . . . brought for declaratory or injunctive relief to challenge the constitutionality of any provision of this Act."  BCRA § 403(a)(3).  Though framed in mandatory terms, the provision cross-references 28 U.S.C. § 2284, which provides that a single judge need not convene a three-judge panel if she "determines that three judges are not required."  § 2284(b)(2).  The Supreme Court has held that a "three-judge court is not required where the district court itself lacks jurisdiction [over] the complaint or the complaint is not justiciable in the federal courts." *Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015) (quoting *Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90, 100 (1974)).  A case is not justiciable in federal courts when the plaintiff lacks standing, and therefore the absence of standing is a "ground upon which a single judge [may] decline[] to convene a three-judge court."  *See Gonzalez*, 419 U.S. at 100.

 Plaintiffs object that *Gonzalez* and *Shapiro* are inapposite because they did not involve a challenge to BCRA.  They contend that BRCA is unique among other three-judge judicial review provisions because it requires a three-judge court to "adjudicate the entire 'action'—which includes . . . a pre-trial motion to dismiss for lack of jurisdiction."  Pls.' Reply at 13.  BCRA's use of the word "action" is not unique, however.  Like BCRA, the statute at issue in *Shapiro* similarly requires the convening of a three-judge court to adjudicate the entire "action," 28 U.S.C. § 2284(a), and yet the Supreme Court had no difficulty concluding that "a district judge need not unthinkingly initiate the procedures to convene a three-judge court without first examining the allegations in the complaint" and determining whether it "lacks jurisdiction [over] the complaint," *Shapiro*, 136 S. Ct. at 452; *see also Wertheimer v. FEC*, 268 F.3d 1070, 1072

(D.C. Cir. 2001) (finding that "an individual district court judge may consider threshold jurisdictional challenges prior to convening a three-judge panel" under the Presidential Campaign Fund Act, which, like BCRA, requires three-judge courts to hear applicable "actions"). The D.C. Circuit has specifically applied *Shapiro*'s reasoning in the context of BCRA, explaining that "a three-judge court is not required" to hear a constitutional challenge to BCRA "where the district court itself lacks jurisdiction [over] the complaint or the complaint is not justiciable in the federal courts." *Indep. Inst. v. FEC*, 816 F.3d 113, 116 (D.C. Cir. 2016) (quoting *Shapiro*, 136 S. Ct. at 455).[2] Consistent with this precedent, a host of district courts have held that a single judge may dismiss a constitutional challenge to BCRA for lack of standing. *See, e.g.*, *Republican Party of La. v. FEC*, 146 F. Supp. 3d 1, 8 (D.D.C. 2015); *Rufer v. FEC*, 64 F. Supp. 3d 195, 202 (D.D.C. 2014); *Schonberg v. FEC*, 792 F. Supp. 2d 14, 17 (D.D.C. 2011).

To be sure, *Shapiro* was focused on a separate jurisdictional issue—whether a claim was too "constitutionally insubstantial" to implicate the court's federal subject-matter jurisdiction—but there is no basis to distinguish between Article III jurisdiction (standing) and federal subject-matter jurisdiction (constitutional substantiality) for purposes of convening a three-judge court. As with Article III standing, the court's power to dismiss a constitutionally insubstantial question does not hinge on any "interpretation of statutory text" of BCRA or 28 U.S.C. § 2284, but on the familiar proposition that the "essential" jurisdictional prerequisites must be met before a single-judge court will exercise its jurisdiction to convene a three-judge panel. *See Shapiro,* 136 S. Ct. at 455 (quoting *Ex parte Poresky*, 290 U.S. 30, 31 (1933) (per curiam)); *see also O'Hair v. United States*, 281 F. Supp. 815, 818 (D.D.C. 1968) ("The first duty of the sole judge is to pass

---

[2] Plaintiffs argue that *Independent Institute*'s statement is dicta. *See* Pls.' Reply at 14. Even if it is, the issue is still controlled by *Shapiro* and *Gonzalez*; therefore, the court does not consider this argument further.

on the sufficiency of the complaint specifically as to whether or not a justiciable controversy is presented over which he has adjudicatory powers, and if he determines that the Court lacks jurisdiction, he must dismiss the suit.").  As discussed below, Plaintiffs freely concede that a single judge may dismiss a constitutionally insubstantial challenge to BCRA for lack of jurisdiction, *see* Pls.' Reply at 14; it follows that the same is true of a case where jurisdiction is lacking for want of standing.

