# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TED CRUZ FOR SENATE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-908-NJR-APM-TJK |
| | ) | |
| FEDERAL ELECTION COMMISSION, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS
## AND AUTHORITIES IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Chris Gober
  (D.C. Bar No. 975981)
The Gober Group PLLC
3595 RR 620 S., Suite 200
Austin, TX 78738
  (512) 354-1787

Charles J. Cooper
  (D.C. Bar No. 248070)
John D. Ohlendorf
  (DC Bar. No. 1024544)
J. Joel Alicea
  (D.C. Bar. No. 1022784)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (facsimile)
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

June 9, 2020

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ........................................................................................................ 4

I.      BCRA Section 304's Limit on the Repayment of Candidate Loans. ................. 4

II.     Senator Cruz's 2018 Loans. ............................................................................. 8

III.    Procedural History. .......................................................................................... 9

ARGUMENT ........................................................................................................... 11

I.      The Loan-Repayment Limit Violates the First Amendment. .......................... 11

        A.      Because the Loan-Repayment Limit Burdens Core Political Speech,
                It Is Subject to Strict Scrutiny. ........................................................... 13

        B.      The Loan-Repayment Limit Fails Even "Closely-Drawn" Scrutiny Because
                It Does Not Further Any Anti-Corruption Interest. .............................. 21

        C.      The Loan-Repayment Limit Is Not Sufficiently Tailored. .................... 33

II.     Plaintiffs Are Entitled to Declaratory and Injunctive Relief. ......................... 34

CONCLUSION ........................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*ACLU v. Mineta*, 319 F. Supp. 2d 69 (D.D.C. 2004) .................................................................34

\* *Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004) .............................................8, 11, 14, 23, 27, 33

\* *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
   564 U.S. 721 (2011) ...............................................1, 12, 13, 17, 21, 22, 23, 26, 33

*Beck v. Test Masters Educ. Servs. Inc.*,
   994 F. Supp. 2d 98 (D.D.C. 2014) .............................................................................34

\* *Buckley v. Valeo*, 424 U.S. 1 (1976) .............................................1, 4, 12, 13, 14, 18, 19, 20, 21, 22

*Citizens United v. FEC*, 558 U.S. 310 (2010) ...............................................................24, 28, 29

*Colorado Republican Fed. Campaign Comm. v. FEC*,
   518 U.S. 604 (1996) ...............................................................................................21

\* *Davis v. FEC*, 554 U.S. 724 (2008) ...............................................1, 3, 13, 14, 16, 19, 20, 22, 23, 26

*Davis v. FEC*, 501 F. Supp. 2d 22 (D.D.C. 2007) .............................................................15, 16

*Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338 (Fed. Cir. 2010) ...............................................35

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................................34

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978) ...............................................................18

*Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31 (D.D.C. 2016) ...............................................35

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) .....................................................................35

*Libertarian Nat'l Comm., Inc. v. FEC*,
   924 F.3d 533 (D.C. Cir. 2019) (en banc) ...................................................................20

\* *McCutcheon v. FEC*, 572 U.S. 185 (2014) .........................3, 12, 21, 24, 25, 26, 27, 28, 33, 34, 35

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................................34

*Randall v. Sorrell*, 548 U.S. 230 (2006) ..................................................................................24

*Scott v. Harris*, 550 U.S. 372 (2007) ......................................................................................11

*United Mine Workers of America v. Illinois State Bar Ass'n*,
   389 U.S. 217 (1967) ...............................................................................................15

**Statutes and Legislative Materials**

52 U.S.C.

   § 30101(8)(A) ...................................................................................................29
   § 30101(8)(B)(vii) .............................................................................................29
   § 30101(9)(A) ...................................................................................................29
   § 30101(9)(A)(i) .............................................................................................4, 14
   § 30109(a)(5)(A) ...............................................................................................8
   § 30109(a)(5)(B) ...............................................................................................8

§ 30109(d)(1)(A) .................................................................................................8
§ 30114(b) ......................................................................................................31
§ 30116(a) .......................................................................................................25
§ 30116(a)(1)(A) .................................................................................25, 26, 29
§ 30116(j) ......................................................................................................2, 5

ALASKA STAT. § 15.13.078(b)(1) ........................................................................28

CAL. GOV'T CODE § 85307(b) .............................................................................28

FLA. STAT. § 106.08(2)(c)(3) ..............................................................................28

GA. CODE § 21-5-41(h) .......................................................................................28

KAN. STAT. ANN. § 25-4157a(b) .........................................................................28

MASS. GEN. LAWS ch. 55, § 7 .............................................................................28

NEB. REV. STAT. § 49-1446.04 ...........................................................................28

N.Y. ELEC. LAW § 14-130(2) ..............................................................................28

17 R.I. GEN. LAWS §17-25-7.4 ...........................................................................28

S.C. CODE § 8-13-1328 .......................................................................................28

TEX. ELEC. CODE § 253.042(a) ...........................................................................28

VA. CODE § 24.2-947.4:1 ....................................................................................28

WASH. REV. CODE § 42.17A.445(3) ....................................................................28

147 CONG. REC.
S2459 (daily ed. Mar. 19, 2001) (statement of Sen. Feinstein) ...................6, 21
S2460 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) ...............6, 7, 21
S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) .......................22
S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin) ........2, 7, 22, 32, 33
S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin) ................2, 7, 22
S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) ............2, 7, 32
S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine) ..............1, 6, 21
S2464 (daily ed. Mar. 19, 2001) (statement of Sen. Sessions) ................7, 21
S2465 (daily ed. Mar. 19, 2001) (statement of Sen. Sessions) .................2, 7
S2465 (daily ed. Mar. 19, 2001) (statement of Sen. Dodd) ....................8, 23
S2538 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine) .................7, 22
S2540 (daily ed. Mar. 20, 2001) (statement of Sen. McCain) .......2, 8, 23, 24
S2540 (daily ed. Mar. 20, 2001) (statement of Sen. Durbin) ..................6, 21
S2544 (daily ed. Mar. 20, 2001) (statement of Sen. Daschle) .................7, 23
S2548 (daily ed. Mar. 20, 2001) (statement of Sen. Levin) .........................8
S2853 (daily ed. Mar. 26, 2001) (statement of Sen. Reid) .....................8, 23

## Rules and Administrative Materials

11 C.F.R.
§ 100.82 ..........................................................................................................29
§ 100.83 ..........................................................................................................29

§ 100.110.................................................................................................14

§ 100.111(a)...........................................................................................4, 14

§ 100.111(b)...........................................................................................4, 14

§ 100.142.................................................................................................4

§ 100.143.................................................................................................4

§ 110.1(b)(1)............................................................................................6

§ 110.1(b)(3)...........................................................................................20

§ 110.1(b)(3)(i)......................................................................................6, 29

§ 110.1(b)(3)(ii)(C)................................................................................6, 20

§ 110.1(b)(3)(iii)....................................................................................25

§ 110.1(b)(3)(iii)(C)................................................................................6

§ 116.2...................................................................................................5

§ 116.3................................................................................................5, 29

§ 116.11(a)..............................................................................................5

§ 116.11(b)(3)..........................................................................................5

§ 116.11(c)(1)..........................................................................................5

§ 116.11(c)(2)..........................................................................................5

Fed. R. Civ. P. 25(d) ............................................................................10

Fed. R. Civ. P. 56 .................................................................................11

84 Fed. Reg. 2504 (Feb. 7, 2019) ..........................................................6

4 Neb. Admin Code ch. 10, § 004(02) ..................................................28

## INTRODUCTION

"[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment . . . ." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976). After all, "[t]he Constitution . . . confers upon voters, not Congress, the power to choose [elected federal officials], and it is a dangerous business for Congress to use the election laws to influence the voters' choices." *Davis v. FEC*, 554 U.S. 724, 742 (2008). Accordingly, the Supreme Court has repeatedly affirmed that an attempt to "level electoral opportunities for candidates of different personal wealth" is not "a legitimate government objective, let alone a compelling one." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 749–50 (2011).

When Congress enacted the Bipartisan Campaign Reform Act of 2002 ("BCRA"), it included a provision—the so-called "Millionaire's Amendment"—that openly flouts this principle. The Millionaire's Amendment avowedly sought to "level the playing field" between wealthy candidates and their less wealthy rivals, 147 Cong. Rec. S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine), and it did so through two related mechanisms. First, the Millionaire's Amendment created a complicated system of "asymmetrical contribution limits" designed to impose a "special and potentially significant burden" on candidates who used their own "personal funds to finance campaign speech." *Davis*, 554 U.S. at 738, 739, 744. In *Davis*, the Supreme Court struck that scheme down as flatly contrary to the core First Amendment right of a candidate "to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election." *Id.* at 738.

