**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TED CRUZ FOR SENATE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 19-908 (NJR, APM, TJK) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, *et al.*, | ) | SUMMARY JUDGMENT |
| | ) | MOTION |
| Defendants. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant Federal Election Commission ("Commission") respectfully cross-moves this Court for an order (1) granting summary judgment to the Commission pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h), and (2) denying plaintiffs' summary judgment motion (Docket No. 61).

In support of this motion, the Commission is filing a Memorandum in Support of Its Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment; a Statement of Undisputed Material Facts and accompanying exhibits; a Statement of Genuine Issues in response to Plaintiff's Statement of Undisputed Material Facts; and a Proposed Order.

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

Kevin Deeley
Associate General Counsel
kdeeley@fec.gov

Seth Nesin
Attorney
snesin@fec.gov

Tanya Senanayake (D.C. Bar No. 1006218)
Attorney
tsenanayake@fec.gov

Harry J. Summers                    COUNSEL FOR DEFENDANT
Assistant General Counsel           FEDERAL ELECTION COMMISSION
hsummers@fec.gov                    1050 First Street NE
                                    Washington, DC 20463
                                    (202) 694-1650

July 14, 2020

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TED CRUZ FOR SENATE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 19-908 (NJR, APM, TJK) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, *et al.*, | ) | SUMMARY JUDGMENT |
| | ) | MEMORANDUM |
| Defendants. | ) | |
| | ) | |

## FEDERAL ELECTION COMMISSION'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

Kevin Deeley
Associate General Counsel
kdeeley@fec.gov

Harry J. Summers
Assistant General Counsel
hsummers@fec.gov

Seth Nesin
Attorney
snesin@fec.gov

Tanya Senanayake (D.C. Bar No. 1006218)
Attorney
tsenanayake@fec.gov

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
1050 First Street NE
Washington, DC 20463
(202) 694-1650

July 14, 2020

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

I.      PARTIES ........................................................................................................ 2

      A.    The Federal Election Commission.......................................................... 2

      B.    Plaintiffs ............................................................................................... 3

II.     STATUTORY AND REGULATORY BACKGROUND................................... 3

      A.    Passage and Judicial Review of the 1974 FECA Amendments.............. 3

      B.    Campaign Committees and Their Receipt of Contributions................... 4

      C.    BCRA and the Loan Repayment Limit.................................................. 5

      D.    Candidate Loans and Corruption Risks ................................................. 7

      E.    Public Opinion Regarding Post-Election Contributions and
          Repayment of Candidate Loans ........................................................... 10

III.    FACTUAL BACKGROUND ........................................................................ 11

IV.    PROCEDURAL BACKGROUND................................................................. 13

ARGUMENT ........................................................................................................... 14

I.      SUMMARY JUDGMENT STANDARD ...................................................... 14

II.     THE LOAN REPAYMENT LIMIT IS CONSTITUTIONAL AS APPLIED TO
      PLAINTIFFS BECAUSE THEY SUFFERED NO BURDEN ON THE
      EXERCISE OF THEIR CONSTITUTIONAL RIGHTS ............................... 14

      A.    Senator Cruz Suffered No Constitutional Burden in 2018 .................. 15

      B.    The Committee Suffered No Constitutional Burden in 2018 ............... 16

C.      Neither Contributors Nor Potential Contributors to Senator Cruz's Campaign Suffered Constitutional Burdens During the 2018 Election Cycle ............................................................................... 18

III.    BECAUSE THE LOAN REPAYMENT LIMIT BURDENS NO FUNDAMENTAL RIGHT, THE COURT EVALUATES PLAINTIFFS' FACIAL CHALLENGE TO THE PROVISION USING DEFERENTIAL RATIONAL BASIS REVIEW ...................................................................... 19

    A.      The Loan Repayment Limit Does Not Restrict Political Speech ...................... 19

    B.      The Loan Repayment Limit Does Not Restrict Candidate Expenditures .................................................................. 26

IV.     THE LOAN REPAYMENT LIMIT IS RATIONALLY RELATED TO THE GOVERNMENT'S ANTICORRUPTION AND DISCLOSURE INTERESTS, AND THE STATUTE WOULD SURVIVE EVEN MORE RIGOROUS REVIEW IF IT APPLIED ....................................................................... 29

    A.      Rational Basis Standard of Review ........................................................ 30

    B.      The Government Has Not Just Legitimate, But Important and Compelling Interests in Lessening the Risk of Actual and Apparent Quid Pro Quo Corruption and Informing Voters .................................. 30

        1.      Anticorruption .......................................................................... 30

        2.      Disclosure ................................................................................ 37

    C.      The Loan Repayment Limit Proportionally Serves the Government's Interests and Is Not Overbroad ............................................................ 38

CONCLUSION ............................................................................................... 43

## TABLE OF AUTHORITIES

*Cases*                                                                                          *Page*

*Anderson v. Celebrezze*, 460 U.S. 780, 796 (1983) ...................................................... 38

*Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004) .......................................................... 28

*Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011) ................................................................................... 22, 23, 24

*Ark. Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99 (D.C. Cir. 2003) ........................... 21

*Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 139 S. Ct. 1780 (2019) .................... 21

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ................................................................. 42

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............. 3, 4, 15, 21, 22, 25, 26, 27, 31, 37, 38, 39, 40, 41, 42

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................. 14

*Citizens United v. FEC*, 558 U.S. 310 (2010) ................................................................ 14

*Dandridge v. Williams*, 397 U.S. 471 (1970) .................................................................. 30

*Davis v. FEC*, 554 U.S. 724 (2008) .................................................................. 15, 22, 23, 24

*Durant v. Dist. of Columbia*, 875 F.3d 685 (D.C. Cir. 2017) ...................................... 29

*Evans v. Sebelius*, 716 F.3d 617 (D.C. Cir. 2013) ......................................................... 43

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ............................................... 21, 30

*FCC v. Colo. Repub. Fed. Campaign Comm.*, 533 U.S. 431 (2001) ........................... 31

*FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480 (1985) .............................. 29-30

*FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197 (1982) ...................................... 31, 40

*FEC v. O'Donnell*, 209 F. Supp. 3d 727 (2016) .......................................... 21, 29, 41

*Grimes v. Dist. of Columbia*, 794 F.3d 83 (D.C. Cir. 2015) ...................................... 29

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) ....................................................... 39

*Heller v. Doe*, 509 U.S. 312 (1993) .............................................................................. 30

*Holmes v. FEC*, 875 F.3d 1153 (D.C. Cir. 2017) ..................................................... 19, 25

*Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533 (D.C. Cir. 2019) ..................... 17, 39, 41, 43

*McConnell v. FEC*, 540 U.S. 93 (2003) ...................................................... 5, 26, 31, 37, 43

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ............................................ 31, 34, 36, 37, 38, 39

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) .................................... 30

*New York State Club Ass'n, Inc. v. City of New York*,
    487 U.S. 1 (1988) ......................................................................................... 41, 42

*New York v. Ferber*, 458 U.S. 747 (1982) ..................................................................... 42

*Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386 (D.C. Cir. 2020) ........................... 14

*Randall v. Sorrell*, 548 U.S. 230 (2006) ....................................................................... 41

*Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150 (D.D.C. 2010)
    *aff'd*, 561 U.S. 1040 (2010)) .............................................................................. 31

*Republican Party of La. v. FEC*, 219 F. Supp. 3d 86, 91-92 (D.D.C. 2016),
    *aff'd* 137 S. Ct. 2178 (2017) ............................................................................. 31

*Romer v. Evans*, 517 U.S. 620 (1996) .......................................................................... 19

*Sec. Title Guarantee Corp. of Baltimore v. 915 Decatur St NW, LLC*,
    427 F. Supp. 3d 1, 6 (D.D.C. 2019) ..................................................................... 14

*SpeechNow.org v. FEC*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc),
    *cert. denied*, 131 S. Ct. 553 (2010) .................................................................... 37

*Stop This Insanity, Inc. Emp. Leadership Fund v. FEC*,
    761 F.3d 10 (D.C. Cir. 2014) ...................................................................... 1, 17, 38

*Ted Cruz for Senate v. FEC*, No. 19-908, 2019 WL 8272774 (Dec. 24, 2019) ........................... 17

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................................... 39

*Vance v. Bradley*, 440 U.S. 93 (1979) .......................................................................... 30

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) ............................................................ 35-36

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ....................................................................................... 39, 42

iv

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009) ........................................................ 21

**Statutes and Regulations**

Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81

    BCRA § 304 ........................................................................................................................ 5

Federal Election Campaign Act, 52 U.S.C. §§ 30101-30146 ........................................................ 3

    52 U.S.C. § 30101(5) ........................................................................................................ 4

    52 U.S.C. § 30101(6) ........................................................................................................ 4

    52 U.S.C. § 30101(8)(A)(i) .............................................................................................. 32

    52 U.S.C. § 30102(e)(1) .................................................................................................... 4

    52 U.S.C. § 30102(e)(2) .................................................................................................... 4

    52 U.S.C. § 30104 ............................................................................................................. 3

    52 U.S.C. § 30106(b)(1) .................................................................................................... 3

    52 U.S.C. § 30107(a)(8) .................................................................................................... 3

    52 U.S.C. § 30109(a)(1) .................................................................................................... 3

    52 U.S.C. § 30109(a)(2) .................................................................................................... 3

    52 U.S.C. § 30109(a)(6) .................................................................................................... 3

    52 U.S.C. § 30111(a)(8) .................................................................................................... 3

    52 U.S.C. § 30116(a) ..................................................................................................... 3, 4

    52 U.S.C. § 30116(j) ...................................................................................................... 1, 6

    52 U.S.C. § 30118 ............................................................................................................. 3

    52 U.S.C. § 30119 ............................................................................................................. 3

    52 U.S.C. § 30121 ............................................................................................................. 3

11 C.F.R. § 110.1(b)(2)(i) ............................................................................................................. 4

11 C.F.R. § 110.1(b)(2)(ii) ............................................................................ 4

11 C.F.R. § 110.1(b)(3)(i) .............................................................................. 5

11 C.F.R. § 110.1(b)(3)(ii)(A) ...................................................................... 5

11 C.F.R. § 110.1(b)(3)(ii)(B) ...................................................................... 5

11 C.F.R. § 110.1(b)(3)(ii)(C) ...................................................................... 5

11 C.F.R. § 116.3 ........................................................................................... 8

11 C.F.R. § 116.11(a) .................................................................................... 8

11 C.F.R. § 116.11(b) .................................................................................... 8

11 C.F.R. § 116.11(c) .................................................................................... 7

11 C.F.R. § 116.11(c)(1) ......................................................................... 7, 12

11 C.F.R. § 116.11(c)(2) .............................................................................. 13

***Miscellaneous***

147 Cong. Rec. S2462 (daily ed. Mar. 19, 2001) ................................... 6, 32

147 Cong. Rec. S2537 (daily ed. Mar. 20, 2001) ....................................... 6

147 Cong. Rec. S2541 (daily ed. Mar. 20, 2001) ............................... 6, 7, 32

147 Cong. Rec. S2452 (daily ed. Mar. 20, 2001) ....................................... 7

FEC, Increased Contribution and Coordinated Party Expenditure Limits for Candidates
    Opposing Self-Financed Candidates, 68 Fed. Reg. 3970 (Jan. 27, 2003) .................................. 7

Fed. R. Civ. P. 56 ........................................................................................ 14

Anne Baker, *Are Self-Financed House Members Free Agents?*,
    35:1 Congress & the Presidency: A Journal of Capital Studies, 53 (2008) ...................... 8, 9, 33

Alexei Ovtchinnikov & Philip Valta, *Debt in Political Campaigns* (May 2020) ................ 8, 9, 33

Senator Rafael Edward ("Ted") Cruz and his campaign committee, Ted Cruz for Senate (the "Committee"), have brought a constitutional challenge to 52 U.S.C. § 30116(j) (the "Loan Repayment Limit"), under which an authorized campaign committee may not use contributions received after an election to repay more than $250,000 of a candidate's personal loans to that committee. But contrary to plaintiffs' claims, the Loan Repayment Limit does not burden First Amendment speech rights. It sets reasonable temporal and amount restrictions on the *repayment* of candidate loans, but not on how much candidates may loan or contribute to their campaigns, nor on how campaigns may use such funds for political activity. And considerable evidence shows that the Limit deters corruption and its appearance and that it serves key disclosure interests. Therefore, the Court should reject plaintiffs' claims.

First, plaintiffs' as-applied claim must fail because they have stipulated to facts that confirm that the law did not actually impose any First Amendment burden on them, and there is no "constitutional right to do things the hard way." *Stop This Insanity, Inc. Emp. Leadership Fund v. FEC*, 761 F.3d 10, 14 (D.C. Cir. 2014). Plaintiffs planned this lawsuit over a period of years, they initiated the otherwise purpose-less loan on the eve of the 2018 election, and they nearly completed repayment as soon as the permitted repayment period expired. After being compelled to produce evidence that confirmed the obvious, plaintiffs admitted, as they must, that "the sole and exclusive motivation behind Senator Cruz's actions in making the 2018 loans and the Committee's actions in waiting to repay them was to establish the factual basis for this [lawsuit]." (Federal Election Commission's Statement of Undisputed Material Facts ("SMF") ¶ 56.) The Limit did not in fact deter Senator Cruz from making a larger loan, and so it did not infringe on either of the plaintiffs' constitutional rights.

Plaintiffs' facial challenge also fails. The Loan Repayment Limit does not restrict speech but merely limits how much money is taken away from campaign spending and directed back to

1

the candidate.  That activity, like the personal use of campaign funds, is not constitutionally protected.  Candidates remain free to make unlimited personal expenditures to support their campaigns.  And the Limit easily passes the applicable rational basis scrutiny, because it is rationally related to a legitimate government interest and not overbroad.  Indeed, the provision would survive even more rigorous review because, operating in the temporally-limited context of the post-election repayment of large candidate loans, it serves important and even compelling government interests.

Those interests are vital to the integrity of the federal government.  The Loan Repayment Limit was designed to deter corruption, and plaintiffs' extensive citations to the legislative history of a different part of the statute do not show otherwise.  And the Limit does deter corruption:  Considerable evidence, including campaign data, scholarly research, and public opinion polling, shows that post-election fundraising to repay large candidate loans presents particular concerns that contributions will be made in exchange for federal policy favors.  By its nature, the Limit also serves to further disclosure interests by increasing voter knowledge of the sources of campaign financing at the most crucial juncture, *i.e.*, before voting, thereby protecting the integrity of the electoral process.  It should be found valid.

## BACKGROUND

## I. PARTIES

### A. The Federal Election Commission

The Federal Election Commission ("Commission" or "FEC")[1] is an independent agency

---

[1]     In addition to the FEC, plaintiffs' lawsuit names each of the agency's three current commissioners as defendants in their official capacities.  (Compl. for Decl. and Inj. Relief ("Compl.") (Docket No. 1) (naming Commissioner Weintraub and now-Vice Chair Walther); Pls.' Mem. at 10 n.1 (naming Chair Trainor).)   References to "defendant," "FEC," and "Commission" herein should be understood to refer to all defendants.

of the United States with exclusive jurisdiction to administer, interpret, and civilly enforce the Federal Election Campaign Act ("FECA"), 52 U.S.C. §§ 30101-46 (formerly 2 U.S.C. §§ 431-57 before reclassification in 2014).  Congress authorized the Commission to "formulate policy" with respect to FECA, 52 U.S.C. § 30106(b)(1); "to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of [FECA]," *id.* §§ 30107(a)(8), 30111(a)(8); to investigate possible violations of the Act, *id.* § 30109(a)(1)-(2); and to initiate civil enforcement actions for violations of FECA, *id.* §§ 30106(b)(1), 30109(a)(6).

### B.    Plaintiffs

Plaintiffs are U.S. Senator Rafael Edward ("Ted") Cruz and Ted Cruz for Senate.  (SMF ¶¶ 2-3; *see infra* Section II.B.)  Senator Cruz was first elected to represent Texas in the U.S. Senate in 2012, won re-election in 2018, and is a candidate for 2024.  (SMF ¶ 2.)  Ted Cruz for Senate is the principal campaign committee for the 2018 and 2024 primary and general election campaigns of Senator Cruz.  (SMF ¶ 3.)

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.    Passage and Judicial Review of the 1974 FECA Amendments

In 1974, Congress created the FEC and substantially revised FECA in response to the Watergate scandal and "deeply disturbing" reports from the 1972 federal elections of contributors giving large amounts of money to candidates "to secure a political quid pro quo." *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976) (per curiam).  Congress primarily intended to "limit the actuality and appearance of corruption resulting from large individual financial contributions." *Id.* at 26.  To that end, the statute limits the dollar amounts and permissible sources of contributions to candidates for federal office, political parties, and political committees, and it requires those entities to disclose what they spend and receive through reports filed with the FEC.  52 U.S.C. §§ 30104, 30116(a), 30118-19, 30121.

3

In 1976, the Supreme Court generally upheld FECA's contribution limits and disclosure requirements against a facial constitutional challenge. In rejecting the challenge to the contribution limits, the Court explained that "[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." *Buckley*, 424 U.S. at 26-27. In the same case, however, the Court struck down FECA's limits on expenditures by candidates. *Id.* at 43-44. As originally drafted, FECA set "limits on expenditures by a candidate 'from his personal funds, or the personal funds of his immediate family.'" *Id.* at 51. The Court struck down this limit on self-funding as an infringement on the candidate's "First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates." *Id.* at 52. The Court reasoned that the "primary governmental interest served" by FECA was "the prevention of actual and apparent corruption," and that "the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse to which the Act's contribution limitations are directed." *Id.* at 53.

### B.     Campaign Committees and Their Receipt of Contributions

FECA requires federal candidates to designate at least one "authorized committee," which may receive contributions and make expenditures on the candidate's behalf, to serve as its "principal campaign committee." 52 U.S.C. §§ 30101(5)-(6), 30102(e)(1)-(2). The statute also limits the amount individual contributors may give to a campaign committee to an inflation-adjusted $2,800 per election. (52 U.S.C. § 30116(a); SMF ¶ 4.) Under the Commission's regulations, contributors may designate their contributions for a particular election. 11 C.F.R. § 110.1(b)(2)(i). In the absence of a designation, a contribution is presumed to be for the recipient candidate's next election. *Id.* § 110.1(b)(2)(ii).

4

A contribution designated for a *previous* election may be accepted by a campaign committee only to the extent that the contribution does not exceed the committee's "net debts outstanding" from that election. *Id.* § 110.1(b)(3)(i). In general, a campaign committee's "net debts outstanding" equals its total amount of unpaid debts and obligations for an election, less its total resources from that election available to pay those debts and obligations, including its cash on hand and amounts owed to the committee by others. *Id.* § 110.1(b)(3)(ii)(A)-(C). Thus, a campaign may accept post-election contributions only to the extent necessary to pay down a net shortfall from that election.

### C.     BCRA and the Loan Repayment Limit

In 2002, Congress enacted the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 ("BCRA"), which amended FECA. BCRA's most prominent change to FECA was its prohibition of the use in federal campaigns of "soft money" raised outside FECA's source and amount limitations, a change that was intended to prevent the circumvention of those limits. *McConnell v. FEC*, 540 U.S. 93, 132 (2003). The Supreme Court upheld the soft money ban because it advanced the government's important interests in diminishing quid pro quo corruption and its appearance. *Id* at 188-89.

Another element of BCRA was the Loan Repayment Limit challenged in this case. The Loan Repayment Limit does not restrict the repayment of candidate loans with contributions made *before* an election, but under the provision a campaign committee may use contributions raised *after* an election to repay "personal loans" that a candidate "incurs . . . in connection with the candidate's campaign" up to a limit of $250,000.[2] The floor discussion of this small, discrete

---

[2]     The Loan Repayment Limit states that a candidate "who incurs personal loans . . . in connection with the candidate's campaign for election shall not repay (directly or indirectly), to the extent such loans exceed $250,000, such loans from any contributions made to such

part of BCRA establishes that the provision was an anti-corruption measure.  Multiple statements indicate that the Limit was intended to mitigate the heightened risk of quid pro quo corruption and its appearance resulting from already-elected officeholders soliciting contributions for their own personal benefit.  *See* 147 Cong. Rec. S2537 (daily ed. Mar. 20, 2001) (statement of Sen. Domenici) ("If you incur debt from a personal loan and then you get elected as Senator, and then you go around and say, now I am Senator, I want you to get me money so I can pay back what I used of my own money to run for election.  It is clear in this amendment that you cannot do that in the future."); *id.* at S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) (explaining that a candidate who incurred personal loans for his campaign should not be able "to get it back from [his or her] constituents under fundraising events that [he or she] would hold and then ask them: How would you like me to vote now that I am a Senator?"); *id.* at S2451 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) ("This [amendment] limits candidates who incur personal loans in connection with their campaign in excess of $250,000.  They can do $250,000 and then reimburse themselves with fundraisers.  But anything more than that, they cannot repay it by going out and having fundraisers once they are elected with their own money.''); *id.* at S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin) ("[The] language [of the Loan Repayment Limit] makes it clear there will not be any effort after the election to raise money to repay those loans."); *id.* at S2541 (Mar. 20, 2001) (statement of Sen. Hutchison) ("[Candidates] have a constitutional right to try to buy the office, but they do not have a constitutional right to resell it.  That is what my part of this amendment attempts to prevent, so a candidate can spend

---

candidate or any authorized committee of such candidate after the date of such election."
52 U.S.C. § 30116(j).

his or her own money but there would be a limit on the amount that candidate could go out and raise to pay himself or herself back.").[3]

Following the passage of BCRA, the Commission issued regulations implementing the new statute, including the Loan Repayment Limit.  One such regulation establishes a 20-day period following an election during which a committee can use the cash it has on hand as of the day after the election to pay back all or part of the candidate's personal loans, without limitation ("20-Day Repayment Period").  11 C.F.R. § 116.11(c)(1).  After a general election, a campaign committee must file a report with the FEC reporting its receipts and disbursements for a period expiring 20 days after the election.  FEC, Increased Contribution and Coordinated Party Expenditure Limits for Candidates Opposing Self-Financed Candidates, 68 Fed. Reg. 3970, 3974 (Jan. 27, 2003).  Thus, after the 20-day post-election period has elapsed, a campaign committee must "treat the remaining balance of the candidate's personal loan that exceeds $250,000 as a contribution from the candidate to the authorized committee, given that this amount could never be repaid, and given that the amount must be accounted for on the authorized committee's next report."  *Id.* (citing 11 C.F.R. § 116.11(c)).