At oral argument, Plaintiffs sought to draw a line between these two jurisdictional inquiries, urging that the question of constitutional substantiality is within the single-judge court's jurisdiction because it goes to whether a constitutional question is raised at all—a necessary prerequisite to trigger BCRA § 403's judicial review requirement—whereas questions regarding a litigant's standing fall under the broad umbrella of an "action" challenging BCRA, and therefore must go to a three-judge court.  That reading, however, is irreconcilable with *Gonzalez*, in which the Supreme Court held that it did not have mandatory jurisdiction over a three-judge court's dismissal of a claim for lack of standing because the lower court's dismissal was "not merely short of the ultimate merits; it was also, like an absence of statutory subject-matter jurisdiction, a ground upon which a single judge could have declined to convene a three-judge court." 419 U.S. at 100.  The Court acknowledged that, under the statute at issue, a "single judge is literally forbidden to 'dismiss the action, or enter a summary or final judgment' in any case required to be heard by three judges," but it eschewed such a literalist reading, noting that "we have always recognized a single judge's power to dismiss a complaint for want of . . . jurisdiction." *Id.* at 96 n.14 (quoting 28 U.S.C. § 2284(5)).  Thus, *Gonzalez* confirms that a single judge's power to dismiss a case on jurisdictional grounds does not turn on the type of

jurisdictional question presented, even when, as here, the statute requires three-judge review of an entire "action."

The single-judge court's power to dispose of non-justiciable challenges to BCRA finds further support from its important role as a gatekeeper. *See Republican Party of La.*, 146 F. Supp. 3d at 8 (explaining that "the [single judge's] role at this stage of the proceedings is to determine how and by whom this case will be heard").  It is the single-judge court's responsibility to weed out jurisdictionally lacking cases that would otherwise "triple[] the normal cost of a case for the district court," *Turner Broad. Sys., Inc. v. FCC*, 810 F. Supp. 1308, 1312 (D.D.C. 1992), and burden the Supreme Court's docket with mandatory review, *see Gonzalez*, 419 U.S. at 98 (explaining that three-judge judicial review statutes should be construed narrowly consistent with the Court's "overriding policy, historically encouraged by Congress, of minimizing the mandatory docket of [the Supreme Court] in the interests of sound judicial administration").

Plaintiffs' unyielding interpretation of the word "action" would upend this court's important gatekeeping role.  For instance, because any "action" challenging BCRA's constitutionality is reviewable "only by appeal directly to the Supreme Court," *see* BCRA § 403(a)(3), Plaintiffs' reading would require that the Supreme Court assume "mandatory, direct appellate jurisdiction in this case" even if this court were to dismiss Plaintiffs' Complaint for lack of standing, *see* Pls.' Reply at 10.  That cannot be squared with the "well settled" rule that the "refusal to request the convention of a three-judge court, dissolution of a three-judge court, and dismissal of a complaint by a single judge are orders reviewable in the court of appeals," not in the Supreme Court.  *Gonzalez*, 419 U.S. at 100; *see also Turner*, 810 F. Supp. at 1312

(rejecting an identical construction of the word "action" due to the "considerable burdens" it would place "on the federal judicial system").

In short, Plaintiffs seek to pile more weight on the word "action" as it is used in BCRA § 403 than it can bear.  This court has authority to consider the question of Plaintiffs' standing, which it turns to now.

### 2.    Plaintiffs' Standing

A plaintiff in federal court bears the burden of showing that she meets the "irreducible constitutional minimum" of Article III standing:   (1) injury in fact, (2) causation, and (3) redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).   To establish standing at the motion to dismiss stage, the plaintiff "must state a plausible claim that [she has] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)); *see also Republican Party of La.*, 146 F. Supp. 3d at 9.