But the Millionaire's Amendment contained another provision—the one at issue in this case. Rather than targeting candidates who directly *spend* their own money advocating their

election, that provision, enacted as Section 304 of BCRA and now codified at 52 U.S.C. § 30116(j), seeks to deter candidates from *loaning* money to their authorized campaign committee. Section 304 was based on the recognition by the supporters of the Millionaire's Amendment that "a lot of people who are very wealthy do not give money to their campaign; they loan it and say they will be repaid later." 147 CONG. REC. S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin). The legislative history of the Millionaire's Amendment leaves no doubt that this provision, too, was expressly designed to "better balance the playing field." *Id.* at S2460 (statement of Sen. Domenici). Indeed, the senators debating the Amendment *simply did not distinguish* between the *spending* that wealthy candidates engaged in and the *loans* they made to their campaigns, instead treating these two forms of self-funding as equal and equivalent threats to the ability of "nonmillionaire Member[s]" of Congress to "run for their seat" against "some multimillionaire." 147 CONG. REC. S2540 (daily ed. Mar. 20, 2001) (statement of Sen. McCain); *see, e.g.*, 147 CONG. REC. S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin); *id.* at S2465 (statement of Sen. Sessions); *id.* at S2462 (statement of Sen. Domenici).

Section 304 deters these candidate loans by making it more difficult for the candidate's campaign committee to repay them: it caps, at $250,000, the amount of candidate loans that a committee may repay using funds raised *after* election day for the purpose of paying back campaign debt owed to the candidate. To be sure, the loans may still be repaid with funds raised *prior to* the election, but there can be no question that Section 304's loan-repayment limit forces a candidate to think twice before making those loans in the first place—and, if he does choose to loan more than $250,000, to do so at the substantially increased risk that the loan will *never be repaid in full*. Indeed, that is precisely how Defendants described the effect of Section 304 in prior briefing in this case: because of Section 304, the FEC explained, "a candidate deciding to loan his

or her campaign money in advance of the election [will] not be able to accurately determine the likelihood he or she might be repaid." Def. FEC's Opp'n to Pls.' Appl. for a Three-Judge Ct. & Mot. to Dismiss at 44 (June 7, 2019), Doc. 26 ("FEC's MTD Br."). Section 304 thus puts candidates to the following unpalatable choice: either limit your financial support of your own candidacy to $250,000, or fund your campaign above that amount with "loans" that in reality are likely to become donations. And it is obvious that for candidates who can *only afford* to support their election effort beyond the $250,000-level if there is some likelihood that any funds above that amount *will be repaid* after election day, the function (and design) of Section 304 is to *prevent them from self-funding their campaign above that level at all*.

That burden on a candidate's right to speak freely in favor of his own election cannot be squared with the First Amendment. Just like the portion of the Millionaire's Amendment struck down in *Davis*, Section 304 imposes "a special and potentially significant burden" on any candidate "who robustly exercises th[e] First Amendment right" to financially support their own campaign. 554 U.S. at 739. Just like the provisions invalidated in *Davis*, Section 304 "is not justified by any governmental interest in eliminating corruption or the perception of corruption," *id.* at 740—for even if the loan-repayment limit actually served an anti-corruption interest (and it does not), it would merely provide an additional and redundant layer of protection sitting atop the $2,800 individual contribution limit already in place, which the Supreme Court has held *eliminates* any "cognizable risk of corruption" in this context *as a matter of law*, *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014). So just like the scheme in *Davis*, Section 304 and its implementing regulations "violate the First Amendment" and must be struck down. 554 U.S. at 744.

## BACKGROUND

I. **BCRA Section 304's Limit on the Repayment of Candidate Loans.**

 A. The provisions challenged in this lawsuit limit the ability of a federal campaign committee to use funds contributed after an election to repay "personal loans" that the candidate made or incurred in support of his election campaign. While the limit challenged in this litigation is itself fairly straightforward, it sits at the intersection of a complex web of rules governing political expenditures by federal *candidates*, expenditures by their authorized *committees*, and the contributions by third-party *contributors* used to fund that spending. The loan-repayment limit at issue in this case affects all three of these actors.

 ***Candidates.*** Ever since the landmark decision in *Buckley v. Valeo*, it has been a foundational principle of campaign finance law that a candidate may spend unlimited amounts of his own money in support of his own campaign for election. 424 U.S. at 54. This self-financing can take the form not only of direct monetary expenditures but also of loans—for under federal law, the "expenditure" of money generally includes the conveyance of "anything of value," and specifically includes "any . . . loan." 52 U.S.C. § 30101(9)(A)(i); *see also* 11 C.F.R. § 100.111(a) (defining expenditure to include a "loan"); *id.* §§ 100.142 & 100.143 (excepting certain bank loans and lines of credit made in the ordinary course of business). A candidate can engage in expenditures in the form of loans both by lending money directly to his campaign or by guaranteeing a loan from a third-party lender, such as a bank. *See id.* § 100.111(a) & (b) (defining expenditure to include both a "loan" and "any guarantee or endorsement of a loan").

 However, Section 304 of BCRA imposes a $250,000 limit on a committee's ability to *repay* those "candidate loans" with post-election money, i.e., money contributed by donors after the election:

> Any candidate who incurs personal loans made after the effective date of the Bipartisan Campaign Reform Act of 2002 in connection with the candidate's campaign for election shall not repay (directly or indirectly), to the extent such loans exceed $250,000, such loans from any contributions made to such candidate or any authorized committee of such candidate after the date of such election.

52 U.S.C. § 30116(j). While the text of Section 304 reaches only loans that a candidate "*incurs*" in connection with his campaign, *id.* (emphasis added), Defendant FEC has promulgated regulations implementing Section 304's loan-repayment limit, and those regulations apply not only to loans *incurred* by the candidate for the benefit of his campaign, but also to loans that a candidate *makes* directly to the campaign from his personal funds. *See* 11 C.F.R. § 116.11(a).

**Committees.** Section 304's limit also acts as a restriction on spending by campaign committees. The speech and political activities of a committee leading up to an election are often financed on credit, leaving the committee with a variety of debts it must repay after election day. *See* 11 C.F.R. § 116.3 (allowing vendors to extend credit to committees in the ordinary course of business). Committees therefore often *spend money after* an election to pay for *speech that occurred before* the election. *See generally* 11 C.F.R. § 116.2 (rules governing committees' repayment of post-election debts). The FEC's regulations implementing Section 304's loan-repayment restriction, however, limit these post-election expenditures in two ways. First, the regulations, like Section 304 itself, cap at $250,000 the amount of money contributed *after* the election that committees may use to repay candidate loans. 11 C.F.R. § 116.11(b)(3). And second, to the extent a committee wishes to repay candidate loans with money contributed *before* election day, it must prioritize those repayments ahead of any other expenditures it may wish to make, since it must make any such repayments of candidate loans "within 20 days of the election." *Id.* § 116.11(c)(1). Any candidate loan in excess of 250,000 that is not repaid within those first 20 days must be treated "as a contribution by the candidate." *Id.* § 116.11(c)(2).

*Contributors.* Finally, the challenged loan-repayment limit also restricts the actions of contributors. Federal law generally allows an individual to contribute money in support of a federal candidate's election *after* election day, so long as **(a)** each contribution is within the contributor's inflation-adjusted $2,800 contribution limit with respect to that candidate and that election, *see* 11 C.F.R. §§ 110.1(b)(1), (b)(3)(iii)(C); 84 Fed. Reg. 2504, 2506 (Feb. 7, 2019), and **(b)** the sum of post-election contributions received by the committee does not exceed its "net debts outstanding" from that election—that is, the "total amount of unpaid debts and obligations incurred with respect to [the] election" less its cash on hand and receivables as of election day. *See* 11 C.F.R. § 110.1(b)(3)(i). However, Defendant FEC's rules cap at $250,000 the amount of post-election contributions that contributors can donate for the repayment of candidate loans, by providing that the calculation of "net debts outstanding" must *exclude* the amount of any candidate loans "that in the aggregate exceed $250,000 per election." 11 C.F.R. § 110.1(b)(3)(ii)(C).