### D.    Candidate Loans and Corruption Risks

Almost half of all federal campaign committees use some sort of debt to finance their campaigns.  (SMF ¶ 31.)  Campaigns can lawfully obtain loans from candidates or from

---

[3]    One supporter of the provision stated a hope "to level the playing field," but those comments contrasted a self-lending candidate's ability to "go out and repay themselves" "when they win" with persons running with a "variety of support from his or her constituents," *i.e.*, people who do not have the same opportunity for post-election fundraising for self-payment. 147 Cong. Rec. S2451-S2452 (daily ed. Mar. 20, 2001) (statement of Sen. Hutchison).  Senator Hutchison belabored the points that she "want[ed] people to be able to spend their own money," as she previously had, and that "[n]o one argues" against candidates like her having "a constitutional right to spend our money."  *Id.* at S2451.

commercial lending institutions, but there are very different rules surrounding these two types of loans. 11 C.F.R. § 116.3, 11(a). Commercial loans must be made in the ordinary course of a commercial vendor's business, and the terms of the loan must be substantially similar to those given to nonpolitical debtors that are of a similar risk and size, in order to avoid constituting a contribution to the campaign (and thus an unlawful corporate subsidization). *See* 11 C.F.R. § 116.11(a), (b). Loans from candidates to their campaigns are not subject to those restrictions, and need not be arms-length financial transactions in which the candidate sets terms based on his or her risk of not being repaid. Federal campaigns have made extensive use of loans from candidates both before and after the passage of BCRA, though many of the loans were in essence contributions with limited expectations of repayment. (SMF ¶ 32 (citing Anne Baker, *Are Self-Financed House Members Free Agents?*, 35:1 Congress & the Presidency: A Journal of Capital Studies, 53, 56 (2008) ("Baker") ("[M]ost self-financing takes the form of personal loans.").)

Candidate campaign loans can create concerns about whether indebted candidates are more likely to engage in quid pro quo corruption. As a recent comprehensive study of federal candidate debt, campaign finance data, and legislative activity over a 20-plus-year period showed, officeholders in debt are more likely to be influenced in their legislative voting by PACs and other special interest groups that contribute to their campaigns. (SMF ¶ 67.) Debt creates "legislative distortions" because "indebted politicians, relative to their debt-free counterparts, are significantly more likely to switch their votes if they receive contributions from those special interests between the votes." (SMF ¶ 67 (quoting Alexei Ovtchinnikov & Philip Valta, *Debt in Political Campaigns* ("Ovtchinnikov & Valta ") at 29 (May 2020).) Passage of the Loan Repayment Limit successfully reduced the level of vote switching as a result of contributions, as "politicians with large loans to their campaigns become significantly less responsive to

contemporaneous labor contributions following the passage of BCRA and behave remarkably similar to their debt free counterparts."  (SMF ¶ 68 (quoting Ovtchinnikov & Valta at 26).)

Consistent with those findings, another study examined certain self-funding federal candidates, including those carrying candidate-loan debt beyond an election cycle, and concluded that the self-funding candidates did not vary their votes any more or less than other candidates as a result of interest-group contributions.  (SMF ¶ 68 (citing Baker at 54).)  "A probable explanation . . . is that instead of being free agents, self-financed members feel pressure to court other sources of campaign contributions so they can be less reliant on their own money in the next election."  (*Id.* ¶ 68 (quoting Baker at 65).)  The debt-ridden self-funders would thus be foremost among the candidates studied who would be motivated to reduce their campaign's effect on their personal wealth.

In state elections, many of which are not subject to loan repayment limits, similar concerns about corruption resulting from post-election contributions to indebted candidates have resulted in investigations and actions in states including Ohio, Oklahoma, Kentucky, and Alaska.  (SMF ¶¶ 73-81.)  These included several appearance concerns when contributors provided funds for repayments that personally benefitted candidates and then received state contracts shortly thereafter.  (*Id.* ¶¶ 73-75, 79.)

Consistent with their advantage in being able to take favorable legislative action after a contribution, winning candidates have generally been more likely to be repaid for their loans than losing candidates have in the past.  (SMF ¶ 42.)  Winning candidates often host "debt retirement" fundraising events in which special interest PACs make contributions to help pay down a candidate's debt, while losing candidates seeking to retire debt have "the hardest task in American politics."  (SMF ¶¶ 42, 69.)

The Loan Repayment Limit is targeted to the limited number of very large loans to which it applies, where it plays a vital anti-corruption role. The large majority of candidate loans to campaigns are for under $250,000, and therefore they are not impacted by the Loan Repayment Limit at all. During the five most recent two-year election cycles, the proportion of loans that were for $250,000 or less was very similar to the ratio of such loans before the Loan Repayment Limit became effective. (SMF ¶¶ 38-41.) The number of candidate loans that are exactly $250,000 or within that general range also does not appear to have changed significantly following the effective date of the Loan Repayment Limit. (SMF ¶¶ 33-36.) One independent scholarly study that looked only at federal candidate loans between $100,000 and $1,000,000 indicates that from 1983 until BCRA became effective, 3.6% of such loans were between $240,000 and $250,000, while from the time BCRA became effective until 2014, 7% of such loans were at that that threshold. (SMF ¶ 37.) Those figures suggest that, even disregarding factors like inflation, the Loan Repayment Limit has impacted the conduct of a relatively small number of candidates, with only about 3% of that subset of loan candidates (which represents less than 1% of candidates overall) possibly altering the amount of their loans as a result of the Limit.

### E. Public Opinion Regarding Post-Election Contributions and Repayment of Candidate Loans

The public overwhelmingly views post-election contributions as raising expectations of political favors from federal candidates who later take office. In an April 2020 poll of 1,000 nationally-representative Americans aged 18 and over conducted by the prominent public opinion research firm YouGov, 81% of respondents said they believed that it was "very likely" or "likely" that individuals who donate money to a federal candidate's campaign after the election expect a political favor in return from candidates who later take office. (SMF ¶ 90.)

In the same April 2020 YouGov poll, an overwhelming majority of respondents also expressed the view that, if a loan repayment limit did not exist, donors would be more likely to expect political favors from federal candidates to whom they make contributions. (SMF ¶ 95.) Specifically, respondents were asked: "Currently, there is a limit on how much money a federal campaign may raise after Election Day to repay a candidate loan. If there were no limit on how much money a federal campaign could raise after Election Day to repay a candidate, would donors be more likely to expect political favors? Less likely to expect political favors? Or would it make no difference?" (*Id*.) In response, 67% of respondents answered that they believed that donors would be more likely to expect political favors if there were no limit. (*Id*.)

## III.    FACTUAL BACKGROUND

In 2012, Senator Cruz ran for a U.S. Senate seat to represent Texas for the first time, and as part of his highly competitive primary and primary run-off election campaigns, he made multiple loans to his authorized committee totaling approximately one million dollars. (SMF ¶ 44.) The largest loan of about $800,000 came from a margin account with Senator Cruz's wife's employer, Goldman Sachs, and was at the low interest rate level of 3%. (SMF ¶ 45.) Senator Cruz has publicly stated that the loan represented the entire liquid net worth and savings of his household. (SMF ¶ 45.) Goldman Sachs is a large, multinational bank that had recently received approximately $10 billion in public bailout funds and has an extensive stake in federal policies for which Senators have responsibility. (*Id.* ¶ 46.) Senator Cruz was not repaid in full prior to the 2012 general election, and as a result of the Loan Repayment Limit, his campaign was prohibited from repaying the full amount of the loan using funds raised after that election. (SMF ¶ 47.) When the full details of the loans later came under scrutiny, public concerns were raised regarding the susceptibility of a candidate to exchanges of favors where their personal finances are impacted and whether Senator Cruz's positions on issues of importance to Goldman

11

Sachs, like the availability of H-1B visas, had been altered.  (*Id.* ¶ 48.)  Senator Cruz circulated

many of these media reports to his staff.  (*Id.* ¶ 48.)

Starting shortly after the 2012 election and into the following year, the Cruz campaign

began having discussions about the possibility of bringing a lawsuit to strike down the Loan

Repayment Limit.  (SMF ¶ 50.)  Those discussions continued for several years, concurrently

with Senator Cruz's preparation to run for reelection in 2018.  (SMF ¶ 51.)  One article

circulated by Senator Cruz quoted a Republican campaign finance attorney noting:  "The law is

designed to prevent people from giving their campaign a bunch of money and then raising

money from donors years later when they're in office to pay themselves back personally."  (SMF

¶ 49.)

By a significant margin, the 2018 Texas Senate campaign between Senator Cruz and Beto

O'Rourke was the most expensive Senate campaign in U.S. history.  (SMF ¶ 52.)  The

Committee raised more than $35 million from contributors during the 2018 election cycle.  (*See*

SMF ¶ 53.)  Nonetheless, on the day before the November 6, 2018 general election, Senator Cruz

made the long-planned loan to provide a basis for a lawsuit, loaning his campaign $260,000.

(*See* SMF ¶ 54.)  This was the only loan received by the Cruz Committee for the 2018 election.

(*Id.*)  Of the total loan amount, $255,000 originated from Senator Cruz's margin-approved

brokerage account, and $5,000 originated from his personal bank accounts.  (*See* SMF ¶ 55.)

At the end of election day, November 6, 2018, the Committee had approximately $2.38

million cash on hand.  (Pls.' SOF ¶ 36.)  Pursuant to the 20-Day Repayment Period, the

Committee had until November 26, 2018 to use that cash on hand to repay Senator Cruz all or

part of the $260,000 he had loaned it the day before the election.  *See* 11 C.F.R. § 116.11(c)(1).

Because the Committee is permitted to repay candidate loans up to $250,000 after the 20-Day

Period using any source of funds, the Committee only needed to repay $10,000 of the loan in that

12

20-day period to assure that the law would not be an impediment to repaying Senator Cruz in full. The plaintiffs repaid no money during that period, however, because they wanted to bring this lawsuit. (SMF ¶ 59.) In addition, during the 20 days after the election and later, the Committee continued receiving post-election contributions, but rather than using those contributions to pay vendors or to pay any of Senator Cruz's debt, the campaign designated the contributions for Senator Cruz's 2024 re-election effort. (SMF ¶ 60.) Starting on November 27, 2018, the Committee was required to treat the $10,000 of Senator Cruz's personal loans that exceeded the $250,000 Loan Repayment Limit, and which the Committee did not use its cash on hand to repay during the 20-Day Repayment Period, as a contribution from Senator Cruz to his Committee. *See* 11 C.F.R. § 116.11(c)(2).

Two days after the 20-day deadline elapsed, Senator Cruz emailed his campaign staff, stating: "Since more than 20 days have passed, it would be REALLY good if we could pay back at least some of the $250k now. Our cash is really getting stretched." (SMF ¶ 62).) Less than a week after that email, the Committee started repaying Senator Cruz, and it completed paying $250,000 in four payments within the month. (SMF ¶ 63.) None of the $250,000 was from contributions raised after the election. (SMF ¶ 64.) All of the loan payments went toward Senator Cruz's loan that originated from his margin account. (SMF ¶ 65.) As a result, of the remaining $10,000 of Cruz's personal loan that was converted to a contribution to his Committee, $5,000 originated from Cruz's personal bank account and $5,000 originated from his margin loan. (*Id.*)

## IV.   PROCEDURAL BACKGROUND

On April 1, 2019, plaintiffs filed the complaint in this case. (Compl. ¶¶ 34-51.) Plaintiffs' Counts I and II assert that the Loan Repayment Limit violates the First Amendment on

its face and as applied to plaintiffs and to "potential post-election donors to Plaintiffs."  (*Id.*

¶¶ 34-44.)  Those challenges to the statute are at issue here.[4]

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Oviedo v. Wash. Metro. Area Transit

Auth.*, 948 F.3d 386, 392 (D.C. Cir. 2020).  "[I]n ruling on cross-motions for summary judgment,

the court shall grant summary judgment only if one of the moving parties is entitled to judgment

as a matter of law upon material facts that are not genuinely disputed."  *Sec. Title Guarantee

Corp. of Baltimore v. 915 Decatur St NW, LLC*, 427 F. Supp. 3d 1, 6 (D.D.C. 2019), *as amended*

(Mar. 23, 2020).

## II.   THE LOAN REPAYMENT LIMIT IS CONSTITUTIONAL AS APPLIED TO PLAINTIFFS BECAUSE THEY SUFFERED NO BURDEN ON THE EXERCISE OF THEIR CONSTITUTIONAL RIGHTS

The Loan Repayment Limit imposed no burden on plaintiffs during the 2018 campaign,

nor is there any evidence that they are suffering any such burden today.  Moreover, plaintiffs

have already stipulated that the sole reason that Senator Cruz made the loans in the first place,

and the sole reason that the Committee chose not to pay him back in full, was to bring this

lawsuit.  *See supra* pp. 12-13.  In such a situation, plaintiffs cannot show that the Loan

Repayment Limit imposed any unconstitutional burden on them.

Perhaps because the actual facts are fatal to plaintiffs' as-applied challenge, plaintiffs

resisted admitting the true purpose of the loans until forced to do so by the FEC's motion to

---

[4]   Plaintiffs' three additional counts challenge the Commission's implementing regulations
and are being held in abeyance pending resolution of this motion.  (Order (Apr. 15, 2020)
(Docket No. 49).)

compel.  In their opening brief here, plaintiffs now attempt to portray their conduct in a different light, describing their purpose as "to help finance [Senator Cruz's] reelection campaign for the United States Senate."  (Pls.' Mem. of P. & A. in Supp. of Their Mot. for Summ. J. ("Pls.' Mem.") at 8 (Docket No. 61-1); *see also id*. at 13 (Senator Cruz "was using his personal financial means to 'vigorously and tirelessly . . . advocate his own election'" (quoting *Buckley,* 424 U.S. at 52) (alteration in original)); *id.* at 13 (Senator Cruz "was engaged in 'the vigorous exercise of the right to use personal funds to finance campaign speech'" (quoting *Davis v. FEC*, 554 U.S. 724, 739 (2008)); *id.* at 13-14 (asserting that the loans "went to fund *pure political speech*").)  Plaintiffs also state that "the Committee used its cash on hand to satisfy debts to other creditors rather than repay Senator Cruz's loans" (*id.* at 9), suggesting that they were required to repay others first.  But plaintiffs have stipulated that they delayed repayment solely because of this lawsuit, and the lack of any constitutional burden on plaintiffs forecloses their as-applied challenge in any event.

### A.    Senator Cruz Suffered No Constitutional Burden in 2018

Senator Cruz was not deterred by the Loan Repayment Limit.  As he has conceded, the only reason he loaned money to his 2018 campaign was to bring this lawsuit.  Senator Cruz was a well-funded incumbent who made the loans at a time when they could serve little other purpose — the day before the election.

Plaintiffs make a series of general allegations about burdens on candidates that are conspicuously vague regarding whether they apply to the facts of the as-applied challenge here. Senator Cruz did not determine to loan money to fund additional speech during the heat of his 2018 campaign (Pls.' Mem. at 11), was not a challenger in need of speaking early in order to establish position and garner contributions (*id.*), and was not deterred from making a larger loan out of concerns about repayment (*id.* at 12, 15).  These constitutional theories for hypothetical

15

candidates have no application to the facts of the as-applied challenge here.  Plaintiffs did not

submit evidence of constitutional burdens Senator Cruz suffered in 2018, nor could they.  The

Loan Repayment Limit imposed no constitutional burden on Senator Cruz in 2018.

### B.   The Committee Suffered No Constitutional Burden in 2018

Similarly, the Court should reject any claim that the Committee was constitutionally

burdened by the Loan Repayment Limit.  Plaintiffs again rest on general hypothetical

possibilities, arguing that by requiring committees to use only pre-election funds to repay the

candidate loans, the loan-repayment limit effectively forces the committee to choose to

"(1) repay the over-$250,000 balance of candidate loans, or (2) repay other vendors (or engage in

other constitutionally-protected political expenditures)."  (Pls.' Mem. at 17.)  But the Committee

did not face this dilemma here — it had more than enough cash on hand to repay Senator Cruz

$10,000 while still repaying other vendors, and doing so would have enabled it to repay him in

full using either pre-election or post-election contributions.  In addition, the Committee was

actively designating incoming money during the 20-day period for an election six years off,

funds that would have readily enabled the Committee's balance for 2018 expenses to reimburse

Senator Cruz during that period.  (SMF ¶ 60.)  Nor have plaintiffs claimed that repaying Senator

Cruz in full would have forced the Committee to default on its obligations to other vendors.  And

Plaintiffs can hardly argue that the Committee was injured by having to repay Cruz using at least

$10,000 in pre-election funds when it voluntarily repaid Senator Cruz with $250,000 of pre-

election funds.  (SMF ¶ 64.)  And of course, *the Committee* was not injured by keeping $10,000

rather than transmitting it to Senator Cruz.

To the extent that plaintiffs argue that the Committee was nonetheless burdened by

having to use pre-election funds, that argument is foreclosed as a matter of law.  The D.C.

Circuit has held that plaintiffs cannot impose First Amendment harm on themselves by foregoing

16

legally available options for their desired spending in lieu of more burdensome unlawful spending options. *See Stop This Insanity, Inc. Emp. Leadership Fund*, 761 F.3d at 10. In *Stop This Insanity*, the Court of Appeals rejected a corporation's argument that its connected political committee should be free from FECA's restrictions on its ability to solicit funds to pay for electoral speech. *Id.* at 11. The D.C. Circuit pointed out that the corporation itself already had the ability under FECA to freely solicit funds to pay for its speech. *Id.* at 11, 14. As a result, the plaintiff had passed up a "*less* burdensome" and "more robust option" for its desired spending, and then, "trapped in a snare it ha[d] fashioned for itself," the plaintiff "claim[ed] there is a constitutional right to do things the hard way." *Id.* at 14. The D.C. Circuit's response: "We cannot sanction such an illogical conclusion." *Id.* Likewise, this Court should reject any argument that plaintiffs were burdened because the Loan Repayment Limit did not allow the Committee to repay Senator Cruz using "the hard way."[5]

This is also not a case where a campaign committee was "forced to *refrain* from spending money [by delaying paying off vendor debts or by transferring funds to advocacy organizations] so that it may avoid defaulting on its candidate loans." (Pls' Mem. at 18

---

[5]      The posture of this case and plaintiffs' desire to repay Senator Cruz's $10,000 the "hard way" distinguishes this case from the D.C. Circuit's recent ruling in *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, (D.C. Cir. 2019) (en banc), *cert. denied*, 140 S. Ct. 569 (2019). There, the D.C. Circuit held that a political party had not caused its own injury by refusing to accept an entire bequeathed contribution at once because FECA required it "to choose between immediate access to the money [that had been contributed to the party] and long-term flexibility in spending it." *Id.* at 538. That court said that when the "committee chose the lesser of two evils" and refused to accept the entire contribution subject to restrictions on how it could be spent, that choice did not "transform[] FECA's limitation into a self-imposed restriction." *Id.* But that ruling merely regarded whether the plaintiffs had standing there, an inquiry distinct from the merits question now presented here. *See, e.g.*, *Ted Cruz for Senate v. FEC*, No. 19-908, 2019 WL 8272774, *7 (Dec. 24, 2019) (Mehta, J.) (distinguishing merits inquiries from the injury requirement for standing at plaintiffs' request). Moreover, in contrast with the *Libertarian* facts, plaintiffs here voluntarily chose to forego an option with no "evil" attached to it at all: using its cash on hand to repay $10,000 of Senator Cruz's loans.

(emphasis in original).)  That did not happen here — the Committee deliberately chose to default on its loan to Senator Cruz, even though it had sufficient cash on hand to repay him.  (SMF ¶ 57.)

Nor did plaintiffs submit evidence to establish that Senator Cruz will be deterred from loaning further funds in the future and preventing the committee from raising funds that it might otherwise have obtained.  (Pls.' Mem. at 18.)  That plainly did not happen to the plaintiff Committee; the evidence instead shows that Senator Cruz loaned the precise desired amount for litigation purposes here and himself decided that he should not be paid back within 20 days.  (SMF ¶¶  56, 62.)  And Senator Cruz has never asserted in this litigation that his failure to be paid back in full for this campaign loan will deter him from making loans to future campaigns.

## C.    Neither Contributors Nor Potential Contributors to Senator Cruz's Campaign Suffered Constitutional Burdens During the 2018 Election Cycle

None of the contributors or potential contributors to Senator Cruz's campaign suffered a constitutional burden either.  Plaintiffs argue that "by barring more than $250,000 in post-election contributions from going towards repayment of the candidate's loans . . . [the Loan Repayment Limit] effectively prohibits individuals from making such postelection contributions once the candidate's *other* outstanding debts have been paid off."  (*Id.* at 20.)  But once again, even if the Court were to agree with that claim, it does not apply to potential contributors to the Cruz Committee.  Plaintiffs acknowledge later in their brief that "there is no dispute that any given contributor could have given Senator Cruz $2,800 on November 7, 2018, if he had designated it for the *upcoming* election cycle."  (*Id.* at 30 (emphasis in original).)  The Supreme Court in *Buckley* held that contributions can constitutionally be capped because they merely "serve[] as a general expression of support for the candidate and his views," and therefore limiting contributions "involves little direct restraint on [a contributor's] political

18

communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Buckley*, 424 U.S. at 21. In the same way, a post-election contributor's First Amendment rights are not materially infringed when his contribution has to be used for the next election and not the previous election, because the contributor is not impeded from making his symbolic expression of support. *See Holmes v. FEC*, 875 F.3d 1153, 1166 (D.C. Cir. 2017) (en banc). In any event, plaintiffs raised no post-election funds in connection with the 2018 election, and they have presented no evidence that they tried to do so, nor that any specific potential contributors believed they were harmed by being unable to make contributions to enable the Committee to repay Senator Cruz using more than $250,000 in post-election funds. (SMF ¶ 66.)

For all these reasons, plaintiffs' as-applied challenge should be rejected.