Plaintiffs allege a variety of injuries, but the most clear-cut is Senator Cruz's $10,000 financial injury.   To recap, Senator Cruz loaned his campaign $10,000 more than he could legally be repaid using post-election contributions.  Compl. ¶ 28.  Believing that he had a right be repaid with such funds, he declined to pay himself back with available pre-election funds and instead used those funds to pay back other creditors.  *Id.* ¶ 29.  After the 20-day period had elapsed, Senator Cruz's campaign repaid him the $250,000 maximum using post-election contributions, but it is legally barred from paying him back the $10,000 balance.  *Id.* ¶¶ 30–32.

As a consequence of all this, Senator Cruz is still owed $10,000, *id.* ¶ 32, which is plainly a cognizable injury.  Indeed, any financial loss—even if only a "dollar or two"—is ordinarily a

cognizable injury for standing purposes. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008).  That injury is caused by the Loan Repayment Limit, because the Cruz Committee's inability to repay the $10,000 balance is due to the law's restrictions on the amount of post-election contributions a campaign can use to repay a candidate's loans.  And the injury would be redressed by a favorable court decision, because, if a three-judge court were to strike down the Loan Repayment Limit, the Cruz Committee would solicit additional post-election contributions to pay off Senator Cruz's loans. *See* Compl. ¶¶ 32–33.  Senator Cruz has therefore met his burden of plausibly alleging each of the three elements of standing.[3]

The FEC nevertheless argues that Senator Cruz lacks standing because, it says, the Senator's injury is self-inflicted.  A self-inflicted harm is neither a "cognizable" Article III injury, nor "fairly traceable to the defendant's challenged conduct." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).  However, to be self-inflicted, an injury must be "so completely due to the [plaintiff's] own fault as to break the causal chain." *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.5 (2d ed. 1984)).  Plaintiffs' role in Senator Cruz's injury does not rise to that level.

The FEC's primary self-infliction argument—that Senator Cruz caused his own injury by "transparently tailor[ing]" the $260,000 loans to bring a challenge to the Loan Repayment Limit, Defs.' Mot. at 15, is easily disposed of.  It has "long been settled . . . that an individual does not forfeit his standing for jurisdictional purposes merely because he is a 'test' plaintiff." *Gavett v. Alexander*, 477 F. Supp. 1035, 1041 (D.D.C. 1979) (collecting cases).  That is because, "if

---

[3] Because Senator Cruz has standing due to his financial injury, the court does not address Plaintiffs' other theories of standing. *See Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 443 (D.C. Cir. 2013) (explaining that "to proceed to the merits" of a group of petitioners' claims, the court "need only find one party with standing").

actual[] adversary interests are involved, deliberate provocation of litigation does not defeat the existence of a controversy."  Wright & Miller, 13 Fed. Prac. & Proc. Juris. § 3530 (3d ed. 2019). So long as there is "concrete adverseness" between the parties, *see Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1045 (D.C. Cir. 1976), a test case brought by a litigant who has been injured by a law he seeks to challenge is no less justiciable than any other, *see Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) ("[W]hen an individual searches for and finds a violation of the law, it is the violation itself—not the search—that causes the plaintiff injury.").[4]  Because the parties' interests here are plainly adverse, the fact that Senator Cruz may have made the two loans fully expecting that the Loan Repayment Limit would inhibit his ability to be fully repaid has no bearing on his standing to challenge the law.

The FEC's second argument—that Plaintiffs could have easily "taken legally available steps to avoid" Senator Cruz's injury, Defs.' Mot. at 16—is equally unavailing.  Recall that the Loan Repayment Limit gives a campaign committee two options for paying back a candidate's personal loans after an election.  The committee may either (1) repay up to "the entire amount of the personal loans using" pre-election contributions, so long as it makes the payment within 20 days of the election, 11 C.F.R. § 116.11(b)(1), (c)(1), or (2) "repay up to $250,000 of the personal loans from" post-election contributions at any time, with any outstanding balance above $250,000 converting to a contribution from the candidate after the 20-day period expires, *id.* § 116.11(b)(2), (c)(2).  The FEC argues that Senator Cruz could have repaid himself with a minimum of $10,000 in pre-election contributions under Option 1, which would have enabled