B.      Section 304 and the FEC regulations implementing it thus impose limits on candidates, their campaign committees, and their contributors—all with the goal of preventing the repayment of more than $250,000 of candidate loans with post-election money. Adopted as part of the "Millionaire's Amendment," this limit was designed to "level the playing field" between self-funding candidates and their non-self-funding opponents. 147 Cong. Rec. S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine); Plaintiffs' Statement of Undisputed Material Facts ¶¶ 2, 12 (June 9, 2020) ("SOF"). Indeed, the congressional debate that ensued when the provision was introduced is *replete* with statements that the Amendment was "an attempt to level the playing field." 147 Cong. Rec. S2459 (daily ed. Mar. 19, 2001) (statement of Sen. Feinstein); *see also, e.g.*, *id.* at S2540 (statement of Sen. Durbin) ("What we are trying to address with this amendment is to level the playing field."); *id.* at S2460 (statement of Sen. Domenici) (attempting to "better

balance the playing field"); *id.* at S2464 (statement of Sen. Sessions) ("I believe we have an unfair situation. It makes it difficult for candidates to run on a level playing field."); *see* SOF ¶¶ 3–11.

And this was not simply the purpose of the Millionaire's Amendment as a whole: it was the purpose of *the loan-repayment limit in particular*. SOF ¶ 12. The debate over the provision *simply did not distinguish* between wealthy candidates *spending* money and *loaning it*, because, as its sponsors noted, "a lot of people who are very wealthy do not give money to their campaign; they loan it and say they will be repaid later." 147 CONG. REC. S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin); *see also id.* at S2462 (statement of Sen. Durbin) ("Think about what this institution will become if that is what one of the rules is to be part of the game: That you have to be loaning or contributing literally millions of dollars in order to be a candidate for public office."); *id.* at S2465 (statement of Sen. Sessions) (amendment "prohibits wealthy candidates, who incur personal loans in connection with their campaign that exceed $250,000, from repaying those loans from any contributions made to the candidate."); *id.* at S2462 (statement of Sen. Domenici) ("it should be a condition to your putting up your own money, knowing right up front you are not going to get it back from your constituents"); *see* SOF ¶¶ 12–18. Accordingly, as one co-sponsor made clear, the loan-repayment limit on "personal loans or property used for collateral for a loan to the campaign" was merely a part of the Amendment's effort to "create greater fairness and accountability in the Federal election process by addressing the inequity that arises when a wealthy candidate pays for his or her campaign with personal funds." 147 CONG. REC. S2538 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine).

In addition to "leveling the playing field," several legislators opposed to the Millionaire's Amendment pointed out that the provision also had an even more sinister design—it "protects incumbents." 147 CONG. REC. S2544 (daily ed. Mar. 20, 2001) (statement of Sen. Daschle); SOF

¶ 19. After all, while challengers often need to spend significant amounts of seed money to raise name recognition even *before* they start to receive significant contributions, *see Anderson v. Spear*, 356 F.3d 651, 673 (6th Cir. 2004) ("[A] candidate may need to speak early in order to establish her position and garner contributions."), incumbents "have a lot of advantages that do not come out of our personal checkbooks," 147 CONG. REC. S2465 (daily ed. Mar. 19, 2001) (statement of Sen. Dodd); *see also id.* at S2548 (daily ed. Mar. 20, 2001) (statement of Sen. Levin) ("The incumbent who already has the financial advantage and the incumbency advantage is then also given the advantage of having the higher contribution limits."); *id.* at S2853 (daily ed. Mar. 26, 2001) (statement of Sen. Reid) ("[The Millionaire's Amendment] is an incumbent advantage measure in this underlying bill."); *see* SOF ¶¶ 10–25. Indeed, in a remarkably forthright statement, Senator McCain—a supporter of the Amendment—noted that the provision

> addresses, in all candor, a concern that literally every nonmillionaire Member of this body has, and that is that they wake up some morning and pick up the paper and find out that some multimillionaire is going to run for their seat, and that person intends to invest 3, 5, 8, 10, now up to $70 million of their own money in order to win.

*Id.* at S2540 (daily ed. Mar. 20, 2001) (statement of Sen. McCain); SOF ¶ 26.

The penalties for violating the $250,000 limit found in BCRA and Section 116.11 are serious, including both civil and criminal penalties. *See* 52 U.S.C. §§ 30109(a)(5)(A); 30109(a)(5)(B); 30109(d)(1)(A).

## II.   Senator Cruz's 2018 Loans.

Prior to the November 6, 2018 election, Senator Cruz made or incurred two loans totaling $260,000 to the Cruz Committee to help finance his reelection campaign for the United States Senate. SOF ¶ 32. One loan, in the amount of $255,000, came from a third-party-lender margin account secured by Senator Cruz's personal assets. SOF ¶ 33. The other loan, for $5,000, was made directly from Senator Cruz's personal bank account. SOF ¶ 34.

At the end of November 6, the Cruz Committee did not have sufficient funds to both repay these loans and satisfy the Committee's other creditors. SOF ¶ 35. In fact, while the Committee ended the election campaign with approximately $2.38 million deposited in, or in transit to, its bank accounts, it also owed about $2.7 million in debts it incurred in connection with the election— including the $260,000 it owed to Senator Cruz—leaving it with approximately $337,748 in "net debts outstanding," as of election day. SOF ¶¶ 36–38. During the 20 days following the election, the Committee used its cash on hand to satisfy debts to other creditors rather than repay Senator Cruz's loans. SOF ¶ 40. Only in December of 2018—after 11 C.F.R § 116.11(c)'s 20-day deadline had passed—did the Committee begin to repay Senator Cruz's personal loans. SOF ¶ 41. And at that point, in compliance with the challenged limits, the Committee only repaid Senator Cruz $250,000, leaving a total of $10,000 unpaid ($5,000 of the margin loan and the entirety of the $5,000 loan from Senator Cruz's own bank accounts). SOF ¶¶ 42–44.

### III.  Procedural History.

Plaintiffs brought suit on April 1, 2019, challenging both Section 304 of BCRA and the FEC's implementing regulation, 11 C.F.R § 116.11, as unconstitutional under the First Amendment's Free Speech Clause. Compl. ¶¶ 34–48 (April 1, 2019), Doc. 1. The Complaint also alleges that Section 116.11 of FEC's implementing regulation is contrary to law and arbitrary and capricious because it extends the loan-repayment limit not only to loans "incurred" by a candidate but also loans the candidate directly *makes* to his campaign from his personal funds, an interpretation contrary to the plain text of Section 304. Compl. ¶¶ 49–51. Because Plaintiffs'

complaint includes a constitutional challenge to a provision of BCRA, Plaintiffs simultaneously filed an application for the constitution of a three-judge court pursuant to Section 403 of BCRA.[1]

Defendants resisted the convening of a three-judge court, arguing that Plaintiffs lacked standing and that they needed to take discovery in support of their standing argument. Defendants served discovery requests on May 9, 2019, which Plaintiffs answered with written responses and the production of over 2,500 pages of documents. On June 7, Defendants moved to dismiss, arguing that Plaintiffs' lacked standing, that their constitutional claims were wholly insubstantial (and consequently outside the scope of BCRA § 403's three-judge-court provision), and that the jurisdiction of a three-judge court convened under BCRA would not in any event extend to Plaintiffs' challenge to the FEC's implementing regulation, 11 C.F.R. § 116.11. On December 24, the Court denied FEC's motion to dismiss in its entirety, concluding that Plaintiffs had standing to challenge Section 304, that their constitutional claims were substantial, and that the three-judge court would have supplemental jurisdiction over Plaintiffs' regulatory challenge. The Court accordingly called for the convening of a three-judge court.

On January 7, 2020, Defendants Answered Plaintiffs' Complaint. On January 9, the Chief Judge of the D.C. Circuit Court of Appeals convened a three-judge court to hear and determine the case. On March 30, 2020, the Court assumed supplemental jurisdiction over Plaintiffs' regulatory claims, rejecting the FEC's objection that those claims were not sufficiently related to Plaintiffs' constitutional challenge to support supplemental jurisdiction. On April 14, however, the Court held

---

[1] Plaintiffs' Complaint names as defendants both the FEC and its four Commissioners as of the date of filing. One of those named defendants, then-Commissioner Matthew Peterson, left office in August of 2019, and on May 19, 2020, the Senate confirmed the appointment of a new Commissioner, Trey Trainor, to the Commission. Under FED. R. CIV. P. 25(d), Mr. Peterson has been automatically terminated as a defendant in this action, and Mr. Trainor has been automatically added, without the need for any further action by the Parties or the Court.

those regulatory claims in abeyance, pending its decision on the claims challenging the constitutionality of Section 304. Plaintiffs now move for summary judgment on those constitutional claims.