## III. BECAUSE THE LOAN REPAYMENT LIMIT BURDENS NO FUNDAMENTAL RIGHT, THE COURT EVALUATES PLAINTIFFS' FACIAL CHALLENGE TO THE PROVISION USING DEFERENTIAL RATIONAL BASIS REVIEW

The candidate loan repayments plaintiffs want to undertake without limitation actually involve making funds *unavailable for political expression* and returning the funds instead to a candidate's personal domain. Limits on repayment thus do not involve any restraint on a candidate's spending to further her candidacy. Because the Loan Repayment Restriction does not burden any fundamental right, the Court should apply rational basis review when determining its constitutionality. *Romer v. Evans*, 517 U.S. 620, 631 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the [law] so long as it bears a rational relation to some legitimate end.").

### A.   The Loan Repayment Limit Does Not Restrict Political Speech

The Loan Repayment Limit does not infringe on political speech. Loan repayments involve the removal of funds from campaign advocacy and reversion of funds to use by

candidates for non-campaign uses.  Limiting loan repayments thus does not restrict a federal candidate's right to make unlimited personal expenditures to pursue a political campaign; it does not limit a campaign's ability to receive and use funds from the candidate; and has no effect on contributors' right to donate to campaigns.  And where a law limits no political speech right, rational basis scrutiny clearly applies.

Money that repays a candidate's personal loan after an election effectively goes into the candidate's pocket, and not to fund speech or speech-related activities.  The facts of this case are illustrative.  If the Committee were able to raise an additional $10,000 in post-election contributions to repay Cruz, $5,000 of that amount would replenish personal bank accounts and the other $5,000 would satisfy Cruz's obligation on the margin loan that is secured with Cruz's personal assets.  Either way, no political speech is involved.

As a result, plaintiffs are incorrect when they claim that the Loan Repayment Limit restricts political speech by limiting the time period in which the candidate may raise money to communicate his or her political message.  (Pls.' Mem. at 11.)  Repaying a candidate so their personal funds increase is not the communication of a political message.  And it makes little sense to equate the two because when a candidate raises money *after* an election, by that time any political message has already been communicated.  For example, if plaintiffs were to obtain the relief they seek here, the additional post-election contributions they may receive to repay $10,000 to Cruz would not result in any additional speech; rather, those contributions would do the opposite and reduce funding available to the Committee for speech.  The funds would simply be given to Cruz, who could then replenish his own bank account and repay his margin loan. Plaintiffs would not engage in more speech without the Loan Repayment Limit.  The Limit thus places no burden on the exercise of the right to engage in campaign speech.

The Supreme Court has consistently applied rational basis scrutiny where a challenged law does not restrict First Amendment or other fundamental rights. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009) ("Given that the State has not infringed the unions' First Amendment rights, the State need only demonstrate a rational basis . . . ."); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (applying rational basis review to equal protection challenge "[i]n areas of social and economic policy[] [for] a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights"); *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 139 S. Ct. 1780, 1781 (2019) (applying rational basis review where the Court assumed that "the law does not implicate a fundamental right").

Because the Limit does not cap candidate expenditures, or individual contributions, or the campaign's receipt of contributions, there is no infringement on "the amount of money" the committee "can spend on political communication during a campaign." *Buckley*, 424 U.S. at 18-19. In a highly analogous recent case, the court applied rational basis review in rejecting a First Amendment claim against FECA's provision banning campaigns from spending campaign funds on a candidate's personal use. *FEC v. O'Donnell*, 209 F. Supp. 3d 727, 739 (2016). That provision bars the use of campaign funds to pay expenses that would exist irrespective of the candidate's campaign, such as for a mortgage or clothing. *Id.* The court held that heightened scrutiny did not apply, even though the statute necessarily limited the range of uses for which a candidate and his or her committee could spend funds received from campaign contributors, a spending restriction not present here. *Id.* As the court explained, since the law "does not restrict the content of one's message" or "limit the amount of speech or political activity in which one can engage," the law "does not implicate First Amendment concerns." *Id.* at 739. The court therefore upheld the FECA provision under rational basis scrutiny. *Id.* Similarly, the Loan

21

Repayment Limit does not restrict the content of any political message or infringe on the amount of speech that a candidate, campaign, or contributor may engage in.

Plaintiffs fail to show that the Loan Repayment Limit actually restricts the political speech of candidates.[6]  Their "risk intensifying" theory is far from what courts have considered to be infringements on political speech.  *See, e.g.*, *Buckley*, 424 U.S. at 51 (invalidating specific limits on the amount that candidates could spend on their campaigns).  Plaintiffs also argue that the Limit forces candidates into an "unpalatable choice" to "either limit [their] financial support of [their] own candidacy to $250,000, or fund [their] campaign above that amount with 'loans' that in reality are likely to become donations."  (Pls.' Mem. at 3.)  But plaintiffs' "choice" conflates the political speech paid for by candidate loans and contributions to their campaign — which remain unlimited — with the terms for repayment of candidate loans.  And campaigns are free to repay candidate loans of any amount using contributions received before an election. Plaintiffs also have not shown that, in the narrow slice of situations where campaigns have candidate loans of more than $250,000 outstanding after the election (SMF ¶¶ 38-41 (describing FEC data)), the Loan Repayment Limit has any appreciable effect on a candidate's choice to loan or contribute funds.

Plaintiffs' reliance on *Davis v. FEC*, 554 U.S. 724 (2008), and *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011), to justify the application of a higher level of scrutiny here is misplaced.  (*See* Pls.' Mem. at 16, 17.)  Like *Buckley*, both of those cases involved speech infringements that are not present here.  In *Davis*, the Court invalidated the

---

[6]     To the extent that plaintiffs rely on FEC regulations to mount their constitutional challenge to the statute (Pls.' Mem. at 4-6), this reliance is not appropriate in this proceeding, as this Court held plaintiffs' regulatory claims in abeyance pending resolution of their statutory constitutional challenge.  *See supra* p. 14 n.4.

Millionaire's Amendment, a BCRA provision distinct from the Loan Repayment Limit that allowed a candidate's opponent to accept larger individual contributions if the candidate spent more than a certain amount of his or her personal funds on the campaign. *Davis*, 554 U.S. at 728. The self-funding candidate was still subject to the lower individual contribution limits, however, and the Court found such "asymmetrical" limits unconstitutional because they "impose[d] an unprecedented penalty on any candidate who robustly exercises [the] First Amendment right" to self-finance. *Id*. at 739, 741. *Davis* explained that a candidate considering self-funding "must shoulder a special and potentially significant burden if they make that choice," because doing so would not only increase his or her quantity of speech, but also that of his or her opponent. *Id*. at 739. The extensive legislative history of the Millionaire's Amendment indicated that its purpose was to "level the playing field" by equalizing resources in federal campaigns. *See Davis*, 554 U.S. at 741-42. The Supreme Court held that attempting to equalize candidate resources was not a compelling government interest sufficient to justify the burden the Amendment imposed. *Id*. The reasoning behind this invalidation was that asymmetrical limits were unconstitutionally discriminatory. Here, as explained above, the Loan Repayment Limit was intended to combat the permissible purpose of combating corruption and its appearance, *see supra* section II.C, and it does not function to equalize campaign spending in any way.

     *Arizona Free Enterprise* is inapposite because, like the law in *Davis*, the Arizona law at issue there impermissibly imposed an asymmetrical penalty on self-funding candidates, providing that a candidate accepting public financing would receive additional public financing if his or her privately-financed opponent spent money above a certain threshold. *Ariz. Free Enter.*, 564 U.S. at 728-32. The Supreme Court invalidated this law, citing the "'special and

23

potentially significant burden'" that a privately financed candidate faced in exercising his or her constitutional right to spend funds. *Id*. at 737 (quoting *Davis*, 554 U.S. at 739).

Unlike the provisions at issue in *Davis* and *Arizona Free Enterprise*, the Loan Repayment Limit is not asymmetrical. Instead, it applies equally to all candidates and grants no special advantages to the opponent of a candidate who loans money to his or her campaign. The Limit thus does not force candidates into the choice that the Court in *Davis* and *Arizona Free Enterprise* found so problematic: whether to exercise constitutional rights and thereby help an opponent, or to forego exercising those rights. And the statute challenged here also does not impermissibly "diminish[] the effectiveness of [the self-funder's] speech" by amplifying the speech of the self-funder's opponents. *Davis*, 554 U.S. at 736.

In addition, plaintiffs' contention that the FEC's own descriptions of the effect of the Loan Repayment Limit in prior briefing supports their claim is misleading. (Pls.' Mem. at 2-3 ("[B]ecause of Section 304, the FEC explained, "a candidate deciding to loan his or her campaign money in advance of the election [will] not be able to accurately determine the likelihood he or she might be repaid." (quoting FEC's Opp'n to Pls.' Application for a Three-Judge Court and Mot. to Dismiss for Lack of Subject Matter Jurisdiction ("FEC Mot. to Dismiss") at 44 (Docket No. 26))); 14-15 (same).) The FEC was explaining that the statute was not overbroad because, in the hypothetical situation that the Loan Repayment Limit applied only to winning candidates, that law "would risk creating the very type of 'asymmetrical' limit that the Supreme Court condemned in *Davis*," and that such a law that treated candidates differently "would be administratively problematic for candidates, because a candidate deciding to loan his or her campaign money in advance of the election would not be able to accurately determine the likelihood he or she might be repaid." (FEC Mot. to Dismiss at 44; *see id*. at 42-44.) The uncertainty that the FEC described clearly stemmed from a hypothetical law not present here.

Plaintiffs' theory about how the Loan Repayment Limit ostensibly burdens the speech of committees is also unsupported. Plaintiffs allege that the Limit "forces the committee to use its cash on hand, if any, to *pay the candidate first* . . . then to repay debts to other creditors . . . ." (Pls.' Mem. at 12.) But the Limit does not "force" the committee to curb its speech, and plaintiffs have provided no evidence that committees' political speech rights have in fact been limited. A committee's strategizing about the ordering of vendor payments is not protected political speech simply because those vendors may have been involved in disseminating a campaign message. Further, committees may pay any amount of candidate loans using pre-election contributions, which plaintiffs readily concede (Pls.' Mem. at 2 ("To be sure, the loans may still be repaid with funds raised *prior to* the election . . . .".)), and up to $250,000 in loans with contributions received after the election. And the Limit does not restrict or limit committees' ability to pay other vendors or other lenders.

The First Amendment value of a contribution is that it constitutes a "symbolic expression of support" for a candidate and serves to "affiliate a person with a candidate," *see supra* pp. 18-19 (citing *Buckley*, 424 at 21-22), a value that does not rely on the manner in which a campaign uses the contribution, *Buckley*, 424 at 21. Because contributors have no right to direct the use of funds, each spending decision is generally "an independent one on the part of the campaign." *Holmes*, 875 F.3d at 1167. And under FECA's per election framework, post-election contributions rightfully are intended to generally correspond with expenses actually incurred during the previous election. Thus, plaintiffs' contention that the Loan Repayment Limit wrongfully prohibits individuals from making postelection contributions once the candidate's other outstanding debts have been paid off (Pls.' Mem. at 20) misses the mark. The Loan Repayment Limit implicates no fundamental rights of campaign contributors.

25

In sum, the Loan Repayment Limit does not prevent candidates from making any amount of loans and contributions to their campaigns, nor does it prevent the campaigns from accepting such loans and contributions, nor does it place restrictions on campaign spending.  Its only constraint relates to committee choices not to spend funds on campaign activity.  The Limit implicates no fundamental right of contributors to donate to candidates they support.  Where a law "does not regulate or affect speech or speech-related activities," it "does not implicate First Amendment concerns," and mere rational basis scrutiny applies.  *O'Donnell*, 209 F. Supp. 3d at 739-40.

### B.  The Loan Repayment Limit Does Not Restrict Candidate Expenditures

Rational basis scrutiny is also appropriate here because the Loan Repayment Limit does not restrict candidate expenditures.  Where rules involve the implementation of contribution limits, rather than the contribution limits themselves, the Supreme Court has found that the relevant inquiry is "whether the mechanism adopted to implement the contribution limit . . . burdens speech in a way that a direct restriction on the contribution itself would not."  *McConnell v. FEC*, 540 U.S. 93, 138-39 (2003).  Provisions that prevented political party committees from raising and spending funds outside of federal source and amount limits did not impose such a burden.  *Id*. at 139.  "That they do so by prohibiting the spending of [money outside the limits]," the Court concluded, "does not render them expenditure limitations."  *Id*.

Plaintiffs argue that the Limit is subject to strict scrutiny because the loans to which it applies are considered expenditures, and in plaintiffs' view the provision limits the loans.  (Pls.' Mem. at 14.)  But this argument is without merit.  In *Buckley v. Valeo*, the Court found that a monetary limit on the amount that candidates could spend constituted an infringement on a candidate's "First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates."  424 U.S. at 52.

26

Because *Buckley* also found that this burden on a candidate's First Amendment rights was not supported by a sufficient government interest, it held that the "restriction on a candidate's personal expenditures is unconstitutional." *Id*. at 54. At the same time the Supreme Court held that candidates have the right to contribute and spend their own money without a cap, however, it also upheld FECA's limits on individual contributions to candidates, in part because such a contribution limit "entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id*. at 20.

Unlike the candidate expenditure limit struck down in *Buckley*, the Loan Repayment Limit does not infringe on a candidate's ability to spend as much as he or she wants to engage in discussion of issues or to advocate in an election. The provision does not function as a limit to candidate expenditures.

Senator Cruz was free to contribute or loan as much money as he wished to the Committee for campaign speech.[7] Plaintiffs do not claim otherwise, instead arguing that the Limit imposes a "burden." But even assuming attempts to remove funds from campaign use could relate to a cognizable burden, rather than "significantly limiting the sources of funding" for loan repayment (Pls.' Mem. at 14), the provision merely sets a narrow restriction on how a campaign may repay such loans, and even then, only to the extent such loans exceed $250,000, and even then, only after the election is over. And plaintiffs have not offered evidence to support their allegation that the Limit significantly deters candidates from making loans to their campaigns in amounts greater than $250,000. (Pls.' Mem. at 15.) In this case, Cruz provided a

---

[7]     Plaintiffs argue that, "[i]f the Committee chooses to repay the candidate loans, it will have been forced to forego—or at least delay—funding core First Amendment expression." (Pls.' Mem. at 17.) But when a candidate raises money after an election, the campaign has already communicated any political message that the initial loan may have financed.

loan to his campaign for the sole purpose of bringing this challenge. *See supra* pp. 12-13..
Plaintiffs have proffered no evidence that any other candidates have felt deterred in making a
loan to their campaigns because of the Limit. In fact, publicly available FEC data indicates that
in the wake of the Loan Repayment Limit's enactment in BCRA in 2002, federal candidates have
continued to loan their campaigns amounts over $250,000 at similar rates. (SMF ¶¶ 38-41.)

       The Loan Repayment Limit does not implicate the expenditure-limit cases plaintiffs cite
in urging heightened scrutiny. Plaintiffs rely heavily on a wholly inapposite Sixth Circuit case.
(Pls.' Mem. at 14.) In *Anderson v. Spear*, the Sixth Circuit found unconstitutional a state law
that prohibited candidates from making loans to their campaigns in excess of $50,000 — a
monetary cap similar to the one invalidated in *Buckley*. 356 F.3d 651, 673 (6th Cir. 2004).
There is no such limitation here. Plaintiffs offer dicta from the case to argue that the limitation
here is one on candidate expenditures, but *Anderson* involved a direct cap on the amount that
candidates could loan their campaigns. By contrast, the Loan Repayment Limit sets no cap on
the amount that candidates can choose to loan or contribute to their campaigns.

       Plaintiffs also incorrectly argue that the Loan Repayment Limit forces candidates into an
impossible choice: to accept a "significantly enhanced risk that such a loan *will not be repaid* in
full, or simply decline to loan money in excess of this sum at all." (Pls.' Mem. at 16.) But
plaintiffs have provided no evidence that the Limit in fact enhances any risk, or even that it
actually affects decisions by candidates regarding personal loans to their campaigns. Plaintiffs
state without evidence that candidates "presumably [provide loans] because in many cases, this
method of funding their operations is the most efficient one, resulting in greater speech overall
than if committees were forced to pay for speech up-front or contemporaneously." (Pls.' Mem.
at 18.) But the record shows that candidates have various reasons for loaning funds to their
campaigns. (SMF ¶ 43) For instance, some candidates appear to loan funds to their campaign to

disclaim reliance on contributions and special interests.  (*Id*.)   And while allegations were

sufficient for plaintiffs to survive a motion to dismiss, they must provide evidence at the

summary judgment stage.  *See Durant v. Dist. of Columbia*, 875 F.3d 685, 696 (D.C. Cir. 2017);

*Grimes v. Dist. of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015) (noting that "the burden on a

defendant moving for summary judgment may be discharged without factual disproof of the

plaintiff's case; the defendant need only identify the ways in which the plaintiff has failed to

come forward with sufficient evidence to support a reasonable jury to find in her favor on one or

more essential elements of her claim").  Plaintiffs' claim for heightened scrutiny also fails for

lack of evidence.

Accordingly, because the Loan Repayment Limit does not burden political speech and

does not restrict candidate expenditures, the Court should apply rational basis review here.

*O'Donnell*, 209 F. Supp. 3d at 740 (applying rational basis to FECA's ban on the personal use of

campaign funds because it does not implicate a First Amendment harm).

## IV.   THE LOAN REPAYMENT LIMIT IS RATIONALLY RELATED TO THE GOVERNMENT'S ANTICORRUPTION AND DISCLOSURE INTERESTS, AND THE STATUTE WOULD SURVIVE EVEN MORE RIGOROUS REVIEW IF IT APPLIED

The Loan Repayment Limit passes constitutional review because it is rationally related to

the government's interest in preventing corruption and the appearance of corruption, and

although heightened scrutiny does not apply, the Limit would survive that review as well.  If

plaintiffs prevail, federal officeholders will be able to accept unlimited amounts of money from

contributors after an election to repay loans from the candidates themselves, a context with a

heightened risk of the "subversion of the political process" that corruption presents, where

"[e]lected officials are influenced to act contrary to their obligations of office by the prospect of

financial gain to themselves or infusions of money into their campaigns."  *FEC v. Nat'l*

*Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985). Post-election contributions are a highly valuable quid for which a candidate or officeholder may exchange an improper quo, and the "hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *Id.*

### A.     Rational Basis Standard of Review

Under rational basis review, a court is not to judge the "wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Instead, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)). Claimants attacking a legislative classification under rational-basis review have the burden "to negative every conceivable basis which might support it." *Beach Commc'ns*, 508 U.S. at 315 (citation and quotation marks omitted). "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993) ("A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970))).

### B.     The Government Has Not Just Legitimate, But Important and Compelling Interests in Lessening the Risk of Actual and Apparent Quid Pro Quo Corruption as Well as Informing Voters

#### 1.     *Anticorruption*

Even with respect to provisions that place genuine limitations related to political speech rights, the Supreme Court has long affirmed that such limits can be justified by the important governmental interests in preventing quid pro quo corruption or its appearance. In *Buckley*, the Court upheld FECA's $1,000 per-election limit on contributions by individuals to candidates,

under heightened scrutiny, because that limit furthered the government's anti-corruption interests.  424 U.S. at 26-27.  As the *Buckley* Court explained, "'[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." *Id.*  The Court later observed that the government's interests in preventing corruption and its appearance "directly implicate 'the integrity of our electoral process.'" *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 208 (1982) (internal citation omitted).  The Court has also upheld limits on the amounts that national political parties could spend in coordination with federal candidates on political speech "on the theory that unlimited coordinated spending by a party raises the risk of corruption (and its appearance) through circumvention of valid contribution limits." *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001).  In 2003, the Court again "made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits," in upholding BCRA's ban on national political parties raising and spending "soft money" donations that were not subject to FECA's source and amount restrictions.  *McConnell*, 540 U.S. at 143.  The Court has subsequently issued two judgments that summarily reject as-applied challenges to that ban and constitute binding precedent.  *Republican Party of La. v. FEC*, 219 F. Supp. 3d 86, 91-92 (D.D.C. 2016), *aff'd* 137 S. Ct. 2178 (2017) (discussing *Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150 (D.D.C. 2010) *aff'd*, 561 U.S. 1040 (2010)).  And just a few years ago in *McCutcheon v. FEC*, the Court affirmed that "the Government's interest in preventing quid pro quo corruption or its appearance was 'sufficiently important,' . . . [and that] elsewhere [it has] stated that the same interest may properly be labeled 'compelling,' so that the interest would satisfy even strict scrutiny."  572 U.S. 185, 199 (2014) (internal citations omitted).

31

In 2002, Congress recognized the heightened risk of quid pro quo corruption and its appearance resulting from already-elected officeholders soliciting contributions for their own personal benefit, and it sought to limit this risk through the passage of the Loan Repayment Limit. (SMF ¶¶ 21-28.) As explained above, the purpose of the Limit was to combat corruption, not to "level the playing field" by equalizing candidate spending, as plaintiffs suggest (Pls.' Mem. at 2, 6-8, 21-24). Plaintiffs' reliance on the legislative history they describe is misplaced, as those legislative statements largely pertain to the Millionaire's Amendment challenged in *Davis*, and not to the Limit in particular. (*See* Def.'s Resp. to Pls.' SMF ¶¶ 2-26.)[8] The legislative history about the Loan Repayment Limit establishes that it was designed to deter corruption. *See, e.g.*, 147 Cong. Rec. S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici) (explaining that a candidate who incurred personal loans for his campaign should not be able "to get it back from [his or her] constituents under fundraising events that [he or she] would hold and then ask them: How would you like me to vote now that I am a Senator?"); *id.* at S2541 (Mar. 20, 2001) (statement of Sen. Hutchison) ("[Candidates] have a constitutional right to try to buy the office, but they do not have a constitutional right to resell it."); *see supra* pp. 6-7.

Recent public opinion polling clearly shows that, contrary to plaintiffs' claim that the Loan Repayment Limit "does nothing to advance the goal of preventing *quid pro quo* corruption" (Pls.' Mem. at 24), the public understands that limiting the post-election repayment of federal candidate loans reduces at least the appearance of quid pro quo corruption. An April

---

[8]     Plaintiffs attempt to tie any reference to "loan" in the Millionaire's Amendment floor debate to the Loan Repayment Limit (Pls.' MotMem. at 6-7), but the Millionaire's Amendment on its own terms applies to both self-financing through a contribution of funds or loans, as well as "contributions" and "expenditures" under FECA generally. *See* 52 U.S.C. § 30101(8)(A)(i) (defining "contribution" to include a "loan"); Pls.' MotMem. at 4 (quoting FECA's expenditure definition).