---

[4] The only case cited by the FEC in support of its position, *J. Roderick MacArthur Foundation v. FBI*, 102 F.3d 600 (D.C. Cir. 1996), is not to the contrary.  That case did not discuss the plaintiffs' subjective motivations in bringing the lawsuit, and the only alleged harm—the risk to privacy associated with the public release of the plaintiffs' information—was exclusively the fault of the plaintiffs, who voluntarily chose to make that information public. *Id.* at 606.  Unlike that case, Senator Cruz's harm is indisputably caused by the Loan Repayment Limit's restrictions on how his loans can be repaid.

him to make himself whole with a maximum $250,000 payment using post-election funds. By choosing not to make a modest loan payment of $10,000 using pre-election funds, the FEC contends, Plaintiffs voluntarily chose to subject Senator Cruz to an injury under Option 2.  Defs.' Mot. at 16–17.

The flaw in the FEC's argument is that it would require Senator Cruz to avoid an injury by subjecting himself to the very framework he alleges is unconstitutional.  For standing purposes, the court must accept as valid the merits of Plaintiffs' claim, *see re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019), meaning the court must assume that the Loan Repayment Limit's restriction on the amount of post-election contributions a campaign committee can use to repay a candidate's pre-election loans unconstitutionally burdens free speech, *see* Compl. ¶¶ 3, 35–41.  The corollary of this is that Plaintiffs would have the right to repay Senator Cruz's loans in full using post-election contributions.  Obligating Plaintiffs to avoid the Senator's injury by repaying at least a portion of the loans using pre-election contributions would therefore require Senator Cruz to forego exercising a right that the court must assume he has, and subject him to the very framework that ostensibly unconstitutionally burdens his free speech.

This principle animated the D.C. Circuit's recent decision in *Libertarian National Committee, Inc. v. FEC*, where the court rejected an argument that a political committee had caused its own injury by refusing to subject itself to the statutory requirement it was challenging. 924 F.3d 533, 536 (D.C. Cir. 2019).  In that case, a deceased member of the Libertarian Party had bequeathed more than $200,000 to the Libertarian National Committee ("LNC")—well above the annual contribution limit of $33,400.  *Id.* at 536.  The LNC could have accepted the bequest all at once by placing $33,400 in its general treasury and the rest in segregated accounts

that limited the purposes for which the funds could be spent, but the committee believed it had a First Amendment right to receive the full bequest with no strings attached. *Id.* at 538. Rather than accept the money into spending-limited accounts, the LNC deposited the money into escrow, which limited its ability to use the money for expressive purposes. *See id.* at 538–39. The court rejected the FEC's argument that the LNC inflicted its own injury by failing to accept the entire bequest into segregated accounts, reasoning that "the LNC's injury stems not from its inability to accept the entire bequest immediately (which it could have done), but rather from the committee's inability to accept immediately the entire bequest for *general expressive purposes* (which FECA prohibits)." *Id.* at 538 (cleaned up). Thus, as with this case, the LNC had no obligation to avoid its injury by subjecting itself to the very statutory requirement it claimed to be unconstitutional.

None of the cases the FEC cites supports the notion that to avoid causing her own injury a plaintiff must do the very thing she claims she has a right not to do. For instance, in *Gonzalez*, the D.C. Circuit held that a plaintiff lacked standing where its purported injury—uncertainty as to how to comply with a purportedly conflicting statute and regulation—could have easily been resolved by asking the relevant agency to clarify its regulations. 468 F.3d at 831. The plaintiff was not challenging the requirement that it seek clarification, however. Thus, unlike Plaintiffs' injury here, the *Gonzalez* plaintiff's "easy means for alleviating the alleged [injury]," *id.*, did not require it to comply with a legal requirement it was challenging. Likewise, in *Huron v. Berry*, the court held that a family lacked standing to challenge the federal government's approval of certain health insurance plans for federal employees after the family switched to a plan that lacked medical coverage the father needed. 12 F. Supp. 3d 46, 47 (D.D.C. 2013). The family's injury was self-inflicted, the court held, because they had chosen to enroll in a plan that lacked

14

the needed coverage notwithstanding the fact that there were at least seven other federal plans that offered such coverage. *Id.* at 52–53. The family's decision not to enroll in those other plans was based purely on their "own economic self-interest," *id.* at 53; the family did not allege, as Plaintiffs allege here, that they had a constitutional right to enroll in the plan that lacked coverage, or that enrolling in any of the other plans would violate their rights.