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. There is no genuine issue of material fact if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, there are no material facts genuinely in dispute, and Plaintiffs are entitled as a matter of law to a judgment establishing that the loan-repayment limit violates the First Amendment, and that Defendants may not enforce that unconstitutional and invalid limit against Plaintiffs.

## I.    The Loan-Repayment Limit Violates the First Amendment.

Section 304 represents a remarkable intrusion on the rights of candidates and their campaign committees to make constitutionally protected decisions about how and when to speak during an election. During the heat of a campaign, a candidate may determine that she must give or loan her own money to her campaign to fund additional speech. That is particularly true of a challenger, who "may need to speak early in order to establish her position and garner contributions." *Anderson*, 356 F.3d at 673. And in the critical days before an election, a campaign's creditors are in an especially precarious position, since any debts they are owed as of election night are inherently subject to a risk of default. After all, the campaign may close out the election without sufficient cash on hand to cover all of its outstanding debts; and a candidate's ability to raise money to repay debts *after* an election is far from assured. Indeed, a candidate may be forced to loan her campaign *additional* money just so that it can repay its other creditors—and avoid the legal and reputational risks of defaulting on its obligations to those who spoke on its behalf.

Section 304 intensifies and distorts these inherent risks, deliberately curbing the funding, and thus the speech, of both candidates and their campaigns. By barring the repayment of candidate loans greater than $250,000 from money raised *after* the election, the challenged limit necessarily increases the risk that these loans will not be repaid in full, or perhaps at all. Section 304 thus has the design and effect of *deterring* a candidate from making loans in excess of $250,000—directly burdening his First Amendment right "to speak without legislative limit on behalf of his own candidacy." *Buckley*, 424 U.S. at 54. And Section 304 burdens the speech of committees, too. If a committee ends an election owing both debts to creditors and more than $250,000 in debt to the candidate, Section 304 forces the committee to use its cash on hand, if any, to *pay the candidate first* (or default on that portion of the candidate's loan outright), and if there is any money left over, then to repay debts to other creditors, including the vendors who engaged in core political speech on behalf of the campaign.

Because Section 304 intrudes upon the heartland of the First Amendment, it must be subjected to strict scrutiny. *See Bennett*, 564 U.S. at 734. And because "[the Supreme] Court has identified only one legitimate governmental interest for restricting campaign finances," that means the loan-repayment limit may be upheld only if the Government demonstrates that it furthers the interest in "preventing [*quid pro quo*] corruption or [its] appearance" and is narrowly tailored to that goal. *McCutcheon*, 572 U.S. at 206; *see also Bennett*, 564 U.S. at 734. Section 304 and its implementing regulations cannot clear these hurdles.

A.   **Because the Loan-Repayment Limit Burdens Core Political Speech, It Is Subject to Strict Scrutiny.**

1.   "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Bennett*, 564 U.S. at 734 (quotation marks omitted). And as the Supreme Court has repeatedly made clear, there is no more sacred First Amendment

liberty than the right of a candidate "to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election." *Davis*, 554 U.S. at 738.

While the Supreme Court's campaign finance jurisprudence has ebbed and flowed over the decades following its landmark decision in *Buckley*, one principle has endured without change: any governmental burden placed "on personal expenditures by a candidate in furtherance of his own candidacy . . . clearly and directly interferes with constitutionally protected freedoms" and may be upheld only if it satisfies the strictest judicial scrutiny. *Buckley*, 424 U.S. at 53. "Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Id.* at 53–54. Accordingly, "the First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy." *Id.* at 54.

A candidate who makes or incurs loans for the benefit of his campaign is exercising this core First Amendment freedom. When Senator Cruz, for example, loaned $5,000 of his own money to his Committee for expenditure on behalf of his reelection, he was using his personal financial means to "vigorously and tirelessly . . . advocate his own election," *id.* at 52—and that was no less true because of the Committee's commitment, when he loaned this money, that it would reimburse the sum after the election. Likewise, when Senator Cruz pledged his own personal assets to secure a $255,000 loan that he, in turn, loaned to his Committee, he was engaged in "the vigorous exercise of the right to use personal funds to finance campaign speech," *Davis*, 554 U.S. at 739—notwithstanding the Committee's commitment to later repay the loan so that Senator Cruz, in turn, could discharge the security interest on his assets. After all, those loans went

to fund *pure political speech*—either directly or by repaying debts to vendors and other campaign creditors.

While making or incurring loans on behalf of one's own candidacy is different in some respects not relevant here from spending personal funds outright, it is nonetheless the conveyance of a "[ ]thing of value," so it plainly qualifies as an "expenditure." 52 U.S.C. § 30101(9)(A)(i); *see also* 11 C.F.R. § 100.110. In fact, both BCRA and Defendants' implementing regulations *explicitly define* "expenditure" to *include loans*. *See* 52 U.S.C. § 30101(9)(A)(i) ("The term 'expenditure includes . . . any . . . loan . . . made by any person for the purpose of influencing any election for Federal office . . . ."); *see also* 11 C.F.R. § 100.111(a) & (b) (defining "expenditure" to include a "loan" or "any guarantee or endorsement of a loan by a candidate"). As the Sixth Circuit held in a directly analogous case, "[a]s a matter of campaign finance law, . . . limitations on candidate loans are limitations on campaign expenditures." *Anderson*, 356 F.3d at 673. Moreover, they "are particularly onerous" limitations "because they limit when a party can speak (or how much he can say at a given time)," by preventing him from speaking "prior to contributions arriving." *Id.* Accordingly, under both common sense and Congress's and the FEC's own definitions, a candidate who (like Senator Cruz) lends money to his own campaign is exercising his core First Amendment right of using his own financial resources "to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election." *Buckley*, 424 U.S. at 52.

Section 304 imposes a direct and significant burden on the exercise of this fundamental First Amendment right. By significantly limiting the sources of funding that committees can use to repay candidate loans, the $250,000 cap necessarily increases the risk that these loans will not be repaid in full, or perhaps at all. Indeed, in prior briefing the FEC itself acknowledged that when Section 304 applies, "a candidate deciding to loan his or her campaign money in advance of the

election [will] not be able to accurately determine the likelihood he or she might be repaid." FEC's MTD Br. 44. For a candidate who wishes to spend more than $250,000 on behalf of his own election but can afford to do so only if he is reasonably assured of repayment after Election Day, the loan-repayment limit, by design and inevitable effect, will deter the candidate from making the expenditure at all.

To be sure, while Section 304 *burdens* a candidate's right to spend his own money, in the form of loans, to fund his election, it does not *prohibit* its exercise: candidates remain free to make such loans at their own risk. But it is far too late in the day to argue that the Government is free to burden the right to spend money on speech so long as it refrains from *directly capping* those expenditures. After all, the First Amendment would "be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such." *United Mine Workers of America v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). Accordingly, the Supreme Court has repeatedly held that the Government may no more *burden and impede* a candidate's right to spend his own money than it may *ban it outright*.

In *Davis*, for example, a self-funding candidate challenged another portion of the Millionaire's Amendment, which asymmetrically raised the contribution limits for the supporters of a self-funding candidate's opponent when the candidate spent more than a certain amount of his personal funds. This Court upheld the challenged provision, contending that it "does not limit in any way the use of a candidate's personal wealth in his run for office." *Davis v. FEC*, 501 F. Supp. 2d 22, 29 (D.D.C. 2007), *see also Davis*, 554 U.S. at 753 (Stevens, J., dissenting) ("The Millionaire's Amendment quiets no speech at all"). The Supreme Court disagreed, reasoning that "[w]hile BCRA does not impose a cap on a candidate's expenditure of personal funds, it imposes

15

an unprecedented penalty on any candidate who robustly exercises that First Amendment right," by limiting him to "two choices: abide by a limit on personal expenditures or endure the burden that is placed on that right by the activation of a scheme of discriminatory contribution limits." *Id.* at 738–39, 740 (majority opinion). And that "special and potentially significant burden" on core First Amendment rights, the Court concluded, could be upheld only if it satisfied strict scrutiny. *Id.* at 739, 740.

The portion of the Millionaire's Amendment challenged here triggers strict scrutiny under the very same reasoning. As in *Davis*, Section 304 subjects a candidate who wishes to "robustly exercise[ ]" his right to spend his own money on his campaign, in the form of loans, to a "special and potentially significant burden." *Id.* at 739. For as in *Davis*, this provision limits such a candidate "[to] two choices," *id.* at 740: loan more than $250,000 under the significantly enhanced risk that such a loan *will not be repaid* in full, or simply decline to loan money in excess of this sum at all. And as in *Davis*, Section 304 "does not provide any way in which a candidate can exercise that right without abridgment." *Id.* Accordingly, "that provision cannot stand unless it is justified by a compelling state interest." *Id.* (quotation marks omitted).