2020 YouGov poll shows that 81% of the U.S. public believes that it is at minimum "likely" that individuals who donate money to a candidate's campaign after the election expect a political favor in return from candidates who later take office.  (*See supra* p. 10; SMF ¶ 90.)  Moreover, the poll shows that 67% of the respondents believe that, if a loan repayment limit did not exist, donors would be more likely to expect political favors from candidates to whom they make contributions.  (*See supra* p. 11; SMF ¶ 95.)

There is substantial evidence that the situation the Loan Repayment Limit addresses involves the risk of actual quid pro quo corruption.  As described *supra* pp. 8-9, a recent academic study that analyzed both candidate debt and the voting patterns of officeholders concluded that officeholders that are in debt are more likely to change their votes to benefit the interests of PACs that make campaign contributions after the election when the PAC has an interest in pending legislation.  (SMF ¶ 67 ("[I]ndebted politicians, relative to their debt-free counterparts, are significantly more likely to switch their votes if they receive contributions from those special interests between the votes." (quoting Ovtchinnikov & Valta  at 29); *see id.* ¶ 68 ("self-financed members feel pressure to court other sources of campaign contributions so they can be less reliant on their own money in the next election." (quoting Baker at 65).)  The study also found that the Loan Repayment Limit effectively deters this apparently corruptive distortion of federal government policy-making.  (SMF ¶ 68 (quoting Ovtchinnikov & Valta at 26 ("[P]oliticians with large loans to their campaigns become significantly less responsive to contemporaneous labor contributions following the passage of BCRA and behave remarkably similar to their debt free counterparts.")).)

Media reports have also pointed to at least the appearance of federal candidates trading dollars for favors in the context of repayment of candidate loans.  As noted above, debt retirement events financed by those seeking legislative favors have long been a fixture for

successful candidates.  (SMF ¶¶ 42, 69.)  One 2009 press report detailed how Rep. Grace Napolitano held debt retirement events, hosted by a lobbyist for transportation interests with business before Congressional committees on which she served, to repay a large campaign debt from many years earlier.  (SMF ¶ 69.)  The article quoted an observer as stating that contributors want to participate in such events because of the clear benefit provided to the member.  (*Id.*)[9]

The Loan Repayment Limit also serves an important anti-circumvention purpose.  In the absence of the Loan Repayment Limit, a candidate could keep outstanding debt from past campaigns such that a single individual contributor could simultaneously make maximum contributions to multiple campaigns for the same candidate.  For example, if there were no Loan Repayment Limit now, a contributor that had not previously given to Senator Cruz could donate $16,000 today:  the maximum $5,000 to his 2012 primary and general campaigns (to retire his 2012 debt); an additional $5,400 to his 2018 campaigns (to retire his 2018 debt); and another $5,600 to his 2024 campaigns.  And Senator Cruz would be able to make yet another loan to his 2024 campaign to keep the cycle going.  Some members of Congress appear to have deliberately employed this sort of debt stacking to circumvent contribution limits in recent years.  (SMF ¶¶ 70-72.)  The Loan Repayment Limit diminishes the ability of candidates to do so successfully in large amounts.

And while plaintiffs argue that this Court should discount an anticorruption interest because only a minority of states have adopted similar laws (Pls.' Mem. at 28), the evidence shows that states actually face similar issues.  For instance, Kentucky in the early 1990s had "endured the consequences of millionaires 'loaning' their campaigns millions of dollars, only to be repaid by contributors seeking no-bid contracts."  (SMF ¶ 77.)  Kentucky Governors John

---

[9]     The Loan Repayment Limit is now nearly 20 years old, which lowers the evidentiary burden because direct, recent federal examples could only exist in "the counterfactual world in which" the existing campaign finance limits "do not exist."  *McCutcheon*, 572 U.S. at 219.

Brown and Wallace Wilkinson had provided loans to their campaigns totaling $3.55 million. (*Id.* ¶ 78.) Further, "[o]bservers argued that Kentucky's gubernatorial races were already [']publicly financed['] by the profit margins on the state contracts awarded to those who helped repay the Governors' campaign debts." (*Id.* ¶ 77.) For example, a family and its employees in Kentucky reportedly contributed over $200,000 to a gubernatorial campaign and a political action committee after the candidate won the primary election while "seeking a state permit to open what would become the state's largest landfill." (*Id.* ¶ 79). And in Ohio, the *Dayton Daily News* reported in 2012 that Mike DeWine had loaned his campaign for Ohio Attorney General $2 million in an attempt to unseat Richard Cordray in 2010. In the next two years, DeWine raised $1.47 million to pay off the debt, but the debt was reportedly retired by $194,830 in contributions from 10 law firms that received $9.6 million in legal fees for 225 assignments from the Attorney General's office. (SMF ¶ 73.) Clearly, the Loan Repayment Limit works in a landscape that poses specific, unique risks of at least the potential appearance of corruption.

Plaintiffs also argue that FECA's base contribution limits are sufficient to deter corruption and that any further anti-corruption work done by the Loan Repayment Limit would be redundant. (Pls.' Mem. at 24-27.) This argument is meritless. The Loan Repayment Limit addresses a limited situation involving special dangers of corruption where Congress can legitimately regulate further. The Limit's role is thus comparable to other FECA limitations that are needed in addition to the generally applicable contribution limits. The Act's prohibition on contributions by individual federal contractors, for example, was the subject of a constitutional challenge in *Wagner v. FEC*, 793 F.3d 1, 21 (D.C. Cir. 2015) (en banc). The plaintiffs there similarly argued that the prohibition was "overinclusive because Congress banned their contributions entirely, rather than simply resting on the contribution limits generally applicable to all citizens." *Id.* But the court found that the contribution ban — which applied only while

35

the individuals were actually negotiating or performing federal contracts — was constitutional even under heightened scrutiny, because the context in which the prohibition operates poses special concerns about corruption:  "[I]n the case of contracting there is a very specific quo for which the contribution may serve as the quid: the grant or retention of the contract."  *Id*. at 22. Moreover, the court found that the "appearance problem is also greater: a contribution made while negotiating or performing a contract looks like a quid pro quo, whether or not it truly is." *Id*.  Likewise here, the Loan Repayment Limit functions in a specific, temporally-limited context where concerns about both actual quid pro quo corruption and its appearance are heightened and require a restriction (albeit a narrow one) beyond the general public contribution limits.  Post-election contributions that can be used to repay candidates pose a particular risk of quid pro quo corruption, *supra pp*. 7-10, and an even greater risk of its appearance, "whether or not it truly is," *supra pp*. 10-11.

Plaintiffs' reliance on *McCutcheon* (Pls.' Mem. at 25-26) to support their redundancy argument is unavailing.  The aggregate contribution limits in *McCutcheon* were invalidated in part because the Court found that "[s]pending large sums of money in connection with elections, but *not in connection with an effort to control the exercise of an officeholder's official duties*, does not give rise to such *quid pro quo* corruption."  *McCutcheon v. FEC*, 572 U.S. 185, 208 (2014) (emphasis added).  The situation that the Loan Repayment Limit addresses falls into the Court's carve-out:  Evidence shows that post-election contributions in fact do involve a substantial risk of at least the appearance, if not the reality, of an "effort to control the exercise of an officeholder's official duties."  (*See supra* pp. 10-11 (describing public perception that those who contribute to candidates after an election are likely to expect a political favor in return); *see also* SMF ¶ 90.)   And, while in *McCutcheon* the Court found no "possibility that an individual who spends large sums may garner 'influence over or access to' elected officials or political

36

parties," the record here shows that the Loan Repayment Limit implicates concerns regarding corrupt exchanges.

2.    *Disclosure*

The Supreme Court and the D.C. Circuit have repeatedly emphasized the important interests that FECA's disclosure provisions support.  As the Supreme Court's plurality opinion in *McCutcheon v. FEC* explained, generally "[d]isclosure requirements are in part justified based on a governmental interest in provid[ing] the electorate with information about the sources of election-related spending."  134 S. Ct. 1434, 1459 (2014) (internal quotation marks omitted); *SpeechNow.org v. FEC*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 553 (2010) (recognizing the "interest in knowing who is speaking about a candidate and who is funding that speech").

Where fundamental rights are implicated, courts evaluate disclosure requirements by applying "'exacting scrutiny,' a standard that asks whether there is a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64, 66; *McConnell v. FEC*, 540 U.S. 93, 231-32 (2003), *overruled in part by Citizens United*, 558 U.S. 310)).

The Loan Repayment Limit not only readily satisfies rational basis review, but would also be found to substantially relate to the government's interests in providing voters with information about the sources of campaign spending.  The Limit ensures that candidate loan amounts above $250,000 are re-paid with pre-election contributions.  Pre-election contributions are reported publicly, which allows voters to determine who is financially supporting and associating with the campaign *prior to the election*; post-election contributions do not provide this value to the electorate.  In the absence of the Loan Repayment Limit, candidates could provide very large loans to their campaigns prior to the election, and then solicit post-election

37

contributions to repay those loans, without the relevant electorate having any ability to access that information about those sources before heading to the polling booth.  Candidates would thus be free to provide millions of dollars in loans to their campaigns, then raise funds to repay themselves from those with economic interests before the fundraising officeholder, and voters would be wholly unable to learn these key facts in advance of the election.  This scenario has proven problematic in a number of contexts.  (SMF ¶¶ 69-79.)  Moreover, in the absence of the Loan Repayment Limit, the evidence in this case shows that the attractiveness of using contributions to secure quid pro quos from candidates, *see, e.g., McCutcheon*, 134 S. Ct. at 1450, both creates and appears to create opportunities for corruption, as candidates, campaigns, and contributors can exploit the inability of voters to determine contributor identity in advance of an election (SMF ¶ 95; *see supra* pp. 10-11 (describing survey results)).

In this way, the Loan Repayment Limit serves to protect the integrity of the electoral process.  *Buckley*, 424 U.S. at 26-27; *Anderson v. Celebrezze*, 460 U.S. 780, 796 (1983) ("There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election.").  Just as disclosure interests were sufficient to affirm restrictions on solicitations for contributions to a particular class of FEC-regulated committee, so too are disclosure interests sufficient to justify the temporal repayment limitations at issue here.  *Stop This Insanity, Inc. Emp. Leadership Fund*, 761 F.3d at 16-17.

## C.   The Loan Repayment Limit Proportionally Serves the Government's Interests and Is Not Overbroad

The Loan Repayment Limit is rationally related to the government's legitimate and important interests in preventing corruption and its appearance, as well as informing voters, in that it limits the amount of post-election contributions that a campaign can give directly to the candidate to repay personal loans.  The Loan Repayment Limit passes constitutional scrutiny

under rational basis review and would survive more rigorous review if it applied.  Even closely

drawn scrutiny only "require[s] 'a fit that is not necessarily perfect, but reasonable; that

represents not necessarily the single best disposition but one whose scope is in proportion to the

interest served.'" *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 552 (D.C. Cir. 2019),

*cert. denied*, 140 S. Ct. 569 (2019) (quoting *McCutcheon*, 572 U.S. at 218 (plurality opinion)).

Moreover, to succeed in their general facial challenge, plaintiffs "must establish that no set of

circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S.

739, 745 (1987) — in other words, "that the law is unconstitutional in all of its applications,"

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008), or at a

minimum that the "statute lacks any 'plainly legitimate sweep,'" *Hodge v. Talkin*, 799 F.3d

1145, 1156–57 (D.C. Cir. 2015) (quoting *Wash. State Grange,* 552 U.S. at 449).

　　　The Supreme Court has made clear that statutes like the Loan Repayment Limit are not

overbroad and are sufficiently tailored to the government's interests where those restrictions

target the types of contributions or spending most likely to result in corruption, particularly when

other avenues for political speech and association are left open.  Indeed, in *Buckley*, the Court

found that the availability of avenues for "independent political expression" in the context of

FECA's contribution limits were evidence of a close fit, explaining that the contribution limits

"focus[] precisely on the problem of large campaign contributions" but "do not undermine to any

material degree the potential for robust and effective discussion of candidates and campaign

issues by individual citizens, associations, the institutional press, candidates, and political

parties."  424 U.S. 28-29.  The Court held that the contribution limits were closely drawn to

anticorruption interests because they focus on "the narrow aspect of political association where

the actuality and potential for corruption have been identified."  *Id.*

The Loan Repayment Limit is tailored to apply in situations when the strength of the government's important anti-corruption interests are at their peak.  The statute applies only where a candidate is seeking to be repaid for a loan over $250,000 in contributions that the campaign received after an election, at a time when it is clear whether the candidate will be in a position to grant political favors to those contributors.  The FEC has shown that the public overwhelmingly perceives that such post-election contributions pose a significant risk of corruption, and that donors are likely to expect political favors from candidates in return for their contributions after an election.  *See supra* pp. 10-11.   As the Supreme Court has explained, "the avoidance of the appearance" of corruption is "critical" to prevent the public's "confidence in the system of representative Government" from being "eroded to a disastrous extent."  *Buckley*, 424 U.S. at 27 (internal quotation marks omitted).  And historically the situation the Loan Repayment Limit addresses has presented instances of actual quid pro quo corruption.  *See supra* pp. 7-10.  Plaintiffs' argument that corruption and its appearance do not exist in this context because the majority of states have not implemented similar measures (Pls.' Mem. at 28) is unavailing.  Concerns have been raised regarding post-election fundraising for candidate loan repayments in a number of states.  (SMF ¶¶ 73-79.)  And even if most state legislatures have not enacted actual candidate loan repayment restrictions, Congress is entitled to determine that the Loan Repayment Limit is necessary at the federal level to combat corruption and its appearance arising in the context of post-election contributions to repay candidate loans.  Courts have been loathe to "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared."  *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982).  "[L]acking any 'scalpel to probe'" such laws, courts "'defer[] to the legislature's' 'empirical judgments' about 'the precise restriction necessary to carry out the statute's legitimate

40

objectives.'" *Libertarian Nat'l Comm.*, 924 F.3d at 552 (quoting *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (plurality opinion)).

Moreover, the Loan Repayment Limit only applies to loans that a candidate makes to the campaign — loans that a candidate may or may not expect to be repaid at the time the loan is made, depending on the campaign's messaging and strategy (*see* SMF ¶¶ 32, 43) — where repayment of such loans means that the candidate or officeholder is directly, personally benefiting from the contributions. In the absence of the Loan Repayment Limit, any individual interested in obtaining political favors from a newly elected officeholder could give up to a total of $5,600 ($2,800 for the primary and general elections) that would, in effect, go directly into the pocket of that officeholder. At the same time, the Loan Repayment Limit is well-tailored because it does not prevent campaigns from repaying candidate personal loans in full by using any funds that the campaign received before an election, or by using their election-day cash on hand within 20 days of the election. *See supra* pp. 5-6 & n.2. Because the Limit serves to increase the funds available to campaign committees, plaintiffs lack any argument that it prevents campaigns from "amassing the resources necessary for effective advocacy," *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (quoting *Buckley*, 424 U.S. at 21), which is the most prominent reason courts have identified for finding campaign finance measures impermissible.

Finally, the Loan Repayment Limit is not overbroad. First, the statute does not infringe on political speech, and the overbreadth doctrine would only apply if the First Amendment were implicated. *See O'Donnell*, 209 F. Supp. 3d at 740 (rejecting overbreadth challenge against the personal-use ban because defendants "fail to identify *even one* fact pattern in which a prohibited expense would interfere with political speech"). But even if the Court finds some infringement of speech, "overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (quoting

*Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973)).  A law is "impermissibly overbroad [when]
a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's
plainly legitimate sweep.'"  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. at
449 n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769–771 (1982)).  To prevail on an
overbreadth challenge, plaintiffs "must demonstrate from the text of [the law] and from actual
fact that a substantial number of instances exist in which the Law cannot be applied
constitutionally."  *New York State Club Ass'n*, 487 U.S. at 14.

　　　　And this plaintiffs cannot do.  Plaintiffs have not identified any candidates who have
been deterred or otherwise prohibited from making loans to their campaigns due to the Loan
Repayment Limit.  Plaintiffs have also not identified any campaigns or contributors whose First
Amendment rights have been impermissibly infringed by the Loan Repayment Limit.  Thus,
plaintiffs have not shown that the Loan Repayment Limit undermines the First Amendment
interests of any candidate, campaign, or contributor, and clearly not a substantial number of these
persons that would be sufficient to sustain an overbreadth challenge.  *See New York State Club
Ass'n, Inc.*, 487 U.S. at 14 (holding that challenged law is not overbroad and "assum[ing] that
'whatever overbreadth may exist should be cured through case-by-case analysis of the fact
situations . . . .'" (internal citation omitted)).

　　　　Further, any arguable overbreadth of the Loan Repayment Limit would be insubstantial
in relation to its legitimate sweep.  The Loan Repayment Limit's "plainly legitimate sweep"
includes application to all candidates, in particular those who seek to repay large personal loans
using post-election contributions.  Courts have repeatedly upheld FECA restrictions that apply to
all candidates against overbreadth challenges, even if the justification applied more to some
candidates than others, as a prophylactic measure needed to combat corruption.  *Buckley*, 424
U.S. at 29-30 (even though "most large contributors do not seek improper influence over a

candidate's position or an officeholder's action," a contribution limit is nonetheless justified as a "prophylactic" to limit the risk and appearance of corruption arising inherently from large contributions because it is "difficult to isolate suspect contributions"); *McConnell*, 540 U.S. at 158-59 (restrictions on minor parties are closely drawn despite the unlikelihood of electoral success because "[i]t is . . . reasonable to require that all parties and all candidates follow the same set of rules designed to protect the integrity of the electoral process."); *Libertarian Nat'l Comm.*, 924 F.3d at 544 ("Because the First Amendment does not require Congress to ignore the fact that candidates, donors, and parties test the limits of the current law, prophylactic contribution limits are permissible — even vital — to forestall the worst forms of political corruption." (internal quotation marks and citations omitted)).[10]

The Loan Repayment Limit rationally serves the government's legitimate interests in diminishing quid pro quo corruption and its appearance as well as informing voters.

## CONCLUSION

For the foregoing reasons, the Court should grant the FEC's motion for summary judgment and deny plaintiffs' motion for summary judgment.

---

[10]     Plaintiffs have waived their claim that the Loan Repayment Limit is overbroad because it has "no justifiable application to losing candidates" (Compl. ¶ 40) by making no effort to advance that claim in summary judgment briefing.  *Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013) (citing *Ark. Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003) (noting that arguments not raised in briefs are waived)).

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)           /s/ Seth Nesin
Acting General Counsel                            Seth Nesin
lstevenson@fec.gov                                Attorney
                                                  snesin@fec.gov

Kevin Deeley
Associate General Counsel                         /s/ Tanya Senanayake
kdeeley@fec.gov                                   Tanya Senanayake (D.C. Bar No. 1006218)
                                                  Attorney
                                                  tsenanayake@fec.gov
Harry J. Summers
Assistant General Counsel                         COUNSEL FOR DEFENDANT
hsummers@fec.gov                                  FEDERAL ELECTION COMMISSION
                                                  1050 First Street NE
                                                  Washington, DC 20463
July 14, 2020                                     (202) 694-1650

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TED CRUZ FOR SENATE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 19-908 (NJR, APM, TJK) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, *et al.*, | ) | STATEMENT OF |
| | ) | MATERIAL FACTS |
| Defendants. | ) | |
| | ) | |

## DEFENDANT FEDERAL ELECTION COMMISSION'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

Kevin Deeley
Associate General Counsel
kdeeley@fec.gov

Harry J. Summers
Assistant General Counsel
hsummers@fec.gov

Seth Nesin
Attorney
snesin@fec.gov

Tanya Senanayake (D.C. Bar No. 1006218)
Attorney
tsenanayake@fec.gov

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
1050 First Street NE
Washington, DC 20463
(202) 694-1650

July 14, 2020

# TABLE OF CONTENTS

**Page**

I.     THE PARTIES..........................................................................................................1

     A.     The Federal Election Commission.........................................................1

     B.     Plaintiffs ..................................................................................................1

II.     CONGRESSIONAL CONCERN ABOUT CORRUPTION
     IN ELECTIONS....................................................................................................2

III.     BCRA AND THE LOAN REPAYMENT LIMIT.................................................6

IV.     HOW FEDERAL CANDIDATES HAVE USED PERSONAL
     LOANS TO THEIR CAMPAIGNS IN RECENT ELECTION CYCLES ...................... 10

V.     THE CAMPAIGN LOANS OF SENATOR CRUZ ......................................... 13

VI.     SPECIAL RISKS OF QUID PRO QUO CORRUPTION AND ITS
     APPEARANCE EXIST IN THE CONTEXT OF CANDIDATE LOANS.................... 18

     A.     Considerable Research, Experience, and Reporting Point to
     Dangers of Corruption and its Appearance in Candidate Loans........................... 18

     B.     The Dangers of Corruption and its Appearance in the
     Context of Post-Election Contributions and Donations....................................... 24

     C.     The Public's Perceptions of the Potential for Corruption in
     Candidate Loan Repayment ...................................................................... 24

          1.  YouGov Survey Timeline ........................................................... 24

          2.  Survey Results ............................................................................. 28

**DEFENDANT FEDERAL ELECTION COMMISSION'S**
**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h)(1), the Federal Election Commission ("Commission" or "FEC") submits the following statement of material facts not in genuine dispute in support of its Motion for Summary Judgment.

## I.     THE PARTIES

### A.     Defendant Federal Election Commission

1.     The FEC is an independent agency vested with statutory authority over the administration, interpretation, and civil enforcement of the Federal Election Campaign Act, 52 U.S.C. §§ 30101-146 ("FECA").  Congress authorized the Commission to "formulate policy" with respect to FECA, 52 U.S.C. § 30106(b)(1); "to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of [FECA]," *id*. §§ 30107(a)(8), 30111(a)(8); and to investigate possible violations of the Act, *id*. § 30109(a)(1)-(2).  The FEC has jurisdiction to initiate civil enforcement actions for violations of FECA in the United States district courts.  *Id*. §§ 30106(b)(1), 30109(a)(6).