The FEC makes much of the D.C. Circuit's decision in *Stop This Insanity Inc. Employee Leadership Fund v. FEC*, 761 F.3d 10 (D.C. Cir. 2014), but, as the agency conceded at oral argument, that case was not about standing. Instead, the court held "on the merits" that a corporation that sought to use a functionally obsolete type of political action committee to solicit contributions and make independent expenditures had no First Amendment right to be free of restrictions on that type of committee when the corporation itself could have engaged in the same activity free of any such restrictions. *Id.* at 12–14. The court could not have reached the merits if the plaintiffs lacked standing, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998), which suggests that, as here, a plaintiff does not lack an injury simply because there are "*less* burdensome" and "more robust option[s]" to accomplish her desired goals, *see Stop This Insanity*, 761 F.3d at 14.

In sum, Senator Cruz has plausibly alleged a cognizable, redressable injury that is caused by the Loan Repayment Limit, not by Plaintiffs.

## B.    The Constitutional Substantiality of Plaintiff's BCRA Challenges

The FEC argues that the court should also deny Plaintiffs' application for a three-judge court "for the separate and independent reason that plaintiffs have failed to 'present a substantial [constitutional] claim.'" Defs.' Mot. at 25 (quoting *Republican Party of La.*, 146 F. Supp. 3d at 8). The court disagrees.

"[A] district judge need not unthinkingly initiate the procedures to convene a three-judge court without first examining the allegations in the complaint" and determining whether it has jurisdiction over the action. *Shapiro*, 136 S. Ct. at 455.  A challenge to BCRA fails to implicate federal subject-matter jurisdiction, thereby precluding federal judicial review, when the constitutional claim is "wholly insubstantial and frivolous." *Id.* (quoting *Bell v. Hood*, 327 U.S. 678, 682–683 (1946)).  "[T]he exception for insubstantial claims is narrow," however. *Independence Institute*, 816 F.3d at 116.  "It applies only when the case is 'essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit.'" *Id.* (quoting *Shapiro*, 136 S. Ct. at 456).  Plaintiffs' constitutional challenges to BCRA are not so lacking as to fail to clear this low bar.

Plaintiffs' main constitutional concern with the Loan Repayment Limit is straightforward:  "[B]y bar[r]ing the repayment of candidate loans greater than $250,000 from money raised after the election," they argue, "the [Loan Repayment Limit] necessarily increases the risk that these loans will not be repaid in full, or perhaps at all."  Pls.' Reply at 15–16.  This has the effect, Plaintiffs continue, of "deterring a candidate from making loans in excess of $250,000," thereby "directly burdening his First Amendment right 'to speak without legislative limit on behalf of his own candidacy.'"  *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 54 (1976)). The FEC responds that Plaintiffs' constitutional argument is "wholly insubstantial" because the Loan Repayment Limit "merely sets conditions on a candidate having his or her loans repaid, which is not a constitutional right at all," and that even if the Limit did burden a candidate's free speech, it would be justified by the government's compelling interest in preventing corruption. *See* Defs.' Mot. at 26–27.

16

The FEC has not shown that Plaintiffs' argument is "frivolous or . . . so settled by precedent as to be beyond controversy." *Republican Party of La.*, 146 F. Supp. 3d at 13.  Indeed, the FEC has not identified any case law specifically holding that the type of indirect burden on a candidate's ability to freely loan to his campaign identified by Plaintiffs does not implicate the First Amendment's protections on political speech.  Nor has the FEC shown that any speech burdens that the Loan Repayment Limit places on candidates would unequivocally survive constitutional scrutiny.  Thus, while the argument "may or may not prevail on the merits," Plaintiffs are entitled to make that case before a three-judge court.  *Independence Institute*, 816 F.3d at 117.