The Supreme Court's decision in *Bennett* is to the same effect. That case involved an Arizona law that granted publicly financed candidates extra funding when their privately financed competitor spent more than a certain amount of personal funds—a similar mechanism to the one struck down in *Davis*, though the burden on candidate-spending came in the form of direct public funds, rather than asymmetrically heightened contribution limits. As in *Davis*, the defenders of the law argued that it "imposes no ceiling on speech and does not prevent anyone from speaking." 564 U.S. at 763 (Kagan, J., dissenting) (brackets omitted). But in *Bennett*, too, the Supreme Court emphatically rejected this argument. Under Arizona's scheme, the Court reasoned, "[t]he direct

result of the speech of privately financed candidates . . . is a state-provided monetary subsidy to a political rival," and because that scheme "plainly forces the privately financed candidate to shoulder a special and potentially significant burden when choosing to exercise his First Amendment right to spend funds on behalf of his candidacy," it "must be justified by a compelling state interest." *Id.* at 737, 740, 742 (majority opinion) (quotation marks omitted). So too here.

2.      In addition to significantly burdening the First Amendment rights of candidates, Section 304's loan-repayment limit also burdens the right of their campaign committees to speak freely, by effectively forcing them to choose *which* First Amendment rights to sacrifice. Consider a committee, like the Cruz Committee, that closes out election day owing money to its vendors, owing more than $250,000 to its candidate, and without sufficient cash on hand to fully satisfy both sets of debts. By requiring the committee to use only *pre*-election funds to repay the candidate loans—and to do so within the first 20 days—the loan-repayment limit effectively forces the committee to choose between two horns of an intolerable dilemma: using its limited cash on hand to (1) repay the over-$250,000 balance of candidate loans, or (2) repay other vendors (or engage in other constitutionally-protected political expenditures). Whichever choice it makes, it suffers First Amendment harm.

If the Committee chooses to repay the candidate loans, it will have been forced to forego— or at least delay—funding core First Amendment expression. When a committee spends money during the first 20 days after an election to repay vendors who produced campaign advertisements, for instance, it is exercising a right that lies at the core of the First Amendment's protective sweep: the right to "spend [money] on political communication during a campaign." *Buckley*, 424 U.S. at 19. Similarly, when a committee transfers its own funds to advocacy organizations who share its worldview, it is engaging in speech that is "at the heart of the First Amendment's protection": "the

17

liberty to discuss publicly and truthfully all matters of public concern." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978). When a campaign committee is forced to *refrain* from spending money in these constitutionally protected ways so that it may avoid defaulting on its candidate loans, it has suffered a real and tangible infringement of its First Amendment right to engage in political speech: Section 304 has "necessarily reduce[d] the quantity of expression," thereby "restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19.

That is no less true because the payments Section 304 pressures committees to forego take place *after* the election is over—for the speech those payments go to fund *occurred during* the campaign. To reason otherwise would be to draw a wholly arbitrary and unjustifiable line between committees that fund speech in advance or on delivery and those that fund speech through credit. Campaign committees, like ordinary commercial entities, often fund their operations in part by taking on debt. According to one recent study, "[a]lmost half of all campaigns (46.75 percent) rely on some form of debt," which constitutes "the second largest source of campaign funds trailing only total individual contributions." SOF ¶ 39. They presumably do so because in many cases, this method of funding their operations is the most efficient one, resulting in greater speech overall than if committees were forced to pay for speech up-front or contemporaneously. By forcing committees to delay paying down any ordinary debts in favor of repaying candidate loans (on pain of defaulting on the candidate), Section 304 distorts this calculation, exacting what is in effect a surcharge on a committee's access to credit, and inevitably forcing some committees at the margin to forego speech they would engage in if they were free to finance it in the way they deemed most efficient. As a matter of economic reality, that is a limit on political expenditures. There is nothing in *Buckley*'s holding that a law limiting expenditures imposes "severe restrictions on protected

18

freedoms of political expression and association," 424 U.S. at 19, 23, to suggest that those burdens melt away if they are imposed on the back end rather than the front end.

To be sure, Section 304 leaves a committee with the option of choosing the second horn of the dilemma: defaulting on its candidate's loans so that it may spend its cash on hand paying (or repaying) for the types of protected expression just discussed. But that choice, too, involves an infringement of its First Amendment rights. When a committee chooses this alternative, it necessarily *deters* the candidate from loaning money to his campaign in the future, for all the reasons discussed above. Just as from the candidate's point of view, the loan-repayment limit functions as a "special and potentially significant burden" on his right to *spend* money on his own campaign, *Davis*, 554 U.S. at 739, from the campaign's point of view, the limit functions as a burden on its right to *raise* money to fund political speech. It is exactly as though Congress had provided that for every $1,000 a committee spends on repaying its campaign vendors in the first 20 days after an election, the base contribution limit for its donors in the *next* election will be reduced by $1 per donor.

Accordingly, the loan-repayment limit burdens the rights of campaign committees to spend money on political speech, and it must be subjected to strict scrutiny for that reason, too. *Buckley*, 424 U.S. at 44–45. Indeed, that is once again the only conclusion consistent with the Supreme Court's decision in *Davis*. For just as the provision of the Millionaire's Amendment struck down there burdened a candidate's right to fund his own campaign by asymmetrically *allowing* his opponent to raise *more* money if he exercised the right, the provision at issue here burdens a committee's right to fund speech with its cash-on-hand after an election by *impeding* it from raising *as much* money, from candidate loans in future elections, if it exercises that right. That

"unprecedented penalty" on the right of committees to spend money on core political speech must be subjected to the strictest scrutiny. *Davis*, 554 U.S. at 739.[2]

3.    Finally, in addition to burdening the rights of candidates and their authorized committees to *spend* money on political speech, the loan-repayment limit burdens the expressive and associational right of individuals to *contribute* money in support of the candidate of their choice. An individual who wishes to contribute money to a candidate in connection with an election but is unable to do so *before* the election may still exercise his expressive and associational rights by contributing money *after* the election to help pay down the candidate's "net debts outstanding" from the election. 11 C.F.R. § 110.1(b)(3). However, by barring more than $250,000 in post-election contributions from going towards repayment of the candidate's loans—and excluding that amount of those loans from the calculation of net debts outstanding, *id.* § 110.1(b)(3)(ii)(C)—Section 304 effectively prohibits individuals from making such post-election contributions once the candidate's *other* outstanding debts have been paid off. Indeed, that is the whole purpose of the loan-repayment limit: to prevent individuals from contributing post-election money to pay off any candidate loans above the $250,000 cap. The loan-repayment limit thus directly burdens the "right to participate in the public debate through political expression

---

[2] Accordingly, although Section 304 in some respects functions as a limit on the ability of campaign committees to receive *contributions*—in the form of candidate loans—because that restriction on contributions operates as a burden on the committee's ability to freely *spend* money to fund speech, as described in the text above, it must be subject to strict scrutiny, not the "closely drawn" scrutiny that *Buckley* applied to contribution limits. *See Davis*, 554 U.S. at 737–40. For the same reason, Plaintiff Cruz Committee need not show that Section 304 prevents it "from amassing the resources necessary for effective advocacy," since that requirement at most applies when a committee claims it is unable to freely *raise* money—not when it claims that it is unable to freely *spend* money on political speech. *Buckley*, 424 U.S. at 636; *see also Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 541 (D.C. Cir. 2019) (en banc) (holding that "*Buckley* and its progeny hardly foreclose application of closely drawn scrutiny" to contribution limits challenged by a committee, even if the limits do not prevent it from amassing the necessary resources for effective advocacy).

and political association," *McCutcheon*, 572 U.S. at 203, and it may be upheld only "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms," *Buckley*, 424 U.S. at 25.[3]

**B.   The Loan-Repayment Limit Fails Even "Closely-Drawn" Scrutiny Because It Does Not Further Any Anti-Corruption Interest.**

Because Section 304 burdens the First Amendment expression of candidates, committees, and contributors, it is subject to strict scrutiny, *see Bennett*, 564 U.S. at 748—or, at a minimum, *Buckley*'s "closely drawn" scrutiny, *see McCutcheon*, 572 U.S. at 199. It flunks either standard as a matter of law, because it does not further the "only . . . legitimate governmental interest for restricting campaign finances"—preventing " '*quid pro quo*' corruption" or its appearance. *Id.* at 206–07.