### B.     Plaintiffs

2.     Plaintiff Rafael Edward ("Ted") Cruz is a United States Senator from the state of Texas.  (United States Senate, Senators, https://www.senate.gov/senators/index.htm.)  Senator Cruz was first elected to represent Texas in the U.S. Senate in 2012, and he won re-election in 2018.  (Official Election Results for United Senate, 2012 U.S. Senate Campaigns at 71, https://www.fec.gov/resources/cms-content/documents/2012congresults.pdf; Federal Elections 2018, Election Results for the U.S. Senate and the U.S. House of Representatives at 29, https://www.fec.gov/resources/cms-content/documents/federalelections2018.pdf.)

1

3.      Plaintiff Ted Cruz for Senate (the "Committee") is the principal campaign committee for Senator Cruz.  (Ted Cruz for Senate FEC Form 1, https://docquery.fec.gov/pdf/ 975/201810159125135975/201810159125135975.pdf).  FECA requires federal candidates to designate at least one "authorized committee," which may receive contributions and make expenditures on the candidate's behalf, to serve as its "principal campaign committee." 52 U.S.C. §§ 30101(5)-(6), 30102(e)(1)-(2).

4.      FECA limits the amount individual contributors may give to a campaign committee to an inflation-adjusted $2,800 per election.  52 U.S.C. § 30116(a); FEC, Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 84 Fed. Reg. 2504, 2506 (Feb. 7, 2019).

## II.      CONGRESSIONAL CONCERN ABOUT CORRUPTION IN ELECTIONS

5.      In the first half of the twentieth century, Congress became particularly concerned about corruption arising from contributions to federal candidate campaigns and political parties. In 1907, it passed the Tillman Act, providing "'[t]hat it shall be unlawful for any national bank, or any corporation organized by authority of any laws of Congress, to make a money contribution in connection with any election to any political office.'"  *United States v. Int'l Union United Auto., Aircraft & Agric. Implement Workers of Am. (UAW-CIO)*, 352 U.S. 567, 575 (1957) (quoting 34 Stat. 864 (1907)) ("*UAW*").  That legislation declared that "'[i]t shall also be unlawful for any corporation whatever to make a money contribution in connection with any election at which Presidential and Vice-Presidential electors or a Representative in Congress is to be voted for or any election by any State legislature of a United States Senator.'"  *Id.* (quoting 34 Stat. 864).

6.      The Tillman Act "was merely the first concrete manifestation of a continuing congressional concern for elections free from the power of money." *UAW*, 352 U.S. at 575 (internal quotation marks omitted).  Congress soon enacted amendments requiring disclosures of "committees operating to influence the results of congressional elections in two or more States" and "persons who spent more than $50 annually for the purpose of influencing congressional elections in more than one State." *Id.* at 575-76 (citing 36 Stat. 822 (1907)).  "The amendment also placed maximum limits on the amounts that congressional candidates could spend in seeking nomination and election, and forbade them from promising employment for the purpose of obtaining support." *Id.* at 576 (citing 37 Stat. 25 (1907)).  In 1925, Congress passed FECA's precursor, the Federal Corrupt Practices Act of 1925, 43 Stat. 1070.  One senator explained that "'[w]e all know . . . that one of the great political evils of the time is the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions,'" adding that that such "'large contributions'" lead to "'consideration by the beneficiaries . . . which not infrequently is harmful to the general public interest.'" *UAW*, 352 U.S. at 576 (quoting 65 Cong. Rec. 9507-08 (1924) (statement of Sen. Robinson) (alteration in original)).

7.      In 1939, Senator Carl Hatch introduced, and Congress passed, S. 1871, officially titled "An Act to Prevent Pernicious Political Activities" and commonly referred to as the Hatch Act.  S. Rep. 101-165 at *18; *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 560 (1973); 84 Cong. Rec. 9597-9600 (1939).

8.      Congress established individual contribution limits in the 1940 amendments to the Hatch Act, Pub. L. No. 76-753, 54 Stat. 767 (1940).  That legislation prohibited "any person, directly or indirectly" from making "contributions in an aggregate amount in excess of $5,000,

during any calendar year" to any candidate for federal office, to any committee "advocating" the

election of such a candidate, or to any national political party. *Id*. § 13(a), 54 Stat. 770.

9.      The limit was sponsored by Senator John H. Bankhead, who expressed his hope

that it would help "bring about clean politics and clean elections":  "We all know that large

contributions to political campaigns . . . put the political party under obligation to the large

contributors, who demand pay in the way of legislation . . . ."  86 Cong. Rec. 2720 (1940)

(statement of Senator Bankhead); *see also* 84 Cong. Rec. 9616 (daily ed. July 20, 1939)

(statement of Rep. Ramspeck) (stating that what "is going to destroy this Nation, if it is

destroyed, is political corruption, based upon traffic in jobs and in contracts, by political parties

and factions in power").

10.      From the start, the 1940 individual contribution limit was "ineffective."  Robert E.

Mutch, Campaigns, Congress, and Courts:  The Making of Federal Campaign Finance Law 66

(Praeger 1988).  Individuals circumvented the $5,000 limit by routing additional contributions

through other committees supporting the same candidate, *see* Louise Overacker, Presidential

Campaign Funds 36 (Boston University Press 1946), and the Hatch Act amendments allowed

donors to make unlimited contributions to state and local parties, *see* 86 Cong. Rec. 2852-53

(1940) (amending bill to exempt state and local parties from contribution limit).

11.      By 1971, when Congress began debating the initial enactment of FECA, the

$5,000 individual contribution limit was being "routinely circumvented."  117 Cong. Rec.

43,410 (1971) (statement of Rep. Abzug).

12.      In 1974, shortly after the Watergate scandal, Congress substantially revised

FECA.  These amendments established new contribution limits, including a $1,000 base limit on

contributions to candidates.  Fed. Election Campaign Act Amendments of 1974, Pub. L. No. 93-

443 § 101(b)(3), 88 Stat. 1263.  In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the

Supreme Court upheld FECA's contribution limits on the basis that they furthered the

government's important interest in preventing corruption and the appearance of corruption.  *Id.*

at 23-38.

13.     The *Buckley* Court itself noted the "deeply disturbing examples surfacing after the

1972 election" of "large contributions . . . given to secure a political quid pro quo from current

and potential office holders."  424 U.S. at 26-27 & n.28.

14.     During the 1972 presidential campaign, President Nixon's personal attorney and a

principle fundraiser, Herbert Kalmbach, described the price-point for ambassadorships, relaying

that "[a]nybody who wants to be an ambassador must give at least $250,000."  Reeves at 462.

This amount would be equal to over $1.4 million in 2016 dollars.  *CPI Inflation Calculator*,

Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/cpicalc.pl (last visited July 10, 2020).

15.     On February 25, 1974, Herbert Kalmbach pled guilty to violating 18 U.S.C. § 600

by promising a more "prestigious" ambassadorship to an individual, J. Fife Symington, in return

for "a $100,000 contribution to be split between" various third parties — "1970 senatorial

candidates designated by the White House" — "and [President] Nixon's 1972 campaign."

*Buckley v. Valeo*, 519 F.2d 821, 840 n.38 (D.C. Cir. 1975); Final Report of the Select Committee

on Presidential Campaign Activities at 492, S. Rep. No. 93-981, 93d Cong., 2d Sess. (1974); *see*

*also id.* at 501 ("De Roulet agreed to split his $100,000 contribution between the 1970 Senate

races and Mr. Nixon's 1972 campaign — as Symington had done."); *id.* at 493-494 (listing

individuals who contributed to President Nixon's campaign and became or sought to become

ambassadors, some of whom gave hundreds of thousands of dollars).

III.     **BCRA AND THE LOAN REPAYMENT LIMIT**

16.     In 2002, Congress enacted the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 ("BCRA"), which amended FECA.

17.     BCRA's most prominent change to FECA were its prohibition of the use in federal campaigns of "soft money" raised outside FECA's restrictions, which was intended to prevent the circumvention of important elements of FECA.  *McConnell v. FEC*, 540 U.S. 93, 132 (2003).

18.     Another element of BCRA was the so-called "Millionaire's Amendment."  Under that part of the law, if a candidate for Congress spent in excess of a certain amount of personal funds in support of his or her campaign and additional criteria were met, the law would increase the contribution limits for the self-funding candidate's opponent to help the opponent keep pace. *See Davis v. FEC*, 554 U.S. 724, 729-30 (2008).

19.     Although the primary governmental interest in the passage of BCRA as a whole was to deter corruption and its appearance, extensive legislative history of the Millionaire's Amendment indicates that it had a different purpose – to level the playing field in federal campaigns.  *See Davis*, 554 U.S. at 741-42.

20.     The Loan Repayment Limit challenged in this case was a distinct provision from the limit-shifting provision described above that was originally introduced on its own and later combined into a bill that also included the Millionaire's Amendment during the amendment process.  147 Cong. Rec. S2541 (Mar. 20, 2001) (statement of Sen. Hutchison).

21.     The Loan Repayment Limit states that a candidate "who incurs personal loans . . . in connection with the candidate's campaign for election shall not repay (directly or indirectly), to the extent such loans exceed $250,000, such loans from any contributions made to such

candidate or any authorized committee of such candidate after the date of such election."  52

U.S.C. § 30116(j).

22.     The Loan Repayment Limit does not restrict the repayment of candidate loans

with contributions made *before* an election, but under the provision, a campaign committee may

use contributions raised *after* an election to repay "personal loans" that a candidate "incurs . . . in

connection with the candidate's campaign" only up to a limit of $250,000.  52 U.S.C. § 30116(j).

23.     Multiple legislative statements indicate that the Loan Repayment Limit was

intended to mitigate the heightened risk of quid pro quo corruption and its appearance resulting

from already-elected officeholders soliciting contributions for their own personal benefit.  For

example, Senator Domenici stated that "[i]f you incur debt from a personal loan and then you get

elected as Senator, and then you go around and say, now I am Senator, I want you to get me

money so I can pay back what I used of my own money to run for election.  It is clear in this

amendment that you cannot do that in the future."  *See* 147 Cong. Rec. S2537 (daily ed. Mar. 20,

2001) (statement of Sen. Domenici).

24.     Senator Domenici also stated that a candidate who incurred personal loans for his

campaign should not be able "to get it back from [his or her] constituents under fundraising

events that [he or she] would hold and then ask them: How would you like me to vote now that I

am a Senator?"  *Id.* at S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici).

25.     Senator Domenici further stated that "[t]his (amendment) limits candidates who

incur personal loans in connection with their campaign in excess of $250,000.  They can do

$250,000 and then reimburse themselves with fundraisers.  But anything more than that, they

cannot repay it by going out and having fundraisers once they are elected with their own

money.'' *Id.* at S2451 (daily ed. Mar. 19, 2001) (statement of Sen. Domenici).

26.     Senator Durbin stated that ''[the] language [of the Loan Repayment Limit] makes it clear there will not be any effort after the election to raise money to repay those loans . . . .'' *Id.* at S2462 (daily ed. Mar. 19, 2001) (statement of Sen. Durbin).

27.     Senator Hutchison stated that "[candidates] have a constitutional right to try to buy the office, but they do not have a constitutional right to resell it.  That is what my part of this amendment attempts to prevent, so a candidate can spend his or her own money but there would be a limit on the amount that candidate could go out and raise to pay himself or herself back." *Id.* at S2541 (Mar. 20, 2001) (statement of Sen. Hutchison).  While Senator Hutchison also stated a hope "to level the playing field," those comments contrasted a self-lending candidate's ability to "go out and repay themselves" "when they win" with persons running with a "variety of support from his or her constituents," *i.e.* people who do not have the same opportunity for post-election fundraising for self-payment.  *Id.* at S2541-42.  Senator Hutchison belabored the points that she "want[ed] people to be able to spend their own money," as she previously had, and that "[n]o one argues" against candidates like her having "a constitutional right to spend our money."  *Id.* at S2541.

28.     Following the passage of BCRA, the Commission issued regulations implementing the new statute, including the Loan Repayment Limit.  One such regulation establishes a 20-day period following an election during which a committee can use the cash it has on hand as of the day after the election to pay back all or part of the candidate's personal loans, without limitation ("20-Day Repayment Period").  11 C.F.R. § 116.11(c)(1).  After a general election, a campaign committee must file a report with the FEC reporting its receipts and disbursements for a period expiring 20 days after the election.  FEC, Increased Contribution and Coordinated Party Expenditure Limits for Candidates Opposing Self-Financed Candidates, 68

Fed. Reg. 3970, 3974 (Jan. 27, 2003).  Thus, after the 20-day post-election period has elapsed, a campaign committee must "treat the remaining balance of the candidate's personal loan that exceeds $250,000 as a contribution from the candidate to the authorized committee, given that this amount could never be repaid, and given that the amount must be accounted for on the authorized committee's next report."  *Id.* (citing 11 C.F.R. § 116.11(c)).

29.     In 2008, the Supreme Court struck down the Millionaire's Amendment, holding that leveling the playing field was not a compelling government interest sufficient to justify the burden the Amendment imposed.  *Davis*, 554 U.S. at 741-42.  Specifically, the Court found that the Amendment's "asymmetrical" contribution limits burdened a candidate's First Amendment right to make "unlimited expenditures of his personal funds" by "enabling his opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of [the self-funder's] speech."  *Id*. at 734, 736.

30.     Following the Supreme Court's decision in *Davis*, the FEC engaged in a rulemaking in which it revised its regulations.  FEC, Notice 2008–14; Repeal of Increased Contribution and Coordinated Party Expenditure Limits for Candidates Opposing Self-Financed Candidates, 73 Fed. Reg. 79597 (Dec. 30, 2008).  The FEC determined that the *Davis* decision did not impact the Loan Repayment Limit or its regulations.  *Id.* at 79599-600.  The Commission reached this determination because it found that the Loan Repayment Limit "has a wider application than other provisions of the Millionaires' Amendment," explaining that the Limit "applies equally to all candidates and regardless of whether the Millionaires' Amendment provisions also apply to those candidates."  *Id.* at 79600.  Furthermore, the Commission noted that "while other provisions of the Millionaires' Amendment apply only to Senate and House of Representatives candidates, the loan repayment provision applies to candidates for all Federal

offices, including presidential candidates" and that the original regulations for the Loan

Repayment Limit and the Millionaire's Amendment had been placed in completely different

sections of the Code of Federal Regulations, because the two provisions were distinct.  *Id.*

## IV.    HOW FEDERAL CANDIDATES HAVE USED PERSONAL LOANS TO THEIR CAMPAIGNS IN RECENT ELECTION CYCLES

31.    "Almost half of all campaigns (46.75 percent) rely on some form of debt, and,

conditional on borrowing, campaigns borrow almost a third of total raised funds."  Alexei

Ovtchinnikov & Philip Valta, Debt in Political Campaigns at 2 (May 2020) (*available at*

https://ssrn.com/abstract=2804474) (FEC Exh. 1). "The majority of campaign debt comes in the

form of personal loans that candidates make to their own campaigns, with eight percent of

campaigns relying on outside loans."  *Id.* at 2-3.

32.    Federal campaigns have made extensive use of loans from candidates before and

after the passage of BCRA.  (Declaration of Paul C. Clark II at ¶¶ 4-5 (July 14, 2020) ("Clark

Decl.") (FEC Exh. 2).)  Although difficult to quantify, many of these loans were in essence

contributions with limited expectations of repayment.  *See, e.g.,* Corzine 2000, Inc. Year End

Report, available at https://docquery.fec.gov/pdf/755/21020031755/21020031755.pdf (showing

over $56 million in candidate loans for a New Jersey Senate race); Anne Baker, *Are Self-*

*Financed House Members Free Agents?,* 35:1 Congress & the Presidency: A Journal of Capital

Studies, 53, 56 (2008) ("Baker") (FEC Exh. 3) ("[M]ost self-financing takes the form of personal

loans.").

33.    During the five most recent election cycles, a total of 588 loans were made by

Senate candidates to their campaigns (some candidates made loans in multiple election cycles).

(Clark Decl. at ¶ 4 (FEC Exh. 2).)  Twelve of those loans were for exactly $250,000, which

represents 2.0% of the loans.  (*Id.*)  By comparison, during the five election cycles immediately

10

before BCRA became effective, a total of 441 loans were made by Senate candidates to their campaigns.  (*Id.*)  One of those candidates made a loan of exactly $250,000, which represents 0.2% of the loans.  (*Id.*)

34.     During the five most recent election cycles, 3,444 loans were made by House candidates to their campaigns (some candidates made loans in multiple election cycles).  (*Id.* at ¶ 5.)  Twenty-six of those loans were for exactly $250,000, which represents 0.7% of the loans. (*Id.*)  By comparison, during the five election cycles immediately before BCRA became effective, 2,868 loans were made by House candidates to their campaigns.  (*Id.*)  Four of those loans were for exactly $250,000, which represents 0.1% of the loans.  (*Id.*)

35.     During the five most recent election cycles, forty-six loans made by Senate candidates were between $200,000 and $300,000, which represents 7.8% of the loans. (*Id.* at ¶ 6.)  By comparison, during the five election cycles immediately before BCRA became effective, thirty such loans were between $200,000 and $300,000, which represents 6.8% of the loans. (*Id.*)

36.     During the five most recent election cycles, one hundred and ninety loans made by House candidates were between $200,000 and $300,000, which represents 5.5% of the loans. (*Id.* at ¶ 7.)  By comparison, during the five election cycles immediately before BCRA became effective, eighty-five such loans were between $200,000 and $300,000, which represents 3.0% of the loans.  (*Id.*)

37.     One independent study that looked only at federal candidate loans between $100,000 and $1,000,000 indicates that from 1983 until BCRA became effective, 3.6% of such loans were between $240,000 and $250,000, while from the time BCRA became effective until

2014, 7% of such loans were at that threshold.  Ovtchinnikov & Valta, at 24-25, 38 (FEC Exh. 1).

38.     A large majority of recent loans made by federal candidates to their campaigns are for $250,000 or less.  Of the 588 loans made by Senate candidates to their campaigns during the five most recent election cycles, 466 of those loans were for $250,000 or less, which represents 79.3% of the loans.  (Clark Decl. at ¶ 8 (FEC Exh. 2).)  Therefore, only 20.7% of the loans were for more than $250,000.

39.     Similarly, of the 3,444 loans made by House candidates to their campaigns during the five most recent election cycles, 3,076 of those loans were for $250,000 or less, which represents 89.3% of the loans.  (*Id.* at ¶ 10.)  Therefore, only 10.7% of the loans were for more than $250,000.

40.     The ratio of loans below $250,000 has not changed substantially from what the ratio was prior to BCRA.  Of the 441 loans made by Senate candidates to their campaigns during the five election cycles immediately before BCRA became effective, 335 of those loans were for $250,000 or less, which represents 76.0% of the loans.  (*Id.* at ¶ 9.)  Therefore, only 24.0% of the loans were for more than $250,000.

41.     Of the 2,868 loans made by House candidates to their campaigns during the five election cycles immediately before BCRA became effective, 2,658 of those loans were for $250,000 or less, which represents 92.7% of the loans.  (*Id.* at ¶ 11.)  Therefore, only 7.3% of the loans were for more than $250,000.

42.     Historically, losing candidates have had a more difficult time repaying loans than winning candidates do.  (Ovtchinnikov & Valta at 2 & n.3 (FEC Exh. 1) ("When you wake up a loser [in a political campaign], you have a deficit. When you wake up a winner, you have a

deficit retirement party." (quoting Roberts, S., "Debt Retirement Party Becoming an Institution." The New York Times, November 29. 1982)); Peter Overby, *How Will Clinton Resolve Campaign Debt?*, National Public Radio (May 14, 2018, 6:00 AM), *available at* https://www.npr.org/templates/story/story.php?storyId=90425733 (last visited July 14, 2020) (noting the comment of a former FEC Commissioner and counsel to a losing presidential campaign that "only winners have an easy time dealing with debt" and that debt retirement in the context of those not taking office "'is the hardest task in American politics'").

43.     Candidates provide loans to their campaigns for various reasons, such as for messaging that the candidate will not be beholden to special interests once elected.  Linda McMahon loaned nearly $100 million to her 2010 and 2012 U.S. Senate campaigns.  Peter Applebome, *Personal Cost for 2 Senate Bids: $100 Million*, N.Y.Times (Nov. 2, 2012) (FEC Exh. 4), *available at* https://www.nytimes.com/2012/11/03/nyregion/linda-e-mcmahon-has-spent-nearly-100-million-in-senate-races.html.  One article reported that "Ms. McMahon says that spending her own money leaves her — unlike [her opponent] Mr. Murphy — in no one's debt."  *Id.*  The article quoted one of Ms. McMahon's campaign ads: "In the Senate I will owe you, not the special interests who corrupt so many career politicians from Hartford to Washington."  *Id.*; *see also* Ari Melber, *Trump Campaign Could Use New Donations to Pay Donald Trump $36M for Loan*, nbcnews.com (May 13, 2016, 6:03 AM EDT), https://www.nbcnews.com/politics/2016-election/trump-campaign-may-use-new-donations-pay-donald-trump-36-n573291 (last visited July 14, 2020) (quoting then-candidate President Trump as saying, "I'm self-funding my campaign" and "Let me tell you, the politicians will never do the job because they're bought and paid for, folks").

## V.      THE CAMPAIGN LOANS OF SENATOR CRUZ

44.      In 2012, Senator Cruz ran for a U.S. Senate seat to represent Texas for the first time, and as part of the campaign, he made multiple loans to his authorized committee, totaling $1,064,000.   *See* FEC, Conciliation Agreement with Ted Cruz for Senate, *et al.*, ¶ 2, https://www.fec.gov/files/legal/murs/7455/19044461484.pdf .

45.      The largest loan of approximately $800,000 came from a margin account with Senator Cruz's wife's employer, Goldman Sachs, and was at the low interest rate level of 3%. *Id.* ¶ 3; Mike McIntire, *Ted Cruz Didn't Report Goldman Sachs Loan in a Senate Race*, N.Y. Times (Jan. 13, 2016), *available at* https://www.nytimes.com/2016/01/14/us/politics/ted-cruz-wall-street-loan-senate-bid-2012.html.  Senator Cruz has publicly stated that the loan represented the entire liquid net worth and savings of his household.  *Id.*

46.      Goldman Sachs is a large, multinational bank that had recently received approximately $10 billion in public bailout funds and has an extensive stake in federal policies for which Senators have responsibility.  Paritosh Bansal, *Goldman's share of AIG bailout money draws fire,* Reuters (Mar. 17, 2009), available at https://www.reuters.com/article/us-aig-goldmansachs-sb/goldmans-share-of-aig-bailout-money-draws-fire-idUSTRE52H0B520090318.