Plaintiffs also argue that the Loan Repayment Limit unconstitutionally burdens the First Amendment rights of committees and potential contributors, Pls.' Reply at 20–23, and the FEC contends that these claims are similarly insubstantial, Defs.' Mot. at 33–35.  The court need not address these arguments, however.  Since Plaintiffs have advanced "at least one argument . . . that is not essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit, the case must proceed to a three-judge court."  *Independence Institute*, 816 F.3d at 117 (internal quotation marks omitted).

### C.    Whether Plaintiffs' Challenges to the FEC's Implementing Regulations May Be Heard by a Three-Judge Court

Finally, the FEC argues that the court should decline Plaintiffs' request to convene a three-judge court with respect to Plaintiffs' claims challenging the FEC's implementing regulations because, it insists, a three-judge court would have no authority to rule on those claims.  That is incorrect; if appropriate, a three-judge court could exercise supplemental jurisdiction over Plaintiffs' challenges to the FEC's regulations.

It has long been understood that in cases involving a claim that must be heard by a three-judge court, that court "has power to decide other claims in the case that, standing alone, would require only a single judge."  *See* Wright & Miller, 17A Fed. Prac. & Proc. Juris. § 4235 (3d ed. 2019) (collecting cases); *see also* 28 U.S.C. § 1367(a) (granting district courts supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy").  In *Zemel v. Rusk*, for instance, the Supreme Court held that a three-judge court properly exercised jurisdiction over a claim that the Secretary of State was acting in excess of his statutory authority because the complaint also included a substantial constitutional challenge to the enabling statutes themselves.  381 U.S. 1, 5 (1965).  The Court rejected the government's argument that the three-judge court was improperly convened, holding that the "joining in the complaint of a nonconstitutional attack along with the constitutional one does not dispense with the necessity to convene [a three-judge] court."  *Id.* at 6 (quoting *Fla. Lime & Avocado Growers, Inc. v. Jacobsen*, 362 U.S. 73, 80 (1960)).  Likewise, in *Allee v. Medrano*, the court reiterated that a three-judge court "could properly consider" a challenge that raised claims not covered by the three-judge statute because it had "jurisdiction ancillary to that conferred by the constitutional attack . . . which plainly required a three-judge court."  416 U.S. 802, 812 (1974).

The FEC argues that the Supreme Court's decision in *McConnell v. FEC*, 540 U.S. 93 (2003), compels a different result, *see* Defs.' Reply in Supp. of its Mot. to Dismiss for Lack of Subject-Matter Jurisdiction, ECF No. 32 [hereinafter Defs.' Reply], at 9–10, but the agency misreads that case.  The *McConnell* plaintiffs had raised vagueness and overbreadth challenges to a new provision of BCRA that directed the FEC to issue new regulations regarding non-candidates' expenditures in support of a candidate.  540 U.S. at 220.  The FEC issued its

18

regulations only after oral argument and briefing had completed, however, and the plaintiffs never amended their complaints to challenge the regulations themselves.  *See McConnell v. FEC*, 251 F. Supp. 2d 176, 261–62 (D.D.C. 2003); *see generally* Docket Nos. 1:02-cv-00583-CKK-RJL; 1:02-cv-00751-CKK-RJL; 1:02-cv-00754-CKK; 1:02-cv-00754-CKK-RJL.   The three-judge district court held that the challenge was unripe because the plaintiffs had not directly challenged the regulations, and the court did "not know to what extent the regulations have clarified the vagueness Plaintiffs contend would chill their rights."  *McConnell*, 251 F. Supp. at 262.[5]  On appeal, "portions of plaintiffs' challenge . . . focus[ed] on the regulations" themselves, and the Supreme Court rejected those arguments, explaining that "issues concerning the regulations are not appropriately raised in this facial challenge to BCRA, but must be pursued in a separate proceeding."  *McConnell*, 540 U.S. at 223.   Accordingly, the Court agreed with the district court that, "to the extent that the alleged constitutional infirmities are found in the implementing regulations rather than the statute itself," plaintiffs' challenge to the provision was unripe. *Id.*