1.   Section 304 was never *designed* as an anti-corruption measure, so if it *did* function to serve that interest, it would be pure happenstance. Instead, the provision's legislative history leaves no doubt about the purpose it was *actually* designed to serve: burdening the ability of wealthy candidates to loan large sums to their campaign and thereby "level[ling] the playing field" between competing candidates. 147 Cong. Rec. S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine); *see also, e.g.*, *id.* at S2459 (statement of Sen. Feinstein); *id.* at S2540 (statement of Sen. Durbin); *id.* at S2460 (statement of Sen. Domenici); *id.* at S2464 (statement of Sen. Sessions).

In *Davis*, the Government affirmatively stated, and the Court accepted, that the purpose of the Millionaire's Amendment was to "level electoral opportunities for candidates of different personal wealth." 554 U.S. at 741. And the legislative history demonstrates that this purpose

---

[3] Plaintiffs reserve the right to argue before the Supreme Court that *Buckley*'s prescription of "closely drawn" scrutiny for contribution limits either is tantamount to strict scrutiny or is itself inconsistent with fundamental First Amendment principles. *See, e.g.*, *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 635–44 (1996) (Thomas, J., dissenting).

extended to Section 304 in particular, for as one of its co-sponsor's recognized, "a lot of people who are very wealthy do not give money to their campaign; they loan it and say they will be repaid later." 147 CONG. REC. S2461 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin); *see* SOF ¶ 14. Indeed, the congressional debate—just like campaign finance law more generally, *see supra*, p. 14—repeatedly equated candidate *loans* with candidate *spending*, treating the two as functionally equivalent (and as posing the same threat to "a level playing field and . . . fairness in . . . election campaigns"). *Id.* at S2461 (statement of Sen. Domenici); *see id.* at S2462 (statement of Sen. Durbin); 147 CONG. REC. S2538 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine); *see* SOF ¶¶ 14–18.

As the Supreme Court has repeatedly stressed, because "[l]eveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election, . . . it is *not legitimate* for the government to attempt to equalize electoral opportunities in this manner." *Bennett*, 564 U.S. at 749–50 (quotation marks omitted) (emphasis added). After all, "[d]ifferent candidates have different strengths. Some are wealthy; others have wealthy supporters who are willing to make large contributions. Some are celebrities; some have the benefit of a well-known family name." *Davis*, 554 U.S. at 742. Accordingly, any attempt at "the equalization of permissible campaign expenditures might serve not to equalize the opportunities of all candidates, but to handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign." *Buckley*, 424 U.S. at 56–57. Ultimately, "[t]he Constitution . . . confers upon voters, not Congress, the power to choose [elected federal officials], and it is a dangerous business for Congress to use the election laws to influence the voters' choices." *Davis*, 554 U.S. at 742. Congress's attempt to "intru[de] into the debate over who should govern," *Bennett*, 564 U.S. at 750, by preventing "self-funding

wealthy candidates" from "loaning or contributing literally millions of dollars" to their own campaign, 147 CONG. REC. S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin), "goes to the heart of First Amendment values." *Bennett*, 564 U.S. at 750.

In addition to "leveling the playing field," several legislators opposed to the Millionaire's Amendment pointed out that the provision also had an even more sinister design—it "protects incumbents." 147 CONG. REC. S2544 (daily ed. Mar. 20, 2001) (statement of Sen. Daschle); *see* SOF ¶ 19. After all, challengers often need to spend significant amounts of seed money to raise name recognition even *before* they start to receive significant contributions. *See Anderson*, 356 F.3d at 673 ("[A] candidate may need to speak early in order to establish her position and garner contributions."). Incumbents, by contrast, "have a lot of advantages that do not come out of our personal checkbooks," 147 CONG. REC. S2465 (daily ed. Mar. 19, 2001) (statement of Sen. Dodd); *see also id.* at S2548 (daily ed. Mar. 20, 2001) (statement of Sen. Levin) ("The incumbent who already has the financial advantage and the incumbency advantage is then also given the advantage of having the higher contribution limits."); *id.* at S2853 (daily ed. Mar. 26, 2001) (statement of Sen. Reid) ("[The Millionaire's Amendment] is an incumbent advantage measure in this underlying bill."); *see* SOF ¶¶ 20–25. Indeed, in a remarkably forthright statement, Senator McCain—a supporter of the Amendment—noted that the provision

> addresses, in all candor, a concern that literally every nonmillionaire Member of this body has, and that is that they wake up some morning and pick up the paper and find out that some multimillionaire is going to run for their seat, and that person intends to invest 3, 5, 8, 10, now up to $70 million of their own money in order to win.

*Id.* at S2540 (daily ed. Mar. 20, 2001) (statement of Sen. McCain); *see* SOF ¶ 26. The Supreme Court has consistently cautioned that campaign finance restrictions may not "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage," and that "where there is strong indication in a particular case, *i.e.,* danger signs, that such risks

exist (both present in kind and likely serious in degree), courts . . . must review the record independently and carefully with an eye toward assessing the statute's 'tailoring.' " *Randall v. Sorrell*, 548 U.S. 230, 248, 249 (2006) (opinion of Breyer, J.). Those "danger signs" are present here.

2.     Because Congress did not design Section 304 to combat corruption or its appearance, it can come as no surprise that it in fact fails to do so. As the Supreme Court has stated repeatedly and emphatically, "while preventing corruption or its appearance is a legitimate objective, Congress may target only a specific type of corruption—'*quid pro quo*' corruption." *McCutcheon*, 572 U.S. at 207. "And because the Government's interest in preventing the appearance of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government may not seek to limit the appearance of mere influence or access." *Id.* at 208. It is thus not enough for the Government to invoke generalized concerns that donors have outsized influence in the halls of Congress, or that there is "too much money in politics." Rather, its legitimate interest in this area is strictly confined to preventing the actual or apparent "financial *quid pro quo:* dollars for political favors." *Citizens United v. FEC*, 558 U.S. 310, 359 (2010) (quoting *FEC v. National Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)).

Section 304 does nothing to advance the goal of preventing *quid pro quo* corruption. For to the extent that the use of post-election contributions to refund personal loans *does* pose any potential risk of corruption, the federal contribution limits *already* serve to adequately address that risk. The base limit of $2,800 per contributor (as adjusted for inflation, *see* Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 84 Fed. Reg. 2504, 2506 (Feb. 7, 2019)) applies to all contributions "with respect to any election," 52 U.S.C. § 30116(a)—so it governs post-election contributions "with respect to

[that] election" in the same measure of pre-election contributions. *Id.*; *see also* 11 C.F.R. § 110.1(b)(3)(iii) (noting that post-election contributions may "not exceed the contribution limitations in effect on the date of such election"). The only effect of striking down the loan-repayment limit would thus be to place *post-election* contributions on equal footing with *pre-election* contributions—such that both sets of contributions, when added together, must still total $2,800 or less per contributor. And under the Supreme Court's holding in *McCutcheon*, that $2,800 limit *eliminates* any "cognizable risk of corruption," rendering an *additional* layer of restrictions on contributions unnecessary and unjustified. *McCutcheon*, 572 U.S. at 210.

The plaintiffs in *McCutcheon* challenged FECA's "aggregate" contribution limits. While the "base" limit of $2,800 restricts the amount any individual may contribute to a particular candidate or committee, the challenged "aggregate" limits capped how much any individual could "contribute in total to all candidates or committees"—even if each individual contribution within the aggregate total was $2,800 or less. *Id.* at 192. The Government defended the aggregate limits as an additional layer of protection against the same risk of corruption targeted by the base limits, but the Court rejected this "prophylaxis-upon-prophylaxis approach." *Id.* at 221. The "base limits remain the primary means of regulating campaign contributions," the Court explained, and "Congress's selection of a [$2,800] base limit indicates its belief that contributions of that amount or less *do not create a cognizable risk of corruption*." *Id.* at 209, 210 (emphasis added). And "[i]f there is no corruption concern" in donating the maximum allowable amount to each candidate until the aggregate limit is met, there can be no anti-corruption interest in preventing any *further* donations that *also* comply with the limit selected by Congress—donations that cannot be "regarded as corruptible" as a matter of law. *Id.*

While *McCutcheon* is the Supreme Court's clearest articulation of this principle, the Court had relied on the same reasoning even before that case. In *Davis*, for example, the Court reasoned that "given Congress' judgment that liberalized limits for non-self-financing candidates do not unduly imperil anticorruption interests, it is hard to imagine how the denial of liberalized limits to self-financing candidates can be regarded as serving anticorruption goals sufficiently to justify the resulting constitutional burden." 554 U.S. at 741. And similarly in *Bennett*, one of the reasons the Court found Arizona's differential public-financing scheme unnecessary to prevent corruption was that "Arizona already has some of the most austere contribution limits in the United States" and "[i]n the face of such ascetic contribution limits, strict disclosure requirements, and the general availability of public funding, it is hard to imagine what marginal corruption deterrence could be generated by the matching funds provision." 564 U.S. at 751–52. Indeed, the *FEC itself* appears to view the present contribution limits as sufficient to address any cognizable risks of *quid pro quo* corruption based on individual contributions. The FEC regularly recommends to Congress certain amendments to the federal campaign finance laws, but it has *never* included any recommendation, from the enactment of BCRA's inflation-adjusted limits down to the present day, that the base limits on individual campaign contributions must be lowered in order to adequately guard against *quid pro quo* corruption or its appearance. SOF ¶¶ 30–31.