47.      Senator Cruz was not repaid in full prior to the 2012 general election, and as a result of the Loan Repayment Limit, his campaign was prohibited from repaying the full amount of the loan using funds raised after that election.  Email from Senator Cruz attaching Andrea Drusch, *Cruz says he ate a big 2012 campaign loan, but he's still listing it as a top asset,* Fort Worth Star-Telegram (Aug. 15, 2018) (FEC Exh. 5).

48.      When the full details of the loans later came under scrutiny, public concerns were raised regarding the susceptibility of a candidate to exchanges of favors where their personal

finances are impacted and whether Senator Cruz's positions on issues of importance to Goldman like the availability of H-1B visas had been altered. *See* Jennifer Rubin, *10 Reasons that Goldman Sachs Loan is a Nightmare for Ted Cruz*, Wash. Post (Jan. 14, 2016), https://www.washingtonpost.com/blogs/right-turn/wp/2016/01/14/10-reasons-that-goldman-sachs-loan-is-a-nightmare-for-ted-cruz/ (associating Senator Cruz's loans with Goldman's positions on H-1B visas and quoting a Republican Senate staff member's allegations of "crony capitalism"). Senator Cruz circulated many of these media reports to his staff. (*See, e.g.*, Email from Senator Ted Cruz to Jeff Roe, et al. (May 26, 2017, 12:18:38 PM EDT) (with tweet linking Fox News story) (FEC Exh. 6); Email from Senator Ted Cruz to Prerak Shah, et al. (Aug. 15, 2018, 5:52:03 PM) (attaching article from Fort Worth Star-Telegram (FEC Exh. 5); Email from Senator Ted Cruz to Catherine Frazier (May 26, 2017 4:29:51 PM) (with tweet from Salon.com) (FEC Exh. 7); Email from Senator Ted Cruz to Jeff Roe, et al. (May 26, 2017, 3:25:36 PM EDT) (with tweet linking Texas Tribune) (FEC Exh. 8).)

49.     One such article circulated by Senator Cruz quoted a Republican campaign finance attorney noting: "The law is designed to prevent people from giving their campaign a bunch of money and then raising money from donors years later when they're in office to pay themselves back personally." (Email from Senator Ted Cruz to Prerak Shah, *et al.* (Aug. 15, 2018, 5:52:03 PM) (FEC Exh. 5).)

50.     Starting shortly after the 2012 election and into the following year, the Cruz campaign began having discussions about the possibility of bringing a lawsuit to strike down the Loan Repayment Limit. (Deposition Transcript of Cabell Hobbs (May 13, 2020) at 51-52 ("30(b)(6) Dep.") (FEC Exh. 9).)

15

51.    Those discussions continued for several years, concurrently with Senator Cruz's preparation to run for reelection in 2018.  (30(b)(6) Dep. at 57-59 (FEC Exh. 9).)

52.    By a significant margin, the 2018 Texas Senate campaign between Senator Cruz and Beto O'Rourke was the most expensive Senate campaign in U.S. history.  Most Expensive Races, OpenSecrets.org, https://www.opensecrets.org/overview/topraces.php?cycle=2018&display=allcands (last viewed July 10, 2020).

53.    The Cruz Committee raised more than $35 million in the 2018 election cycle.  (FEC, Ted Cruz for Senate Financial Summary, https://www.fec.gov/data/committee/C00492785/?cycle=2018).

54.    Nonetheless, on the day before the November 6, 2018 general election, Senator Cruz loaned his campaign $260,000.  *See* Ted Cruz for Senate, FEC Form 3 at 401-02 (Jan. 31, 2019, http://docquery.fec.gov/pdf/325/201901319145235325/201901319145235325.pdf.  This was the only loan received by the Cruz Committee for the 2018 election.  FEC, Ted Cruz for Senate Financial Summary, https://www.fec.gov/data/committee/C00492785/?cycle=2018.

55.    Of the total loan amount, $255,000 originated from Senator Cruz's margin-approved brokerage account, and $5,000 originated from his personal bank accounts.  (Compl. ¶ 28; Pls.' Statement of Undisputed Material Facts ("Pls.' SOF") ¶¶ 33-34.)

56.    The 2018 loans were made for the sole purpose of providing a basis to bring this lawsuit.  (*See* 30(b)(6) Dep. at 177 (FEC Exh. 9) (confirming the Committee's previously-stated position that "Plaintiff hereby stipulates that the sole and exclusive motivation behind Senator Cruz' actions in making the 2018 loan and the committee's actions in waiting to repay them was to establish the factual basis for this challenge to [the Loan Repayment Limit]."").)

16

57.     At the end of election day, November 6, 2018, the Committee had approximately $2.38 million cash on hand.  (Pls.' SOF ¶ 36.)

58.     Pursuant to the 20-Day Repayment Period, the Committee had until November 26, 2018 to use that cash on hand to repay Senator Cruz all or part of the $260,000 he had loaned it the day before the election.  *See* 11 C.F.R. § 116.11(c)(1).  Because the Committee is permitted to repay candidate loans up to $250,000 after the 20-Day Period using any source of funds, the Committee only needed to repay $10,000 of the loan in that 20-day period to assure that the Loan Repayment Limit would not be an impediment to repaying Senator Cruz in full.  (*Id.*)

59.     The plaintiffs repaid no money during that period, however, because they wanted to bring this lawsuit.  (*See* 30(b)(6) Dep. at 177 (FEC Exh. 9) (confirming the Committee's previously-stated position that "Plaintiff hereby stipulates that the sole and exclusive motivation behind Senator Cruz' actions in making the 2018 loan and the committee's actions in waiting to repay them was to establish the factual basis for this challenge to [the Loan Repayment Limit].").)

60.     In addition, during the 20 days after the election and later, the Committee continued receiving post-election contributions, but rather than using those contributions to pay vendors or to pay any of Senator Cruz's debt, the campaign designated the contributions for Senator Cruz's 2024 re-election effort.  (*See* 30(b)(6) Dep. at 96-97 (FEC Exh. 9).)

61.     Starting on November 27, 2018, the Committee was required to treat the $10,000 of Senator Cruz's personal loans that exceeded the $250,000 Loan Repayment Limit, and which the Committee did not use its cash on hand to repay during the 20-Day Repayment Period, as a contribution from Senator Cruz to his Committee.  *See* 11 C.F.R. § 116.11(c)(2).

62.     Two days after the 20-day deadline elapsed, Senator Cruz emailed his campaign staff, stating:  "Since more than 20 days have passed, it would be REALLY good if we could pay back at least some of the $250k now.  Our cash is really getting stretched."  (*See* Email from Senator Ted Cruz to Jeff Roe, Nov. 28, 2018, 12:46:26 PM (FEC Exh. 10).)

63.     Less than a week after that email, the Committee started repaying Senator Cruz, and it completed paying $250,000 in four payments within the month.  Pls.' SOF ¶ 42; Ted Cruz for Senate FEC Form 3 at 398-99, https://docquery.fec.gov/pdf/526/201908239163101526/ 201908239163101526.pdf (showing loan repayments totaling $250,000 on Dec. 4, 2018, Dec. 11, 2018, Dec. 18, 2018 and Dec. 24, 2018).

64.     None of the $250,000 of the loan that was repaid was from contributions raised after the election.  (30(b)(6) Dep. at 95 (FEC Exh. 9) ("the committee did not receive any general 2018 contributions after Election Day 2018.").)

65.     All of the funds that comprised the repaid $250,000 went toward Senator Cruz's personal loan that originated from his margin account.  (Pls.' SOF ¶ 30.)  As a result, of the remaining $10,000 of Cruz's personal loan that was converted to a contribution to his Committee, $5,000 originated from Cruz's personal bank account and $5,000 originated from his margin loan.  *Id.* ¶¶ 31-32; Ted Cruz for Senate FEC Form 3 at 401-02, https://docquery.fec.gov/ pdf/526/201908239163101526/201908239163101526.pdf (showing $5000 balance on each loan).

66.     Plaintiffs are unable to identify a single potential contributor that was unable to make contributions to enable the Committee to repay Senator Cruz using more than $250,000 in post-election funds.  (30(b)(6) Dep. at 98-99 (FEC Exh. 9).)

VI.   **SPECIAL RISKS OF QUID PRO QUO CORRUPTION AND ITS APPEARANCE EXIST IN THE CONTEXT OF CANDIDATE LOANS**

A.   **Considerable Research, Experience, and Reporting Point to Dangers of Corruption and its Appearance in Candidate Loans**

67.    The repayment of large federal candidate loans has fueled corruption concerns. One 2020 study that analyzed data regarding debt concluded that federal officeholders that are in debt are more likely to make decisions in accord with the interests of PACs and other special interest groups that can contribute to their campaigns.  Ovtchinnikov & Valta at 26 (FEC Exh. 1).  The study found that "indebted politicians, relative to their debt-free counterparts, are significantly more likely to switch their votes if they receive contributions from those special interests between the votes."  *Id.* at 29.

68.    The same study concluded, however, "that politicians with large loans to their campaigns become significantly less responsive to contemporaneous labor contributions following the passage of BCRA and behave remarkably similar to their debt free counterparts." *Id.* at 26.  The authors of the study attribute this change to the Loan Repayment Limit.  *Id*. Consistent with those findings, another study examined certain self-funding federal candidates, including those carrying candidate-loan debt beyond an election cycle, and concluded that the self-funding candidates did not vary their votes any more or less than other candidates as a result of interest-group contributions.  (Baker at 54).)  "A probable explanation . . . is that instead of being free agents, self-financed members feel pressure to court other sources of campaign contributions so they can be less reliant on their own money in the next election."  (Baker at 65.)

69.    A 2009 press report stated that U.S. Representative Grace F. Napolitano had held several fundraisers to solicit donations to pay down a $150,000 loan that she had made to her campaign in 1998.  Andrew Zajac, *Interest on Campaign Loan Pays*, L.A. Times (Feb. 14,

2009), https://www.latimes.com/archives/la-xpm-2009-feb-14-me-napolitano14-story.html (last visited July 14, 2020).  These fundraisers were hosted by "a Capitol Hill lobbying firm whose clients include several transportation interests," while Napolitano served as "a member of the House Transportation and Infrastructure Committee and [] chairwoman of the water and power subcommittee of the Natural Resources Committee."  *Id*. The invitation for one of these fundraisers "invited political action committee checks of $1,500 or personal donations of $500, payable to the 'Napolitano for Congress '1998 Primary Debt Retirement.'"  *Id*.  One retired campaign finance specialist noted that lobbyists assist with debt retirement fundraisers because they know it is really of benefit to the member.  *Id*.

70.     Some members of Congress used personal loans in a manner that appeared to some to circumvent the per election contribution limit in recent years.  Karl Evers-Hillstrom, *Ted Cruz's FEC lawsuit could give special interests more power in federal elections,* Opensecrets.org (Apr. 1, 2019) (FEC Exh. 11), *available at* https://www.opensecrets.org/news/2019/04/ted-cruz-fec-lawsuit/.

71.     For example, Senate candidate Matt Rosendale's 2014 campaign debt was repaid in 2018 by "nine wealthy donors," eight of whom had already given the maximum to his 2018 campaign.  *Id.* at 3.  Rosendale then loaned his 2018 campaign more money, "effectively creating a cycle of loans and repayments that bypasses traditional contribution limits."  *Id.*

72.     Senator Mike Braun also allegedly used the tactic in 2018 by "taking contributions for the purpose of paying down his personal campaign debts from the Republican primary" and then "loan[ing] his general election campaign the exact same sums, effectively allowing his donors to bypass contribution limits.  *Id.* at 4.

73.     Concerns about the appearance of corruption with regard to candidate loans have also roiled state election systems.  For example, in an investigative report in February 2012, the *Dayton Daily News* reported that Mike DeWine had loaned his campaign for Ohio Attorney General $2 million in an attempt to unseat Richard Cordray in 2010, and then "after winning the election [] began raising money to help retire the debt."  The article reports that "[w]riting checks to the DeWine campaign last year were hundreds of lawyers from dozens of law firms, many of which hold special counsel contracts awarded by the attorney general's office to represent public pensions, colleges, state agencies and more."  In the year following the election, DeWine raised $1.47 million to pay off the debt, including, reportedly, $194,830 in contributions from ten law firms and their lawyers that received $9.6 million in legal fees for 225 assignments from the Attorney General's office.  An analyst at the Center for Governmental Studies observed that "Money given after the election that goes into the candidate's pocket provides the contributor with even more influence over the candidate since the candidate is benefiting personally from the contribution."  *See* Bischoff, Laura, "Donations Helping DeWine Pay Down Campaign Loan," *Dayton Daily News* (Feb. 12, 2012) (FEC Exh. 12), *available at* https://www.springfieldnews sun.com/news/national-govt--politics/donations-helping-dewine-pay-down-campaign-loan/UAkVmO6kothwHSzC6tNJiP/.

74.     Another report from 2014 stated that, "In the three years since winning a close race for attorney general, Mike DeWine and his political team have been raising hundreds of thousands of dollars – often from lawyers who want state business — and then using that campaign cash to pay off a $2 million personal loan that DeWine made to his committee in 2010 and to build up a war chest for his 2014 re-election bid."  *See* Bischoff, Laura, "Firms Gave Heavily to DeWine, GOP," *Dayton Daily News* (Jan. 26, 2014) (FEC Exh. 13), *available at*

21

https://www.daytondailynews.com/news/state--regional-govt--politics/firms-gave-heavily-dewine-gop/RV4vShQrE3qzJVij8rp2tN/.  The report found that as attorney general, DeWine was responsible for selecting law firms for a securities fraud advisory panel that had 27 firms, with 12 of those firms from Ohio, and whose members received special counsel work.  *Id*.  The report "found huge campaign contributions from some of the members of the panel, including some that came as DeWine was deliberating on which firms to put on the panel."  *Id*.  In addition, the report found that, "[o]f the 27 law firms assigned to the cases that pay on contingency, 19 serve on DeWine's panel," "[m]ost of them also contributed via PACs or employees to the Ohio GOP, Mike DeWine and/or [Mike DeWine's son] Pat DeWine — more than $1.3 million from 2010 to 2013," and "[a]bout half of the donations came from firms whose main office is outside Ohio."  *Id*.  And the report noted that "[t]he Ohio Republican Party, which received the bulk of the campaign contributions from firms seeking outside work with DeWine's office, has funneled $977,537 to DeWine's campaign fund since he took over as AG in January 2011."  *Id*.

75.   A 2018 report also included concerns about an appearance of corruption related to the Ohio Attorney General's office in this period.  An investigation by the Ohio Center for Investigative Journalism reported that debt collection firms who contracted with the Ohio Attorney General's Office "whose contracts were not renewed during the DeWine years were skeptical about the political purity of the contracting process."  James McNair, *Unlike Neighboring States, Ohio Lacks Transparent, Merit Process For Debt Collection Outsourcing; Campaign Contributors Much More Likely To Get Contracts*, Eye on Ohio:  Ohio Center for Investigative Journalism (June 25, 2018), https://eyeonohio.com/ag_collections/ (last visited July 14, 2020).  The report cited the example of one contractor that had received contracts under five

prior attorneys general before its contract was not renewed under Attorney General DeWine.  *Id*.

The report noted that the founder of the company believed the non-renewal stemmed from "his

lack of financial support for the DeWine campaign."  *Id*.  The report quoted the founder as

saying, "This is what they all do . . . .  This is their business, and they'll pay to play.  I don't pay

to play.  I do good work."  *Id*.  The report also quoted the founder of another debt collection

company whose contract was not renewed as saying, "I always thought what they were looking

for was someone to perform, and I thought our record spoke for itself . . . .  We had done it under

both parties and for a number of years.  It's not like we didn't make campaign contributions.  We

may have not made them of the size that a lobbyist might have suggested."  *Id*.

76.     Oklahoma Governor Kevin Stitt made $5 million in personal loans to his

campaign in 2018.  In the year after winning the election, Governor Stitt raised over $800,000 in

contributions, with "more than $100,000 from political action committees funded by industries

or special interests."  Trevor Brown, *After Election, Stitt Continues to Rake in Campaign

Donations*, OklahomaWatch.org (Nov. 11, 2019), https://oklahomawatch.org/2019/11/11/after-

election-stitt-continues-to-rake-in-campaign-donations/ (last visited July 14, 2020).

77.     In another example at the state level, the Kentucky Registry of Election Finance

in 1994 observed that, "[i]n the last fifteen years, Kentuckians have endured the consequences of

millionaires 'loaning' their campaigns millions of dollars, only to be repaid by contributors

seeking no-bid contracts."  Def.'s Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. at 9, *Wilkinson v.

Jones*, Civ. No. 94-0664, at 9 (W.D. Ky. Dec. 22, 1994) (FEC Exh. 14).  According to the

Registry, "[o]bservers argued that Kentucky's gubernatorial races were already publicly financed

by the profit margins on the state contracts awarded to those who helped repay the Governors'

23

campaign debts." *Id*. at 10 (citing Penny Miller, Kentucky Politics & Government: Do We Stand United? 219 (Lincoln: University of Nebraska Press (1994))).

78.    Kentucky Governors John Y. Brown, Jr. and Wallace Wilkinson provided loans to their campaigns of $3.55 million, "only to be repaid after the election by contributors seeking no-bid contracts." Jennifer A. Moore, *Campaign Finance Reform in Kentucky: The Race for Governor*, 85 Ky. L.J. 723, 746 (1997) (citing Penny Miller, Kentucky Politics & Government: Do We Stand United? 219 (Lincoln: University of Nebraska Press (1994))). In 1987, for instance, Governor Wilkinson loaned $3.2 million to his campaign and then, "[a]fter the election, Wilkinson spent a great deal of time raising money to reimburse himself for the loans he made to the campaign." *Id*. at 754. Governor Wilkinson's loan repayments and solicitation practices reportedly incentivized Kentucky's 1992 campaign finance reforms. *Id*.

79.    In 1991 the *Courier-Journal* in Louisville, Kentucky reported: "The Addington family of Catlettsburg and their employees contributed at least $215,000 to Wallace Wilkinson's gubernatorial campaign and political action committee during a six-month period following Wilkinson's primary victory in May 1987." Tom Loftus, *Big-Money Politic$*, The Courier-Journal, Dec. 29, 1991, at 2 (FEC Exh. 15). The article continued: "The Addingtons, who have vast coal operations in the state, were seeking a state permit to open what would become the state's largest landfill." *Id*.

**C.    The Dangers of Corruption and its Appearance in the Context of Post-Election Contributions and Donations**

80.    In 1989, "a majority of the [Alaska Public Offices Commission] commissioners stated strong support for barring post-election contributions, and hoped such a ban would curtail contributions 'intended to influence a successful candidate rather than the outcome of an

election.'"  *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 628 (Alaska 1999) (quoting

Alaska Public Offices Commission, *Ann. Rep. to the Legislature* 10 (1989)).

81.     In that case, the court observed that "Former Alaska Governor [Walther] Hickel

affied that 'post-election contributions can too easily be viewed as an attempt to purchase

influence and are one of the most troubling kinds of contribution.'"  *Id.*

**D.     The Public's Perceptions of the Potential for Corruption in Candidate Loan
         Repayment**

**1.     YouGov Survey Timeline**

82.     In April 2020, the global public opinion and data firm YouGov conducted a

survey, at the request of the FEC in connection with this case, that yielded responses from 1,000

adults in the United States over the age of 18 years.  (Decl. of Ashley Grosse ¶ 5 (Apr. 24, 2020)

("Grosse Decl.") (FEC Exh. 16).)  Following its ordinary practice, "YouGov interviewed 1202

respondents who were then matched down to a sample of 1000 to produce the final dataset,"

using "a sampling frame on gender, age, race, and education."  (Grosse Decl. Exh. C at 1 (FEC

Exh. 16).)  YouGov followed the accepted methodology of constructing a nationally-

representative sample using the 2017 American Community Survey.  (*Id.*)  This survey was paid

for by the FEC and was managed by Ashley Grosse, Senior Vice President of Client Services at

YouGov.  (Grosse Decl. ¶¶ 3, 5, 6 (FEC Exh. 16).)

83.     The FEC supplemented its initial disclosures in this matter pursuant to Federal

Rule of Civil Procedure 26(e)(1) on April 27, 2020, providing plaintiffs with the name, address

and telephone number of Ms. Grosse.  (Email from Tanya Senanayake, FEC counsel, to John

Ohlendorf, plaintiffs' counsel (Apr. 27, 2020) (FEC Exh. 17); Def. FEC Supplement to Its Initial

Disclosures (Apr. 27, 2020) (FEC Exh. 18).)  At this time, the FEC also provided to plaintiffs a

declaration by Ms. Grosse and the results and methodology of the survey.  (*Id.*)

84.     On May 7, 2020, plaintiffs sent to the FEC a request for "all documents relating to the survey, including (but not limited to) any communications between Defendants and YouGov relating to the survey."  (Pls.' First Req. for Prod. (May 7, 2020) (FEC Exh. 19).)  At the same time, plaintiffs noticed a deposition of Ms. Grosse for May 26, 2020.  (Notice of Dep. for Ashley Grosse (May 7, 2020) (FEC Exh. 20).)  On May 20, 2020, the FEC produced to plaintiffs non-privileged documents responsive to plaintiffs' request that were in the FEC's possession, custody, or control and a log of withheld privileged documents.  (Def. FEC's Resps. To Pls.' First Req. for Prod. (May 20, 2020) (FEC Exh. 21); Def. FEC's Docs and Info. Withheld In Connection With Pls.' First Req. for Prod. (FEC Exh. 22).)  In addition, while the FEC objected that documents not in its possession, custody, or control at the time that plaintiffs served the discovery request were not properly sought, the FEC did obtain and produce responsive documents that had been in YouGov's possession at that time.  (Def. FEC's Resps. To Pls.' First Req. for Prod. (May 20, 2020) (FEC Exh. 21).)