     The FEC seizes on the Supreme Court's statement that "issues concerning the regulations . . . must be pursued in a separate proceeding," *see* Defs.' Reply at 10 (alterations in FEC's brief), but it omits the Court's clarification that those issues were not appropriately raised "in *this* facial challenge"—not *all* facial challenges to BCRA.  *McConnell*, 540 U.S. at 223 (emphasis added).   Any challenges to the regulations were not appropriately raised in *McConnell* for the simple reason that the plaintiffs had not challenged the regulations in their complaints.   The Supreme Court thus could not have been overruling its decades-old rule that a three-judge court

---

[5] The district court also noted that BCRA's jurisdictional grant "does not extend to the consideration of FEC regulations," *McConnell*, 251 F. Supp. 2d at 258, but that statement was dicta because the court was not confronted with a challenge to an FEC regulation.

may assume jurisdiction over a supplemental claim, nor creating an exception to that rule under BCRA, when there was no such supplemental claim to begin with.[6]

The FEC responds that supplemental jurisdiction under BCRA § 403 would be incompatible with 52 U.S.C. § 30110, another special judicial review provision in FECA.  *See* Defs.' Reply at 10.  Because that provision requires that constitutional challenges to non-BCRA provisions of FECA be certified directly to the *en banc* D.C. Circuit, the FEC fears that allowing supplemental jurisdiction in a BCRA challenge would mean that a constitutional challenge to FECA, brought alongside a constitutional challenge to BCRA, would have to be heard simultaneously by the D.C. Circuit and a three-judge district court.  The FEC misconstrues the nature of supplemental jurisdiction, however.  Supplemental jurisdiction is not required when "expressly provided otherwise by Federal statute," or when "there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(a), (c)(4).  These exceptions would surely excuse a three-judge court from exercising supplemental jurisdiction over claims for which the D.C. Circuit had exclusive jurisdiction.[7]

Finally, the FEC argues that supplemental jurisdiction is inappropriate because Plaintiffs' regulatory claims are insufficiently related to their constitutional claims.  *See* Defs.' Reply at 10–11.  That argument is dubious, as the challenged regulations implement Section 304 of BCRA.

---

[6] The district court in *Bluman v. FEC*—cited by the FEC in support of its position—also read *McConnell* as holding that regulatory challenges are "not appropriately raised in [a] facial challenge to BCRA."  766 F. Supp. 2d 1, 4 (D.D.C. 2011) (alterations in original).  This court is not, of course, bound by that decision.  As discussed, *McConnell*'s holding that the backdoor regulatory challenges raised by the plaintiffs on appeal were not appropriately raised in "*this* facial challenge to BCRA" was confined to the facts of that case; the statement had nothing to do with whether a three-judge court has supplemental jurisdiction to hear non-constitutional claims alongside a BCRA claim.

[7] That said, this potential statutory conflict illuminates why Plaintiffs' alternate theory—that any claim that is part of an "action" that includes a constitutional challenge to BCRA challenge *must* be heard by the three-judge court, *see* Pls.' Reply at 29–32—is incorrect.  Such mandatory three-judge jurisdiction over all claims accompanying a BCRA constitutional claim—even claims utterly unrelated to BCRA—would directly conflict with 52 U.S.C. § 30110, *see Wagner v. FEC*, 717 F.3d 1007, 1011–12 (D.C. Cir. 2013) (explaining that section 30110 "deprive[s] both the district court and panels of the court of appeals of authority to hear the merits of constitutional challenges to the provisions of FECA"), and would impose untenable burdens on the courts, *see Turner*, 810 F. Supp. at 1312 (rejecting a similar argument due to its potential "burdens on both lower federal courts and the Supreme Court").

20

In any event, the issue is one better left for the three-judge panel to resolve in the discretionary exercise of its supplemental jurisdiction.

IV.     **CONCLUSION AND ORDER**

For the foregoing reasons, the court grants Plaintiffs' Application for a Three-Judge Court, ECF No. 2, and denies the FEC's Motion to Dismiss, ECF No. 25.  As required under 28 U.S.C. § 2284(b)(1), the Clerk of Court shall, on behalf of this court, notify the Chief Judge of the D.C. Circuit for assignment of this matter to a three-judge district court.

Dated:  December 24, 2019                    Amit P. Mehta
                                             United States District Court Judge