Accordingly, under settled law, Congress's selection of a $2,800 base limit for all contributions "with respect to any election," 52 U.S.C. § 30116(a)(1)(A), indicates its judgment that "contributions of that amount or less do not create a cognizable risk of corruption." *McCutcheon*, 572 U.S. at 210. As in *McCutcheon*, all Plaintiffs ask is that contributors be free to make contributions, with respect to each election, in this non-corrupting amount—free from Section 304's "prophylaxis-upon-prophylaxis" limit preventing contributions "of *any* amount"

that go to repay candidate loans in excess of $250,000. *Id.* at 210, 221. Under current law, if an individual contributes $2,800 to a candidate before an election, "there is no corruption concern." *Id.* at 210. Further, if an individual contributes $2,800 to a candidate *after* an election—so long as the candidate has $2,800 or more of outstanding debts—there again "is no corruption concern." *Id.* And further yet, if an individual contributes $2,800 to a candidate to help repay *the first $250,000 of candidate loans*, current law *still* deems there to be "no corruption concern." *Id.* Given all of that, "it is difficult to understand" how contributing even a dime to help pay off the *250,001st* dollar of outstanding candidate loans suddenly poses a "cognizable risk of corruption." *Id.*

The Sixth Circuit adopted precisely this reasoning in *Anderson*, 356 F.3d 651, a directly analogous case addressing Kentucky campaign finance law. The provision at issue in *Anderson* "prohibit[ed] candidates from loaning their respective campaigns more than $50,000 in a given election." *Id.* at 672. The district court had upheld that limit as preventing the "risks of *quid pro quo* corruption" posed by accepting contributions for the "repayment [of candidate loans] after the election." *Id.* at 673. The Sixth Circuit reversed, explaining that the limit on candidate loans could not be justified as an anti-corruption measure because "the risk of *quid pro quo* is substantially mitigated by [Kentucky's $1,000] individual contribution limits." After all, "[i]f a $1000 contribution has been found by the Kentucky legislature to be sufficiently low to avoid the appearance or fact of corruption, then a $1000 contribution to a campaign that is indebted to the candidate should also be found to be non-corrupting." *Id.* Accordingly, the Sixth Circuit struck the Kentucky provision down as unconstitutional. *Anderson*'s reasoning—which precisely anticipates the Supreme Court's reasoning in *McCutcheon*—is highly persuasive authority, and Section 304's loan-repayment limit must meet the same fate.

27

The absence of any legitimate anti-corruption interest in limiting the repayment of candidate loans is underscored by the overwhelming preponderance of States that do not impose any such limit. Forty States and the District of Columbia allow candidate loans in unlimited amounts and impose no separate monetary restriction on their repayment, either before or after an election.[4] And *only six States* impose a repayment limit akin to Section 304.[5] Unless the FEC can demonstrate that the political process has been corrupted, either in reality or in appearance, in the overwhelming majority of States that do not impose a restriction analogous to Section 304, its contention that the challenged limit is a necessary anti-corruption measure is wholly unpersuasive. *Cf. McCutcheon*, 572 U.S. at 209 n.7 (rejecting anti-corruption justification because "[j]ust eight of the 38 States that have imposed base limits on contributions from individuals to candidates have also imposed aggregate limits" and "[t]he Government presents no evidence concerning the circumvention of base limits from the 30 States with base limits but no aggregate limits"); *Citizens United*, 558 U.S. at 357 ("The anticorruption interest is not sufficient to displace the speech here in question. Indeed, 26 States do not restrict independent expenditures by for-profit corporations. The Government does not claim that these expenditures have corrupted the political process in those States.").

---

[4] Three of these States freely allow the making and repayment of candidate loans without limit but proscribe the payment of interest on the loan to the candidate. *See* Kan. Stat. Ann. § 25-4157a(b); N.Y. Elec. Law § 14-130(2); Va. Code § 24.2-947.4:1.

[5] *See* Alaska Stat. § 15.13.078(b)(1); Ga. Code § 21-5-41(h); 17 R.I. Gen. Laws §17-25-7.4; S.C. Code § 8-13-1328; Tex. Elec. Code § 253.042(a); Wash. Rev. Code § 42.17A.445(3). Florida allows the making and pre-election repayment of candidate loans but generally bans all post-election contributions to candidates. Fla. Stat. § 106.08(2)(c)(3). The remaining three States impose no special limit on the repayment of candidate loans but do cap the amount of such loans outright. *See* Cal. Gov't Code § 85307(b); Mass. Gen. Laws ch. 55, § 7; Neb. Rev. Stat. § 49-1446.04; 4 Neb. Admin. Code ch. 10, § 004(02).

3.      As just shown, the loan-repayment limit does not further any cognizable anti-corruption interest, and it therefore fails either strict or "closely-drawn" scrutiny. The FEC has resisted this conclusion, arguing in prior briefing that Section 304 is justified for two reasons: (1) because it applies to contributions "received *after* an election, at a time when the winner is already known and thus in a better position than a mere candidate to guarantee legislative favors to big donors"; and (2) because contributions used to repay candidate loans flow directly "to a candidate or officeholder who can then essentially pocket those funds and use them for any purpose." FEC's MTD Br. 40–41. Both justifications fail as a matter of law.

FEC's suggestion that contributions made "*after* an election," *id.*, are especially corrupting cannot conceivably justify the loan-repayment limit, because Congress has seen fit to *freely allow* such contributions, except when the go to pay off more than $250,000 of candidate loans. Apart from Section 304 itself, Congress has placed *no limits* on an individual's ability to contribute $2,800 or less "with respect to any election for Federal office" after election day has passed. 52 U.S.C. § 30116(a)(1)(A); *see also* 11 C.F.R. § 110.1(b)(3)(i) (allowing post-election contributions). And BCRA repeatedly countenances the fact that election campaigns may be partially financed on credit—such that candidates and their committees may *pay after* an election campaign for speech that *occurred during* the campaign. *See* 52 U.S.C. § 30101(8)(A) (defining "contribution" to include a "loan [or] advance"); *id.* § 30101(8)(B)(vii) (exempting certain types of loans); *id.* § 30101(9)(A) (defining "expenditure" to include a "loan [or] advance"); *see also* 11 C.F.R. § 116.3 (discussing vendor extensions of credit); *id.* § 100.82 (discussing bank loans); *id.* § 100.83 (discussing other lines of credit). By the FEC's lights, *any* post-election contribution—including one used to pay debts a committee owes, say, to the vendor that produced its TV commercials—must pose "heightened corruption risks." FEC's MTD Br. 36. Yet federal law

29

generally *allows* those post-election contributions, up to $2,800—so this supposedly heightened risk of corruption *cannot* justify Section 304's limit on a small, arbitrary subset of those contributions.

Even more fundamentally, the FEC's indictment of post-election contributions would also doom *all contributions to incumbent officeholders*. These, no less than loan-repayment contributions, take place "*after* an election, at a time when the winner is already known." *Id.* at 40–41. Yet Congress has placed *no* additional limits on contributions to incumbents. Accordingly, there is no dispute that any given contributor could have given Senator Cruz $2,800 on November 7, 2018, if he had designated it for the *upcoming* election cycle. The notion that the same contribution would have suddenly become corrupting if it were instead designated for *the 2018* election is farcical.