85.     On May 26, 2020, plaintiffs deposed Ms. Grosse.  (Dep. of Ashley Grosse (May 26, 2020) ("Grosse Dep.") (FEC Exh. 23))  During this deposition, Ms. Grosse confirmed that the FEC did not seek and YouGov did not provide to the FEC any information about the party identification and ideology of survey respondents.  (Grosse Dep. at 63:21-22, 64:1-4, 12-22.)  Plaintiffs' counsel questioned Ms. Grosse about party identification and whether respondents who identified with various political parties have different opinions about campaign finance laws.  (Grosse Dep. at 76:3-80:7.)  Ms. Grosse testified that she did not know.  (Grosse Dep. at 77:13; 78:12-13; 80:6-7.)

86.     Plaintiffs' counsel also asked Ms. Grosse, "If my proposition was accurate and that party affiliation was significantly correlated with one's views about restrictions on campaign

fundraising and expenditures, would that be an important profile item to include in a survey?"
(Grosse Dep. at 80:8-13.)  Ms. Grosse responded, "No."  (Grosse Dep. at 80:14.)  Plaintiffs'
counsel questioned Ms. Grosse on whether political party identification affected the
representativeness of the respondent sample for the survey, and Ms. Grosse testified that this
variable did not affect representativeness.  (Grosse Dep. at 80:20-82:13.)

87.     During the deposition, Plaintiffs' counsel also asked Ms. Grosse about quality
control questions in the script for the survey.  (Grosse Dep. 110:13-17.)  Ms. Grosse explained
that, though the quality control questions were presented to survey respondents, the quality
control questions and responses had not been provided to the FEC.  (Grosse Dep. at 110:19)  Ms.
Grosse explained that the responses to the quality control questions are limited in their utility for
addressing the quality of the FEC's survey because respondents typically answer the questions
after taking multiple surveys in one sitting.  (Grosse Dep. at 111:3-19.)

88.     On June 2, 2020, plaintiffs sent to the FEC another request for production of
documents regarding the YouGov survey, including "all documents containing the data,
information, or results that YouGov obtained from respondents to the survey relating to
respondents' Three-Point Party ID."  (E-mail from Charles Cooper to FEC Counsel (June 2,
2020) (FEC Exh. 24 (unrelated e-mails deleted)).)

89.     On July 9, 2020 the FEC, while preserving its objection to producing material not
in its possession, custody, or control and other objections, provided to plaintiffs "the responses
that YouGov collected from respondents in the survey that it conducted for the FEC, or in some
places responses that respondents had previously provided . . . , that the FEC obtained."  (FEC
Exh. 25.)  The FEC provided to plaintiffs additional raw data related to the survey.  (*Id.*)  This
included responses to the survey, as well as information previously provided by respondents for

the additional questions that were discussed during Ms. Grosse's deposition and that YouGov had not previously provided to the FEC, such as party identification, ideology, and reported 2016 vote for president, in addition to numerical responses to quality control questions. Further, "to comprehensively address suggestions made in questions at Ms. Grosse's deposition," the FEC provided to plaintiffs survey results that are weighted by 2016 presidential vote and cross-tabulations of the survey results that contain reported 2016 presidential vote choice, three-point party identification, and ideology. (FEC Exh. 25; Declaration of Tanya Senanayake (July 14, 2020) ("Senanayake Decl.") (FEC Exh. 26) & Exh. A-B.)

### 2.    Survey Results

90.    In the April 2020 YouGov poll of 1,000 nationally-representative Americans aged 18 and over, 81% of respondents stated that they believed it was "very likely" or "likely" that individuals who donate money to a federal candidate's campaign after an election expect a political favor in return from candidates who later take office. (Grosse Decl. ¶¶ 1-2 & Grosse Decl. Exh. A (Question 5) (FEC Exh. 16).)

91.    According to the 2020 YouGov poll, the public's overwhelming perception that it is likely that post-election contributors expect a political favor in return from candidates who later take office was consistent across different demographics. With regard to education, for instance, 75% of respondents with a high school education or less, 85% of respondents with some college, 86% of respondents who had graduated college, and 82% of respondents with post-graduate education said that it was "very likely" or "likely" that "those who donate money to a candidate's campaign after the election expect a political favor in return from candidates who later take office." (Grosse Decl. Exh. B (Question 5) (FEC Exh. 16).)

28

92.     According to the 2020 YouGov poll, the public's overwhelming perception that it

is likely that post-election contributors expect a political favor in return from candidates who

later take office is similar among respondents who identify with different political parties.  In

fact, 78% of respondents who identified as Democrat, 78% of respondents identifying as

Republican, and 84% of respondents identifying as Independent said that it was "likely" that

"those who donate money to a candidate's campaign after the election expect a political favor in

return from candidates who later take office."  (Senanayake Decl. Exh. B (Question 5) (FEC

Exh. 26).)

93.     According to the 2020 YouGov poll, the public's overwhelming perception that it

is likely that contributors who donate money to a candidate's campaign after the election expect

a political favor in return from candidates who later take office is also similar among respondents

with different political ideologies.  In fact, 83% of respondents who identified as liberal, 76% of

respondents identifying as moderate, and 81% of respondents identifying as conservative said

that it was "likely" that "those who donate money to a candidate's campaign after the election

expect a political favor in return from candidates who later take office."  (Senanayake Decl. Exh.

B (Question 5) (FEC Exh. 26).)

94.     According to the poll, the public's overwhelming perception that it is likely that

contributors who donate money to a candidate's campaign after the election expect a political

favor in return from candidates who later take office is also similar among respondents who

reported casting different presidential votes in 2016.  In fact, 85% of respondents who voted for

Senator Hillary Clinton and 80% of respondents who voted for President Donald Trump said that

it was "likely" that "those who donate money to a candidate's campaign after the election expect

a political favor in return from candidates who later take office." (Senanayake Decl. Exh. B (Question 5) (FEC Exh. 26).)

95.     In this 2020 YouGov poll, 67% of respondents believed that, if a candidate loan repayment limit did not exist, donors would be more likely to expect political favors from candidates to whom they make contributions. (Grosse Decl. ¶¶ 1-2 & Grosse Decl. Exh. A (Question 6) (FEC Exh. 16).) Specifically, respondents were asked the following: "Currently, there is a limit on how much money a federal campaign may raise after Election Day to repay a candidate loan. If there were no limit on how much money a federal campaign could raise after Election Day to repay a candidate, would donors be more likely to expect political favors? Less likely to expect political favors? Or would it make no difference?" (*Id*.) In response, 67% of respondents answered that they believed that donors are more likely to expect political favors if there were no limit; 6% of respondents answered that they believed that donors are less likely to expect political favors if there were no limit; and only 27% of respondents believed that there would be no difference. (*Id*.)

96.     According to the 2020 YouGov poll, the public's overwhelming perception that if a candidate loan repayment limit did not exist, donors would be more likely to expect political favors, was also consistent across different demographics. With regard to education, for instance, 61% of respondents with a high school education or less, 67% of respondents with some college, 75% of respondents who had graduated college, and 74% of respondents with post-graduate education said that it was more likely that donors would expect political favors in return for contributions "[i]f there were no limit on how much money a federal campaign could raise after Election Day to repay a candidate." (Grosse Decl. ¶¶ 1-2 & Grosse Decl. Exh. B (Question 6) (FEC Exh. 16).)

97.     The public's overwhelming perception that, if a candidate loan repayment limit did not exist, donors would be more likely to expect political favors is similar among respondents identifying with different political parties.  For instance, 67% of respondents identifying as Democrat, 63% of respondents identifying as Republican, and 68% of respondents identifying as Independent said that it was more likely that donors would expect political favors in return for contributions "[i]f there were no limit on how much money a federal campaign could raise after Election Day to repay a candidate."  (Senanayake Decl. Exh. B (Question 6) (FEC Exh. 26).)

98.     The public's perception that, if a loan repayment limit did not exist, donors would be more likely to expect political favors is similar for respondents identifying with different political ideologies as well.  For instance, 72% of respondents identifying liberal, 67% of respondents identifying moderate, and 64% of respondents identifying as conservative said that it was more likely that donors would expect political favors in return for contributions "[i]f there were no limit on how much money a federal campaign could raise after Election Day to repay a candidate."  (Senanayake Decl. Exh. B (Question 6) (FEC Exh. 26).)

99.     Finally, the public's perception that, if a loan repayment limit did not exist, donors would be more likely to expect political favors is similar for respondents with different candidate preferences in the 2016 presidential election.  For instance, 74% of respondents who voted for Senator Hillary Clinton and 67% of respondents who voted for President Donald Trump said that it was more likely that donors would expect political favors in return for contributions "[i]f there were no limit on how much money a federal campaign could raise after Election Day to repay a candidate."  (Senanayake Decl. Exh. B (Question 6) (FEC Exh. 26).)

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)     /s/ Seth Nesin

Acting General Counsel     Seth Nesin

lstevenson@fec.gov     Attorney

     snesin@fec.gov

Kevin Deeley

Associate General Counsel     /s/ Tanya Senanayake

kdeeley@fec.gov     Tanya Senanayake (D.C. Bar No. 1006218)

     Attorney

Harry J. Summers     tsenanayake@fec.gov

Assistant General Counsel

hsummers@fec.gov     COUNSEL FOR DEFENDANT

     FEDERAL ELECTION COMMISSION

     1050 First Street NE

     Washington, DC 20463

     (202) 694-1650

July 14, 2020

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TED CRUZ FOR SENATE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 19-908 (NJR, APM, TJK) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, *et al.*, | ) | STATEMENT OF GENUINE ISSUES |
| | ) | |
| Defendants. | ) | |

**FEDERAL ELECTION COMMISSION'S STATEMENT OF GENUINE ISSUES**

Pursuant to Federal Rule of Civil Procedure 56(c), Local Civil Rule 7(h)(1), and paragraphs IV.F & G of the Court's Order on scheduling (Jan. 29, 2020) (Docket No. 40), defendant Federal Election Commission ("FEC") hereby submits this statement of genuine issues in response to plaintiffs' Statement of Undisputed Material Facts (Docket No. 61-2):

**I.      BCRA Section 304's Limit on the Repayment of Candidate Loans.**

1.          Section 304 of BCRA, currently codified at 52 U.S.C. § 30116(j), provides:

Any candidate who incurs personal loans made after the effective date of the Bipartisan Campaign Reform Act of 2002 in connection with the candidate's campaign for election shall not repay (directly or indirectly), to the extent such loans exceed $250,000, such loans from any contributions made to such candidate or any authorized committee of such candidate after the date of such election.

**FEC Response to Statement 1**:  ADMIT.

2.          BCRA Section 304 was enacted as part of the so-called "Millionaire's Amendment," which was designed to "level the playing field" between wealthy and non-wealthy candidates by making it more difficult for wealthy candidates to spend money on behalf of their own election. 147 CONG. REC. S2463 (daily ed. Mar. 19, 2001) (statement of Sen. DeWine) (attached as Exhibit 1 to Declaration of John D. Ohlendorf (June 9, 2020) ("Ohlendorf Decl.")); *Davis v. FEC*, 554 U.S. 724, 729, 741–44 (2008).

1

**FEC Response to Statement 2:** ADMIT that 52 U.S.C. § 30116(j) (the "Loan Repayment Limit") was enacted along with the Millionaire's Amendment as part of BCRA, but DENY that the Loan Repayment Limit was designed to "'level the playing field' between wealthy and non-wealthy candidates by making it more difficult for wealthy candidates to spend money on behalf of their own election."

3.      The debate over the adoption of the Millionaire's Amendment is replete with statements that the Amendment was, as Senator Feinstein put it, "an attempt to level the playing field." 147 CONG. REC. S2459 (Mar. 19, 2001) (statement of Sen. Feinstein).

**FEC Response to Statement 3:** ADMIT. The Commission DENIES that this is a "material fact," however, because, with one apparent exception, none of these statements were made about the Loan Repayment Limit at issue in this case, and other legislative history indicates that "leveling the playing field" was not the purpose behind the Loan Repayment Limit.

4.      For example, Senator DeWine, who opposed the Amendment as initially proposed but ultimately supported the final, compromise version that he helped to draft, stated that the Amendment "identified a real problem," because "[a]s a practical matter, a person who has [$10 to $60 million of an opponent's own money] spent against them has a very difficult time competing, making it a level playing field or even close to being a level playing field." *Id.* at S2463 (statement of Sen. DeWine).

**FEC Response to Statement 4:** ADMIT. The Commission DENIES that this is a "material fact," however, because these statements were not made about the Loan Repayment Limit at issue in this case. This is evident from the next paragraph of Senator DeWine's speech, where he explains that he is talking about the part of the Millionaire's Amendment permitting candidates to receive larger campaign contributions when opposing self-funding candidates. 147 CONG. REC. S2463 (Mar. 19, 2001) (statement of Sen. DeWine) ("The amendment I will be proposing raises the dollar amounts a person can give to an individual candidate.").

5.      The Millionaire's Amendment, Senator DeWine explained, would "begin to level the playing field." *Id.*

**FEC Response to Statement 5:**  ADMIT.  The Commission DENIES that this is a "material fact," however, because this statement was not made about the Loan Repayment Limit at issue in this case.  This is evident from earlier in Senator DeWine's speech, where he explains that he is talking about the part of the Millionaire's Amendment permitting candidates to receive larger campaign contributions when opposing self-funding candidates.  147 CONG. REC. S2463 (Mar. 19, 2001) (statement of Sen. DeWine) ("The amendment I will be proposing raises the dollar amounts a person can give to an individual candidate.").

6.      Senator DeWine later stated that "[w]hat this amendment is aimed at dealing with is the perception, and the perception that someone can buy a seat in the Senate with their own money. It begins to level that playing field." 147 CONG. REC. S2547 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine) (attached to Ohlendorf Decl. as Exhibit 2).

**FEC Response to Statement 6:**  ADMIT.  The Commission DENIES that this is a "material fact," however, because this statement was not made about the Loan Repayment Limit at issue in this case.  This is evident from earlier in Senator DeWine's speech, where he explains that he is talking about the part of the Millionaire's Amendment permitting candidates to receive larger campaign contributions when opposing self-funding candidates.  147 CONG. REC. S2546-47 (daily ed. Mar. 20, 2001) (statement of Sen. DeWine) ("[W]hat it means is that the candidate who is facing that multimillionaire will also have the opportunity to have a bigger megaphone, to grow that megaphone if, in fact, he or she can go out and convince enough people to make individual contributions.  That is what this amendment does.").

7.      Likewise, Senator Domenici—the author and principal sponsor of the Amendment—explained that the goal of his Amendment was to "better balance the playing field." 147 CONG. REC. S2460 (Mar. 19, 2001) (statement of Sen. Domenici).

**FEC Response to Statement 7:**  ADMIT.  The Commission DENIES that this is a "material fact," however, because this statement was not made about the Loan Repayment Limit at issue in this case.  This is evident from the remainder of Senator Domenici's speech, where he explains that he is talking about the part of the Millionaire Amendment's permitting candidates to receive larger campaign contributions when opposing self-funding candidates.  147 CONG. REC. S2460 (Mar. 19, 2001) (statement of Sen. Domenici) ("My first draft of this amendment was to take everything off the [candidate facing a wealthy self-funder], no limits.  They could do whatever they would like, just as they used to years ago, as long as they listed it.  Others have said, no, leave some limitations.  So we are in the process . . . of working with other Senators who would like to refine the Domenici amendment.").

8.      Senator Hutchison, another supporter of the Amendment, explained that "[o]ur purpose is to level the playing field so that one candidate who has millions, if not billions, of dollars to spend on a campaign will not be at such a significant advantage over another candidate who does not have such means as to create an unlevel playing field." 147 CONG. REC. S2541 (Mar. 20, 2001) (statement of Sen. Hutchison).

**FEC Response to Statement 8:**  ADMIT that the Senator Hutchison made the statement in connection with the merged amendment combining a contribution limit-shifting provision with a loan repayment provision, but DENY that the excerpt fairly and accurately conveys Senator Hutchison's views regarding the loan repayment provision specifically.  At the quoted point in her remarks, Senator Hutchison was discussing both the limit-shifting and loan repayment provisions.  Later, when more specifically discussing the loan repayment provision, Senator Hutchison stated that the purpose of that provision was to prevent a candidate from "reselling" the office, a clear reference to corruption.  147 Cong. Rec. S2541 (daily ed. Mar. 20, 2001) (statement of Sen. Hutchison) ("[Candidates] have a constitutional right to try to buy the office, but they do not have a constitutional right to resell it.  That is what my part of this

4

amendment attempts to prevent, so a candidate can spend his or her own money but there would

be a limit on the amount that candidate could go out and raise to pay himself or herself back.").

While Senator Hutchison does say the provision is intended "to level the playing field," those

comments contrasted a self-lending candidate's ability to "go out and repay themselves" "when

they win" with persons running with a "variety of support from his or her constituents," *i.e.*,

people who do not have the same opportunity for post-election fundraising for self-payment.  *Id.*

at S2451-S2452 (statement of Sen. Hutchison).  Senator Hutchison belabored the points that she

"want[ed] people to be able to spend their own money," as she previously had, and that "[n]o one

argues" against candidates like her having "a constitutional right to spend our money."  *Id.* at

S2451.

        9.        Similarly, Senator Durbin, an enthusiastic co-sponsor of the Amendment,
stated that "What we are trying to address with this amendment is to level the playing field so
that if someone shows up in the course of the campaign who is independently wealthy and is
willing to spend \$10, \$20, \$30, \$40, \$50, \$60 million of their own money . . . then at least the
other candidate has a fighting chance." *Id.* at S2540 (statement of Sen. Durbin).

**FEC Response to Statement 9:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, because this statement was not made about the Loan Repayment Limit

at issue in this case.  This is evident from the very next paragraph of Senator Durbin's speech,

where he explains that he is talking about the part of the Millionaire's Amendment permitting

candidates to receive larger campaign contributions when opposing self-funding candidates.  147

CONG. REC. S2540 (Mar. 20, 2001) (statement of Sen. Durbin). ("How do we do it? Currently

you can only accept \$1,000 per person per election.  We have said: If you run into the so-called

self-financing candidate who is going to spend millions of dollars, then you can accept a larger

contribution from an individual.").

10.     And then-Senator Sessions, an opponent of BCRA more generally, spoke in favor of the Millionaire's Amendment because current law "makes it difficult for candidates to run on a level playing field." 147 CONG. REC. S2464 (Mar. 19, 2001).

**FEC Response to Statement 10:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, because this statement does not appear to have been made about the

Loan Repayment Limit at issue in this case.  This is evident from the remainder of Senator

Sessions's speech, where he speaks in great detail about the part of the Millionaire Amendment

permitting candidates to receive larger campaign contributions when opposing self-funding

candidates.  147 CONG. REC. S2464-65 (Mar. 19, 2001) (statement of Sen. Sessions) ("If a

wealthy candidate declares his or her intent to spend in excess of $500,000, the opponent of that

candidate can increase individual and PAC contribution limits threefold."); *id.* at 2465 (If the

candidate says in his declaration that he or she intends to spend more than $750,000, his or her

opponent can increase individual and PAC contribution limits by five times.); *id.* ( If the wealthy

candidates exceed $1 million in personal expenditures . . . the direct party contribution limit and

party coordinated expenditure limits are eliminated.").  After discussion of that provision of the

Millionaire's Amendment, Senator Sessions did briefly mention two other provisions of the law,

including the Loan Repayment Limit, but he did not tie either provision to a motivation to level

the playing field.  *Id.*  (mentioning both: 1) a "give-back" provision whereby candidates that

receive excess funds as a result of increased contribution limits under the Millionaire's

Amendment must return such funds to the contributor; and 2) the Loan Repayment Limit).

11.     Then-Senator Sessions stated: "[A] wealthy candidate can waltz in out of left field with hundreds and hundreds of millions of dollars in his account and can just overwhelm their opponent, and it creates, I believe, an unfair situation." *Id.*

**FEC Response to Statement 11:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, because this statement does not appear to have been made about the

Loan Repayment Limit at issue in this case.  This is evident from the remainder of Senator

Sessions's speech, where he speaks in great detail about the part of the Millionaire's Amendment

permitting candidates to receive larger campaign contributions when opposing self-funding

candidates.  147 CONG. REC. S2464-65 (Mar. 19, 2001) (statement of Sen. Sessions) ("If a

wealthy candidate declares his or her intent to spend in excess of $500,000, the opponent of that

candidate can increase individual and PAC contribution limits threefold."); *id.* at 2465 (If the

candidate says in his declaration that he or she intends to spend more than $750,000, his or her

opponent can increase individual and PAC contribution limits by five times.); *id.* ( If the wealthy

candidates exceed $1 million in personal expenditures . . . the direct party contribution limit and

party coordinated expenditure limits are eliminated.").  After discussion of that provision,

Senator Sessions did briefly mention two other provisions of the law, including the Loan

Repayment Limit, but did not tie either provision to a motivation to level the playing field.  *Id.*

(mentioning both: 1) a "give-back" provision whereby candidates that receive excess funds as a

result of increased contribution limits under the Millionaire's Amendment must return such

funds to the contributor; and 2) the Loan Repayment Limit).

> 12.    This was not only the purpose of the Millionaire's Amendment generally; it
> was also the purpose of the loan-repayment limit in particular. See *id.* at S2461 (statement of
> Sen.Durbin); *id.* at 2462 (statement of Sen. Durbin); *id.* at 2465 (statement of Sen. Sessions); id.
> at S2463 (statement of Sen. Domenici); 147 CONG. REC. S2538 (Mar. 20, 2001) (statement of
> Sen. DeWine).

**FEC Response to Statement 12:**  DENY.  None of the five citations to the legislative

history provides any support for plaintiffs' statement that leveling the playing field was the

purpose of the Loan Repayment Limit.  As described in the FEC's responses to Statements 10

and 11, Senator Sessions's reference to the Loan Repayment provision appears only in a

recitation of provisions of the proposed amendment, and it is in no way tied to the purpose of

leveling the playing field.  147 CONG. REC. S2464-65 (Mar. 19, 2001) (statement of Sen.