The FEC's second justification—that contributions used to repay candidate loans "go directly into the [candidate's] pocket," *id.* at 41—fares no better. As an initial matter, this argument fundamentally misunderstands what happens when contributions are used to repay a candidate's loan. Such payments do not go into the candidate's "pocket[s]," or to fund his "personal projects." *Id.* They go to reimburse the candidate for money he spent *on political speech furthering his election campaign*, just like any other contribution. Where a candidate wishes to spend an extra $1,000 on his election campaign, the following two alternative transactions are, for all intents and purposes, completely identical:

> (1) the candidate makes a $1,000 loan to his campaign before the election, which is paid back by the campaign after the election because a contributor has made a $1,000 post-election donation;
>
> (2) the contributor makes a $1,000 contribution before the election, which relieves the candidate of the need of loaning the campaign $1,000 of his own money.

In both cases, the candidate is able to spend the needed $1,000 on core political speech, and in both cases, the contribution allows the Candidate to spend $1,000 of his own money for purposes other than the campaign. In neither case can there be any suggestion that the candidate has pocketed $1,000 for his "personal use." *Id.* at 38. That is why Section 304 itself allows such loan repayments *without limit*, if they are made with pre-election money. That is why repaying candidate loans (either before or after election day) *does not* fall afoul of the federal law's separate prohibition, not challenged here, on the conversion of campaign funds to personal use. *See* 52 U.S.C. § 30114(b). And that is why when a committee repays the loans it owes to its *vendors*, no one thinks the money is going to fund the vendor's "own personal expenses" or "personal projects." FEC's MTD Br. 41.

Even setting this threshold problem aside, the supposedly heightened corruption risk the FEC thinks is associated with contributions used to repay candidate loans once again *cannot* justify Section 304's loan-repayment limit, because Congress has *deliberately allowed* contributions to be used for that *very purpose*, without limit, so long as the contributions come in *before election day*. A *pre-election* contribution used to repay a candidate loan, no less than a *post-election* one, goes "directly into the [candidate's] pocket" on FEC's (flawed) reasoning. *Id.* Yet under the plain terms of Section 304 itself, pre-election contributions may be used this way *without limit*.

Nor could there be any argument that it is somehow the *union* of these two arguments that justifies Section 304—that is, that the supposedly "heightened risk of quid pro quo corruption and its appearance," is only present where contributions *both* (1) are "received after an election" and (2) go to "the personal benefit of the[ ] candidate." *Id.* at 39. For *both* of these factors are present *to exactly the same degree* whenever an incumbent officeholder loans money to his reelection campaign and those loans are repaid with contributions received before Election Day. Just like the

repayments capped by Section 304, a contribution to such a candidate is both (1) received when the recipient is already in office "and thus in a better position than a mere candidate to guarantee legislative favors to big donors," and (2) goes (by FEC's reasoning) directly to the "officeholder who can then essentially pocket those funds and use them for any purpose." *Id.* at 41. Yet so long as the contributions come in before the officeholder's re-election campaign has concluded, Section 304 allows them to be used to repay his loans *without limit*.

Once again, there is no dispute that a contributor could have given Senator Cruz $2,800 on *November 5*, 2018, and that this contribution could have been used to pay off Senator Cruz's 2018 candidate loans without limit, *even though Senator Cruz was already a federal officeholder*. And once again, the FEC's justification of Section 304 thus depends on a completely untenable proposition: that the very same contribution would have suddenly become especially corrupting if it were instead made *two days later*—when *nothing* about Senator Cruz's status as an officeholder, or the use to which the contribution could be put, had changed.

In the end, the FEC's complaint that without Section 304, candidates could use post-election contributions "to subsidize their own personal expenses," *id.*, appears to be based on little more than the same justification that *Congress* offered for the loan-repayment limit: leveling the playing field between wealthy and non-wealthy candidates.  The legislative debate over Section 304, too, found fault with the idea of a wealthy candidate "putting up [his] own money" and then "get[ting] it back from [his] constituents" after the election. 147 CONG. REC. S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici). But the legislative debate also makes clear *the source* of this discomfort: the fact that the Constitution "allows individuals to spend literally millions of their own money while mere mortals running for office are trying to keep up." *Id.* at S2461 (statement

of Sen. Durbin). And *that* concern is not "a legitimate government objective, let alone a compelling one." *Bennett*, 564 U.S. at 750 (quotation marks omitted).

### C.    The Loan-Repayment Limit Is Not Sufficiently Tailored.

Even if the loan-repayment limit *did* somehow further the Government's interest in curbing *quid pro quo* corruption and its appearance, the limit would *still* fail constitutional muster—under both strict and "closely drawn" scrutiny—because it is not "narrowly tailored to achieve [that] objective." *McCutcheon*, 572 U.S. at 218. "In the First Amendment context, fit matters," *id.*, and Section 304 is a poor fit for the Government's asserted anti-corruption interest because it is seriously overinclusive, sweeping in far more conduct protected by the First Amendment than reasonably necessary.

Recall that on the FEC's theory, the contributions limited by Section 304 pose a "heightened risk of quid pro quo corruption" in part because they are received "*after* an election, at a time when the winner is already known and thus in a better position than a mere candidate to guarantee legislative favors to big donors." FEC's MTD Br. 39, 40–41. Even if this consideration had force as to candidates who *prevailed* in the election in question (and for the reasons already discussed, it does not), it obviously has *no* purchase with respect to *losing* candidates—who no longer have the *power* to grant political favors in a *quid pro quo* return for post-election contributions. Indeed, the Sixth Circuit's persuasive decision in *Anderson* struck down the Kentucky limit on candidate loans in part for this very reason: "the risk of *quid pro quo* is virtually non-existent where the contribution is made to a losing candidate who seeks to recoup some of his debt." 356 F.3d at 673. Section 304 is thus "poorly tailored to the Government's interest," and "impermissibly restricts participation in the political process." *McCutcheon*, 572 U.S. at 218. It must be struck down. *Id.* at 227.

33

## II.     Plaintiffs Are Entitled to Declaratory and Injunctive Relief.

Because Section 304 is unconstitutional, Plaintiffs are entitled to an injunction restraining Defendants from enforcing it. To obtain permanent injunctive relief, a plaintiff must show that "(1) it will suffer an irreparable injury in the absence of an injunction; (2) legal remedies are insufficient to compensate for that injury; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) the injunction is in the public interest." *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 101 (D.D.C. 2014). Each of these factors is met.

As demonstrated above, the loan-repayment limit inflicts ongoing constitutional harm on Plaintiffs: it unconstitutionally prevents both Senator Cruz and his committee from exercising their core First Amendment right to fund political speech supporting Senator Cruz's election. It is well settled that the infliction of First Amendment harm constitutes irreparable injury that cannot be remedied by a damages judgment at law. As the Supreme Court plurality opinion in *Elrod v. Burns* explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976); *accord ACLU v. Mineta*, 319 F. Supp. 2d 69, 87 (D.D.C. 2004), *appeal dismissed*, 2005 WL 263924 (D.C. Cir. Feb. 2, 2005). And no damages judgment can remedy this ongoing infringement of Plaintiffs' Free Speech rights. *See Elrod*, 427 U.S. at 373.

The balance of the equities and the public interest—factors that "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—also favor entry of a permanent injunction putting a stop to Defendants' ongoing constitutional violation. As shown above, the loan-repayment limit does not further the Government's interest in curbing *quid pro quo* corruption or its appearance—and that is the "only . . . legitimate governmental interest for restricting campaign finances" that the Supreme Court has identified. *McCutcheon*, 572 U.S. at

206. Enjoining these unconstitutional provisions would thus inflict *no* cognizable harm on Defendants. And as the D.C. Circuit has held, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

In addition to enjoining the enforcement of Section 304, the Court should also issue a declaration making clear that this provision violates the First Amendment and is thus invalid. Declaratory relief is appropriate where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1345 (Fed. Cir. 2010). Here, a declaration that the challenged provision is unconstitutional and invalid would "terminate and afford relief from the uncertainty, insecurity, and controversy" between the parties over the constitutionality of the loan-repayment limit. *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016).

## CONCLUSION

For the foregoing reasons, the Court should grant Summary Judgment to the Plaintiffs and strike down BCRA § 304 as unconstitutional, both as applied to Plaintiffs and on its face.

Dated:  June 9, 2020

Chris Gober
  (D.C. Bar No. 975981)
The Gober Group PLLC
3595 RR 620 S., Suite 200
Austin, TX 78738
(512) 354-1787

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
  (D.C. Bar No. 248070)
John D. Ohlendorf
  (D.C. Bar. No. 1024544)
J. Joel Alicea
  (D.C. Bar. No. 1022784)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (facsimile)
ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

35