Sessions).  Senator DeWine's words make no reference to the Loan Repayment Limit.  147

CONG. REC. S2538 (Mar. 20, 2001) (statement of Sen. DeWine).  Senator DeWine does

reference "personal loans," but that is in context of his discussion of contribution limit increases

associated with the Millionaire's Amendment.  147 CONG. REC. S2538 (Mar. 20, 2001)

(statement of Sen. DeWine) ("Specifically, our amendment would raise the contribution limits

for candidates facing wealthy opponents to fund their own campaigns.").  Loans were included in

that other provision of the Millionaire's Amendment to prevent a wealthy candidate from

avoiding the intended increase in an opponent's contribution limits by making a "loan" to the

first candidate's campaign and then have that loan converted to a contribution after the election.

Neither of the two cited statements of Senator Durbin support plaintiffs' statement.  In the first

citation, Senator Durbin merely asked Senator Domenici to explain the amendment, without

Durbin expressing his view on its purpose.  147 CONG. REC. S2461 (Mar. 19, 2001) (statement

of Sen. Durbin) ("Will the Senator be good enough to explain the provision he has on loan

repayment?").  Senator Domenici then goes on to explain that the Loan Repayment Limit is

needed because candidates that loan large sums to their campaign "are not in office 1 month and

[they] are interested in the special interests.  Why?  Because [they] want to pay the loan off."  *Id.*

at S2462 (statement of Sen. Domenici); *see also id*. (Sen. Domenici expressing concern about

fundraising events to pay off a personal loan where an officeholder asks his contributors ""How

would you like me to vote now that I am a Senator?").  After Senator Domenici's explanation,

Senator Durbin briefly addresses the Loan Repayment Limit again and states, "The Senator from

New Mexico [Domenici] is right on that point."  *Id.* at S2462 (statement of Sen. Durbin).

Senator Durbin then discusses several other unrelated provisions of the amendment.  Plaintiffs'

citation to Senator Domenici's statements on 147 CONG. REC. S2463 appears to be an error –

Senator Domenici does not speak on that page of the Congressional Record, and as noted above,

his descriptions of the purpose of the Loan Repayment Limit do not support plaintiffs' statement.

13.     Many comments on the Amendment drew no distinction between wealthy
candidates financing their own campaigns through direct spending and through candidate loans.
*See infra*, ¶¶ 14–18.

**FEC Response to Statement 13:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, because none of these statements were made about the Loan

Repayment Limit at issue in this case.  Each of these statements were referring to the part of the

Millionaire's Amendment permitting candidates to receive larger campaign contributions when

opposing self-funding candidates, because under that provision of the statute, candidate loans

were treated as contributions for the purpose of calculating an opponent's contribution limits.

14.     Senator Durbin, for example, explained that "a lot of people who are very
wealthy do not give money to their campaign; they loan it and say they will be repaid later." 147
CONG. REC. S2461 (Mar. 19, 2001) (statement of Sen. Durbin).

**FEC Response to Statement 14:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, in part because Senator Durbin's quoted statement makes no reference

to loans being treated differently or similarly to contributions, and in part because it does not

appear that the quoted statement is about the Loan Repayment Limit.  After this statement,

Senator Durbin asks Senator Domenici to explain the Loan Repayment Limit, as explained in the

FEC's Response to Statement 13.

15.     Minutes later, Senator Durbin referred to candidate spending and candidate
loans interchangeably: "Think about what this institution will become if that is what one of the
rules is to be part of the game: That you have to be loaning or contributing literally millions of
dollars in order to be a candidate for public office." *Id.* at 2462 (statement of Sen. Durbin).

**FEC Response to Statement 15:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, because there is no indication that Senator Durbin's quote is

referencing the Loan Repayment Limit.  As described in the FEC's Response to Statement 12,

loans were treated the same as contributions for the purpose of determining an opponent's

contribution limit increases in accord with the Millionaire's Amendment.

> 16.     Senator Sessions made a similar point, explaining that the Amendment "also prohibits wealthy candidates, who incur personal loans in connection with their campaign that exceed $250,000, from repaying those loans from any contributions made to the candidate." *Id.* at 2465 (statement of Sen. Sessions).

> **FEC Response to Statement 16:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, because in this quote Senator Sessions is merely describing how the

Loan Repayment Limit works; here he does not express any view as to the purpose behind the

provision.

> 17.     As Senator Domenici put the point, the Amendment's loan-repayment limit was "very fair," because "it should be a condition to your putting up your own money, knowing right up front you are not going to get it back from your constituents." Id. at S2462 (statement of Sen. Domenici).

> **FEC Response to Statement 17:**  ADMIT that this is a partial quote from Senator

Domenici's statement, but deny that the statement failed to distinguish between loans and

spending.  Only loans would enable a Senator to "get [money] back."  The full quote is:

> > I think that is very fair.  In fact, it should be a condition to your putting up your own money, knowing right up front you are not going to get it back from your constituents under fundraising events that you would hold and then ask them: How would you like me to vote now that I am a Senator?
> > That is what we are talking about.  I think you are absolutely right on that.

147 CONG. REC. S2462 (Mar. 19, 2001) (statement of Sen.Domenici).

> 18.     As Senator DeWine explained, the Amendment was designed to "create greater fairness and accountability in the Federal election process by addressing the inequity that arises when a wealthy candidate pays for his or her campaign with personal funds—personal funds that are defined, by the way, to include cash contributions and any contributions arising from personal or family assets such as personal loans or property used for collateral for a loan to the campaign."  147 CONG. REC. S2538 (Mar. 20, 2001) (statement of Sen. DeWine).

**FEC Response to Statement 18:**  ADMIT.  The Commission DENIES that this is a "material fact," however, because this statement was not made about the Loan Repayment Limit at issue in this case.  In this passage Senator DeWine was explaining the part of the Millionaire's Amendment permitting candidates to receive larger campaign contributions when opposing self-funding candidates.  147 CONG. REC. S2538 (Mar. 20, 2001) (statement of Sen. DeWine) ("Specifically, our amendment would raise the contribution limits for candidates facing wealthy opponents to fund their own campaigns.").

19.      In addition to "levelling the playing field," the legislative record indicates that the Millionaire's Amendment was also designed to "protect[ ] incumbents." *Id.* at S2544 (statement of Sen. Daschle).

**FEC Response to Statement 19:**  DENY.  Senator Daschle opposed the Millionaire's Amendment.  147 CONG. REC. S2544 (Mar. 20, 2001) (statement of Sen. Daschle) ("I support McCain-Feingold, but I do not support this.").  However, the Commission DENIES that this is a "material fact," because Senator Daschle's statement was not made about the Loan Repayment Limit at issue in this case.

20.      Senator Dodd, for example, opposed the Amendment's attempt to curb the ability of wealthy candidates to finance their own campaigns because "we are talking, in many instances, about challengers. We are incumbents. As incumbents, we have a lot of advantages that do not come out of our personal checkbooks." 147 CONG. REC. S2465 (Mar. 19, 2001) (statement of Sen. Dodd).

**FEC Response to Statement 20:**  ADMIT that Senator Dodd opposed the Millionaire's Amendment.  147 CONG. REC. S2465-66 (Mar. 19, 2001) (statement of Sen. Dodd) ("So I urge my colleagues who are thinking about supporting this amendment, who simultaneously want to see McCain-Feingold become the law of the land, to think twice about this amendment."). However, the Commission DENIES that this is a "material fact," because Senator Dodd's statement was not made about the Loan Repayment Limit at issue in this case.

21.     Senator Dodd later explained that while "[w]hat [the sponsors of the Amendment] are trying to do is level the playing field," it "isn't exactly level, in a sense, when we are talking about incumbents who have treasuries of significant amounts and the power of the office which allows us to be in the press every day, if we want." 147 CONG. REC. S2542 (Mar. 20, 2001) (statement of Sen. Dodd).

**FEC Response to Statement 21:**  ADMIT that Senator Dodd opposed the Millionaire's

Amendment.  147 CONG. REC. S2465-66 (Mar. 19, 2001) (statement of Sen. Dodd) ("So I urge

my colleagues who are thinking about supporting this amendment, who simultaneously want to

see McCain-Feingold become the law of the land, to think twice about this amendment.").

However, the Commission DENIES that this is a "material fact," because Senator Dodd's

statement was not made about the Loan Repayment Limit at issue in this case.

22.     Senator Dodd rejected "[t]he idea that somehow we are sort of impoverished candidates when facing a challenger who may decide they are going to take out a loan, and not necessarily even have the money in the account but may decide to mortgage their house." *Id.*

**FEC Response to Statement 22:**  ADMIT that Senator Dodd opposed the Millionaire's

Amendment.  147 CONG. REC. S2465-66 (Mar. 19, 2001) (statement of Sen. Dodd) ("So I urge

my colleagues who are thinking about supporting this amendment, who simultaneously want to

see McCain-Feingold become the law of the land, to think twice about this amendment.").

However, the Commission DENIES that this is a "material fact," because Senator Dodd's

statement was not made about the Loan Repayment Limit at issue in this case.

23.     Similarly, Senator Levin, who initially opposed the Amendment but ultimately voted in its favor, feared that the Amendment in fact "Creates an unlevel field" because "The incumbent who already has the financial advantage and the incumbency advantage is then also given the advantage of having the higher contribution limits." Id. at S2548 (statement of Sen. Levin).

**FEC Response to Statement 23:**  ADMIT that Senator Levin was critical of the

Millionaire's Amendment at least in part due to concerns that it could help incumbents.  147

CONG. REC. S2548 (Mar. 20, 2001) (statement of Sen. Levin) ("It seems to me that is a

significant flaw which we should attempt to address . . . ..").  However, the Commission

DENIES that this is a "material fact," because Senator Levin's statement was not made about the

Loan Repayment Limit at issue in this case.

24.     Senator Reid, another opponent of the Amendment, declared that "[The
Millionaire's Amendment] is an incumbent advantage measure in this underlying bill." 147
CONG. REC. S2853 (daily ed. Mar. 26, 2001) (statement of Sen. Reid) (attached to Ohlendorf
Decl. as Exhibit 3).

     **FEC Response to Statement 24:**  ADMIT that Senator Reid was critical of the

Millionaire's Amendment at least in part due to concerns that it could help incumbents.  147

CONG. REC. S2852 (daily ed. Mar. 26, 2001) (statement of Sen. Reid) ("In my opinion, the

'millionaire' amendment was a guise to help incumbents.").  However, the Commission DENIES

that this is a "material fact," because Senator Reid's statement was not made about the Loan

Repayment Limit at issue in this case.

25.     Senator Daschle likewise feared that "this protects incumbents." 147 CONG.
REC. S2544 (Mar. 20, 2001) (statement of Sen. Daschle).

     **FEC Response to Statement 25:**  ADMIT.  Senator Daschle opposed the Millionaire's

Amendment.  147 CONG. REC. S2544 (Mar. 20, 2001) (statement of Sen. Daschle) ("I support

McCain-Feingold, but I do not support this.")  However, the Commission DENIES that this is a

"material fact," because Senator Daschle's statement was not made about the Loan Repayment

Limit at issue in this case.

26.     Indeed, in a remarkably forthright statement, Senator McCain—a supporter of
the Amendment—noted that the provision "addresses, in all candor, a concern that literally every
nonmillionaire Member of this body has, and that is that they wake up some morning and pick up
the paper and find out that some multimillionaire is going to run for their seat, and that person
intends to invest 3, 5, 8, 10, now up to $70 million of their own money in order to win." *Id.* at
S2540 (statement of Sen. McCain).

     **FEC Response to Statement 26:**  ADMIT.  The Commission DENIES that this is a

"material fact," however, because this statement was not made about the Loan Repayment Limit

at issue in this case.  Instead, Senator McCain was discussing the part of the Millionaire's Amendment permitting candidates to receive larger campaign contributions when opposing self-funding candidates.  This is evident from the paragraph just before the portion plaintiffs quote, in which Senator McCain stated that the Amendment "lifts some restraints on hard money."  147 CONG. REC. S2540 (Mar. 20, 2001) (statement of Sen. McCain).

27.     Federal campaign finance law also imposes limits on the amount any individual may contribute, per election cycle, to any federal candidate or his authorized committee. 52 U.S.C. Section 30116(a)(1)(A) provides that "no person shall make contributions . . . to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000."

**FEC Response to Statement 27:**  ADMIT that this accurately states the relevant per-election contribution limit in the statute, but DENY that the limit applies per election cycle.  For example, the limit applies separately to primary elections and general elections.

28.     Since the enactment of BCRA in 2002, federal law has directed the Commission to periodically increase these limits to account for inflation. Id. § 30116(c).

**FEC Response to Statement 28:**  ADMIT.

29.     On February 7, 2019, the Commission established an inflation-adjusted limit of $2,800 per individual, per election cycle, effective November 7, 2018 through November 3, 2020.  Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 84 Fed. Reg. 2504, 2506 (Feb. 7, 2019) (attached to Ohlendorf Decl. as Exhibit 4).

**FEC Response to Statement 29:**  ADMIT that this accurately states the per-election contribution limit that applies during the 2019-2020 election cycle, but DENY that the limit applies per election cycle.

30.     The Commission periodically recommends to Congress certain amendments to the federal campaign finance laws, of both a substantive and technical nature. See infra ¶ 31.

**FEC Response to Statement 30:**  ADMIT.

31.     The Commission has never included in these formal recommendations, from the enactment of those inflation-adjusted limits in BCRA until the present, any proposal or suggestion that the base limits on individual campaign contributions be lowered. See Federal

14

Election Commission, Legislative Recommendations: 2003 (attached to Ohlendorf Decl. as Exhibit 5); Federal Election Commission, Legislative Recommendations: 2004 (attached to Ohlendorf Decl. as Exhibit 6); Federal Election Commission, Legislative Recommendations: 2005 (attached to Ohlendorf Decl. as Exhibit 7); Legislative Recommendations of the Federal Election Commission:2007 (attached to Ohlendorf Decl. as Exhibit 8); Legislative Recommendations of the Federal Election Commission: 2009 (attached to Ohlendorf Decl. as Exhibit 9); Legislative Recommendations of the Federal Election Commission: 2011 (attached to Ohlendorf Decl. as Exhibit 10); Legislative Recommendations of the Federal Election Commission: 2012 (attached to Ohlendorf Decl. as Exhibit 11); Legislative Recommendations of the Federal Election Commission: 2013 (attached to Ohlendorf Decl. as Exhibit 12); Legislative Recommendations of the Federal Election Commission: 2014 (attached to Ohlendorf Decl. as Exhibit 13); Legislative Recommendations of the Federal Election Commission: 2015 (attached to Ohlendorf Decl. as Exhibit 14); Legislative Recommendations of the Federal Election Commission: 2016 (Dec. 1, 2016) (attached to Ohlendorf Decl. as Exhibit 15); Legislative Recommendations of the Federal Election Commission: 2017 (Dec. 14, 2017) (attached to Ohlendorf Decl. as Exhibit 16); Legislative Recommendations of the Federal Election Commission: 2018 (Dec. 13, 2018) (attached to Ohlendorf Decl. as Exhibit 17).

**FEC Response to Statement 31:** ADMIT.

## II.    Senator Cruz's 2018 Loans.

32.    Prior to the November 6, 2018 election, Senator Cruz made or incurred two loans totaling $260,000 to the Cruz Committee to help finance his reelection campaign for the United States Senate. Declaration of Cabell Hobbs at ¶¶ 3–5 (June 9, 2020) ("Hobbs Decl.").

**FEC Response to Statement 32:** ADMIT that Senator Cruz made the two loans described above. DENY that those loans were made "to help finance his reelection campaign for the United States Senate." *See* Dep. Tr. of Cabell Hobbs at 177 (May 13, 2020) (confirming plaintiffs' previous stipulation that "the sole and exclusive motivation behind Senator Cruz's actions in making the 2018 loans and the Committee's actions in waiting to repay them was to establish the factual basis for this challenge to Section 304.") (attached to FEC Statement of Undisputed Material Facts, FEC Exh. 9).)

33.    One loan, in the amount of $255,000, came from a third-party-lender margin account secured by Senator Cruz's personal assets. Hobbs Decl. ¶ 4.

**FEC Response to Statement 33:** ADMIT.

34.    The other loan, in the amount of $5,000, was made directly from Senator Cruz's personal bank account. Hobbs Decl. ¶ 5.

**FEC Response to Statement 34:**  ADMIT.

35.       At the end of November 6, the Cruz Committee did not have sufficient funds to both repay these loans and satisfy the Committee's other creditors. Hobbs Decl. ¶ 6–8.

**FEC Response to Statement 35:**  ADMIT that the Cruz Committee did not have sufficient funds in its bank account on November 6, 2018 to repay Senator Cruz's loans in full and also to satisfy all of the Committee's other creditors.  The Commission notes, however, that this does not paint a complete picture of the Committee's financial situation for two reasons.  First, because the Committee could pay $250,000 of Senator Cruz's loans using funds raised after the election, it only needed to pay the remaining $10,000 of the loans using its cash on hand on November 6.  Second, the Cruz Committee was aware on November 6 that it would soon be receiving a substantial transfer of cash from the Ted Cruz Victory Committee, the campaign's joint fundraising committee.  Hobbs Dep. at 122 ("Q. Okay.  So did the Ted Cruz for Senate Committee know about the financial state of the Joint Fundraising Committee during all relevant time periods?  A. Yes.").  That expected transfer of $234,400.93 was made from the Ted Cruz Victory Committee to the Cruz Committee on December 10, 2018.  The funds in the Cruz Committee's bank account on November 6 plus the amount it knew it would receive from the Ted Cruz Victory Committee was sufficient to satisfy all of the Committee's other creditors and to repay Senator Cruz over $100,000 of his loans, which would have allowed Senator Cruz to be repaid in full using post-election contributions.

Furthermore, the Commission DENIES that the Cruz Committee's failure to repay any of Senator Cruz's loans immediately after the election was due to lack of funds.  *See* Hobbs Dep. at 177 (confirming plaintiffs' previous stipulation "that the sole and exclusive motivation behind

Senator Cruz's actions in making the 2018 loans and the Committee's actions in waiting to repay them was to establish the factual basis for this challenge to Section 304.").

36.     In particular, the Committee ended the election campaign with approximately $2,380,277 deposited in, or in transit to, its bank accounts. Hobbs Decl. ¶ 6.

**FEC Response to Statement 36:**  ADMIT.

37.     As of the end of the election, the Committee also owed approximately $2,718,025 in debts for expenses incurred in connection with the election, including bills and obligations to vendors and the $260,000 it owed Senator Cruz. Hobbs Decl. ¶ 7.

**FEC Response to Statement 37:**  ADMIT.

38.     Accordingly, the Committee's "net debts outstanding," as of election day, were approximately $337,748. Hobbs Decl. ¶ 8.

**FEC Response to Statement 38:**  ADMIT that the Cruz Committee's "net debts outstanding" on election day 2018 were approximately $337,748.  The Commission notes, however, that the Cruz Committee was aware that it would soon be receiving a substantial transfer of cash from the Ted Cruz Victory Committee.  Hobbs Dep. at 122 (May 13, 2020) ("Q. Okay.  So did the Ted Cruz for Senate Committee know about the financial state of the Joint Fundraising Committee during all relevant time periods?  A. Yes.").  That expected transfer of $234,400.93 was made from the Ted Cruz Victory Committee to the Cruz Committee on December 10, 2018.

39.     It is common for campaign committees, like the Cruz Committee, to take out debt to finance their campaign speech and other operations. According to one recent analysis, "debt is a major source of funding of U.S. political campaigns. At $1.9 billion or 10.6 percent of the total, debt constitutes the second largest source of campaign funds trailing only total individual contributions and is larger than total contributions from corporate, labor and trade Political Action Committees (PACs). Almost half of all campaigns (46.75 percent) rely on some form of debt, and, conditional on borrowing, campaigns borrow almost a third of total raised funds." Alexei Ovtchinnikov & Philip Valta, Debt in Political Campaigns at 2 (May 2020) (available at https://ssrn.com/abstract=2804474) (attached to Ohlendorf Decl. as Exhibit 18).

**FEC Response to Statement 39:**  ADMIT.

40.     During the 20 days following the election, the Committee used its cash on hand to pay other creditors, but it did not repay any portion of Senator Cruz's loans. Hobbs Decl. ¶ 9.

**FEC Response to Statement 40:**  ADMIT that during the 20 days following the 2018 general election, the Committee paid some creditors but did not repay any portion of Senator Cruz's loans.  DENY that the Committee's lack of repayment during that time was due to financial considerations.  *See* Hobbs Dep. at 177 (confirming plaintiffs' previous stipulation "that the sole and exclusive motivation behind Senator Cruz's actions in making the 2018 loans and the Committee's actions in waiting to repay them was to establish the factual basis for this challenge to Section 304.").

41.     The Committee began to repay Senator Cruz's loans in December of 2018. Hobbs Decl. ¶ 10.

**FEC Response to Statement 41:**  ADMIT.

42.     The Committee has made four repayments of Senator Cruz's margin loan, totaling $250,000: (i) $25,000 on December 4, 2018; (ii) $100,000 on December 11, 2018; (iii) $75,000 on December 18, 2018; and (iv) $50,000 on December 24, 2018. Hobbs Decl. ¶ 10.

**FEC Response to Statement 42:**  ADMIT.

43.     The Committee has not repaid any portion of Senator Cruz's personal loan. Hobbs Decl. ¶ 11.

**FEC Response to Statement 43:**  ADMIT.

44.     Accordingly, a total of $10,000 of Senator Cruz's 2018 loans remains unpaid: $5,000 of the margin loan and the entirety of the $5,000 loan from Senator Cruz's own bank accounts. Hobbs Decl. ¶ 12.

**FEC Response to Statement 44:**  ADMIT.

18

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)          /s/ Seth Nesin          _
Acting General Counsel                           Seth Nesin
lstevenson@fec.gov                               Attorney
                                                 snesin@fec.gov

Kevin Deeley
Associate General Counsel                        /s/ Tanya Senanayake          _
kdeeley@fec.gov                                  Tanya Senanayake (D.C. Bar No. 1006218)
                                                 Attorney
                                                 tsenanayake@fec.gov
Harry J. Summers
Assistant General Counsel                        COUNSEL FOR DEFENDANT
hsummers@fec.gov                                 FEDERAL ELECTION COMMISSION
                                                 1050 First Street NE
                                                 Washington, DC 20463
                                                 (202) 694-1650

July 14, 2020